[ORAL ARGUMENT NOT YET SCHEDULED]

No. 26-5009

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

MARK S. ZAID,
                                    Plaintiff-Appellee,

v.

EXECUTIVE OFFICE OF THE PRESIDENT, et al.,
                                    Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**JOINT APPENDIX**

———————————

ABBE DAVID LOWELL
DAVID A. KOLANSKY
    *Lowell & Associates PLLC*
    *1250 H Street, N.W., Suite 250*
    *Washington, DC 20005*
    *Tel: (202) 964-6110*
    *alowellpublicoutreach@*
        *lowellandassociates.com*
    *dkolansky@*
        *lowellandassociates.com*

MARGARET M. DONOVAN
    *Koskoff, Koskoff & Bieder, PC*
    *350 Fairfield Ave., Suite 501*
    *Bridgeport, CT 06604*
    *Tel: (203) 336-4421*
    *mdonovan@koskoff.com*

STANLEY E. WOODWARD, JR.
    *Associate Attorney General*

ABHISHEK KAMBLI
    *Deputy Associate Attorney*
        *General*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *Tel: (202) 514-6993*
    *abhishek.kambli@usdoj.gov*

*Counsel for Defendants-Appellants*

(Cover continued on next page)

NORMAN L. EISEN
*Democracy Defenders Fund*
*600 Penn. Ave., S.E., #15180*
*Washington, DC 20003*
*Tel: (202) 594-9958*

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

Docket Sheet ........................................................................ JA1

Complaint ........................................................................... JA12

Attachments to Motion for Preliminary Injunction

    Declaration of Plaintiff Mark Zaid .......................................... JA41

    Declaration of Marc Polymeropolous ....................................... JA57

    Expert Report of J. William Leonard........................................ JA62

    Exhibit 1 (DNI Mar. 10, 2025, X Post).................................... JA82

    Exhibit 2 (Presidential Declaration)........................................ JA84

    Exhibit 3 (DCSA Memorandum)............................................. JA88

    Exhibit 4 (CIA Letter) ......................................................... JA90

    Exhibit 5 (ODNI Email) ....................................................... JA92

    Exhibit 7 (ODNI News Release) ............................................. JA94

    Exhibit 8 (DNI May 2, 2025, X Post) ..................................... JA96

    Exhibit 9 (Federal Register Excerpt)....................................... JA98

    Exhibit 10 (Executive Order 12968) ..................................... JA103

    Exhibit 11 (Executive Order 13467) ..................................... JA114

    Exhibit 12 (Nat'l Sec'y Adjudicative Guidelines) ................... JA121

    Exhibit 13 (Intelligence Community Policy Guidance 704.3) JA149

    Exhibit 14 (Dep't of Def. Directive 5220.6)............................ JA153

Attachment to Plaintiff's Memorandum
in Opposition to Defendant's Motion to Dismiss

    Exhibit 15 (Questionnaire for Nat'l Sec'y Purposes).............. JA204

Transcript of Motion Hearing, June 27, 2025
(on Plaintiff's Motion for Preliminary Injunction
and Defendants' Motion to Dismiss).................................................. JA207

Attachments to Plaintiff's Motion and
Notice of Supplemental Facts

      Supplemental Declaration of Mark Zaid ................................ JA298

Attachments to Plaintiff's Second Motion
and Notice of Supplemental Facts

      Exhibit 1 (Second Supplemental Declaration of Mark Zaid) . JA300

Memorandum Opinion and Order
Granting in Part and Denying in Part
Motion for Preliminary Injunction.................................................. JA303

Notice of Appeal, January 6, 2026, to D.C. Circuit ......................... JA342

Transcript of Status Conference, January 7, 2026.......................... JA343

Plaintiff's Status Report, January 21, 2026 .................................... JA361

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25–cv–01365–AHA

| | |
|---|---|
| ZAID v. EXECUTIVE OFFICE OF THE PRESIDENT et al | Date Filed: 05/05/2025 |
| Assigned to: Judge Amir H. Ali | Jury Demand: None |
| Case in other court:  USCA, 26–05009 | Nature of Suit: 899 Administrative |
| Cause: 28:1331 Fed. Question | Procedure Act/Review or Appeal of |
| | Agency Decision |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**MARK S. ZAID**                         represented by    **George W. Croner**
*Esq.*                                                     KOHN, SWIFT & GRAF, P.C.
                                                           1600 Market Street
                                                           Suite 2500
                                                           Philadelphia, PA 19103
                                                           215–238–1700
                                                           Fax: 215–238–1968
                                                           Email: gcroner@kohnswift.com
                                                           *LEAD ATTORNEY*
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Margaret Donovan**
                                                           KOSKOFF, KOSKOFF & BIEDER, P.C.
                                                           350 Fairfield Avenue
                                                           Bridgeport, CT 06604
                                                           203–336–4421
                                                           Email: mdonovan@koskoff.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Christopher Mattei**
                                                           KOSKOFF, KOSKOFF & BIEDER, P.C.
                                                           350 Fairfield Avenue
                                                           Bridgeport, CT 06604
                                                           203–336–4421
                                                           Fax: 203–368–3244
                                                           Email: cmattei@koskoff.com
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **David A. Kolansky**
                                                           LOWELL & ASSOCIATES, PLLC
                                                           1250 H Street, NW
                                                           Second Floor
                                                           Washington, DC 20005
                                                           202–964–6110
                                                           Email: dkolansky@lowellandassociates.com
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Joshua Gabriel Kolb**
                                                           DEMOCRACY DEFENDERS FUND
                                                           600 Pennsylvania Ave SE
                                                           Unit 15180
                                                           Washington, DC 20003
                                                           202–594–9958
                                                           Email: joshua@democracydefenders.org
                                                           *ATTORNEY TO BE NOTICED*

**Abbe David Lowell**
LOWELL & ASSOCIATES, PLLC
1250 H St NW
Suite 250
Washington, DC 20005
202–508–4450
Fax: 202–964–6116
Email: alowellpublicoutreach@lowellandassociates.com
*ATTORNEY TO BE NOTICED*

V.
**Defendant**

**EXECUTIVE OFFICE OF THE**          represented by  **Abhishek Kambli**
**PRESIDENT**                                        DOJ–USAO
                                                     950 Pennsylvania Avenue, NW
                                                     Washington, DC 20530–0001
                                                     202–445–5496
                                                     Email: abhishek.kambli@usdoj.gov
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Michael Kenneth Velchik**
                                                     U.S. DEPARTMENT OF JUSTICE
                                                     950 Pennsylvania Avenue NW
                                                     Washington, DC 20530
                                                     202–860–8388
                                                     Email: michael.velchik@usdoj.gov
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Richard Lawson**
                                                     America First Policy Institute
                                                     1455 Pennsylvania Ave NW Ste 500
                                                     Washington, DC 20004
                                                     813–952–8882
                                                     Email: rlawson@americafirstpolicy.com
                                                     *TERMINATED: 10/22/2025*
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF DEFENSE**            represented by  **Abhishek Kambli**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Michael Kenneth Velchik**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Richard Lawson**
                                                     (See above for address)
                                                     *TERMINATED: 10/22/2025*
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**DEFENSE**                          represented by  **Abhishek Kambli**
**COUNTERINTELLIGENCE AND**                          (See above for address)
**SECURITY AGENCY**                                  *LEAD ATTORNEY*

JA2

*ATTORNEY TO BE NOTICED*

**Michael Kenneth Velchik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*TERMINATED: 10/22/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **CENTRAL INTELLIGENCE AGENCY** | represented by | **Abhishek Kambli**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Michael Kenneth Velchik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*TERMINATED: 10/22/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE** | represented by | **Abhishek Kambli**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Michael Kenneth Velchik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*TERMINATED: 10/22/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | represented by | **Abhishek Kambli**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Michael Kenneth Velchik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*TERMINATED: 10/22/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA3

**Movant**

**JASON GOODMAN**                      represented by  **JASON GOODMAN**
                                                        252 7th Avenue
                                                        Apt. 6S
                                                        New York, NY 10001
                                                        347201–6017
                                                        PRO SE

**Amicus**

**PAST PRESIDENTS OF DC BAR**          represented by  **Andrea C. Ferster**
*et al.*                                                ANDREA C. FERSTER
                                                        68 Beebe Pond Rd
                                                        Canaan, NY 12029
                                                        202–669–6311
                                                        Email: andreaferster@gmail.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**FIRST AMENDMENT**                    represented by  **David A. Schulz**
**SCHOLARS**                                            YALE LAW SCHOOL
                                                        Media Freedom & Information Access Clinic
                                                        127 Wall Street
                                                        New Haven, CT 06511
                                                        212–663–6162
                                                        Email: david.schulz@yale.edu
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**GOVERNMENT**                         represented by  **Elisabeth Connell**
**ACCOUNTABILITY PROJECT**                              GOVERNMENT ACCOUNTABILITY
                                                        PROJECT
                                                        1612 K St., NW
                                                        Ste 808
                                                        Washington, DC 20006
                                                        202–449–6040
                                                        Email: elisabeth.connell@gmail.com
                                                        *TERMINATED: 09/29/2025*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**LAW FIRM PARTNERS UNITED**           represented by  **Eric F. Citron**
**INC.**                                                ZIMMER, CITRON & CLARKE LLP
                                                        130 Bishop Allen Drive
                                                        Cambridge, DC 02139
                                                        617–821–6006
                                                        Email: eric@zimmercitronclarke.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Eric R. Olson**
                                                        OLSON GRIMSLEY KAWANABE
                                                        HINCHCLIFF & MURRAY LLC
                                                        700 17th Street, Suite 1600
                                                        Denver, CO 80202
                                                        303–535–9151
                                                        Email: eolson@olsongrimsley.com
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Amicus**

**WHISTLEBLOWER AID**                represented by **Andrew Peter Bakaj**
                                                 COMPASS ROSE LEGAL GROUP, PLLC
                                                 1250 Connecticut Avenue, NW
                                                 Suite 700
                                                 Washington, DC 20036
                                                 202–570–4896
                                                 Email: apb@compassrosepllc.com
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Amicus**

**AARON H. CAPLAN**                 represented by **Stephen Craig Leckar**
                                                 KALBIAN HAGERTY LLP
                                                 888 17th Street, NW
                                                 Suite 1200
                                                 Washington, DC 20006
                                                 202–223–5600
                                                 Email: sleckar@kalbianhagerty.com
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/05/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC–11667027) filed by MARK S. ZAID. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons)(Lowell, Abbe) (Attachment 1 replaced on 5/6/2025) (zmtm). (Entered: 05/05/2025) |
| 05/05/2025 | 2 | NOTICE of Appearance by Margaret Donovan on behalf of MARK S. ZAID (Donovan, Margaret) (Entered: 05/05/2025) |
| 05/05/2025 | 3 | SEALED DOCUMENT filed by MARK S. ZAID(This document is SEALED and only available to authorized persons.)(Lowell, Abbe) (Entered: 05/05/2025) |
| 05/06/2025 | | Case Assigned to Judge Amir H. Ali. (zmtm) (Entered: 05/06/2025) |
| 05/06/2025 | 4 | SUMMONS (6) Issued Electronically as to All Defendants. (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 05/06/2025) |
| 05/06/2025 | | NOTICE OF NEW CASE ERROR The following error(s) need correction: Missing summonses– U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (zmtm) (Entered: 05/06/2025) |
| 05/06/2025 | 5 | REQUEST FOR SUMMONS TO ISSUE *to the U.S. Attorney and U.S. Attorney General* filed by MARK S. ZAID. (Attachments: # 1 Summons to U.S. Attorney)(Lowell, Abbe) (Entered: 05/06/2025) |
| 05/06/2025 | 6 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (mg) (Entered: 05/06/2025) |
| 05/15/2025 | 7 | STANDING ORDER. The parties are ordered to comply with the directives set forth in the attached standing order. Signed by Judge Amir H. Ali on 5/15/2025. (lcaha2) (Entered: 05/15/2025) |
| 05/15/2025 | 8 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 5/6/2025. Answer due for ALL FEDERAL DEFENDANTS by 7/5/2025. (Attachments: # 1 Exhibit Proof of Service – USAO–DC)(Donovan, Margaret) (Entered: 05/15/2025) |

| 05/21/2025 | 9 | MOTION for Preliminary Injunction by MARK S. ZAID. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Plaintiff Mark Zaid, # 3 Declaration of Marc Polymeropolous, # 4 Exhibit Expert Report of J. William Leonard, # 5 Exhibit 1, # 6 Exhibit 2, # 7 Exhibit 3, # 8 Exhibit 4, # 9 Exhibit 5, # 10 Exhibit 6, # 11 Exhibit 7, # 12 Exhibit 8, # 13 Exhibit 9, # 14 Exhibit 10, # 15 Exhibit 11, # 16 Exhibit 12, # 17 Exhibit 13, # 18 Exhibit 14, # 19 Text of Proposed Order)(Lowell, Abbe) (Entered: 05/21/2025) |
|---|---|---|
| 05/21/2025 | 10 | NOTICE of Appearance by David A. Kolansky on behalf of MARK S. ZAID (Kolansky, David) (Entered: 05/21/2025) |
| 05/21/2025 | 11 | NOTICE of Appearance by Richard Lawson on behalf of All Defendants (Lawson, Richard) (Entered: 05/21/2025) |
| 05/21/2025 | | MINUTE ORDER. The Court is in receipt of Plaintiff's 9 motion for preliminary injunction. The parties are directed to meet, confer, and file a joint status report proposing a briefing schedule by 6:00 p.m. on May 22, 2025. Signed by Judge Amir H. Ali on 5/21/2025. (lcaha2) (Entered: 05/21/2025) |
| 05/22/2025 | 12 | Joint STATUS REPORT by MARK S. ZAID. (Attachments: # 1 Text of Proposed Order)(Lowell, Abbe) (Entered: 05/22/2025) |
| 05/22/2025 | | MINUTE ORDER. The Court is in receipt of the parties' 12 joint status report. The Court adopts the following briefing schedule: Defendants shall file a consolidated opposition to Plaintiff's 9 motion for preliminary injunction and opening Rule 12 motion by May 30, 2025. Plaintiff shall file a consolidated reply in support of the motion for preliminary injunction and opposition to the Rule 12 motion by June 13, 2025. Defendants shall file a reply in support of the Rule 12 motion by June 20, 2025. Signed by Judge Amir H. Ali on 5/22/2025. (lcaha2) (Entered: 05/22/2025) |
| 05/26/2025 | 13 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: JASON GOODMAN'S MOTION for Leave to File Amicus Brief. Reason(s): Filer is not a party to the case. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order) (mg) (Entered: 05/28/2025) |
| 05/28/2025 | 14 | Unopposed MOTION for Leave to File Amicus Brief by PAST PRESIDENTS OF DC BAR ET AL.. (Attachments: # 1 Exhibit Amicus Brief, # 2 Appendix List of Amici, # 3 Text of Proposed Order)(Ferster, Andrea) (Entered: 05/28/2025) |
| 05/28/2025 | 15 | Unopposed MOTION for Leave to File Amicus Brief by First Amendment Scholars. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Exhibit Text of Proposed Order)(Schulz, David) (Entered: 05/28/2025) |
| 05/28/2025 | 18 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: JASON GOODMAN'S MOTION for Judicial Forfeiture. Reason(s): Filer is not a party to the case. (mg) (Main Document 18 replaced on 5/29/2025) (mg). (Entered: 05/29/2025) |
| 05/29/2025 | 16 | NOTICE of Appearance by David A. Schulz on behalf of First Amendment Scholars (Schulz, David) (Entered: 05/29/2025) |
| 05/29/2025 | 17 | NOTICE of Appearance by Andrea C. Ferster on behalf of PAST PRESIDENTS OF DC BAR ET AL. (Ferster, Andrea) (Main Document 17 replaced on 5/29/2025) (mg). (Entered: 05/29/2025) |
| 05/29/2025 | 19 | NOTICE of Filing (Physical Exhibit – Exhibit 6) by MARK S. ZAID re 9 Motion for Preliminary Injunction,, (Donovan, Margaret) (Entered: 05/29/2025) |
| 05/29/2025 | 20 | Unopposed MOTION for Leave to File Amicus Brief by GOVERNMENT ACCOUNTABILITY PROJECT. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order)(Connell, Elisabeth) (Entered: 05/29/2025) |
| 05/29/2025 | 21 | NOTICE of Appearance by Elisabeth Connell on behalf of GOVERNMENT ACCOUNTABILITY PROJECT (Connell, Elisabeth) (Entered: 05/29/2025) |
| 05/30/2025 | 22 | MOTION to Dismiss by EXECUTIVE OFFICE OF THE PRESIDENT. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Lawson, Richard) (Entered: 05/30/2025) |

| 06/12/2025 | 23 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Eric R. Olson, Filing fee $ 100, receipt number ADCDC–11752160. Fee Status: Fee Paid. by LAW FIRM PARTNERS UNITED INC.. (Attachments: # 1 Declaration)(Citron, Eric) (Entered: 06/12/2025) |
|---|---|---|
| 06/12/2025 | 24 | NOTICE of Appearance by Andrew Peter Bakaj on behalf of WHISTLEBLOWER AID (Bakaj, Andrew) (Entered: 06/12/2025) |
| 06/12/2025 | 25 | Unopposed MOTION for Leave to File Amicus Brief by WHISTLEBLOWER AID. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order)(Bakaj, Andrew) (Entered: 06/12/2025) |
| 06/13/2025 | 26 | NOTICE of Appearance by Stephen Craig Leckar on behalf of Aaron H. Caplan (Leckar, Stephen) (Entered: 06/13/2025) |
| 06/13/2025 | 27 | Unopposed MOTION for Leave to File Amicus Brief by Aaron H. Caplan. (Attachments: # 1 Exhibit Amicus Brief of Professor Aaron H. Caplan Regarding Attainder, # 2 Text of Proposed Order)(Leckar, Stephen) (Entered: 06/13/2025) |
| 06/13/2025 | | MINUTE ORDER granting 23 motion for leave to appear pro hac vice. Attorney Eric R. Olson is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Amir H. Ali on 6/13/2025. (lcaha2) (Entered: 06/13/2025) |
| 06/13/2025 | 28 | NOTICE of Appearance by Eric R. Olson on behalf of LAW FIRM PARTNERS UNITED INC. (Olson, Eric) (Entered: 06/13/2025) |
| 06/13/2025 | 29 | Unopposed MOTION for Leave to File Amicus Brief by LAW FIRM PARTNERS UNITED INC.. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order)(Olson, Eric) (Entered: 06/13/2025) |
| 06/13/2025 | 30 | Memorandum in opposition to re 22 MOTION to Dismiss filed by MARK S. ZAID. (Attachments: # 1 Exhibit 15, # 2 Text of Proposed Order (Amended))(Lowell, Abbe) (Entered: 06/13/2025) |
| 06/13/2025 | 31 | REPLY to opposition to motion re 9 Motion for Preliminary Injunction,, filed by MARK S. ZAID. (Attachments: # 1 Exhibit 15, # 2 Text of Proposed Order (Amended))(Lowell, Abbe) (Entered: 06/13/2025) |
| 06/16/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 24 NOTICE of Appearance by Andrew Peter Bakaj on behalf of WHISTLEBLOWER AID (Bakaj, Andrew). |
| | | Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney–renewal. |
| | | Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 6/23/2025. (zapb) Modified on 6/17/2025 (zapb). (Entered: 06/16/2025) |
| 06/16/2025 | 32 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Christopher Mattei, Filing fee $ 100, receipt number ADCDC–11757868. Fee Status: Fee Paid. by MARK S. ZAID. (Attachments: # 1 Exhibit Declaration of Christopher Mattei, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Donovan, Margaret) (Entered: 06/16/2025) |
| 06/17/2025 | | MINUTE ORDER. The Court will hold a motion hearing on Plaintiff's 9 motion for preliminary injunction and Defendants' 22 motion to dismiss on June 27, 2025, at 1:30 p.m. in Courtroom 19. Each party will be given an opportunity to make submissions on the motions. A public access line will be provided for the hearing: the toll–free number is 833–990–9400, and the Meeting ID is 771021014. Persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. *See In re:* |

| | | |
|---|---|---|
| | | *Prohibition on Photographing, Recording, Broadcasting, and Livestreaming Judicial Proceedings*, Standing Order 24–31 (JEB) (Sept. 18, 2024). Signed by Judge Amir H. Ali on 6/17/2025. (lcaha2) (Entered: 06/17/2025) |
| 06/20/2025 | 33 | REPLY to opposition to motion re 22 Motion to Dismiss filed by CENTRAL INTELLIGENCE AGENCY, DEFENSE COUNTERINTELLIGENCE AND SECURITY AGENCY, DEPARTMENT OF DEFENSE, EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. (Lawson, Richard) (Entered: 06/20/2025) |
| 06/23/2025 | 35 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: JASON GOODMAN'S MOTION to ALTER JUDGMENT. Reason(s): Filer is not a party to the case. (mg) (Entered: 06/26/2025) |
| 06/25/2025 | 34 | NOTICE of Appearance by Michael Kenneth Velchik on behalf of All Defendants (Velchik, Michael) (Entered: 06/25/2025) |
| 06/27/2025 | 36 | NOTICE of Appearance by Joshua Gabriel Kolb on behalf of All Plaintiffs (Kolb, Joshua) (Main Document 36 replaced on 6/28/2025) (mg). (Entered: 06/27/2025) |
| 06/27/2025 | | MINUTE ORDER granting 32 motion for leave to appear pro hac vice. Attorney Christopher Mattei is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Amir H. Ali on 6/27/2025. (lcaha2) (Entered: 06/27/2025) |
| 06/27/2025 | | Minute Entry for proceedings held before Judge Amir H. Ali: Motion Hearing held on 6/27/2025 re 9 Motion for Preliminary Injunction and 22 Motion to Dismiss. Oral arguments heard. (Court Reporter: Sonja Reeves) (zalh) (Entered: 06/27/2025) |
| 06/30/2025 | 37 | NOTICE of Appearance by Christopher Mattei on behalf of MARK S. ZAID (Mattei, Christopher) (Entered: 06/30/2025) |
| 06/30/2025 | 38 | NOTICE OF SUPPLEMENTAL AUTHORITY by MARK S. ZAID (Attachments: # 1 Susman Godfrey v. EOP et al., Memorandum Opinion, # 2 Susman Godfrey v. EOP et al., Order)(Lowell, Abbe) (Entered: 06/30/2025) |
| 07/01/2025 | | MINUTE ORDER re 13 **Request for Leave to File Review.** Leave to file is granted. The Clerk is directed to file the attached document on the public docket. The motion for leave to file amicus brief is held in abeyance. Signed by Judge Amir H. Ali on 7/1/2025. (lcaha2) (Entered: 07/01/2025) |
| 07/01/2025 | 39 | MOTION for Leave to File Amicus Brief by JASON GOODMAN. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order)(mg) (Entered: 07/01/2025) |
| 07/08/2025 | 40 | TRANSCRIPT OF MOTION HEARING before Judge Amir H. Ali held on June 27, 2025; Page Numbers: 1–91. Date of Issuance: July 8, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354–3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 7/29/2025. Redacted Transcript Deadline set for 8/8/2025. Release of Transcript Restriction set for 10/6/2025.(Reeves, Sonja) (Entered: 07/08/2025) |

| 07/09/2025 | 41 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– George Croner, Filing fee $ 100, receipt number ADCDC–11807951. Fee Status: Fee Paid. by MARK S. ZAID. (Attachments: # 1 Exhibit Declaration of George Croner, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Donovan, Margaret) (Entered: 07/09/2025) |
|---|---|---|
| 08/06/2025 | 42 | MOTION for Leave to File *Supplemental Facts* by MARK S. ZAID. (Attachments: # 1 Exhibit Supplemental Declaration of Mark S. Zaid, # 2 Text of Proposed Order)(Donovan, Margaret) (Entered: 08/06/2025) |
| 09/29/2025 | 43 | NOTICE OF WITHDRAWAL OF APPEARANCE as to GOVERNMENT ACCOUNTABILITY PROJECT. Attorney Elisabeth Connell terminated. (Attachments: # 1 Affidavit, # 2 Exhibit)(Connell, Elisabeth) (Entered: 09/29/2025) |
| 10/07/2025 | 44 | MOTION for Status Conference by MARK S. ZAID. (Attachments: # 1 Text of Proposed Order)(Donovan, Margaret) (Entered: 10/07/2025) |
| 10/08/2025 | | MINUTE ORDER. The Court is in receipt of Plaintiff's 44 motion for status conference. The parties shall meet and confer regarding Plaintiff's proposal to proceed to summary judgment and/or amend the complaint. By October 15, 2025, the parties shall file a joint status report addressing those issues and proposed next steps, including whether the pending preliminary injunction and motion to dismiss briefing should be converted to summary judgment briefing, or a timeline for new or supplemental briefing. The Court will determine whether to hold a status conference after receiving the parties' joint status report. Signed by Judge Amir H. Ali on 10/8/2025. (lcaha2) (Entered: 10/08/2025) |
| 10/08/2025 | | MINUTE ORDER granting 41 motion for leave to appear pro hac vice. Attorney George Croner is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Amir H. Ali on 10/8/2025. (lcaha2) (Entered: 10/08/2025) |
| 10/10/2025 | 45 | MOTION to Stay by CENTRAL INTELLIGENCE AGENCY, DEFENSE COUNTERINTELLIGENCE AND SECURITY AGENCY, DEPARTMENT OF DEFENSE, EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. (Lawson, Richard) (Entered: 10/10/2025) |
| 10/10/2025 | | MINUTE ORDER. Defendants' 45 motion for a stay of briefing schedule in light of lapse of appropriations is denied. The parties remain subject to the Court's prior order to file a joint status report by October 15, 2025. Signed by Judge Amir H. Ali on 10/10/2025. (lcaha2) (Entered: 10/10/2025) |
| 10/15/2025 | 46 | NOTICE of Appearance by Abhishek Kambli on behalf of All Defendants (Kambli, Abhishek) (Entered: 10/15/2025) |
| 10/15/2025 | 47 | Joint STATUS REPORT by MARK S. ZAID. (Donovan, Margaret) (Entered: 10/15/2025) |
| 10/17/2025 | | MINUTE ORDER. The Court will hold a status conference via teleconference on October 20, 2025, at 3:00 p.m. The parties should be prepared to discuss the issues raised in the 47 joint status report. Signed by Judge Amir H. Ali on 10/17/2025. (lcaha3) (Entered: 10/17/2025) |
| 10/20/2025 | | Minute Entry for proceedings held before Judge Amir H. Ali: Telephonic Status Conference held on 10/20/2025. (Court Reporter SONJA REEVES.) (mac) (Entered: 10/20/2025) |
| 10/22/2025 | 48 | NOTICE OF WITHDRAWAL OF APPEARANCE as to CENTRAL INTELLIGENCE AGENCY, DEFENSE COUNTERINTELLIGENCE AND SECURITY AGENCY, DEPARTMENT OF DEFENSE, EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. Attorney Richard Lawson terminated. (Lawson, Richard) (Entered: 10/22/2025) |
| 11/14/2025 | 49 | NOTICE of Appearance by George W. Croner on behalf of All Plaintiffs (Croner, George) (Main Document 49 replaced on 11/19/2025) (mg). (Entered: 11/14/2025) |

| 12/12/2025 | 50 | Second MOTION for Leave to File *Supplemental Facts* by MARK S. ZAID. (Attachments: # 1 Exhibit Second Supplemental Declaration of Mark S. Zaid)(Lowell, Abbe) (Entered: 12/12/2025) |
| --- | --- | --- |
| 12/14/2025 | | MINUTE ORDER. The court is in receipt of Plaintiff's 50 second motion for leave to file supplemental facts. Defendants shall file any response by December 18, 2025. Signed by Judge Amir H. Ali on 12/14/2025. (lcaha3) (Entered: 12/14/2025) |
| 12/22/2025 | 51 | NOTICE *of Defendants' Concession* by MARK S. ZAID re 50 Motion for Leave to File (Lowell, Abbe) (Entered: 12/22/2025) |
| 12/23/2025 | | MINUTE ORDER. Past Presidents of DC Bar et al.'s 14 unopposed motion for leave to file amicus brief, First Amendment Scholars' 15 unopposed motion for leave to file amicus brief, Government Accountability Project's 20 unopposed motion for leave to file amicus brief, Whistleblower Aid's 25 unopposed motion for leave to file amicus brief, Professor Aaron H. Caplan's 27 unopposed motion for leave to file amicus brief, and Law Firm Partners United Inc.'s 29 unopposed motion for leave to file amicus brief are granted. Jason Goodman's 39 motion for leave to file amicus brief is denied for failure comply with Local Civil Rule 7(o)(2). Signed by Judge Amir H. Ali on 12/23/2025. (lcaha3) (Entered: 12/23/2025) |
| 12/23/2025 | | MINUTE ORDER. Plaintiff's 42 motion for leave to file supplemental facts and 50 second motion for leave to file supplemental facts are granted. While Defendants have indicated their opposition to these motions, they have not supported their opposition with any arguments or legal authority, and have accordingly forfeited any such arguments. Signed by Judge Amir H. Ali on 12/23/2025. (lcaha3) (Entered: 12/23/2025) |
| 12/23/2025 | 52 | MEMORANDUM OPINION AND ORDER. Plaintiff's 9 motion for preliminary injunction is granted in part and denied in part. Defendants' 22 motion to dismiss is denied. See document for details. Defendants shall file a status report by December 30, 2025. Signed by Judge Amir H. Ali on 12/23/2025. (lcaha3) (Entered: 12/23/2025) |
| 12/23/2025 | | MINUTE ORDER. Plaintiff's 44 motion for status conference is denied as moot. Signed by Judge Amir H. Ali on 12/23/2025. (lcaha3) (Entered: 12/23/2025) |
| 12/23/2025 | 53 | AMICUS BRIEF by PAST PRESIDENTS OF DC BAR. (mg) (Entered: 12/29/2025) |
| 12/23/2025 | 54 | AMICUS BRIEF by FIRST AMENDMENT SCHOLARS. (mg) (Entered: 12/29/2025) |
| 12/23/2025 | 55 | AMICUS BRIEF by GOVERNMENT ACCOUNTABILITY PROJECT. (mg) (Entered: 12/29/2025) |
| 12/23/2025 | 56 | AMICUS BRIEF by WHISTLEBLOWER AID. (mg) (Entered: 12/29/2025) |
| 12/23/2025 | 57 | AMICUS BRIEF by AARON H. CAPLAN. (mg) (Entered: 12/29/2025) |
| 12/23/2025 | 58 | AMICUS BRIEF by LAW FIRM PARTNERS UNITED INC.. (mg) (Entered: 12/29/2025) |
| 12/23/2025 | 60 | SUPPLEMENTAL MEMORANDUM to re 9 MOTION for Preliminary Injunction filed by MARK S. ZAID. (mg) (Entered: 12/30/2025) |
| 12/23/2025 | 61 | Second SUPPLEMENTAL MEMORANDUM to re 9 MOTION for Preliminary Injunction filed by MARK S. ZAID. (mg) (Entered: 12/30/2025) |
| 12/29/2025 | | Set/Reset Deadlines: Defendants' Status Report due by 12/30/2025. (zalh) (Entered: 12/29/2025) |
| 12/29/2025 | 59 | Unopposed MOTION for Extension of Time to File *Status Report* by CENTRAL INTELLIGENCE AGENCY, DEFENSE COUNTERINTELLIGENCE AND SECURITY AGENCY, DEPARTMENT OF DEFENSE, EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. (Velchik, Michael) (Entered: 12/29/2025) |
| 12/30/2025 | | MINUTE ORDER. Defendants' 59 unopposed motion for extension of time to file status report is granted in part and denied in part. Defendants shall file their status report by January 6, 2026. The court will hold a status conference on January 7, 2026, |

| | | at 4:00 p.m. in Courtroom 19. Signed by Judge Amir H. Ali on 12/30/2025. (lcaha3) (Entered: 12/30/2025) |
|---|---|---|
| 01/06/2026 | 62 | NOTICE OF APPEAL TO DC CIRCUIT COURT by OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, DEPARTMENT OF DEFENSE, UNITED STATES OF AMERICA, EXECUTIVE OFFICE OF THE PRESIDENT, DEFENSE COUNTERINTELLIGENCE AND SECURITY AGENCY, CENTRAL INTELLIGENCE AGENCY. Fee Status: No Fee Paid. Parties have been notified. (Velchik, Michael) (Entered: 01/06/2026) |
| 01/06/2026 | 63 | STATUS REPORT by CENTRAL INTELLIGENCE AGENCY, DEFENSE COUNTERINTELLIGENCE AND SECURITY AGENCY, DEPARTMENT OF DEFENSE, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES OF AMERICA. (Velchik, Michael) (Entered: 01/06/2026) |
| 01/06/2026 | | MINUTE ORDER. The court is in receipt of Defendants' 63 status report. The report indicates that Defendants plan to seek an expedited appeal and request that the court hold the case in abeyance pending appeal. The parties shall confer in person, by video, or by telephone in advance of tomorrow's status conference regarding Defendants' proposal to hold this case in abeyance, including staying Defendants' responsive pleading and any discovery, as well as a shared understanding of the actions that would be taken to comply with the preliminary injunction during the appeal. The parties may also wish to discuss an expedited timeline to jointly propose to the D.C. Circuit. The parties shall be prepared to address their joint proposal for next steps before this court at the start of tomorrow's hearing. Signed by Judge Amir H. Ali on 01/06/2026. (lcaha3) (Entered: 01/06/2026) |
| 01/07/2026 | 64 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 62 Notice of Appeal to DC Circuit Court,. (mg) (Entered: 01/07/2026) |
| 01/07/2026 | | Minute Entry for proceedings held before Judge Amir H. Ali: Status Conference held on 1/7/2026. The Court takes matter under advisement. Order forthcoming via Chambers. (Court Reporter: Sonja Reeves) (zalh) (Entered: 01/07/2026) |
| 01/09/2026 | 65 | TRANSCRIPT OF STATUS CONFERENCE before Judge Amir H. Ali held on January 7, 2026; Page Numbers: 1–18. Court Reporter Sonja L. Reeves, RDR, CRR, Telephone number (202) 354–3246, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 1/30/2026. Redacted Transcript Deadline set for 2/9/2026. Release of Transcript Restriction set for 4/9/2026.(Reeves, Sonja) (Entered: 01/09/2026) |
| 01/13/2026 | | USCA Case Number 26–5009 for 62 Notice of Appeal to DC Circuit Court, filed by DEPARTMENT OF DEFENSE, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA, DEFENSE COUNTERINTELLIGENCE AND SECURITY AGENCY, EXECUTIVE OFFICE OF THE PRESIDENT. (mg) (Entered: 01/13/2026) |
| 01/21/2026 | 66 | STATUS REPORT by MARK S. ZAID. (Lowell, Abbe) (Entered: 01/21/2026) |

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

MARK S. ZAID, ESQ.[1]

        Plaintiff,

   v.

EXECUTIVE OFFICE OF THE PRESIDENT
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

  and

DEPARTMENT OF DEFENSE
1000 Defense Pentagon
Washington, D.C. 20301

  and

DEFENSE COUNTERINTELLIGENCE AND
SECURITY AGENCY
Building 600, 10th Street
Fort Meade, Maryland 20755

  and

CENTRAL INTELLIGENCE AGENCY
Washington, D.C. 20505

  and

OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE
1500 Tysons McLean Drive
McLean, Virginia 22102

   and

Civil Action No. 25-_____

---

[1] Pursuant to Local Civil Rule 5.1(c)(1), the Plaintiff's residential address is being filed under seal with the Court in a separate Notice of Filing.

THE UNITED STATES OF AMERICA
Washington, D.C. 20500

                Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Mark S. Zaid, Esq. ("Mr. Zaid"), by and through his attorneys, hereby brings this Complaint against the Executive Office of the President, the Department of Defense, the Defense Counterintelligence and Security Agency, the Central Intelligence Agency, the Office of the Director of National Intelligence, and the United States of America to challenge the unlawful revocation of his security clearance.

## NATURE OF THE ACTION

1.      Mr. Zaid is an attorney who specializes in national security law. Through his law firm, Mark S. Zaid, P.C., without regard to party or politics, he represents intelligence, law enforcement and military officers, defense contractors, whistleblowers and others who have grievances with or have been wronged or are being investigated by agencies of the United States Government. Over the past three decades, up through and including the date of this filing, his representation of these clients often requires access to classified information of various levels. As he has never been employed by the federal government, his interactions with the security clearance adjudication process have only ever been in the context of accessing information necessary for his clients' legal representations.

2.      On March 22, 2025, for improper political retribution, President Donald J. Trump directed the summary revocation of security clearances for a group of individuals, including specifically Mr. Zaid, through a Presidential Memorandum titled, "Rescinding Security Clearances and Access to Classified Information from Specified Individuals" (the "Rescinding Security Clearances Memorandum" or the "Memorandum"). The immediate effect of the revocation has been

that Mr. Zaid can no longer represent current or future clients in matters where doing so requires access to classified information. President Trump's actions, and the actions of the Departments or Agencies that have complied with the President's directive, have directly injured Mr. Zaid and his clients by undermining his ability to continue to represent them and zealously advocate on their behalf in the national security arena. For certain present and prospective clients, Mr. Zaid may not be permitted to continue to or ever represent them. President Trump has also directly injured Plaintiff's current and future clients by depriving them of their constitutional right to legal counsel and to petition the court or federal agencies, which are injuries that Mr. Zaid pursues here on their behalf.

3.    This case is about methods and process. More specifically, there were no methods and there was no process. Instead, the Rescinding Security Clearances Memorandum is a dangerous, unconstitutional retaliation by the President of the United States against his perceived political enemies as well as his actual legal adversaries which eschews any semblance of due process. President Trump's directive to summarily revoke Plaintiff's security clearance has thus far been blindly implemented by at least three federal agencies – the Central Intelligence Agency, the Department of Defense, and the Office of the Director of National Intelligence. To date, Mr. Zaid has received none of the procedural protections afforded to cleared individuals facing denial or revocation. He brings valid claims here notwithstanding the normal deference given to decisions concerning the granting, denial or revocation of security clearances. Indeed, what has befallen Mr. Zaid, for exercising his constitutional rights and for enabling his clients to exercise their own, is no different than if Defendants had blanketly revoked the clearances of a person or group because of some other protected category, such as race, gender or ethnicity.

4.    By implementing the Memorandum, Defendants have strayed far afield of any deference granted to them by existing case law. Instead, they have launched a bald-faced attack on

a sacred constitutional guarantee: the right to petition the court or federal agencies on behalf of clients.  An attack on this right is especially insidious because it jeopardizes Mr. Zaid's ability to pursue and represent the rights of others without fear of retribution.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Mr. Zaid's causes of action arise under the Constitution and laws of the United States.

6.      This Court has authority to enter a declaratory judgment and to provide injunctive relief pursuant to Rules 57 and 64 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201-2202, the All Writs Act, and the Court's inherent equitable powers.

7.      Sovereign immunity for non-monetary relief is waived under 5 U.S.C. § 702, which entitles Mr. Zaid to relief when Defendants acted unconstitutionally and beyond statutory authority.

8.      Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) and (e).

## PARTIES

9.      Mr. Zaid is an attorney based in Washington, D.C.  For nearly 35 years, his practice has focused on national security law, First Amendment claims, and government accountability. Since 1993, he has represented countless clients from across the political spectrum, particularly in federal court.  As a result, he has been involved in many high-profile lawsuits and other legal proceedings, including against both Republican and Democrat administrations.  As discussed in further detail below, Mr. Zaid's cases frequently require him to access classified information, including up to Top Secret/Sensitive Compartmented Information ("TS/SCI"), in order to properly represent his clients.  In other words, he is often retained as and specifically sought after because he is "cleared counsel."

10.     Defendant Executive Office of the President is headquartered in Washington, D.C., and is an agency within the meaning of 5 U.S.C. § 702.

11.     Defendant Department of Defense ("DoD") is headquartered in Washington, D.C., and is an agency within the meaning of 5 U.S.C. § 702.  DoD controls its subordinate agency Defendant Defense Security and Counterintelligence Agency ("DSCA"), which is headquartered in Fort Meade, Maryland.

12.     Defendant Central Intelligence Agency ("CIA") is headquartered in Washington, D.C., and is an agency within the meaning of 5 U.S.C. § 702.

13.     Defendant Office of the Director of National Intelligence ("ODNI") is headquartered in McLean, Virginia, and is an agency within the meaning of 5 U.S.C. § 702.

14.     Defendant United States of America is responsible for the exercise of state action by the other named Defendants.  Furthermore, given the number of past, current, and future activities by Mr. Zaid that have been impacted by the Rescinding Security Clearances Memorandum, the United States of America is included as a Defendant to ensure the relief ordered by the Court will apply government-wide.

## FACTS

### *Security Clearances*

15.     Over the past three months, the issue of security clearances has arisen in connection with several matters before this District.  Specifically, President Trump has used security clearances as a weapon on a mass scale since his January 20, 2025, inauguration to punish his perceived political enemies by handicapping their ability to engage with the government and pursue their livelihood.

16.     Over the past half century, the United States Government's security clearance processes have evolved from the arbitrary discretion of a select few leaders within the Executive Branch to a structured, due process-driven system implemented separately across agencies.  The prior discretionary-based system was revamped in the wake of *Greene v. McElroy*, 360 U.S. 474 (1959), which struck down a clearance revocation that lacked due process.  The ruling prompted

procedural reforms first memorialized in President Dwight D. Eisenhower's Executive Order 10865

("Safeguarding Classified Information Within Industry"), which outlined due process procedures for

defense contractors who require security clearances.  After decades of agencies' tinkering with the

guardrails of Executive Order 10865, President William J. Clinton issued Executive Order 12968 in

1995 ("Access to Classified Information") to "establish[] a uniform Federal personnel security

program" still in use today.

17.    Executive Orders 10865 and 12968 remain the central authorities governing access

to classified information within the current national security apparatus.  In sum, they establish that

eligibility to access classified information should be based on loyalty to the United States, good

character, trustworthiness, and sound judgment.

18.    The tenets of Executive Orders 10865 and 12968 were refined by Executive Order

13467, issued by George W. Bush in 2008 ("Reforming Processes Related to Suitability for

Government Employment, Fitness for Contractor Employees, and Eligibility for Access to Classified

National Security Information").  Over the years, agencies have published their own directives in

light of these Executive Orders.  For example, in 2002, the Department of Defense published DoD

Directive 5220.06, "Defense Industrial Personnel Security Clearance Review Program," which

"update[d] policy, responsibilities, and procedures" for implementing Executive Order 10865.  In

2008, ODNI published the Intelligence Community Policy Guidance Number 704.3, "Denial or

Revocation of Access to Sensitive Compartmented Information, Other Controlled Access Program

Information, and Appeals Processes."  And in 2017, ODNI relied on these Executive Orders to issue

the National Security Adjudicative Guidelines ("SEAD-4"), which "applies to any executive branch

agency authorized or designated to conduct adjudications" for classified access.

19.    SEAD-4 requires that an individual's access to classified information be "clearly

consistent with the national security interests" of the United States.  It intends for the adjudicative

process to be an examination of the "whole-person," meaning an examination of "a sufficient period and careful weighing of a number of variables of an individual's life," to calculate whether the person can be trusted with national security matters.  The adjudicative policy is clear that each "case must be judged on its own merits."

20.    In adjudicating a clearance, the following thirteen specific areas are considered: allegiance to the United States; foreign influence; foreign preference; sexual behavior; personal conduct; financial considerations; alcohol consumption; drug involvement and substance misuse; psychological conditions; criminal conduct; handling protected information; outside activities; and use of information technology.

21.    As is currently being litigated in cases involving the mass suspensions of law firm employees' security clearances, clearance decisions must be individualized.[2]  Blanket or "group" suspensions or revocations run headlong into the safeguards enacted to avoid the discredited and arbitrary McCarthy-era practices.

### *Attorney Mark Zaid*

22.    Mr. Zaid is a Washington, D.C.-based attorney who specializes in complex administrative and litigation matters primarily relating to national security, international law, foreign sovereign and diplomatic immunity, the Freedom of Information Act, and the Privacy Act.  His cases often involve representing federal employees, service members', and contractors' challenges to impending denials or revocations of their security clearances, under both Republican and Democrat administrations.

---

[2] *See* Memorandum Op., *Perkins Coie LLP v. U.S. Dep't of Just.*, C.A. No. 25-cv-00716-BAH, Dkt. 185 at 37-43 and 74–77 (May 2, 2025) (discussing other Executive Orders targeting American law firms and blanket suspensions of firm employees' security clearances, including those against employees of Covington & Burling LLP, Jenner & Block LLP, and Wilmer Cutler Pickering Hale and Dorr LLP).

23.     In addition to his representation of current and former federal employees, Mr. Zaid has testified as an expert before, or provided testimony to, a variety of governmental bodies including the Senate Committees on Judiciary and Homeland Security and Governmental Affairs, the House Committees on Judiciary, Homeland Security, Oversight and Accountability, the Department of Energy, the Public Interest Declassification Board and the Assassination Records Review Board.

24.     Mr. Zaid has had authorized access to classified information since approximately 1995, upon his first completion of an SF-86.[3]  During that initial time frame, Mr. Zaid's clearances were based on individual agency decisions granted on a case-by-case basis and did not require the completion of a full-scale background investigation.

25.     Defendant CIA, whose clandestine employees Mr. Zaid frequently represents, calls these types of clearances "Limited Security Access" approvals. These types of approvals are equivalent to interim Secret clearances but are not subject to reciprocity from other agencies.  As part of this process, Mr. Zaid has executed countless lawyer-specific non-disclosure agreements ("NDAs").  Mr. Zaid has regularly accessed classified information through Defendant CIA's Limited Security Access approvals since approximately 1999, up through and including the time at which his clearance was unlawfully revoked here.

---

[3] The SF-86 is a national security questionnaire used to initiate background investigations for security clearances. The document has been modified over the years Mr. Zaid has completed it; the questions are now categorized into the thirteen topics identified in SEAD-4's Adjudicative Guidelines.

26.    Mr. Zaid's first fully approved security clearance—meaning, a clearance supported by a background investigation—was in or around 2002 and handled through the Department of Justice's ("DOJ") Federal Bureau of Investigation ("FBI") after Defendants CIA and DoD were ordered by a federal judge to process him for access to classified information as part of ongoing representation of a client in litigation.  As a result, he was granted a "Secret" clearance.

27.    DOJ's Office of Security oversaw Mr. Zaid's clearance, mostly connected to classified litigation, through on or about 2019.  Between 2002 and 2019, DOJ would often reciprocally certify Mr. Zaid's clearance to other agencies so he could attend classified briefings or otherwise converse in an interagency environment.  This would include, but not be limited to, certifying Mr. Zaid's clearance eligibility to federal agencies' Offices of Inspectors General.

28.    At various times between 2003 and 2024, Mr. Zaid was authorized access to TS/SCI material by both the FBI and the Department of Homeland Security ("DHS") on a case-by-case basis.  In 2020, during President Trump's first administration, Mr. Zaid's access eligibility was *increased* to TS/SCI as part of his representation of a DHS whistleblower.

29.    When an individual no longer requires access to classified information, they are supposed to be debriefed and "read out" of their security access.  For DHS, Mr. Zaid was last debriefed and read out of SCI in November 2024.  However, upon information and belief, DHS did not finalize Mr. Zaid's "read out" in the Scattered Castles system until March 10, 2025.[4]

30.    Since being granted a security clearance in or around 2002, Mr. Zaid has never had his eligibility suspended or revoked.  He has successfully passed multiple background investigations during Republican and Democrat administrations and been adjudicated trustworthy.

---

[4] Scattered Castles is an Intelligence Community database and repository used to verify personnel security access and visit certifications.

31.     In summary, Mr. Zaid has been a practicing attorney for over thirty years and for most of his professional career he has maintained authorized access to classified information. Indeed, far from being a security risk, he has established himself and has been recognized by legal and non-legal entities as a leader in the legal community and in the national security field specifically.  His area of expertise, the *sine qua non* of which is his ability to analyze classified national security information, has made him a highly sought-after attorney for complex national security cases.[5]  A brief review of his considerable qualifications follows:

(a) A 1992 graduate and Associate Editor of the Law Review of Albany Law School of Union University in New York, Mr. Zaid completed his undergraduate education *cum laude* in 1989 at the University of Rochester, New York, with honors in Political Science and high honors in History.  He is a member of the Bars of New York State, Connecticut, the District of Columbia, Maryland, and numerous federal courts;

(b) For over 20 years, he has instructed Continuing Legal Education classes for the District of Columbia Bar Association and other jurisdictions including on "The Basics of Filing and Litigating Freedom of Information/Privacy Act Requests" (since 2003), "Defending Security Clearances" (since 2006) and "Handling Federal Whistleblower Cases" (since 2016);

(c) Since 2009, he has been named a Washington, D.C., Super Lawyer every year (including being profiled) and he is repeatedly named a "Best Lawyer" in Washingtonian Magazine's bi-annual designation for his national security or whistleblower work.  The Magazine also named him one of D.C.'s 250 (2021) and 500 Most Influential People (2022 & 2023), respectively, for national security/legal intelligentsia.  In 2022, the

---

[5] As the National Law Journal once wrote, "if Agent Mulder [of the X-Files] ever needed a lawyer, Zaid would be his man."

magazine awarded him the status of "Lawyer Lifetime Achievement Member";

(d) In 2020, the Washington Metropolitan Employment Lawyer's Association named him "Attorney of the Year" for his work on the Intelligence Community Whistleblower's case;

(e) In 2024, Forbes Magazine announced him as one of the top 200 lawyers in the United States on their inaugural ranking list;

(f) He has taught as an adjunct professor at Johns Hopkins University in the Global Security Studies program from 2014 – 2023, and at Texas A&M's George H.W. Bush School of Government & Public Service since 2024, where he teaches on national security issues. He also serves on the Executive Board at the Center for Ethics and the Rule of Law at the University of Pennsylvania's Annenberg Public Policy Center (https://www.penncerl.org/), and on the Advisory Board of the International Spy Museum (https://www.spymuseum.org/);

(g) In 2017, Mr. Zaid co-founded Whistleblower Aid (https://whistlebloweraid.org/), a non-profit law firm that provides pro bono legal representation to whistleblowers, particularly in the national security arena and sometimes in a classified arena, and where he serves as legal counsel;

(h) From 2014-2016, he served as a Member appointed by the Archivist of the United States to the Freedom of Information Act Advisory Committee;

(i) Mr. Zaid is also the Executive Director and founder of the James Madison Project, a Washington, D.C.-based organization with the primary purpose of educating the public on issues relating to intelligence gathering and operations, secrecy policies, national security and government wrongdoing; and,

(j) Mr. Zaid has been formally recognized by both state and federal courts as an expert

related to national security matters, particularly prepublication review challenges and security clearances.  For example, since 2024, Mr. Zaid has served, at the request of the Presiding Judge of the Dallas County Probate Court, as an expert witness for a probate case involving security clearances and facility clearances.[6]

32.    Mr. Zaid's career is notable both for the depth of contributions to the national security field as well as its breadth.  Mr. Zaid has prominently represented clients across the political spectrum, including both Democrat and Republican Members of Congress, and whistleblowers in every administration since President William J. Clinton.  Notable cases have included his representation of the CIA whistleblowers involved in the Benghazi, Libya attack during their 2013-2015 Congressional testimony (which also involved cooperation with DOJ as part of criminal prosecutions where the clients were witnesses and working closely with then-Congressman Devin Nunes (R-CA)), the Republican National Committee, several Cabinet officials during President Trump's first administration, and media entities such as the *Daily Caller*, *Daily Beast*, *Politico* and *Wall Street Journal*, to name just a few.  Of his aggressive commitment to nonpartisanship, the American Bar Association Journal once wrote, "Zaid is an equal opportunity thorn out to pierce the sides of suit jackets bearing both elephants and donkeys on the lapels."

33.    In short, Mr. Zaid is an excellent national security attorney and an objectively engaged, nonpartisan citizen.  His significant experience and qualifications make him remarkably valuable as counsel to current and former federal employees who require legal advice.  As a lawyer

---

[6] Additional examples include in 2017, when Mr. Zaid was designated as an expert on security and facility clearances in *Skipper v. Skipper*, Case No. 13-C-16-107613 (Howard County Circuit Court) and in 2018, he was designated as an expert for classification and prepublication national security review matters in *Bissonnette v. Podlaski et al.*, No. 1:15-CV-00334-SLC, 2018 WL 2688583, at *23 (N.D. Ind. June 5, 2018).  He has also provided expert advice in multiple matters involving individuals' security clearances, including for criminal matters in state and county courts in Maryland, Virginia, and California, and in a civil matter in the United States District Court for the District of Columbia.

well-versed in suing the United States Government, he is no stranger to identifying overreach and
exposing the abuse of power.  And that is exactly why he is being targeted now.

### *Mr. Zaid and the Trump Administrations*

34.    In September 2019, Mr. Zaid began representing a whistleblower within the
Intelligence Community ("IC Whistleblower") who had five weeks earlier filed a complaint with the
ODNI's Office of Inspector General regarding President Trump's interactions with Ukrainian
President Volodymyr Zelensky.  This complaint ultimately led to the first impeachment of President
Trump, although Mr. Zaid's legal representation of the IC Whistleblower did not involve advocating
for any specific outcome.

35.    Since 2017, Mr. Zaid has handled cases involving Mr. Trump and his Administration
much in the same manner as he had with other Presidential administrations.  But it was not until the
2019 IC Whistleblower matter that Mr. Zaid apparently came onto President Trump's radar,
immediately sparking his ire and that of his loyalists both inside and outside the government.

36.    In the aftermath of Mr. Zaid's role as legal counsel becoming public, President Trump
called him a "sleazeball."  The President's comments occurred at a televised political rally in
Louisiana in November 2019, along with his displaying a photo of someone said to be Mr. Zaid.
The political attacks on Mr. Zaid by President Trump and right-wing media prompted one of the
President's devotees to send Mr. Zaid an email stating that "traitors must die miserable deaths" and
that he and other of President Trump's followers "will hunt you down and bleed you out."  The
threat was fully prosecuted by President Trump's DOJ and the individual served over a year in jail
as a result.

37.     Days after the Louisiana rally, President Trump spoke to reporters at the White House about the impeachment witness: "The whistleblower, because of that, should be revealed. And his lawyer, who said the worst things possibly two years ago, he should be sued and maybe for treason. Maybe for treason, but he should be sued. His lawyer is a disgrace."

38.     Notwithstanding President Trump's public attacks on Mr. Zaid, the first Trump Administration never initiated any adverse action against Mr. Zaid's security clearance. In fact, by 2020, Mr. Zaid was processed and approved by DHS for access to TS/SCI — an even higher level of security clearance than he had held in 2019 — for his role representing a client in another high-profile whistleblower case. He continued to utilize TS/SCI clearance for various cases through 2024.

### The Presidential Memorandum dated March 22, 2025 and Related Events

39.     Despite an entire Presidential administration having come and gone since President Trump had last publicly targeted Mr. Zaid, on February 8, 2025, the *New York Post* reported on President Trump's stated intent to conduct a mass revocation of security clearances for a wide-ranging set of current and former government employees, identifying Mr. Zaid by his 2019 representation of the IC Whistleblower.[7]

40.     This pledge took place less than three weeks after the January 20, 2025 inauguration, and only four days after Mr. Zaid filed a lawsuit suing the Trump Administration on behalf of a group of FBI personnel who had investigated the deadly January 6, 2021 attack by President Trump's supporters on the United States Capitol to prevent the congressional certification of the 2020 election. That lawsuit sought to protect the identities of FBI personnel from being released publicly.

41.     Approximately one month later, on March 10, 2025, Director of National Intelligence Tulsi Gabbard published the following statement on social media platform X:

---

[7] Miranda Devine, *Trump stripping the security clearances of numerous antagonists — including NY AG Letitia James, DA Alvin Bragg*, New York Post (Feb. 8, 2025).



42.     It states: "Per @POTUS directive, I have revoked security clearances and barred access to classified information for Antony Blinken, Jake Sullivan, Lisa Monaco, Mark Zaid, Norman Eisen, Letitia James, Alvin Bragg, and Andrew Weissman, along with the 51 signers of the Hunter Biden 'disinformation' letter. The President's Daily Brief is no longer being provided to former President Biden."[8]

43.     On March 22, 2025, President Trump published a Presidential Memorandum on whitehouse.gov addressed to "the heads of executive departments and agencies." The subject of the memorandum was titled "Rescinding Security Clearances and Access to Classified Information from Specified Individuals."[9]

44.     The four-paragraph Memorandum states as follows:

I have determined that it is no longer in the national interest for the following individuals to access classified information: Antony Blinken, Jacob Sullivan, Lisa Monaco, Mark Zaid, Norman Eisen, Letitia James, Alvin Bragg, Andrew Weissmann, Hillary Clinton, Elizabeth Cheney, Kamala Harris, Adam Kinzinger,

---

[8] Since its initial posting on March 10, 2025, Director Gabbard's post has more than **8.4 million** "views" and 184,000 "likes" on X. *See* @DNIGabbard, X (Mar. 10, 2025, 3:11 PM), *available at* https://x.com/DNIGabbard/status/1899176257406857274.

[9] As of the date of this filing, this Presidential Memorandum has not been published in the Federal Register.

Fiona Hill, Alexander Vindman, Joseph R. Biden Jr., and any other member of
Joseph R. Biden Jr.'s family. Therefore, I hereby direct every executive department
and agency head to take all additional action as necessary and consistent with
existing law to revoke any active security clearances held by the aforementioned
individuals and to immediately rescind their access to classified information. I also
direct all executive department and agency heads to revoke unescorted access to
secure United States Government facilities from these individuals.

This action includes, but is not limited to, receipt of classified briefings, such as the
President's Daily Brief, and access to classified information held by any member
of the Intelligence Community by virtue of the named individuals' previous tenure
in the Congress.

In the event that any of the named individuals received a security clearance by
virtue of their employment with a private entity, the United States Government
entity that granted the security clearance should inform the private entity that these
individuals' ability to access classified information has been revoked.

This memorandum is not intended to, and does not, create any right or benefit,
substantive or procedural, enforceable at law or in equity by any party against the
United States, its departments, agencies, or entities, its officers, employees, or
agents, or any other person.

45.    On information and belief, Mr. Zaid appears to be the only individual specifically

named in the first paragraph of the directive who has never held a security clearance as a federal or

state employee or ever worked in any political capacity as an attorney (other than perhaps some

unnamed Biden family member). In other words, his basis for a security clearance throughout the

entirety of his professional life has been through his legal representation of clients.

46.    Notably, the Rescinding Security Clearances Memorandum actually directs the

*revocation* of the named individuals' security clearances.[10] This is in contrast to the lawsuits

recently filed in this District, where employees of plaintiff law firms are subject to the temporary

*suspension* of clearances pending a *review* by the relevant agency heads.[11]

---

[10] In an apparent misunderstanding of nomenclature, the Memorandum also references the
"rescission" of security clearances. Context suggests that the Memorandum's author(s) intended
"rescission" to be synonymous with "revocation."

[11] On May 2, 2025, Judge Beryl Howell ruled that an Executive Order *suspending* Perkins Coie's

47.     On or about April 3, 2025, Mr. Zaid received a one-page, three-paragraph memorandum from DCSA with the subject line "Revocation of Personnel Security Clearance Eligibility." The DSCA document cites the March 22, 2025 Presidential Memorandum and states as follows:

> The [March 22, 2025 Memorandum] directs every executive department and agency head to take all additional action as necessary and consistent with existing law to revoke any active security clearances held by you, and by other individuals identified or described in the [Memorandum].
>
> Pursuant to that direction, DCSA has revoked the security clearance held by you. The revocation action has been annotated in our system of record for personnel clearances.

48.     The third paragraph then directs the reader to a whitehouse.gov website which displays the Rescinding Security Clearances Memorandum. The letter is signed by the Division Chief, Adjudication and Vetting Services.

49.     On or about April 9, 2025, Mr. Zaid received a one-page, one-paragraph letter from the Central Intelligence Agency's Office of General Counsel. There is no subject line for the correspondence. The single substantive paragraph states as follows:

> I am writing regarding the Presidential Memorandum entitled "Rescinding Security Clearances and Access to Classified Information from Specified Individuals," *available at* https://www.whitehouse.gov/presidential-actions/2025/03/rescinding-security-clearances-and-access-to-classified-information-from-specified individuals. As you are aware, you were specifically identified by the White House in this memo. Pursuant to this memo, the Agency is required to "revoke any active security clearances ... and to immediately rescind [] access to classified information" for the named individuals. Accordingly, you are no longer personally permitted access to classified information in any ongoing matters that you are currently involved in with the Agency. You may continue to represent any current or future clients as you deem appropriate, but you cannot gain access to or make use of classified information in connection with such representations. To the extent necessary

---

clearances via "a publicly announced general policy governing security clearances for *any member of a class of people*—here, the class consists of employees of plaintiff" was "constitutionally suspect on multiple bases" and thus permanently enjoined. *See* Memorandum Op., *Perkins Coie LLP v. U.S. Dep't of Just.*, C.A. No. 25-cv-00716-BAH, Dkt. 185 at 37–43 (May 2, 2025) (emphasis in original).

and appropriate, you are still permitted escorted access to Agency facilities and may review unclassified materials.

50.    The letter is signed by the Deputy General Counsel for Litigation and Investigations. This particular action has a cascading adverse effect on Mr. Zaid's ability to represent other current clients given that classified information he previously learned through authorized representations benefits victims of Anomalous Health Incidents whom he has represented, including as lawful whistleblowers, dating back a decade.[12]    Moreover, restricting Mr. Zaid's ability to act on information he already knows is a constructive severance of his ongoing attorney-client relationships, as he could not possibly uphold his ethical obligations to zealously represent his clients while also ignoring crucial information relevant to their cases.  The CIA's letter thus goes even beyond what the Executive Memorandum ordered by improperly punishing Mr. Zaid for his lawful representation of clients. *See* Tom Rogan, *Trump runs defense for deep state with Mark Zaid clearance revocation,* Washington Examiner (February 11, 2025), available at: https://www.washingtonexaminer.com/opinion/beltway-confidential/3316191/trump-runs-defense-deep-state-mark-zaid-clearance-revocation/.

51.    On April 23, 2025, Mr. Zaid received an email from ODNI's Office of Inspector General that stated he was denied access to a client's classified complaint, which he has previously accessed and remains a critical part of an ongoing case, because ODNI Security determined "(U) Pursuant to Presidential direction issued on 22 March 2025 (attached), the individuals listed therein, no longer have a security clearance, are not authorized for access to classified information, and do not have unescorted access to ODNI facilities."  This client is referred to herein as John Doe-1.

_____

[12] Anomalous Health Incidents, sometimes referred to as "Havana Syndrome," are unexplained health issues and symptoms experienced by government employees, often during or following an assignment abroad.

52.    On May 1, 2025, Director Gabbard followed up her March 10 *X* post by discussing the Government's revocation of Mr. Zaid's security clearance during a sit-down interview with reporter Megyn Kelly on *The Megyn Kelly Show*.  Director Gabbard referenced Mr. Zaid by name directly as among "a number of other people" whose clearances have been revoked, while laughing about it with Ms. Kelly and agreeing it was "fun."[13]

53.    Defendant ODNI then issued a press release[14] on May 2, 2025, which Director Gabbard shared on *X* as well, which noted that she revoked security clearances of "numerous individuals who abused public trust for political purposes."[15]  A click of the hyperlink on the press release directs back to Director Gabbard's original tweet of March 10, 2025, as referenced in paragraph 40, which identifies Mr. Zaid as one of the targeted individuals.

54.    In sum, Mr. Zaid currently represents multiple clients for whom he now cannot access relevant classified information as part of his effective and zealous representation.  Defendants actions have thus obstructed ongoing attorney-client relationships in active matters where the federal government is adverse to those clients.  Furthermore, Mr. Zaid is routinely contacted by individuals who seek to retain his legal services in matters (criminal, civil and administrative) that require access to classified information.  Mr. Zaid must advise these potential clients that, as a result of Defendants' actions, his representation will be limited – and may not even be permitted as a matter of law (particularly where the prospective client's affiliation to agencies such as CIA is covert) until the Memorandum is found unconstitutional or the agencies' actions are otherwise rescinded.

---

[13] "Tulsi Gabbard on Investigating the Leaks, Fighting the Deep State, and Whether She'll Run in 2028," *The Megyn Kelly Show* (May 1, 2025), https://www.youtube.com/watch?v=6tFyUP0TgrM.

[14] ODNI News Release No. 08-25, https://www.dni.gov/index.php/newsroom/press-releases/press-releases-2025/4069-pr-08-25 (May 2, 2025).

[15] https://x.com/DNIGabbard/status/1918333364970365134?s=19.

**COUNT ONE**
**Violation of the Administrative Procedure Act**
**(Against All Agency Defendants: *Department of Defense*; *Defense Counterintelligence and*
*Security Agency*; *Central Intelligence Agency*; *Office of the Director of National Intelligence*)**

55.    Mr. Zaid hereby realleges and incorporates all allegations in the above paragraphs as if fully set forth herein.

56.    Under the Administrative Procedure Act, a court shall "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . contrary to constitutional right, power, privilege, or immunity . . . [or] . . . without observance of procedure required by law." 5 U.S.C. § 706(1) and (2)(A), (B) and (D).

57.    The Defendants failed to abide by the requirements imposed through binding regulations and Executive Orders to include, but not limited to, Executive Order 10865, Executive Order 12968, Executive Order 13467, SEAD-4, Intelligence Community Policy Guidance 704-3 and DoD Directive 5220.6. Each of these and other legally binding provisions require comprehensive and detailed explanations to be provided to Mr. Zaid prior to clearance revocation so that he may have an opportunity to respond.

58.    By taking direct action against Mr. Zaid for exercising his basic rights and carrying out his proper function as counsel and a zealous advocate for his clients, Defendants' have engaged in blatant political retribution and textbook "arbitrary and capricious" conduct. *See* 5 U.S.C. § 706(2)(A). Defendants have given no reasoned or legitimate explanation for their conduct, and ignored all procedural interests implicated by their actions.

59.    Defendants' refusal to adhere to mandated agency processes and procedures violate the Administrative Procedures Act. Their actions and inactions have already harmed and continue to harm Mr. Zaid.

**COUNT TWO**
**Violation of the Fifth Amendment (Procedural Due Process)**
**(Against All Defendants)**

60.     Mr. Zaid hereby realleges and incorporates all allegations in the above paragraphs as if fully set forth herein.

61.     When an individual is summarily denied a security clearance in a way that impairs his livelihood, that individual *must* be provided an opportunity to review and rebut the evidence that caused the injury. This has been the policy of the United States Government, to include every United States President, for nearly seven decades.

62.     Defendants' summary revocation of Mr. Zaid's clearance provided none of the procedural safeguards guaranteed to him through the Fifth Amendment, Executive Order 10865, Executive Order 12968, Executive Order 13467, DoD Directive 5220.6, and SEAD-4.  Instead, the Trump Administration ignored more than a half-century's worth of development and refinement of meaningful, thoughtfully constructed security clearance adjudication processes carefully crafted by national security experts and concerned government leaders.

63.     Apparently without even a passing thought of whether it was constitutional to do so, Defendants replaced the hard-fought, due process-based methods and procedures that have existed for decades by conducting a summary revocation of Mr. Zaid's security clearance.  They did so via a *New York Post* interview, a social media post, and a Presidential Memorandum relying on nothing more than an opaque reference to the "national interest" as opposed to a national *security* interest.

64.     None of the statements of the President quoted in the *New York Post* article, the social media posting from and latest media appearance by Director Tulsi Gabbard, the March 22, 2025 Rescinding Security Clearances Memorandum, the April 3, 2025, DCSA letter, the April 9, 2025, CIA letter, or the April 23, 2025 ODNI email provide any meaningful information that would enable Mr. Zaid to respond to the allegations contained therein.  Indeed, there are no substantive allegations

contained in any of these writings.

65.    As evident from the text of the letters quoted *supra*, the agencies issued final revocations of Mr. Zaid's clearance in reflexive response to the Rescinding Security Clearances Memorandum and without adhering to even a modicum of their own procedures and methods, as set out in, for example, Executive Orders 10865 and 12968, DoD Directive 5220.6, and SEAD-4. Thus, the Rescinding Security Clearances Memorandum is unconstitutional as applied to Mr. Zaid.

66.    The Memorandum itself is also unconstitutional on its face.  It is not possible for agencies to act "consistent with existing law" while also automatically revoking the clearance of the individuals listed in the directive.  Acting consistent with the law and issuing a summary revocation are mutually exclusive concepts, and the entire directive is unconstitutional on its face.

67.    Defendants' constitutional due process violations have already harmed and continue to harm Mr. Zaid.

## COUNT THREE
### Violation of the First Amendment (Speech, Association, Petition)
### (Against All Defendants)

68.    Mr. Zaid hereby realleges and incorporates all allegations in the above paragraphs as if fully set forth herein.

69.    The First Amendment guarantees all citizens "the freedom of speech" and the right "to petition the Government for a redress of grievances."  U.S. Const. amend. I.

70.    The Presidential Memorandum and ensuing agency actions violate the foundational concepts of citizens' right to interact with their government in two ways.

71.    First, as to Mr. Zaid's current clients whose cases require his access to classified information, Defendants have directly obstructed their ability to continue their actions and communicate with cleared counsel.  Mr. Zaid has standing to assert this First Amendment claim both on his own behalf and on behalf of his existing clients based on their attorney-client relationships.

On the issue of restricting clients' access to cleared counsel, it is helpful to envision this case at scale: if Defendants' baseless revocations of security clearances is denied review or otherwise upheld by the courts, this clears the path for limitless, large-scale summary clearance revocations of any cleared counsel who take positions opposed to the Trump Administration.

72.    The effect of this is as predictable as it is frightening: individuals seeking to challenge the Government will be constructively denied competent counsel to do so.  In the instant case, the revocation of a security clearance for an attorney of Mr. Zaid's caliber is particularly deleterious. The Trump Administration is seeking to neutralize someone viewed as an adversarial threat. Through their summary revocation of his clearance, Defendants have found a way to take Mr. Zaid off the ever-expanding chess board of their ongoing litigation battles.  Their actions also prevent him from representing clients within federal agencies, like John Doe-1, who are lawful whistleblowers or whom the Trump Administration is targeting for discipline or termination.

73.    Second, the summary revocation of Mr. Zaid's security clearance is an overt sanction of his good-faith representation of clients.  Mr. Zaid's only interactions with classified information have come from his lawful and government authorized representation of plaintiffs, defendants, and witnesses involved in administrative, legislative or judicial proceedings.  In other words, there is no indication that the revocation is a response to anything other than his proper and ethical representation of clients.  The Petition Clause does not allow the President or his agencies to punish Mr. Zaid or his clients simply because they have engaged in lawsuits or otherwise participated in legal proceedings against the Government.

74.    Defendants' violations of the First Amendment have already harmed and continue to harm Mr. Zaid.

## COUNT FOUR
### Violation of the Fifth Amendment (Vagueness)
**(Against All Defendants)**

75.    Mr. Zaid hereby realleges and incorporates all allegations in the above paragraphs as if fully set forth herein.

76.    A federal law is unconstitutionally vague in the context of Fifth Amendment Due Process Requirements if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or if it is so standardless that it authorizes or encourages seriously discriminatory enforcement.

77.    A Presidential Memorandum, like an Executive Order, is subject to judicial review.

78.    The March 22, 2025 Rescinding Security Clearances Memorandum is unconstitutionally vague and violates the Fifth Amendment's Due Process Clause.  It provides no explanation for the revocation of security clearances, other than asserting the revocations would be in the "national interest."  The variety of interpretations of what the Trump Administration deems to be in the "national interest" is nothing short of limitless.

79.    The guiding principle for security clearance adjudication is, of course, national *security*.  That the Memorandum deliberately elected to forego any reliance on a national security justification further underscores how problematic the directive is.  By relying on "national interest," Defendants test the waters for engaging in large-scale, arbitrary and discriminatory security clearance revocations based on the whims of a single Executive.  Under the guise of an undefined "national interest," Defendants could, for example, seek to rescind the security clearances of all registered Democratic voters, or all contributors (as noted by the Federal Election Commission) to the 2024 presidential campaign of Mr. Trump's opponent Kamala D. Harris.

80.    The intentionally obscure language within the Memorandum provides none of the listed individuals with any information on either the purpose or process behind the revocations.

Further, it provides none of the other estimated millions of Americans who hold security clearances any information with which they may ascertain how to avoid such a summary revocation.  It cites no compelling government interest and includes no indicators that it is narrowly tailored to meet any purported interest.

81.    By extension, the agencies' implementations of the Memorandum thus far have done little more than cite directly, and only, to the Memorandum.  Their actions are similarly deficient.

82.    Defendants' violations of the Fifth Amendment have already harmed and continue to harm Mr. Zaid.

**COUNT FIVE**
**<u>Violation of the Fifth Amendment (Right to Counsel)</u>**
**(Against All Defendants)**

83.    Mr. Zaid hereby realleges and incorporates all allegations in the above paragraphs as if fully set forth herein.

84.    The Fifth Amendment protects both lawyers' and clients' due-process rights in establishing and maintaining attorney-client relationships, including the client's right to choose counsel and the lawyer's corresponding right to maintain that representation free from arbitrary or unjustified governmental interference.  *See U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 721 (1990).

85.    Mr. Zaid will be functionally unable to carry out his duties as an attorney for his clients whose representations require classified access, for example, like John Doe-1.

86.    The Rescinding Security Clearances Memorandum includes no valid stated reasons or legitimate government interest for interfering with his ongoing client relationships, other than a meaningless reference to the "national interest."

87.    The Memorandum's restrictions therefore infringe the rights of both Mr. Zaid as a lawyer and his clients under the Fifth Amendment.

88.     Defendants' violations of the Fifth Amendment have already harmed and continue to harm Mr. Zaid and his clients.

## COUNT SIX
### Bill of Attainder
### (Against Executive Office of the President)

89.     Mr. Zaid hereby realleges and incorporates all allegations in the above paragraphs as if fully set forth herein.

90.     The Bill of Attainder Clause of the United States Constitution states that "No Bill of Attainder . . . shall be passed [by Congress]," U.S. Const. art. I, § 9.  This applies equally to the Executive Branch, as it would be unfathomable that "the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution."  *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 144 (1951) (Black, J., concurring).

91.     Defendants' actions here amount to a constitutionally prohibited Bill of Attainder, prohibited under the Due Process Clause of the Fifth Amendment as a "deprivation[] of liberty without due process of law."  The revocation of Mr. Zaid's security clearance was directed specifically towards him as an identifiable individual, summarily determined his guilt, inflicted punishment and deprived him of his livelihood, and did so without any of the procedural due process Mr. Zaid is entitled to.  On these points:

   a. The March 22, 2025 Rescinding Security Clearances Memorandum identified Mr. Zaid by name along with 14 other named individuals.  President Trump directed agencies to take specific, final action against Mr. Zaid.  Rescinding Security Clearances Memorandum, ¶ 1 ("Therefore, I hereby direct every executive department and agency head to take all additional action as necessary and consistent with existing law to revoke any active security clearances held by the aforementioned individuals and to

immediately rescind their access to classified information.")

b. That final action—revocation of his security clearance—is tantamount to a finding of "guilt" in the context of security clearance adjudicative processes.

c. President Trump's individualized targeting of Mr. Zaid has inflicted punishment. Mr. Zaid can no longer represent clients in accordance with his ethical obligations. Moreover, the public pronouncements of his unfitness to hold a clearance have damaged his reputation and livelihood as a national security lawyer.

d. As outlined above, with the stroke of a pen, Mr. Zaid was deprived of decades' worth of well-developed due process rights afforded to all other security clearance holders. He has thus been found "guilty" and without a "trial."

92.      Mr. Zaid brings this stand-alone Bill of Attainder claim to directly contest this unconstitutional unilateral action by the Executive Office of the President not otherwise authorized by Congress.

**REQUEST FOR RELIEF**

WHEREFORE, Mr. Zaid requests that this Court:

A.  Declare the March 22, 2025 Presidential Memorandum "Rescinding Security Clearances and Access to Classified Information from Specified Individuals" as facially unconstitutional;

B.  Declare the March 22, 2025 Presidential Memorandum "Rescinding Security Clearances and Access to Classified Information from Specified Individuals" as unconstitutional as applied to Mr. Zaid;

C.  Enjoin any further implementation of the Memorandum's directives as to Mr. Zaid;

D.  Rescind the Defendants' revocation of Mr. Zaid's security clearance;

E.  Require the Defendants to provide appropriate procedural and substantive due process as to Mr. Zaid;

F.  Require the Defendants to conduct a name-clearing hearing for Mr. Zaid;

G.  Award Mr. Zaid his costs and reasonable attorneys' fees incurred in this action; and,

H.  Award other relief as the Court deems just.

Dated: May 5, 2025

/s/ Abbe David Lowell
Abbe David Lowell (D.C. Bar # 358651)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., 2nd Fl.
Washington, DC 20005
Tel: 202-964-6110
Fax: 202-964-6116
alowellpublicoutreach@lowellandassociates.com

/s/ Norman L. Eisen
Norman L. Eisen (D.C. Bar # 435051)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue, SE, #15180
Washington, D.C. 20003
Tel: (202) 594-9958
norman@statedemocracydefenders.org

/s/ Margaret M. Donovan
Margaret M. Donovan (D.C. Bar # CT0026)
Christopher M. Mattei (*pro hac vice forthcoming*)
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com
cmattei@koskoff.com

/s/ Kevin T. Carroll
Kevin T. Carroll (D.C. Bar # 1021479)
1751 Pinnacle Drive
Tysons, VA 22102
Tel: 718-791-5761
kevintcarroll@hotmail.com

/s/ George W. Croner
George W. Croner (*pro hac vice forthcoming*)
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: 215-238-1700
gcroner@kohnswift.com

/s/ D.E. Wilson, Jr.
D.E. Wilson, Jr. (D.C. Bar # 932178)
LANKFORD & REED, PLLC
120 North St. Asaph Street
Alexandria, VA. 22314
Tel: 703.299.5000
ewilson@LRfirm.net

/s/ Eugene R. Fidell
Eugene R. Fidell (D.C. Bar # 112003)
FELDESMAN LEIFER LLP
1129 20th Street NW, Ste. 400
Washington, D.C., 20036
Tel: 202-466-8960
efidell@feldesman.com

*Counsel for Plaintiff Mark Zaid, Esq.*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK S. ZAID, ESQ.                    *
                                      *
    Plaintiff,                     *
                                      *
    v.                             *        Civil Action No. 25-01365 (AHA)
                                      *
EXECUTIVE OFFICE OF THE               *
PRESIDENT, <u>et. al.</u>             *
                                      *
    Defendants.                    *
                                      *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>DECLARATION OF MARK S. ZAID, ESQ.</u>

I, MARK ZAID, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a person over eighteen (18) years of age and competent to testify. I make this Declaration on personal knowledge and in support of the Plaintiff's Motion for a Preliminary Injunction.

2. I am the Plaintiff in this action.

**Professional Background**

3. I am admitted to practice law in the States of New York, Connecticut, Maryland, and the District of Columbia, as well as the D.C. Circuit, Federal Circuit, Second Circuit, and Fourth Circuit Courts of Appeals, and the United States District Courts for the District of Columbia, Maryland, Eastern District of New York, Northern District of New York, Southern District of New York, and the U.S. Court of Federal Claims.

4. I am a 1992 graduate of Albany Law School of Union University in New York, where I served as an Associate Editor of the Law Review. I completed my undergraduate education *cum laude* in 1989 at the University of Rochester, New York, with honors in Political Science and high honors in History.

5.  My law practice, which has been based in Washington, D.C., since July 1993, predominantly focuses on cases related to national security that involve members of the Intelligence, Military, and/or Law Enforcement Communities. I have been, or am currently, retained as counsel for current and former employees of Defendants Central Intelligence Agency ("CIA"), Department of Defense ("DoD"), Defense of Counterintelligence and Security Agency ("DCSA"), and the Office of the Director of National Intelligence ("ODNI"), among others.  For most of my professional career, I have held a security clearance, including up to Top Secret/Sensitive Compartmented Information (otherwise commonly known as "TS/SCI") and Q (a clearance level utilized by the Department of Energy that is the basic equivalent of TS/SCI) eligibility and have handled cases with authorized access to classified information since approximately 1995.

6.  I am widely recognized by the news media as an expert in the national security legal arena and frequently asked to comment on such topics. I have been quoted in many print articles as well as appeared in radio and television interviews. I have also written numerous articles that relate to national security legal matters.

7.  I have been specifically designated by courts as an expert in national security legal matters, including by a federal district judge as an expert witness on the issue of prepublication classification review in *Bissonnette v. Podlaski*, 2018 U.S. Dist. LEXIS 94198, *54-*63, (June 5, 2018, N.D. Ind.), and in 2017, on security and facility clearances in *Skipper v. Skipper*, Case No. 13-C-16-107613 (Howard County Circuit Court). Since 2024, I have served, at the request of the Presiding Judge of the Dallas County Probate Court, as an expert consultant for a probate case involving security clearances and facility clearances. Furthermore, I have provided expert advice in multiple matters involving individuals' security clearances, including for criminal matters in

state and county courts in Maryland, Virginia, and California, and in a civil matter in the United States District Court for the District of Columbia, but I was not specifically designated in those matters.

8.   For more than 20 years, I have taught Continuing Legal Education classes for the District of Columbia Bar Association and other jurisdictions including on "The Basics of Filing and Litigating Freedom of Information/Privacy Act Requests" (since 2003), "Defending Security Clearances" (since 2006) and "Handling Federal Whistleblower Cases" (since 2016).

9.   Since 2009, I have been named a Washington, D.C., Super Lawyer every year (including being profiled) and I am repeatedly named a "Best Lawyer" in Washingtonian Magazine's bi-annual designation for my national security or whistleblower work. The Magazine also named me one of D.C.'s 250 (2021) and 500 Most Influential People (2022 & 2023), respectively, for national security/legal intelligentsia. In 2022, the magazine awarded me the status of "Lawyer Lifetime Achievement Member." Additionally, in 2020, the Washington Metropolitan Employment Lawyer's Association named me "Attorney of the Year" for my representation of an Intelligence Community Whistleblower. Finally, in 2024, Forbes Magazine announced that I was one of the top 200 lawyers in the United States on their inaugural ranking list.

10. I taught as an adjunct professor at Johns Hopkins University in the Global Security Studies program from 2014 – 2023, and since 2024, have been at Texas A&M's George H.W. Bush School of Government & Public Service, where my course of instruction at the Masters level has been on national security issues. I also serve on the Executive Board at the Center for Ethics and the Rule of Law at the University of Pennsylvania's Annenberg Public Policy Center (*https://www.penncerl.org),* and on the Advisory Board of the International Spy Museum (*https://www.spymuseum.org).*

11. In 2017, I co-founded Whistleblower Aid (*https://whistlebloweraid.org*), a non-profit law firm that provides pro bono legal representation to whistleblowers, particularly in the national security arena and sometimes in a classified arena, and where I serve as legal counsel.

12. Since 1998, I have served as the Executive Director and founder of the James Madison Project, a Washington, D.C.-based organization with the primary purpose of educating the public on issues relating to intelligence gathering and operations, secrecy policies, national security and government wrongdoing.

13. Additionally, I am a recognized expert on the Freedom of Information Act, especially when it comes to litigation of national security Exemption One claims. I have been regularly litigating FOIA cases since 1993, as well as utilizing FOIA myself for over thirty-five years. I have delivered countless speeches on FOIA processing and litigation, including on panels at the American Society of Access Professionals. I was appointed by the Archivist of the United States to serve a two-year term (2014-2016) on the first Federal FOIA Advisory Committee. I was a co-editor of LITIGATION UNDER THE FEDERAL OPEN GOVERNMENT LAWS from 2002 – 2012.

14. I have never worked for the federal government. In fact, I have never been employed by any level of government, whether city, state or federal, as an attorney. I should also note that I have been a registered Independent my entire adult life and consider myself non-partisan. My law practice has absolutely reflected that fact as I have represented both Republicans (including those who are identified as "MAGA") and Democrats.

15. My employment as an attorney constitutes my primary source of income.

JA44

**My Authorized Access To Classified Information**

16. I have had authorized access to classified information since approximately 1995, upon my first completion of an SF-86, which is the U.S. government's National Security Questionnaire. During that initial time frame, my authorized access was based on individual agency decisions granted on a case-by-case basis and did not require the completion of a full-scale background investigation.

17. Defendant CIA, whose clandestine employees I frequently represent, terms these types of clearances "Limited Security Access" approvals. These types of approvals are equivalent to interim Secret clearances but are not subject to reciprocity from other agencies. As part of this process, I have executed countless lawyer-specific non-disclosure agreements ("NDAs"). I regularly accessed classified information in support of my clients and their cases through Defendant CIA's Limited Security Access approvals since approximately 1999, until such time my security clearance was unlawfully revoked.

18. My first fully approved security clearance—meaning, a clearance supported by a background investigation—was in or around 2002 and handled through the Department of Justice's ("DOJ") Federal Bureau of Investigation ("FBI") after Defendants CIA and Department of Defense were ordered by a federal judge in *Stillman v. DoD et al.*, 209 F.Supp.2d 185, 231 (D.D.C. 2002), to process me for access to classified information as part of ongoing First Amendment representation of a client in litigation. The D.C. Circuit noted that, as a result, the Government "found that Mr. Zaid was trustworthy," *Stillman v. CIA et al.*, 319 F.3d 546, 548 (D.C. Cir. 2003), and I was granted a "Secret" clearance.

19. DOJ's Office of Security oversaw my clearance, mostly connected to classified litigation, through on or about 2019. Between 2002 and 2019, DOJ would often reciprocally certify my

clearance to other agencies so I could attend classified briefings or otherwise converse in an interagency environment. This would include, but not be limited to, certifying my clearance eligibility to federal agencies' Offices of Inspector Generals.

20. At various times between 2003 and 2024, I was authorized access to TS/SCI material by both the FBI and the Department of Homeland Security ("DHS") on a case-by-case basis. In fact, in 2020, during President Donald Trump's first administration, my access eligibility was *increased* to TS/SCI as part of my representation of a DHS whistleblower.

21. When an individual no longer requires access to classified information, they are supposed to be debriefed and "read out" of their security access. For DHS, I was last debriefed and read out of SCI in November 2024. I learned, however, that DHS did not finalize my "read out" in the Scattered Castles system, which is the Intelligence Community database and repository used to verify personnel security access and visit certifications, until March 10, 2025.

22. Since I was first granted a security clearance in or around 2002, I have never had my eligibility suspended or revoked. I have successfully passed multiple background investigations during Republican and Democrat administrations and been adjudicated trustworthy each time.

**My Representation Of The Intelligence Community Whistleblower During The First Trump Administration**

23. In September 2019, I began representing a whistleblower within the Intelligence Community ("IC Whistleblower") who had five weeks earlier filed a classified complaint with Defendant ODNI's Office of Inspector General regarding President Trump's interactions with Ukrainian President Volodymyr Zelensky. This complaint ultimately led to the first impeachment of President Trump, although no aspect of my legal representation of the IC Whistleblower involved advocating for any specific outcome, much less the decision to impeach a president. My work for this client had three objectives: (1) ensure the IC Whistleblower's

6

JA46

complaint reached the proper oversight authorities; (2) protect the anonymity of the IC

Whistleblower; and (3) shield the IC Whistleblower from retaliation. Each of these objectives

was successfully achieved.

24. As I have done with every administration since President William J. Clinton assumed

office in 1993, I handled cases involving various government officials, including President

Trump and his Administration shortly after he was inaugurated in January 2017. But it was not

until the 2019 IC Whistleblower matter that I apparently came onto President Trump's radar and

sparked his ire and that of his loyalists both inside and outside the government.

25. In the aftermath of my role as legal counsel becoming public, President Trump called me

a "sleazeball" while he was speaking at a televised political rally in Louisiana in November

2019, and he displayed a photo of someone he said was me.[1] To my knowledge, this was the

first time an American President has publicly commented about me or my representation of a

client. The multitude of vitriolic attacks that I received because of President Trump and right-

wing media mentioning me actually led to one of the President's devotees sending me an e-mail

that "traitors must die miserable deaths" and that he and other of President Trump's followers

"will hunt you down and bleed you out." That specific threat was fully prosecuted by President

Trump's DOJ and the individual served over a year in jail as a result.[2]

---

[1] Washington Examiner, *https://www.washingtonexaminer.com/news/2767712/sleazeball-trump-condemns-whistleblowers-attorney-for-calling-for-a-coup-in-2017-tweets/#google_vignette* (November 6, 2019). President Trump's recorded remarks about me can be viewed at *https://www.facebook.com/watch/live/?ref=watch_permalink&v=2550184791701934* (beginning at 11:48).

[2] Politico, *https://www.politico.com/news/2021/06/10/man-threatened-whistleblower-gets-sentence-493159* (June 10, 2021).

26. Days after the Louisiana rally, President Trump spoke to reporters at the White House about the IC Whistleblower and stated: "The whistleblower, because of that, should be revealed. And his lawyer, who said the worst things possibly two years ago, he should be sued and maybe for treason. Maybe for treason, but he should be sued. His lawyer is a disgrace."[3]

27. Notwithstanding President Trump's public attacks on me, the first Trump Administration never initiated any adverse action against my security clearance. In fact, the following year in 2020, I was processed and approved by DHS for access to TS/SCI — an even higher level of security clearance than I had held in 2019 — for my role representing a client in another high-profile whistleblower case.

**The Defendants' Revocation Of My Security Clearance**

28. On Saturday, February 8, 2025, I learned that the *New York Post* had reported on an interview with President Donald Trump where he stated an intent to conduct a mass revocation of security clearances for a wide-ranging set of current and former government employees.[4] Although I did not fit within that category, I was specifically identified as part of that group and it was noted that my security clearance was to be revoked because of my 2019 representation of an Intelligence Community whistleblower whose complaint had led to President Trump's first impeachment.

---

[3] American Journal News, *https://americanjournalnews.com/donald-trump-treason-ukraine-whistleblower-impeachment-mark-zaid-twitter-coup* (November 8, 2019)(video of President Trump embedded within story).

[4] Miranda Devine, *Trump stripping the security clearances of numerous antagonists — including NY AG Letitia James, DA Alvin Bragg*, New York Post (February 8, 2025).

29. Approximately one month later, on March 10, 2025, the Director of National Intelligence

Tulsi Gabbard published the following statement on social media platform X[5]:



30. On March 22, 2025, President Trump published a Presidential Memorandum on

*www.whitehouse.gov* addressed to "the heads of executive departments and agencies." The

subject of the memorandum was titled "Rescinding Security Clearances and Access to Classified

Information from Specified Individuals." The four-paragraph Memorandum states as follows:

> I have determined that it is no longer in the national interest for the following
> individuals to access classified information:  Antony Blinken, Jacob Sullivan,
> Lisa Monaco, Mark Zaid, Norman Eisen, Letitia James, Alvin Bragg, Andrew
> Weissmann, Hillary Clinton, Elizabeth Cheney, Kamala Harris, Adam
> Kinzinger, Fiona Hill, Alexander Vindman, Joseph R. Biden Jr., and any other
> member of Joseph R. Biden Jr.'s family.  Therefore, I hereby direct every
> executive department and agency head to take all additional action as necessary
> and consistent with existing law to revoke any active security clearances held
> by the aforementioned individuals and to immediately rescind their access to
> classified information.  I also direct all executive department and agency heads
> to revoke unescorted access to secure United States Government facilities from
> these individuals.
>
> This action includes, but is not limited to, receipt of classified briefings, such as
> the President's Daily Brief, and access to classified information held by any

---

[5] Since its initial posting on March 10, 2025, Director Gabbard's post has more than 8.4 million
"views" and 184,000 "likes" on X. *See* @DNIGabbard, X (Mar. 10, 2025, 3:11 PM), available at
*https://x.com/DNIGabbard/status/1899176257406857274*.

member of the Intelligence Community by virtue of the named individuals'
previous tenure in the Congress.

In the event that any of the named individuals received a security clearance by
virtue of their employment with a private entity, the United States Government
entity that granted the security clearance should inform the private entity that
these individuals' ability to access classified information has been revoked.

This memorandum is not intended to, and does not, create any right or benefit,
substantive or procedural, enforceable at law or in equity by any party against
the United States, its departments, agencies, or entities, its officers, employees,
or agents, or any other person.

31. On April 3, 2025, I received a one-page, three-paragraph memorandum from Defendant

Defense Counterintelligence and Security Agent ("DCSA") with the subject line "Revocation of

Personnel Security Clearance Eligibility." The DSCA document cited to the March 22, 2025

Presidential Memorandum and stated as follows:

The [March 22, 2025 Memorandum] directs every executive department and
agency head to take all additional action as necessary and consistent with
existing law to revoke any active security clearances held by you, and by other
individuals identified or described in the [Memorandum].

Pursuant to that direction, DCSA has revoked the security clearance held by
you. The revocation action has been annotated in our system of record for
personnel clearances.

32. The third paragraph then directs the reader to the *www.whitehouse.gov* website which

displays the Rescinding Security Clearances Memorandum. The letter was signed by the

Division Chief, Adjudication and Vetting Services.

33. On April 9, 2025, I received a one-page, one-paragraph letter Defendant CIA's Deputy

General Counsel for Litigation and Investigations, Office of General Counsel. There is no

subject line for the correspondence and the single substantive paragraph stated as follows:

I am writing regarding the Presidential Memorandum entitled "Rescinding
Security Clearances and Access to Classified Information from Specified
Individuals," *available at* https://www.whitehouse.gov/presidential-
actions/2025/03/rescinding-security-clearances-and-access-to-classified-
information-from-specified-individuals. As you are aware, you were

10

JA50

specifically identified by the White House in this memo. Pursuant to this memo, the Agency is required to "revoke any active security clearances ... and to immediately rescind [] access to classified information" for the named individuals. Accordingly, you are no longer personally permitted access to classified information in any ongoing matters that you are currently involved in with the Agency. You may continue to represent any current or future clients as you deem appropriate, but you cannot gain access to or make use of classified information in connection with such representations. To the extent necessary and appropriate, you are still permitted escorted access to Agency facilities and may review unclassified materials.

34. On April 23, 2025, I received an e-mail from Defendant Office of the Director of National Intelligence's ("ODNI") Office of Inspector General that stated I was being denied access to a whistleblower client's classified complaint (discussed in more detail below), which I had previously accessed and remains a critical part of an ongoing lawsuit, because ODNI Security determined "(U) Pursuant to Presidential direction issued on 22 March 2025 (attached), the individuals listed therein, no longer have a security clearance, are not authorized for access to classified information, and do not have unescorted access to ODNI facilities." This client is referred to in my Complaint and herein as John Doe-1.

35. On May 1, 2025, DNI Gabbard discussed the Defendants' revocation of my security clearance during a sit-down interview with reporter Megyn Kelly on *The Megyn Kelly Show*. DNI Gabbard actually referenced me by name directly as among "a number of other people" whose clearances have been revoked, and laughed about it with Ms. Kelly and agreed it was "fun."[6]

---

[6] "Tulsi Gabbard on Investigating the Leaks, Fighting the Deep State, and Whether She'll Run in 2028," *The Megyn Kelly Show* (May 1, 2025), *https://www.youtube.com/watch?v= 6tFyUP0TgrM*.

36. Defendant ODNI then issued a press release[7] on May 2, 2025, which DNI Gabbard shared on *X* as well, which noted that she revoked security clearances of "numerous individuals who abused public trust for political purposes."[8] A click of the hyperlink on the press release directs back to DNI Gabbard's original tweet of March 10, 2025, which I am identified as one of the targeted individuals.

37. This extraordinary national publication of the revocation of my clearance without process has caused colleagues, friends, family, and even adversaries to reach out to me out of concern. It is apparent to me that news of the revocation was intended to, and did, reach a wide audience, including an invaluable client pool.

38. I have never received any procedural or substantive due process that is "consistent with existing law" as set forth in the Rescinding Security Clearances Memorandum.

**My Use And Reliance As An Attorney On A Security Clearance**

39. I often represent individuals in administrative, civil or criminal matters where classified information is involved, and for those matters I must be able to maintain an active security clearance as an attorney. I have been handling classified cases since approximately 1995.

40. Some of my cases involving classified information were/are very high profile, in that they involved serious allegations against or by government officials. For example, among many other clients for which I had authorized access to classified information, I represented (a) Jeffrey Sterling, a former case officer for the Central Intelligence Agency ("CIA") who was criminally prosecuted under the Espionage Act, as well as handled his civil proceedings against the Agency

---

[7] ODNI News Release No. 08-25, *https://www.dni.gov/index.php/newsroom/press-releases/press-releases-2025/4069-pr-08-25* (May 2, 2025).

[8] *https://x.com/DNIGabbard/status/1918333364970365134?s=19*.

and litigated the State Secrets Privilege[9], (b) SSgt Frank Wuterich, U.S. Marine Corps, who was

criminally prosecuted for alleged war crimes committed in Haditha, Iraq[10]; (c) the anonymous IC

Whistleblower whose classified complaint ultimately led to the first impeachment of President

Donald Trump[11]; and (d) Brian Murphy, the highest ranking whistleblower in modern times who

in 2020 was the Acting DHS Undersecretary of Intelligence and for whose case the first Trump

Administration increased my classified access to TS/SCI.[12]

41. In fact, some of my clients are covert intelligence officers for the U.S. government and

their very affiliation with any specific agency is itself classified. There are even occasions where

only I, and not my client, have had authorized access to classified information concerning their

case. Meaning, the client was not permitted to access the classified information to assist with

their own matter, but I, as cleared legal counsel, was permitted the opportunity to do so and

zealously advocate on their behalf, whatever the case might involve. The last time this scenario

arose was in November 2024 at the TS/SCI level.

42. The revocation of my security clearance has had a cascading adverse effect on my ability

to represent current clients, most notably victims of Anomalous Health Incidents ("AHI") of

---

[9] Courthouse News Service, *https://www.courthousenews.com/feds-subpoenaed-lawyer-for-alleged-cia-turncoat* (January 25, 2011).

[10] Reuters, *https://www.reuters.com/article/world/marine-faces-murder-charges-in-haditha-killings-idUSWBT006331* (August 9, 2007).

[11] NBC, *https://www.nbcnews.com/politics/trump-impeachment-inquiry/whistleblowers-welcome-mark-zaid-represents-trump-accuser-others-secrets-share-n1071811* (October 29, 2019).

[12] Reuters, *https://www.reuters.com/article/us-usa-election-whistleblower-idUSKBN2712U7* (October 16, 2020).

which I represent more than two dozen.[13] I have been representing AHI victims, some of whose

very affiliation with the U.S. government remains classified, for over ten years. I have relied on

my security clearance for many of my AHI clients, especially in participating in classified

meetings with Members of Congress and their staff. For example, on May 8, 2024, I testified

before the Subcommittee On Counterterrorism, Law Enforcement, And Intelligence, Committee

On Homeland Security, House of Representatives, in its hearing on "Silent Weapons: Examining

Foreign Anomalous Health Incidents Targeting Americans In The Homeland And Abroad" and

explained my representation of AHI victims and highlighted how much of my work is in the

classified arena.[14]

43. One of my AHI related clients is a whistleblower, John Doe-1, who currently serves

within the Intelligence Community. I assisted this individual in filing an anonymous classified

complaint with Defendant ODNI regarding allegations of a deliberate cover-up by the U.S.

government, most significantly Defendant CIA, over evidence of a foreign government's

involvement in intentionally targeting U.S. officials and their families with directed energy. I

had authorized access to the portions of this whistleblower complaint that were classified Secret

on multiple occasions, and could previously access them upon request, prior to the unlawful

revocation of my clearance. I am currently handling a FOIA lawsuit to compel disclosure of this

whistleblower complaint in *James Madison Project et. al. v. CIA et. al.*, Civil Action No. 23-

3457 (D.D.C.)(APM). I was recently denied access to this document by Defendant ODNI

because I have had my security clearance unlawfully revoked. My denied access to this

---

[13] Anomalous Health Incidents, misleadingly referred to in the media as "Havana Syndrome," are unexplained health issues and symptoms believed to be caused by directed energy that have been experienced by government employees and their families both abroad and domestically.

[14] The hearing can be viewed at *https://homeland.house.gov/hearing/silent-weapons-examining-foreign-anomalous-health-incidents-targeting-americans-in-the-homeland*.

document not only affects my representation of John Doe-1, but also hinders my ability to represent other AHI clients, such as Marc Polymeropolous, a former CIA case officer.

44. The loss of my security clearance significantly hampers my ability to zealously advocate for my clients, especially my AHI victims. For some of them, it literally destroys my ability to do much of anything on their behalf and constructively severs aspects of my ongoing attorney-client relationships. For example, Defendant CIA's letter emphasizes that I am "no longer personally permitted access to classified information in any ongoing matters that you are currently involved in with the Agency." I interpret this additional retaliatory action as being specifically directed at my representation of AHI victims, such as Marc Polymeropolous, as Defendant CIA is aware that I was bringing whistleblowers to meet with the appropriate Congressional oversight committees for classified meetings in which I was participating and the Agency desires to prevent this from occurring.[15] Each of these opportunities I had to directly engage with Congress in classified meetings concerning AHIs significantly benefited my AHI clients, including Marc Polymeropolous. In that sense, Defendants' actions are not just affecting me and my clients, but also our ability to access and inform the legislative branch of government on matters that potentially affect hundreds, if not more than a thousand, of known AHI victims.

45. I have many clients in the same circumstances but they are not at liberty to publicly raise these claims themselves because either their identity and relationship to the U.S. government is classified, or they remain employed by the Trump Administration and would likely face immediate repercussions (not to mention issues surrounding confidentiality and privilege).

---

[15] *See* Tom Rogan, *Trump runs defense for deep state with Mark Zaid clearance revocation,* Washington Examiner (February 11, 2025), available at *https://www.washingtonexaminer.com/. opinion/beltway-confidential/3316191/trump-runs-defense-deep-state-mark-zaid-clearance-revocation.*

Defendants' actions have put my clients and I in an impossible position, and I cannot risk causing them further harm simply to help me.

46. Since the unlawful revocation of my security clearance, I am still routinely asked to participate in classified matters within the administrative, civil and criminal arenas. Unfortunately, I have already had to turn down prospective clients, from referrals and otherwise, who have approached me for representation, when it became obvious that access to classified information would be an essential requirement in their matter.

47. The revocation does not just impact my ability to represent clients. It personally harms my eligibility for a security clearance in perpetuity. I will now need to disclose this revocation on any future SF-86 (National Security Questionnaire) in Section 25 ("Investigations and Clearance Record") and it will always stand as a black mark on my record.

48. Therefore, the unlawful revocation of my security clearance will have – and is already having – a profound impact on my law practice and livelihood in general.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true to the best of my knowledge.

Date:   May 20, 2025

Mark S. Zaid, Esq.

16

JA56

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

MARK S. ZAID, ESQ.

    Plaintiff,

  v.              Civil Action No. 1:25-cv-01365

EXECUTIVE OFFICE OF THE PRESIDENT
et al.

    Defendants.

### DECLARATION OF MARC POLYMEROPOLOUS[1]

1.   I am a person over eighteen (18) years of age and competent to testify. I make this Declaration on personal knowledge and in support of the Plaintiff Mark S. Zaid's Motion for a Preliminary Injunction.

### I.   Personal and Factual Background

2.   I retired in June 2019 from the CIA's Senior Intelligence Service rank after a 26-year career in operational headquarters and field management assignments covering the Middle East, Europe, Eurasia, and Counter Terrorism. I served extensively in several conflict zones and received the Distinguished Career Intelligence Medal, the Distinguished Intelligence Medal, the Intelligence Medal of Merit, and the Intelligence Commendation Medal. My last position prior to retirement was overseeing CIA's clandestine operations in Europe and Eurasia.

3.   Since 2021, I have served as a nonresident senior fellow at the Atlantic Council and am a regular media commentator on foreign policy and intelligence matters, including as a national

---

[1] Due to my status as a former Senior Intelligence Officer with the CIA, this Declaration was submitted for pre-publication review on May 15, 2025, and it was cleared for public release on May 19, 2025.

security contributor for MSNBC.  In June 2021, I authored a book, *Clarity in Crisis: Leadership Lessons from the CIA*, published by Harper Collins.

4.      During my tenure at the CIA, as part of field assignments and operations, I spent significant time in various countries around the world.

5.      During one particular trip to Russia in December 2017, while on CIA assignment, I experienced an "Anomalous Health Incident" or "AHI"—colloquially referred to in the media as "Havana Syndrome."  AHIs are unexplained health issues and events that have been experienced by a growing number of federal employees and their families, particularly within the Intelligence Community, and generally involve a sudden onset of debilitating symptoms, including severe headaches, loss of balance and reduced cognitive function.  After experiencing this mysterious health event during my trip to Russia, I endured eighteen months of constant headaches and other debilitating symptoms that ultimately caused my premature retirement from the CIA in 2019.

6.      Since my retirement, I have been an outspoken advocate for AHI victims. I have provided classified information to both the Senate and House Intelligence Committees, as well as given countless media interviews (all of an unclassified nature) on the subject.  I went public—and was the first CIA AHI victim to do so—when I was featured in an October 19, 2020, article by GQ entitled "The Mystery of the Immaculate Concussion," which is available at: *https://www.gq.com/story/cia-investigation-and-russian-microwave-attacks*.    More than one thousand American government employees (as well as their family members) serving ████████ ████████ around the world, and even here in the United States, have reported being victimized by an AHI.  I personally know many AHI victims, especially from within CIA, including a number of whom are Mr. Zaid's clients.

2

7.      The issue has spawned congressional investigations, lawsuits and intense advocacy efforts.  Reports of AHIs impacting US officials have been publicly reported in, among other places, Cuba, China, Russia, Austria, India, Vietnam, the United Kingdom, Colombia and even near the White House in Washington, D.C., as well as elsewhere within the United States. Many people hold the view that the Intelligence Community, and notably CIA, is covering up the truth surrounding the perpetrator(s) of AHIs.  Much of the evidence concerning AHIs remains classified, and purposefully so that it prevents most people, including private attorneys, from being able to lawfully access the information.

8.      Mr. Zaid has represented victims of AHIs, including current and former government employees as well as lawful whistleblowers, for more than a decade.  His reputation in this area precedes him, and that is why I, like many other current and former government employees, specifically sought him out for legal assistance on this matter.

**II.      Retention of Mr. Zaid As My Legal Counsel**

9.      As a victim of an AHI, I have been highly critical of the U.S. government and particularly CIA's handling and investigation of AHIs.

10.     I retained Mr. Zaid in September 2020, to help me on all matters related to my AHI, and especially to navigate through CIA's bureaucracy to ensure I received proper healthcare treatment.  We have an agreement as to financial compensation in exchange for these services.  I was aware at the time I retained Mr. Zaid that he held a security clearance and that there might be opportunities for him to rely upon that privilege to help pursue and further my interests, as well as those of other AHI victims who he represented. Mr. Zaid's authorized access to classified information was a significant factor in my retaining him as my legal counsel, and I and his other clients have greatly benefited from this fact.

11.     In January 2021, amid public scrutiny and pressure, which without a doubt involved Mr. Zaid's efforts, CIA agreed to send me to Walter Reed Medical Center, in Washington, D.C., to receive treatment for my AHI injuries. I continue to receive medical treatment care of the U.S. government to this day.

12.     Mr. Zaid has continued to represent me in all matters relating to my AHI through the present day.  I credit Mr. Zaid with helping save my life, as my medical condition had deteriorated significantly prior to gaining entry to Walter Reed's Traumatic Brain Injury program.

13.     I have personal knowledge that during nearly the entirety of his representation of my interests—until the recent Presidential Memorandum—Mr. Zaid possessed a Top Secret clearance. I am personally aware that Mr. Zaid has actively relied upon and utilized his security clearance on behalf of myself and other AHI victims, particularly for purposes of participating in classified meetings with staff of the Senate Select Committee on Intelligence and House Permanent Committee on Intelligence.  Mr. Zaid has especially represented whistleblowers on the matter of AHIs in classified settings.

14.     This includes the circumstances of the client identified as John Doe-1, who I know to be the individual whose classified whistleblower complaint, which Mr. Zaid has had authorized access to, is the subject of litigation being handled by Mr. Zaid in *JMP et al. v. ODNI*, Civil Action No. 23-cv-03457-APM (D.D.C.).  Because many of the AHI victims and the circumstances that led to the incidents are believed to be related, each of these opportunities for Mr. Zaid to rely upon his security clearance served as a clear benefit to me, specifically, and generally to all of his AHI clients.

15.     I have reviewed the Complaint filed in this matter, and I am aware that the Department of Defense and CIA have revoked Mr. Zaid's security clearance, and that the Office of the Director of National Intelligence has prohibited Mr. Zaid from again reviewing the classified

whistleblower complaint referenced in the above paragraph. In reading CIA's revocation letter dated April 9, 2025, it is clear to me that Mr. Zaid is being targeted so as to prevent him from making use of classified information, which he previously already had authorized access to, pertaining to AHI cases that has been relied upon to directly benefit my representation.

16.     The blanket revocation of Mr. Zaid's security clearance by Presidential Memorandum functionally and effectively prevents him from zealously representing me, as well as other AHI victims, in federal courts, in matters before Congress, and before federal agencies because our representation requires him to have classified access.

17.     Mr. Zaid's loss of his security clearance, without any particularized reason or justification or ability to challenge the revocation, has deprived me of his unique qualifications and expertise, and of my choice of counsel. There is no other attorney I trust who has the type of expertise on AHI matters, let alone holding authorized access to classified information, besides Mr. Zaid.

I do solemnly affirm under the penalties of perjury that the contents of the foregoing are true to the best of my knowledge.

Dated: May 16, 2025

Marc Polymeropoulos

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK S. ZAID, ESQ.

          Plaintiff,

    v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al*.

          Defendants.

Civil Action No.: 1:25-cv-1365-AHA

## **EXPERT REPORT OF J. WILLIAM LEONARD**

I, J. WILLIAM LEONARD, declare as follows:

1.      I have agreed to testify *pro bono* as an expert witness in the above matter based upon the expertise I developed during the course of a 34-year career as a Federal public servant in the national security arena and more than 50 continuous years of experience as a cleared individual.

## I.      BACKGROUND AND CREDENTIALS

2.      I was employed by the Department of Defense ("DoD") from 1973 to 2002.  My entire tenure involved the area of Personnel Security.  For the first 23 years of my career, I served in various roles of increasing responsibility at the Defense Investigative Service, which was the precursor to today's Defense Counterintelligence and Security Agency.  *See* https://www.dcsa.mil/. In these roles I had operational responsibilities in the DoD's program providing oversight to private sector entities, to include defense contractors and law firms, and their employees who required access to classified national security information.  From 1992 to 1996, I served as the Assistant Deputy Director at the Defense Investigative Service, where I was responsible for a wide range of policy and operational matters pertaining to the DoD's administration of the National Industrial Security Program ("NISP").  *See* https://www.dcsa.mil/Industrial-Security/National-Industrial-

Security-Program-Oversight.  The NISP is the federal program that manages the access of private industry to classified information.  Among other things, I was responsible in that role for the Field Services Division, the Counterintelligence Office, and all overseas operations of the Defense Investigative Service in Europe, the Middle East, Central and South America, and the Far East. My responsibilities included reviewing submittals to the Office of the Secretary of Defense recommending the suspension of personnel security clearances of private sector individuals when appropriate.

3.     From 1996 to 1998, I served as the Director of Security Programs for the DoD, and from 1999 to 2002, I served at times as the Deputy Assistant Secretary of Defense ("DASD") responsible for security and information operations, and at other times as the Principal Director in that office.   As the DASD, I was the most senior official in the DoD responsible for all security, counterintelligence, computer security, infrastructure protection, and information operations programs within the DoD.   Part of my responsibility at the Pentagon was to develop and oversee policies to ensure the proper protection of classified information within the entirety of the DoD as well as within private sector entities that did business with the DoD.   These policies included the granting, revocation, and suspension of personnel security clearances for military and civilian members of the DoD and for employees of DoD-affiliated private sector entities, to include law firms, that required access to classified national security information.   As DASD, I was the final authority resolving matters relating to security clearance issues.   In 2002, I was a recipient of the Presidential Meritorious Rank, an award that recognizes a select group of career members of the Senior Executive Service ("SES") for exceptional performance over an extended period of time.

4.     From 2002 to January 2008, I served as the Director of the Information Security Oversight Office ("ISOO") during the Administration of President George W. Bush.    ISOO

receives its policy and program guidance from the National Security Council and is an administrative component of the National Archives and Records Administration. *See* https://www.archives.gov/isoo. The Director of ISOO is known colloquially as the "Classification Czar" because the Director is responsible for oversight of the government-wide classification system and aspects of the security clearance process. I was appointed to this position with the approval of President Bush, and in this role I oversaw the entire Executive Branch's classification and handling of classified national security information.

5.     The Director of ISOO has authority to access more classified information than anyone in the government other than the President and Vice President. As the Director of ISOO, I was the primary official charged with the responsibility to ensure that all Executive Branch agencies properly classified and declassified national security information and appropriately granted and restricted access to classified national security information in accordance with established policy. To that end, I had a primary role in the drafting, editing, and issuance by President George W. Bush of Executive Order 13292 (2003), which amended Executive Order 12958 (1995), and established the Federal government's policies with respect to classifying, safeguarding, and declassifying national security information.

6.     As the Director of ISOO, I was also the primary official charged with the responsibility to ensure that Executive Branch agencies appropriately implemented the NISP. The NISP policies that I oversaw included policies around the granting, revocation, and suspension of personnel security clearances for employees of private sector firms that required access to classified national security information in support of Executive Branch agencies or in working with other cleared private sector entities.

7.     In my various capacities with the Federal government, it was my responsibility on a regular basis to recommend and/or determine whether security clearances should be granted, suspended, or revoked, and whether information which an agency sought to classify or keep classified met the appropriate classification criteria.

8.     Between 2008 and 2010, I served as the principal of my own consulting firm advising on security issues related to national defense, homeland security, and counterintelligence. My area of expertise included the investigation and adjudication of personnel security clearances; assessments of the foreign ownership, control, and influence of cleared U.S. defense industry; and the protection of critical infrastructures.  I also served as an adjunct professor of political science at St. Mary's College of Maryland.

9.     Between 2010 and 2019, I served as the Chief Operating Officer of the National Endowment for Democracy, a nongovernmental, nonprofit foundation dedicated to the growth and strengthening of democratic institutions around the world.

10.     While I am retired from full-time employment, I currently serve as a member of the board of directors for a company cleared by the DoD under the terms of a special security agreement.   In this capacity, I am required to retain a personnel security clearance, and my responsibilities include ensuring that the cleared firm and its personnel properly safeguard classified information as well as ensuring that the firm's foreign-owned parent is precluded from accessing classified and other sensitive U.S. Government information.   As such, I have remained abreast of all official policy and requirements for the protection of classified national security information, as well as the standards for approving, suspending, denying, or revoking security clearances.  I have been continuously cleared (i.e., have held an active security clearance) at all times between 1973 and the present.

11.    I hold a Master of Arts degree in International Relations from Boston University and a Bachelor of Arts degree in History from Saint John's University.

## II.    RETENTION IN THIS MATTER AND RELATED DISCLOSURES

12.    In May 2025, I was approached by counsel to Mark Zaid to discuss this case, which relates to a Presidential Memorandum dated March 22, 2025, entitled "Rescinding Security Clearances and Access to Classified Information from Specified Individuals," DCPD-202500388 ("Clearance Recission Memorandum").  More specifically, I was asked to address the purported determination by the President set forth in the Clearance Recission Memorandum that "it was no longer in the national interest" for Mark Zaid, among others, to access classified information.  The Memorandum directed the revocation of any active security clearances held by Mark Zaid, among others, and to immediately rescind his access to classified information.  The Memorandum further directed all executive department and agency heads to revoke unescorted access to secure United States Government facilities from Mark Zaid, among others.  After reviewing the Clearance Recission Memorandum, I agreed to offer the opinions in this report in the capacity of an expert witness based on my experience and credentials above.  I am doing so without compensation, as my sole motivation for involvement in this present matter is my concern for the integrity of the processes around security clearances, a key tool intended to safeguard the security of our nation and the American people.   I have devoted the great majority of my professional career to the protection of our national security through rigorous application of fair criteria determining (1) what information should be classified and (2) which individuals are entitled to access to such information, and on what terms.

13.    In the years since my retirement from public service, I have served as a *pro bono* expert in several prior court proceedings, including in the parallel litigation against Executive Order 14230, entitled "Addressing Risks from Perkins Coie LLP," 90 Fed. Reg. 11781, *see Perkins*

*Coie LLP v. U.S. Department of Justice*, Dkt. 39-8, No. 1:25-cv-716-BAH (D.D.C. Apr. 2, 2025),

and against Executive Order 14250 entitled "Addressing Risks from WilmerHale," 90 Fed. Reg.

14549 (March 27, 2025), *see Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the*

*President, et al.*, Dkt. 16-5, No. 1:25-cv-917-RJL (D.D.C. Apr. 8, 2025). In all such instances, as

in this case, I have made it clear to the counsel that I would become involved in their case not as an

advocate for a party but rather as an advocate for the integrity of the national security classification

and clearance systems.

14.     A list of publications that I have authored in the last ten years is attached as Exhibit 1.

I have not testified in any case as an expert at trial or by deposition in the last four years.  The

facts or data I have considered in forming my opinions are set forth in Section III below.

## III.    SUMMARY OF RELEVANT FACTS

### A.    Presidential Memorandum Dated March 22, 2025 and Related Events

15.     On February 8, 2025, the *New York Post* reported on President Trump's alleged

intent to conduct a mass revocation of security clearances for a wide-ranging set of current and

former government employees, and referenced Mr. Zaid, a lawyer, who was identified in the article

in connection with one of his past whistleblower clients.  Zaid Compl. ¶ 39.  The article is available

online.      *See*   https://nypost.com/2025/02/08/us-news/trump-stripping-the-security-clearances-

from-a-new-hit-list-of-antagonists-including-ny-ag-letitia-james-da-alvin-bragg/ (Feb. 8, 2025).

16.     On March 10, 2025, Director of National Intelligence Tulsi Gabbard posted on

social media platform X a statement that "Per @POTUS directive," she had "revoked security

clearances and barred access to classified information for Antony Blinken, Jake Sullivan, Lisa

Monaco, **Mark Zaid**, Norman Eisen, Letitia James, Alvin Bragg, and Andrew Weissman, along

with the 51 signers of the Hunter Biden 'disinformation' letter."  Zaid Compl. ¶¶ 41-42 (emphasis

added).  This blanket revocation included revoking Mr. Zaid's clearance, who maintained an active security clearance in the context of fulfilling his obligation as a lawyer to represent his clients.

17.     Twelve days later, on March 22, 2025, the Trump White House published a Presidential Memorandum online addressed to "the heads of executive departments and agencies," entitled "Rescinding Security Clearances and Access to Classified Information from Specified Individuals."  *See* https://www.whitehouse.gov/presidential-actions/2025/03/rescinding-security-clearances-and-access-to-classified-information-from-specified-individuals/.     The following points contained in the Presidential Memorandum are relevant to this report.

18.     The Presidential Memorandum is directed to "the heads of executive departments and agencies" and directs the summary revocation of the security clearances of a group of individuals.  The Memorandum reads, in relevant part, "I have determined that it is no longer in the national interest for the following individuals to access classified information:  Antony Blinken, Jacob Sullivan, Lisa Monaco, **Mark Zaid**, Norman Eisen, Letitia James, Alvin Bragg, Andrew Weissmann, Hillary Clinton, Elizabeth Cheney, Kamala Harris, Adam Kinzinger, Fiona Hill, Alexander Vindman, Joseph R. Biden Jr., and any other member of Joseph R. Biden Jr.'s family.  Therefore, I hereby direct every executive department and agency head to take all additional action as necessary and consistent with existing law **to revoke any active security clearances** held by the aforementioned individuals and **to immediately rescind their access to classified information**.  I also direct all executive department and agency heads to revoke unescorted access to secure United States Government facilities from these individuals."  *Id.* (emphasis added).

19.     Shortly after publication of the Presidential Memorandum, on or about April 3, 2025, Mr. Zaid received a one-page, three-paragraph memorandum from the Defense of

Counterintelligence and Security Agency with the subject line, "Revocation of Personnel Security Clearance Eligibility." It stated: "The [March 22, 2025 Rescinding Security Clearances Memorandum] directs every executive department and agency head to take all additional action as necessary and consistent with existing law to revoke any active security clearances held by you, and by other individuals identified or described in the [Memorandum]. Pursuant to that direction, DCSA has revoked the security clearance held by you. The revocation action has been annotated in our system of record for personnel clearances." Zaid Compl. ¶ 47.

20.    Then, on or about April 9, 2025, Mr. Zaid received a one-page, one-paragraph letter from the Central Intelligence Agency's Office of General Counsel, which stated, in relevant part, as follows: ". . . As you are aware, you were specifically identified by the White House in this [March 22, 2025 Presidential Memorandum]. Pursuant to this memo, the Agency is required to 'revoke any active security clearances ... and to immediately rescind [] access to classified information' for the named individuals. Accordingly, you are no longer personally permitted access to classified information in any ongoing matters that you are currently involved in with the Agency." *Id.* ¶ 49. The "you" referenced in the April 9 correspondence refers to Mr. Zaid. The letter is signed by the CIA's Deputy General Counsel for Litigation and Investigations. *Id.* ¶ 50.

21.    On April 23, 2025, Mr. Zaid received an email from the Office of the Director of National Intelligence ("ODNI")'s Office of Inspector General that stated he was denied access to a client's classified complaint, which he has previously accessed, because ODNI Security determined "(U) Pursuant to Presidential direction issued on 22 March 2025 (attached), the individuals listed therein, no longer have a security clearance, are not authorized for access to classified information, and do not have unescorted access to ODNI facilities." *Id.* ¶ 51. Mr. Zaid had maintained a TS/SCI clearance, for which information classified at that level carries a greater exposure to details that implicitly or explicitly implicate intelligence sources or methods.

### B.       Public Commentary by Director Gabbard and Social Media Postings

22.      On May 1, 2025, DNI Director Gabbard publicly discussed the government's revocation of Mr. Zaid's security clearance during a sit-down interview with reporter Megyn Kelly. Director Gabbard referenced Mr. Zaid by name directly as among "a number of other people" whose clearances have been revoked.  The hour-long interview is available on YouTube.  *See* "Tulsi Gabbard on Investigating the Leaks, Fighting the Deep State, and Whether She'll Run in 2028," *The Megyn Kelly Show* (May 1, 2025), https://www.youtube.com/watch?v=6tFyUP0TgrM.

23.      The next day, on May 2, 2025, ODNI issued an official press release which noted that Director Gabbard had revoked security clearances of "numerous individuals who abused public trust for political purposes."  The press release is available online.  *See* ODNI News Release No. 08-25,  https://www.dni.gov/index.php/newsroom/press-releases/press-releases-2025/4069-pr-08-25 (May 2, 2025).

24.      Director Gabbard also posted a copy of the press release on her official X page, which contains a hyperlink directing back to Director Gabbard's original March 10, 2025 tweet identifying Mr. Zaid as one of the targeted individuals, among others who are named.  *See* https://x.com/DNIGabbard/status/1918333364970365134?s=19 (May 2, 2025).

## IV.       BACKGROUND PRINCIPLES ON SECURITY CLEARANCES

### A.       The Rules And Principles Governing The Security Clearance Review Process

25.      Executive Order 12968, which established the protocols governing access to classified information to include provisions for due process, has remained in effect since it was issued nearly thirty years ago by President Bill Clinton.  *Access to Classified Information*, 60 Fed. Reg. 40245 (Aug. 2, 1995).   The protocols in Executive Order 12968 have been subject to minor amendments since then, the most substantive ones being the designation of the Director of National Intelligence as the "Security Executive Agent" by virtue of Executive Order 13467, *Reforming*

*Processes Related to Suitability for Government Employment, Fitness for Contractor Employees, and Eligibility for Access to Classified National Security Information*, which was issued by President George W. Bush on June 30, 2008, and the initiation of continuous vetting procedures through Executive Order 13764 that President Barack Obama signed on January 17, 2017.   None of the subsequent amendments or policy modifications have impacted the core principles of due process that were created in Executive Order 12968.

26.     The protocols established by Executive Order 12968 are aimed at ensuring that the protection of the nation's classified information is consistent with "providing fair and equitable treatment to those Americans upon whom we rely to guard our national security."   60 Fed. Reg. at 40245.   A hallmark of the process, therefore, is that it is an *individualized* one.   The touchstone of that individualized review is whether clearance is consistent with the "national security interest" of the United States.   "National security," meanwhile, is defined both in the United States Code and in Executive Order 13526, *Classified National Security Information* (Dec. 29, 2009), as "the national defense and foreign relations of the United States."   10 U.S.C. §801(16); 75 Fed. Reg. 707, 729 (Jan. 5, 2010) (identical definition in Executive Order 13526, except using the disjunctive "or").[1]

27.     Pursuant to Executive Order 12968, an individual may not access classified information unless (1) that individual has been "determined to be eligible" for access, (2) that individual has signed a nondisclosure agreement, and (3) that individual has a "demonstrated need-

---

[1] Mark Zaid's due process rights are derived from Executive Order 12968.   There are other executive orders and subordinate directives and regulations that touch upon personnel vetting that are not discussed here.   While some of these may reference "national interest" instead of "national security interest," the governing executive order (12968) and the national adjudicative guidelines for security clearances, which are discussed in more detail below, explicitly rely upon the term "national security interests."

to-know" for the information at issue.   60 Fed. Reg. at 40246.   Access to classified information is generally granted (with limited and defined exceptions) only to individuals "who are United States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information." *Id.* at 40250. The determination of eligibility for access to such information is to be "based on judgments by appropriately trained adjudicative personnel." *Id.*

28.    The security clearance process is a critical tool in keeping our nation and its citizens safe.  For it to be effective, it is to be implemented in a "fair and equitable" manner and through a "uniform … program."  *Id.* at 40245.

29.    To ensure that this national security tool (i.e., the individualized security clearance process) is implemented in a fair and equitable manner and through a uniform program, the Director of National Intelligence ("DNI"), under the authority of Executive Order 13467 referenced above and in furtherance of Executive Order 12968, issued DNI Security Executive Agent Directive 4 ("SEAD-4"), *National Security Adjudicative Guidelines*, on June 8, 2017, during the prior Administration of President Donald Trump.   This Directive establishes the criteria to be used by all Federal government agencies authorized to render a determination for initial or continued eligibility of an individual to access classified information.  Off. of the Dir. of Nat'l Intel., *Security Executive Agent Directive 4: National Security Adjudicative Guidelines* (2017), https://www.dni.gov/files/NCSC/documents/Regulations/SEAD-4-Adjudicative-Guidelines-U.pdf.

30.     Pursuant to SEAD-4, an individual's eligibility for a security clearance turns on whether that individual's access to classified information is "clearly consistent with the national security interests" of the United States.   *Id.* at 5.   The adjudicative process is intended to be an examination of the "whole person," meaning an examination of "a sufficient period and careful weighing of a number of variables of an individual's life," in order to make an affirmative determination that the individual is an acceptable security risk.   *Id.* at 6 ("the whole-person concept").   The adjudicative policy states unambiguously that for every individual seeking a security clearance, each such individual "case must be judged on its own merits."   *Id.*   To perform that adjudication, an individual's personal conduct in the following thirteen areas are taken into account:  allegiance to the United States (Guideline A), foreign influence (Guideline B), foreign preference (Guideline C), sexual behavior (Guideline D), personal conduct (Guideline E), financial considerations (Guideline F), alcohol consumption (Guideline G), drug involvement and substance misuse (Guideline H), psychological conditions (Guideline I), criminal conduct (Guideline J), handling protected information (Guideline K), outside activities (Guideline L), and use of information technology (Guideline M).   *Id.*   The guidelines also state that in evaluating the relevance of an individual's conduct with respect to any of the above guidelines, the recency of that conduct is a key element to be taken into account.   *Id.*

31.     In light of the above, the granting, suspending, and revoking of security clearances is a highly individualized process that involves a close and detailed factual analysis of the individual in question and provides any individual subject to this analysis with significant due process protections.  Before any security clearance is granted, denied, or revoked, the appropriate investigative agency must conduct an investigation of the individual to the required scope.   This

investigation addresses the factors outlined in the above adjudicative guidelines outlined in Directive 4, pursuant to Executive Order 12968.

32.    Following the appropriate investigation, should an applicant be denied a clearance or should a cleared individual's clearance be revoked, that individual is entitled to the due process considerations set forth in Executive Order 12968.   The standard due process provisions that are followed within the Executive Branch whenever an individual's security clearance is denied or revoked include the following: (1) a comprehensive and detailed written explanation for the denial or revocation; (2) appropriate access to documents, records, and reports upon which the denial or revocation is based; (3) the right to be represented by counsel; (4) the opportunity to respond in writing; (5) a written notice of and the reasons for the results of the review, the identity of the deciding authority, and written notice of the appeal; and (5) the opportunity to appeal in writing and in some instances in person to a higher level of review.   *See* 60 Fed. Reg. at 40252-53 (Part 5—Review of Access Determinations).

**B.    Relevant History Regarding The Security Clearance Review Process.**

33.    The above-described security-clearance processes set out by Executive Order 12968 and expanded through SEAD-4, and the due process protections afforded individuals as part of the same, are an outgrowth of an earlier period of our nation's history when such rights were not present and the security clearance process was abused.   As illustrated by the well-known case of Robert Oppenheimer, it was not unusual in the immediate aftermath of World War II for groups of persons to have their security clearances denied, revoked or suspended solely based upon their membership in disfavored organizations or upon their association with other known members of such organizations.

34.    In 1947, then-Attorney General Tom Clark released the "Attorney General's List of Subversive Organizations."   As its name implies, this list was intended to compile organizations

deemed to be subversive by the U.S. government.   The list included 50 organizations ranging from Communist Party USA and the Ku Klux Klan to organizations such as the National Negro Congress and the Washington Book Shop Association.   Many Americans had signed petitions or become members of such groups, often not understanding their true nature or the consequences of affiliation.   The Attorney General's List was eventually incorporated by then-President Harry Truman into Executive Order 9835, which established the first federal employee loyalty program. *See* 12 Fed. Reg. 1935 (Mar. 25, 1947).   Executive Order 9835 was in turn superseded by President Dwight Eisenhower's Executive Order 10450 in 1953, which updated the Attorney General's List and expanded the criteria for determining trustworthiness and reliability for purposes of a security clearance.   Security Requirements for Government Employment, 18 Fed. Reg. 2489 (Apr. 27, 1953).   In 1959, the Supreme Court decided the landmark case *Greene v. McElroy*, holding in relevant part that the revocation of the plaintiff's security clearance as a defense contractor on the grounds of alleged Communist associations and sympathies was unlawful in that the plaintiff "was not afforded the safeguards of confrontation and cross-examination."   360 U.S. 474, 508 (1959).[2]

35.   It was the Supreme Court's decision in *Greene* that led to the establishment of due process provisions for the individualized granting, denial, or revocation of security clearances for contractors, which due process provisions continue to this day.   Due process provisions were first adopted for defense contractors through President Eisenhower's Executive Order 10865 in 1960, and similar due process provisions were codified in 1995 by President Clinton in Executive Order 12968 ("Access to Classified Information") to cover civil servants and military personnel.   These

---

[2] *Greene* stands for the proposition that due process applies to security clearances.   360 U.S. 474. There, neither Congress nor the President authorized the constitutionally deficient procedures.   *Id.* at 508.   The Court declined to opine on the constitutionality of those procedures had they been set out in legislation or an executive order.   *Id.*

protections have remained unchanged through five successive administrations, including President Trump's prior Administration between 2017 and 2021.   Executive Orders 10865 and 12968 as well as SEAD-4 remain the current governing policy for granting, denying, and revoking personnel security clearances.[3]   There is no language within the Clearance Recission Memorandum that indicates it is superseding, revoking or modifying the protections set forth in any of the prior Executive Orders or governing due process requirements.

> **C.    The Process For Revoking A Security Clearance**

36.    Importantly, whenever it is proposed that an individual's security clearance be revoked, the government entity that granted the clearance is obligated to notify the individual in writing and to provide that individual with a statement of reasons as to why access to classified information will be revoked.   The proposed revocation is then to be followed by the established processes and due process protections outlined above.

# V.    OPINIONS

> **A.    Opinion 1: The Blanket Approach Of The Clearance Recission Memorandum Is Inconsistent With Governing Policy Requiring Individualized Assessments.**

37.    As described above in Section IV, in order to ensure that clearance procedures "provid[e] fair and equitable treatment to those Americans upon whom we rely to guard our national security," 60 Fed. Reg. at 40245,  the process is always based upon the personal conduct

---

[3] Executive Order 12968 allows for narrow instances when due process may be limited because the required procedure cannot occur "without damaging the national security interests of the United States by revealing classified information."  60 Fed. Reg. at 40252.   This provision might be invoked, for example, when a government employee or contractor is charged with espionage for a foreign power.   But this limited due process section is inapplicable here, including because the required certification has not been made and because there has been no determination that full due process would itself compromise national security by revealing classified information.

of the relevant individual.    That is one of the fundamental hallmarks of the security-clearance review process.

38.    The Clearance Recission Memorandum violates these bedrock principles of the security-clearance review process because it provides no individualized assessment of personal conduct in the revocation of clearances.  The memorandum contains no mention of, let alone any individualized assessment of the named personnel who currently hold security clearances.  And while the Clearance Recission Memorandum does technically list names, it culminates with a vague, blanket reference to "any other member of Joseph R. Biden Jr.'s family" and lacks any individualized assessment.  Indeed, it is just as "blanket" of a revocation as is Executive Order 14230, which would have the exact same effect if it had listed the approximately 1,200 employees of the subject law firm.

39.    Simply put, a blanket revocation of security clearances of a diverse and unrelated group of individuals was—prior to March 2025—unprecedented in its scope and fundamentally inconsistent with existing authority addressing the processing, granting, and revocation of security clearances.    The *ad hoc* directive in this case harkens back to the repudiated and discredited programs that existed before *Greene v. McElroy*, including during the Red Scare.    The arbitrary and ad hoc directive of immediate revocation of security clearances not for any personal conduct by any clearance holder is no different analytically than if a directive were issued to immediately suspend the security clearances of all Jews or Muslims, all members of the LGBTQ+ community, all women, or all registered Democrats or Republicans.

40.    These types of non-individualized, mass revocations of security clearances targeted at groups of individuals threaten to harm our national security efforts.    Should individuals who otherwise meet the standards be summarily denied or stripped of their security clearance through

these types of sweeping, blanket decrees, the resulting uncertainty that would spread throughout the system may severely impact the effectiveness of our military, intelligence and diplomatic capabilities to deter or otherwise respond to our nation's adversaries.

**B.    Opinion 2: The Clearance Recission Memorandum Is Unprecedented In Its Invocation of Conduct Unrelated To National Security.**

41.    The Clearance Recission Memorandum is also contrary to the foundational principles surrounding the granting, suspension, denial, or revocation of security clearances, as set forth in existing and operative policy documentation that have existed for decades, in that it devoid of a statement of reasons with a nexus to national security concerns.   As I explained in Section IV, the touchstone of the individualized security-clearance review is whether clearance is consistent with the "national security interest" of the United States, which is defined as "the national defense and foreign relations of the United States."

42.    Here, however, the Clearance Recission Memorandum makes clear it has nothing to do with national security but rather makes an undefined reference to the "national interest."  I understand that Mark Zaid represented a client in a whistleblower case involving President Trump during his first administration.  In my more than three decades of service culminating as the most senior public servant focused professionally on the protection of United States classified information, I have never seen any security clearance determination that was based on the fact that an attorney represented client in a whistleblower case and I can see no reasonable construction of such activity as being a matter of "national security" as that term is defined and understood.

**C.    Opinion 3: The Clearance Recission Memorandum's Directive Amounts To A Revocation Of Security Clearances Without Due Process.**

43.    The Clearance Recission Memorandum functionally plays the role of judge, jury, and executioner.  Even if the subjects of the Memorandum had been provided with the requisite due process (they were not), for the revocation to be reversed it requires a professional adjudicator

to make findings expressly contradictory to the President's determination.  Further, I believe that Mr. Zaid would have to disclose this revocation—senseless as it is—on any future security clearance application, making the harm he will experience from the lack of due process effectively irreparable.  The approach of the Clearance Recission Memorandum, especially as it pertains to Mark Zaid, is unprecedented and inconsistent with governing guidance and policy documentation.

I declare under penalty of perjury that the foregoing is true and correct.

Date: May 20, 2025

J. William Leonard

# EXHIBIT 1

Authored Publications in Past Ten Years

J. William Leonard, *Congress Must Stop the Weaponization of Personnel Security Clearances*, Just Sec. (Mar. 11, 2025), https://www.justsecurity.org/108657/congress-stop-weaponization- security-clearances/.

J. William Leonard, *Vice Presidents and Rules Governing Classified National Security Information*, Just Sec. (Jan. 17, 2023), https://www.justsecurity.org/84774/vice-presidents-and- rules-governing-classified-national-security-information/.

J. William Leonard, *Myths and Misunderstandings Relating to Mar-a-Lago Documents Investigation*, Just Sec. (Mar. 16, 2022), https://www.justsecurity.org/82706/myths-misunderstandings-relating-to-mar-a-lago-documents-investigation/.

J. William Leonard, *Why Joe Biden Should Pardon Reality Winner*, Wash. Post (Dec. 20, 2019), https://www.washingtonpost.com/opinions/why-joe-biden-should-pardon-reality-winner/2020/12/21/9e6f4094-4162-11eb-8db8-395dedaaa036_story.html.

J. William Leonard, *Barr's Personal Ad Hoc Declassification Authority and the Role of Congress*, Just Sec. (Dec. 9, 2019), https://www.justsecurity.org/67663/barrs-personal-ad-hoc- declassification-authority-and-the-role-of-congress/.

J. William Leonard, *Trump Repudiates a Century of U.S. Policy*, Just Sec. (Nov. 15, 2019), https://www.justsecurity.org/67255/trump-repudiates-a-century-of-u-s-policy/.

# EXHIBIT 1



# EXHIBIT 2



*The* WHITE HOUSE

⬉ **PRESIDENTIAL ACTIONS**

Rescinding Security Clearances and Access to Classified Information from Specified Individuals

Presidential Memoranda

March 22, 2025

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES
SUBJECT:   Rescinding Security Clearances and Access to Classified Information from Specified Individuals

I have determined that it is no longer in the national interest for the following individuals to access classified information:  Antony Blinken, Jacob Sullivan, Lisa Monaco, Mark Zaid, Norman Eisen, Letitia James, Alvin Bragg, Andrew Weissmann, Hillary Clinton, Elizabeth Cheney, Kamala Harris, Adam Kinzinger, Fiona Hill, Alexander Vindman, Joseph R. Biden Jr., and any other member of Joseph R. Biden Jr.'s family.  Therefore, I hereby direct every executive department and agency head to take all additional action as necessary and consistent with existing law to revoke any active security clearances held by the aforementioned individuals and to immediately rescind their access to classified information.  I also direct all executive department and agency heads to revoke unescorted access to secure United States Government facilities from these individuals.

This action includes, but is not limited to, receipt of classified briefings, such as the President's Daily Brief, and access to classified information held by any member of the Intelligence Community by virtue of the named individuals' previous tenure in the Congress.

JA85

In the event that any of the named individuals received a security clearance by virtue of their employment with a private entity, the United States Government entity that granted the security clearance should inform the private entity that these individuals' ability to access classified information has been revoked.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



NEWS

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

Subscribe to The White House newsletter

JA86



# EXHIBIT 3

**DEFENSE COUNTERINTELLIGENCE AND SECURITY AGENCY**
BUILDING 600 10TH STREET
FORT GEORGE G. MEADE, MD  20755-5615

**PERSONNEL SECURITY**

April 3, 2025

MEMORANDUM FOR MARK STEVEN ZAID

THROUGH:  INDUSTRIAL SECURITY INTEGRATORS, LLC
                     (ATTN: SECURITY MANAGEMENT OFFICE)

SUBJECT: Revocation of Personnel Security Clearance Eligibility

Reference:  Presidential Memorandum, "Rescinding Security Clearances and Access to Classified Information from Specific Individuals," March 22, 2025

1.  The Reference directs every executive department and agency head to take all additional action as necessary and consistent with existing law to revoke any active security clearances held by you, and by other individuals identified or described in the Reference.

2.  Pursuant to that direction, DCSA has revoked the security clearance held by you.  The revocation action has been annotated in our system of record for personnel clearances.

3.  For additional information on the Presidential Memorandum, please see the following website: https://www.whitehouse.gov/presidential-actions/2025/03/rescinding-security-clearances-and-access-to-classified-information-from-specified-individuals/

by **A0854**

Division Chief
Adjudication and Vetting Services

THE CONTENTS OF THIS DOCUMENT ARE PROTECTED UNDER THE PRIVACY ACT OF 1974

# EXHIBIT 4

CENTRAL INTELLIGENCE AGENCY

WASHINGTON, D.C. 20505

Office of General Counsel

April 9, 2025

Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 700
Washington, DC 20036

Dear Mr. Zaid,

      I am writing regarding the Presidential Memorandum entitled "Rescinding Security Clearances and Access to Classified Information from Specified Individuals," *available at* https://www.whitehouse.gov/presidential-actions/2025/03/rescinding-security-clearances-and-access-to-classified-information-from-specified-individuals. As you are aware, you were specifically identified by the White House in this memo. Pursuant to this memo, the Agency is required to "revoke any active security clearances . . . and to immediately rescind [] access to classified information" for the named individuals. Accordingly, you are no longer personally permitted access to classified information in any ongoing matters that you are currently involved in with the Agency. You may continue to represent any current or future clients as you deem appropriate, but you cannot gain access to or make use of classified information in connection with such representations. To the extent necessary and appropriate, you are still permitted escorted access to Agency facilities and may review unclassified materials.

Sincerely,

Deputy General Counsel for Litigation and Investigations

# EXHIBIT 5

Case 1:25-cv-01365-AHA    Document 9-9    Filed 05/21/25    Page 2 of 2
USCA Case #26-5009    Document #2159608    Filed: 02/18/2025    Mark S. Zaid, P.C. <mark@markzaid.com
Page 97 of

**Request to review previously submitted complaint**

@odni.gov>                                                    Wed, Apr 23, 2025 at 6:17 PI
: "Mark S. Zaid, P.C." <mark@markzaid.com>
c: ICIG_Hotline <ICIGHotline@odni.gov>


UNCLASSIFIED



Hi Mark,


ODNI Security provided the following response: "(U) Pursuant to Presidential direction issued on 22 March 2025 (attached), the individuals listed therein, no longer have a security clearance, are not authorized for access to classified information, and do not have unescorted access to ODNI facilities."


The referenced attachment is the Presidential Memorandum available here: Rescinding Security Clearances and Access to Classified Information from Specified Individuals – The White House


Best,

███████


UNCLASSIFIED


**From:** Mark S. Zaid, P.C. <mark@markzaid.com>
**Sen** Wednesday, April 23, 2025 3:31 PM
**To:** ████████████    <████████████@odni.gov>
**Cc:** ICIG_Hotline < █████ine@odni.gov>
**Subject:** Re: Request to review previously submitted complaint


████, can you please provide me with a formal determination on my request to access my client's classified OIG submission.


Whatever the decision might be.

# EXHIBIT 7



Office of the Director of National Intelligence

## NEWS RELEASE

FOR IMMEDIATE RELEASE
ODNI News Release No. 08-25
May 2, 2025

### First 100 Days: DNI Gabbard Ends Woke DEI Polices, Saves Millions Of Taxpayer Dollars, Revokes Security Clearances, Refers Leaks To Ensure Apolitical Intelligence Collection And Analysis

**WASHINGTON, D.C.** – At the direction of President Trump during his first 100 days, Director of National Intelligence (DNI) Tulsi Gabbard eliminated diversity, equity, and inclusion (DEI) programs and policies at the Office of Director of National Intelligence (ODNI), saving taxpayers millions of dollars. DNI Gabbard has also revoked security clearances and access to classified information for numerous individuals who abused public trust for political purposes to ensure objective intelligence collection and analysis.

In an exclusive interview with Megyn Kelly, DNI Gabbard detailed the harm caused by previously rampant DEI policies in the Intelligence Community (IC) and explained her and President Trump's efforts to rid the IC of these woke policies:

*"When I came in here...DEI was such a priority, that it was baked into the incentive structure for people to advance professionally. And I would imagine it was very similar across the federal government, where some employees told me that they were put in a position where they had to spend half of their time working on DEI initiatives in order for them to be able to advance professionally. When we look at why this was a priority for the President, this is not some superficial thing. There are national security implications to what the Biden Administration was doing in centering almost their entire administration around DEI initiatives."*

Under the leadership of President Trump and DNI Gabbard, ODNI accomplished the following wins related to ending wokeness and the politicization of intelligence:

- Per President Trump's DEI Executive Order, DNI Gabbard eliminated all DEI programs and policies at ODNI, saving the taxpayer approximately $20 million annually.

- DNI Gabbard is closing ODNI's Human Capital Office after discovering it operates as a slush fund for DEI initiatives. This cut will save taxpayers approximately $150 million annually.

- DNI Gabbard shut down the "NSA sex chats" and formally directed the revocation of security clearances of all Intelligence Community personnel involved in the sexually explicit groups.

- DNI Gabbard also directed the NSA to remove its "Pride Glossary" from intelligence community servers, which was filled with sexually explicit DEI terminology unrelated to protecting American security.

- Per President Trump's directive, DNI Gabbard revoked security clearances and barred access to classified information for:
  - Joe Biden, Kamala Harris, Hillary Clinton, Liz Cheney, Adam Kinzinger, Antony Blinken, Jake Sullivan, Alvin Bragg, Andrew Weissman, the 51 signers of the Hunter Biden "disinformation" letter, among others.

- DNI Gabbard referred three leaks of classified IC information to the Department of Justice for criminal prosecution, with more on the way.

- DNI Gabbard is putting an end to all non-merit-based recruitment of Intelligence Community professionals.

# EXHIBIT 8



During @POTUS's first 100 days in office, I eliminated DEI programs and policies at @ODNIgov, and revoked security clearances and access to classified information for numerous individuals who abused public trust for political purposes. We are saving taxpayers millions and ensuring President Trump's policymakers receive unbiased intelligence assessments to ensure the safety, security, and freedom of the American people. dni.gov/index.php/news...

Office of the Director of National Intelligence

NEWS RELEASE

FOR IMMEDIATE RELEASE
ODNI News Release No. 06-25
May 2, 2025

First 100 Days: DNI Gabbard Ends Woke DEI Polices, Saves Millions Of Taxpayer Dollars, Revokes Security Clearances, Refers Leaks To Ensure Apolitical Intelligence Collection And Analysis

WASHINGTON, D.C. – At the election of President Trump during his first 100 days, Director of National Intelligence (DNI) Tulsi Gabbard eliminated diversity, equity, and inclusion (DEI) programs and policies of the Office of Director of National Intelligence (ODNI), saving taxpayers millions of dollars. DNI Gabbard has also revoked security clearances and access to classified information for numerous individuals who abused public trust for political purposes to ensure objective intelligence collection and analysis.

In an exclusive interview with Megyn Kelly, DNI Gabbard detailed the harm caused by previously released DEI policies in the Intelligence Community (IC) and explained her and President Trump's efforts to rid the IC of these woke policies.

[illegible paragraph]

Under the leadership of President Trump, and DNI Gabbard, ODNI accomplished the following very related to existing protections and the politicization of intelligence:

- Per President Trump, DNI Gabbard ended DEI Programs and policies at ODNI, saving the taxpayer approximately $30 million annually.
- DNI Gabbard is closing ODNI's Human Capital Office after discovering it operates as a slush fund for DEI initiatives. This will also save taxpayers approximately $150 million annually.
- DNI Gabbard [illegible] the "Margaret Hunt" and formally directed the revocation of security clearances of all Intelligence Community personnel involved in the security breach groups.
- DNI Gabbard also directed the NSA to remove all "Woke Glossary" form intelligence community servers, which was filled with woke-style explicit DEI terminology connected to protecting protection security.
- Per President Trump's direction, DNI Gabbard revoked security clearances and access to classified information for Jim Clapper, Kamala Harris, Hillary Clinton, Liz Cheney, Adam Kinzinger, Antony Blinken, Jake Sullivan, Alex Soros, Andrew Weissman, the 51 signers of the infamous Biden "disinformation" letter, and more.
- DNI Gabbard referred three leaks of classified IC information to the Department of Justice for criminal prosecution, with more on the way.
- DNI Gabbard is working to end to all non-merit-based recruitment of Intelligence Community professionals.

###

11:54 AM · May 2, 2025 · **114.5K** Views

 356       1K       4.9K       88      

# EXHIBIT 9



Pages 1581–1603

# FEDERAL REGISTER

**VOLUME 25**     **NUMBER 37**

*Washington, Wednesday, February 24, 1960*

# Contents

## THE PRESIDENT

### Executive Orders
Designating the Southeast Asia Treaty Organization as a public international organization entitled to enjoy certain privileges, exemptions, and immunities _____ 1584
Readiness of the United States District Court for the District of Alaska to assume the functions imposed upon it._____ 1584
Safeguarding classified information within industry._____ 1583

## EXECUTIVE AGENCIES

### Agricultural Marketing Service
RULES AND REGULATIONS:
Milk in the southeastern Florida marketing area; order suspending certain provision._____ 1585

### Agriculture Department
See Agricultural Marketing Service; Commodity Credit Corporation.

### Army Department
See Engineers Corps.

### Civil Aeronautics Board
NOTICES:
Lufthansa German Airlines; hearing._____ 1598

### Civil and Defense Mobilization Office
RULES AND REGULATIONS:
Reimbursement of other Federal agencies performing major disaster relief functions._____ 1587

### Coast Guard
PROPOSED RULE MAKING:
Renewal of masters', mates', or pilots' licenses; hearing._____ 1595

RULES AND REGULATIONS:
Information to be furnished by applicants for, and holders of, special validation endorsement or Coast Guard port security cards._____ 1588

### Commerce Department
See Foreign Commerce Bureau.

### Commodity Credit Corporation
RULES AND REGULATIONS:
Changes in name and address of New York Office and in classes of cotton products and percentages base equalization payment. 1585

### Defense Department
See Engineers Corps.

### Engineers Corps
RULES AND REGULATIONS:
Navigation regulations; Potomac River, Md._____ 1590

### Federal Communications Commission
NOTICES:
Standard broadcast applications ready and available for processing._____ 1597
RULES AND REGULATIONS:
Radio broadcast services:
Miscellaneous amendments.____ 1594
Table of assignments; television broadcast stations in Alabama _____ 1593

### Federal Power Commission
NOTICES:
Garkane Power Association, Inc.; Utah; land withdrawal._____ 1598
Hearings, etc.:
Puget Sound Power & Light Co. and Public Utility District No. 1 of Chelan County, Wash _____ 1598
Richvale Irrigation District.____ 1599
Sierra Pacific Power Co._____ 1599

Transcontinental Gas Pipe Line Corp._____ 1599
Union Electric Co._____ 1600
Vaughey and Vaughey._____ 1600

### Federal Trade Commission
PROPOSED RULE MAKING:
Textile Fiber Products-Identification Act._____ 1596

### Food and Drug Administration
PROPOSED RULE MAKING:
Residues of toxaphene; filing of petition for establishment of tolerance._____ 1595

### Foreign Commerce Bureau
RULES AND REGULATIONS:
Positive list of commodities and related matters; miscellaneous amendments._____ 1586

### Health, Education, and Welfare Department
See Food and Drug Administration.

### Interior Department
See also Land Management Bureau.
NOTICES:
Determination of fees and expenses under attorney contracts with Indian tribes and directly related t r i b a l contracts with technical specialists._____ 1601

### Interstate Commerce Commission
NOTICES:
Fourth section applications for relief._____ 1601

### Land Management Bureau
NOTICES:
Alaska; proposed withdrawal and reservation of lands._____ 1601

*(Continued on next page)*

1581

# CONTENTS

New Mexico; partial termination
of proposed withdrawal and res-
ervation of land_____ 1601

## Post Office Department

RULES AND REGULATIONS:
Procedures relative to fraud and
obscenity orders_____ 1590

## Securities and Exchange Commission

NOTICES:
Central Securities Corp.; applica-
tion_____ 1600

PROPOSED RULE MAKING:
Public offering of convertible se-
curities_____ 1595

## State Department

RULES AND REGULATIONS:
Appointment of Foreign Service
officers; miscellaneous amend-
ments_____ 1587

## Treasury Department

See Coast Guard.

# Codification Guide

A numerical list of the parts of the Code of Federal Regulations affected by documents published in this issue. Proposed rules, as opposed to final actions, are identified as such.

A Cumulative Codification Guide covering the current month appears at the end of each issue beginning with the second issue of the month.

## 3 CFR

EXECUTIVE ORDERS:
10865_____ 1583
10866_____ 1584
10867_____ 1584

## 6 CFR

482_____ 1585

## 7 CFR

1018_____ 1585

## 15 CFR

399_____ 1586

## 16 CFR

PROPOSED RULES:
303_____ 1596

## 17 CFR

PROPOSED RULES:
230_____ 1595

## 21 CFR

PROPOSED RULES:
120_____ 1595

## 22 CFR

11_____ 1587

## 32 CFR

1709_____ 1587

## 33 CFR

121_____ 1588
125_____ 1589
207_____ 1590

## 39 CFR

201_____ 1590

## 46 CFR

PROPOSED RULES:
10_____ 1595

## 47 CFR

3 (2 documents) _____ 1593, 1594

## Announcement

### CFR SUPPLEMENTS
(As of January 1, 1960)

The following Supplements are now available:

| | |
|---|---|
| Title 3_____ | $0.60 |
| Titles 4–5_____ | 1.00 |
| Title 7, Parts 51–52_____ | .45 |
|       Parts 53–209_____ | .40 |
| Title 8_____ | .40 |
| Title 32, Parts 700–799_____ | 1.00 |

Previously announced: Title 36, Revised ($3.00); Title 46, Parts 146–149, Revised ($6.00)

Order from the Superintendent of Documents, Government Printing Office, Washington 25, D.C.


FEDERAL REGISTER

REPublic 7-7500     Extension 3261

Published daily, except Sundays, Mondays, and days following official Federal holidays, by the Office of the Federal Register, National Archives and Records Service, General Services Administration, pursuant to the authority contained in the Federal Register Act, approved July 26, 1935 (49 Stat. 500, as amended; 44 U.S.C., ch. 8B), under regulations prescribed by the Administrative Committee of the Federal Register, approved by the President. Distribution is made only by the Superintendent of Documents, Government Printing Office, Washington 25, D.C.

The FEDERAL REGISTER will be furnished by mail to subscribers, free of postage, for $1.50 per month or $15.00 per year, payable in advance. The charge for individual copies (minimum 15 cents) varies in proportion to the size of the issue. Remit check or money order, made payable to the Superintendent of Documents, directly to the Government Printing Office, Washington 25, D.C.

The regulatory material appearing herein is keyed to the CODE OF FEDERAL REGULATIONS, which is published, under 50 titles, pursuant to section 11 of the Federal Register Act, as amended August 5, 1953. The CODE OF FEDERAL REGULATIONS is sold by the Superintendent of Documents. Prices of books and pocket supplements vary.

There are no restrictions on the republication of material appearing in the FEDERAL REGISTER, or the CODE OF FEDERAL REGULATIONS.

# Presidential Documents

## Title 3—THE PRESIDENT

### Executive Order 10865

#### SAFEGUARDING CLASSIFIED INFORMATION WITHIN INDUSTRY

WHEREAS it is mandatory that the United States protect itself against hostile or destructive activities by preventing unauthorized disclosures of classified information relating to the national defense; and

WHEREAS it is a fundamental principle of our Government to protect the interests of individuals against unreasonable or unwarranted encroachment; and

WHEREAS I find that the provisions and procedures prescribed by this order are necessary to assure the preservation of the integrity of classified defense information and to protect the national interest; and

WHEREAS I find that those provisions and procedures recognize the interest of individuals affected thereby and provide maximum possible safeguards to protect such interests:

NOW, THEREFORE, under and by virtue of the authority vested in me by the Constitution and statutes of the United States, and as President of the United States and as Commander in Chief of the armed forces of the United States, it is hereby ordered as follows:

SECTION 1. (a) The Secretary of State, the Secretary of Defense, the Commissioners of the Atomic Energy Commission, the Administrator of the National Aeronautics and Space Administration, and the Administrator of the Federal Aviation Agency, respectively, shall, by regulation, prescribe such specific requirements, restrictions, and other safeguards as they consider necessary to protect (1) releases of classified information to or within United States industry that relate to bidding on, or the negotiation, award, performance, or termination of, contracts with their respective agencies, and (2) other releases of classified information to or within industry that such agencies have responsibility for safeguarding. So far as possible, regulations prescribed by them under this order shall be uniform and provide for full cooperation among the agencies concerned.

(b) Under agreement between the Department of Defense and any other department or agency of the United States, including, but not limited to, those referred to in subsection (c) of this section, regulations prescribed by the Secretary of Defense under subsection (a) of this section may be extended to apply to protect releases (1) of classified information to or within United States industry that relate to bidding on, or the negotiation, award, performance, or termination of, contracts with such other department or agency, and (2) other releases of clas-

sified information to or within industry which such other department or agency has responsibility for safeguarding.

(c) When used in this order, the term "head of a department" means the Secretary of State, the Secretary of Defense, the Commissioners of the Atomic Energy Commission, the Administrator of the National Aeronautics and Space Administration, the Administrator of the Federal Aviation Agency, and, in sections 4 and 8, includes the Attorney General. The term "department" means the Department of State, the Department of Defense, and the Atomic Energy Commission, the National Aeronautics and Space Administration, the Federal Aviation Agency, and, in sections 4 and 8, includes the Department of Justice.

SEC. 2. An authorization for access to classified information may be granted by the head of a department or his designee, including but not limited to, those officials named in section 8 of this order, to an individual, hereinafter termed an "applicant", for a specific classification category only upon a finding that it is clearly consistent with the national interest to do so.

SEC. 3. Except as provided in section 9 of this order, an authorization for access to a specific classification category may not be finally denied or revoked by the head of a department or his designee, including, but not limited to, those officials named in section 8 of this order, unless the applicant has been given the following:

(1) A written statement of the reasons why his access authorization may be denied or revoked, which shall be as comprehensive and detailed as the national security permits.

(2) A reasonable opportunity to reply in writing under oath or affirmation to the statement of reasons.

(3) After he has filed under oath or affirmation a written reply to the statement of reasons, the form and sufficiency of which may be prescribed by regulations issued by the head of the department concerned, an opportunity to appear personally before the head of the department concerned or his designee, including, but not limited to, those officials named in section 8 of this order, for the purpose of supporting his eligibility for access authorization and to present evidence on his behalf.

(4) A reasonable time to prepare for that appearance.

(5) An opportunity to be represented by counsel.

(6) An opportunity to cross-examine persons either orally or through written interrogatories in accordance with section 4 on matters not relating to the characterization in the statement of reasons of any organization or individual other than the applicant.

(7) A written notice of the final decision in his case which, if adverse, shall specify whether the head of the depart-

ment or his designee, including, but not limited to, those officials named in section 8 of this order, found for or against him with respect to each allegation in the statement of reasons.

SEC. 4. (a) An applicant shall be afforded an opportunity to cross-examine persons who have made oral or written statements adverse to the applicant relating to a controverted issue except that any such statement may be received and considered without affording such opportunity in the circumstances described in either of the following paragraphs:

(1) The head of the department supplying the statement certifies that the person who furnished the information is a confidential informant who has been engaged in obtaining intelligence information for the Government and that disclosure of his identity would be substantially harmful to the national interest.

(2) The head of the department concerned or his special designee for that particular purpose has preliminarily determined, after considering information furnished by the investigative agency involved as to the reliability of the person and the accuracy of the statement concerned, that the statement concerned appears to be reliable and material, and the head of the department or such special designee has determined that failure to receive and consider such statement would, in view of the level of access sought, be substantially harmful to the national security and that the person who furnished the information cannot appear to testify (A) due to death, severe illness, or similar cause, in which case the identity of the person and the information to be considered shall be made available to the applicant, or (B) due to some other cause determined by the head of the department to be good and sufficient.

(b) Whenever procedures under paragraphs (1) or (2) of subsection (a) of this section are used (1) the applicant shall be given a summary of the information which shall be as comprehensive and detailed as the national security permits, (2) appropriate consideration shall be accorded to the fact that the applicant did not have an opportunity to cross-examine such person or persons, and (3) a final determination adverse to the applicant shall be made only by the head of the department based upon his personal review of the case.

SEC. 5. (a) Records compiled in the regular course of business, or other physical evidence other than investigative reports, may be received and considered subject to rebuttal without authenticating witnesses, provided that such information has been furnished to the department concerned by an investigative agency pursuant to its responsibilities in connection with assisting the head of the department concerned to safeguard classified information within industry pursuant to this order.

1583

(b) Records compiled in the regular course of business, or other physical evidence other than investigative reports, relating to a controverted issue which, because they are classified, may not be inspected by the applicant, may be received and considered provided that: (1) the head of the department concerned or his special designee for that purpose has made a preliminary determination that such physical evidence appears to be material, (2) the head of the department concerned or such designee has made a determination that failure to receive and consider such physical evidence would, in view of the level of access sought, be substantially harmful to the national security, and (3) to the extent that the national security permits, a summary or description of such physical evidence is made available to the applicant. In every such case, information as to the authenticity and accuracy of such physical evidence furnished by the investigative agency involved shall be considered. In such instances a final determination adverse to the applicant shall be made only by the head of the department based upon his personal review of the case.

SEC. 6. Because existing law does not authorize the Department of State, the Department of Defense, or the National Aeronautics and Space Administration to subpena witnesses, the Secretary of State, the Secretary of Defense, or the Administrator of the National Aeronautics and Space Administration, or his representative, may issue, in appropriate cases, invitations and requests to appear and testify in order that the applicant may have the opportunity to cross-examine as provided by this order. So far as the national security permits, the head of the investigative agency involved shall cooperate with the Secretary or the Administrator, as the case may be, in identifying persons who have made statements adverse to the applicant and in assisting him in making them available for cross-examination. If a person so invited is an officer or employee of the executive branch of the Government or a member of the armed forces of the United States, the head of the department or agency concerned shall cooperate in making that person available for cross-examination.

SEC. 7. Any determination under this order adverse to an applicant shall be a determination in terms of the national interest and shall in no sense be a determination as to the loyalty of the applicant concerned.

SEC. 8. Except as otherwise specified in the preceding provisions of this order, any authority vested in the head of a department by this order may be delegated to the

(1) Under Secretary of State or a Deputy Under Secretary of State, in the case of authority vested in the Secretary of State;

(2) Deputy Secretary of Defense or an Assistant Secretary of Defense, in the case of authority vested in the Secretary of Defense;

(3) General Manager of the Atomic Energy Commission, in the case of authority vested in the Commissioners of the Atomic Energy Commission;

(4) Deputy Administrator of the National Aeronautics and Space Administration, in the case of authority vested in the Administrator of the National Aeronautics and Space Administration;

(5) Deputy Administrator of the Federal Aviation Agency, in the case of authority vested in the Administrator of the Federal Aviation Agency; or

(6) Deputy Attorney General or an Assistant Attorney General, in the case of authority vested in the Attorney General.

SEC. 9. Nothing contained in this order shall be deemed to limit or affect the responsibility and powers of the head of a department to deny or revoke access to a specific classification category if the security of the nation so requires. Such authority may not be delegated and may be exercised only when the head of a department determines that the procedures prescribed in sections 3, 4, and 5 cannot be invoked consistently with the national security and such determination shall be conclusive.

DWIGHT D. EISENHOWER

THE WHITE HOUSE,
*February 20, 1960.*

[F.R. Doc. 60-1735; Filed, Feb. 23, 1960; 11:51 a.m.]

## Executive Order 10866

### DESIGNATING THE SOUTHEAST ASIA TREATY ORGANIZATION AS A PUBLIC INTERNATIONAL ORGANIZATION ENTITLED TO ENJOY CERTAIN PRIVILEGES, EXEMPTIONS, AND IMMUNITIES

By virtue of the authority vested in me by section 1 of the International Organizations Immunities Act, approved December 29, 1945 (59 Stat. 669), and having found that the United States participates in the Southeast Asia Treaty Organization pursuant to the authority of the Southeast Asia Collective Defense Treaty ratified by the President on February 4, 1955, with the advice and consent of the Senate given on February 1, 1955 (6 UST 81, T.I.A.S. 3170), I hereby designate the Southeast Asia Treaty Organization as a public international organization entitled to enjoy the privileges, exemptions, and immunities conferred by the International Organizations Immunities Act.

The designation of the Southeast Asia Treaty Organization as a public international organization within the meaning of the International Organizations Immunities Act is not intended to abridge in any respect privileges, exemptions, and immunities which that organization may have acquired or may

acquire by treaty or congressional action.

DWIGHT D. EISENHOWER

THE WHITE HOUSE,
*February 20, 1960.*

[F.R. Doc. 60-1734; Filed, Feb. 23, 1960; 11:51 a.m.]

## Executive Order 10867

### READINESS OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ALASKA TO ASSUME THE FUNCTIONS IMPOSED UPON IT

WHEREAS the act of July 7, 1958, 72 Stat. 339, relating to the admission of the State of Alaska into the Union, provides that the United States District Court for the Territory of Alaska shall continue to function as theretofore for a period of three years after the effective date of that act, unless the President, by Executive order, shall sooner proclaim that the United States District Court for the District of Alaska, established in accordance with the provisions of that act, is prepared to assume the functions imposed upon it; and

WHEREAS that act further provides that its provisions relating to the termination of the jurisdiction of the District Court for the Territory of Alaska, the continuation of suits, the succession of courts, and the satisfaction of the rights of litigants in suits before such courts shall not be effective until the expiration of the above-mentioned three-year period or until such Executive order is issued; and that the tenure of the judges, the United States Attorneys, Marshals, and other officers of the United States District Court for the Territory of Alaska shall terminate at such time as that court shall cease to function; and

WHEREAS, I have appointed, by and with the advice and consent of the Senate, and commissioned the Honorable Walter N. Hodge to be United States District Judge for the District of Alaska, and he has taken his oath of office; and

WHEREAS Judge Hodge has appointed an acting United States Attorney, an acting United States Marshal, and other court officers; and

WHEREAS the United States District Court for the District of Alaska is now prepared to assume the functions imposed upon it:

NOW, THEREFORE, by virtue of the authority vested in me by section 18 of the said act of July 7, 1958, I hereby proclaim that the United States District Court for the District of Alaska is prepared to assume the functions imposed upon it. Accordingly, the jurisdiction of the District Court for the Territory of Alaska and the tenure of the judges, the United States Attorneys, Marshals, and other officers of that court are now terminated.

DWIGHT D. EISENHOWER

THE WHITE HOUSE,
*February 20, 1960.*

[F.R. Doc. 60-1733; Filed, Feb. 23, 1960; 11:51 a.m.]

# EXHIBIT 10

Federal Register

Vol. 60, No. 151

Monday, August 7, 1995

# Presidential Documents

Title 3—

## The President

### Executive Order 12968 of August 2, 1995

### Access to Classified Information

The national interest requires that certain information be maintained in confidence through a system of classification in order to protect our citizens, our democratic institutions, and our participation within the community of nations. The unauthorized disclosure of information classified in the national interest can cause irreparable damage to the national security and loss of human life.

Security policies designed to protect classified information must ensure consistent, cost effective, and efficient protection of our Nation's classified information, while providing fair and equitable treatment to those Americans upon whom we rely to guard our national security.

This order establishes a uniform Federal personnel security program for employees who will be considered for initial or continued access to classified information.

NOW, THEREFORE, by the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**PART 1—DEFINITIONS, ACCESS TO CLASSIFIED INFORMATION, FINANCIAL DISCLOSURE, AND OTHER ITEMS**

**Section 1.1.** *Definitions.* For the purposes of this order: (a) ''Agency'' means any ''Executive agency,'' as defined in 5 U.S.C. 105, the ''military departments,'' as defined in 5 U.S.C. 102, and any other entity within the executive branch that comes into the possession of classified information, including the Defense Intelligence Agency, National Security Agency, and the National Reconnaissance Office.

(b) ''Applicant'' means a person other than an employee who has received an authorized conditional offer of employment for a position that requires access to classified information.

(c) ''Authorized investigative agency'' means an agency authorized by law or regulation to conduct a counterintelligence investigation or investigation of persons who are proposed for access to classified information to ascertain whether such persons satisfy the criteria for obtaining and retaining access to such information.

(d) ''Classified information'' means information that has been determined pursuant to Executive Order No. 12958, or any successor order, Executive Order No. 12951, or any successor order, or the Atomic Energy Act of 1954 (42 U.S.C. 2011), to require protection against unauthorized disclosure.

(e) ''Employee'' means a person, other than the President and Vice President, employed by, detailed or assigned to, an agency, including members of the Armed Forces; an expert or consultant to an agency; an industrial or commercial contractor, licensee, certificate holder, or grantee of an agency, including all subcontractors; a personal services contractor; or any other category of person who acts for or on behalf of an agency as determined by the appropriate agency head.

(f) ''Foreign power'' and ''agent of a foreign power'' have the meaning provided in 50 U.S.C. 1801.

(g) ''Need for access'' means a determination that an employee requires access to a particular level of classified information in order to perform or assist in a lawful and authorized governmental function.

(h) ''Need-to-know'' means a determination made by an authorized holder of classified information that a prospective recipient requires access to specific classified information in order to perform or assist in a lawful and authorized governmental function.

(i) ''Overseas Security Policy Board'' means the Board established by the President to consider, develop, coordinate and promote policies, standards and agreements on overseas security operations, programs and projects that affect all United States Government agencies under the authority of a Chief of Mission.

(j) ''Security Policy Board'' means the Board established by the President to consider, coordinate, and recommend policy directives for U.S. security policies, procedures, and practices.

(k) ''Special access program'' has the meaning provided in section 4.1 of Executive Order No. 12958, or any successor order.

**Sec. 1.2.** *Access to Classified Information.* (a) No employee shall be granted access to classified information unless that employee has been determined to be eligible in accordance with this order and to possess a need-to-know.

(b) Agency heads shall be responsible for establishing and maintaining an effective program to ensure that access to classified information by each employee is clearly consistent with the interests of the national security.

(c) Employees shall not be granted access to classified information unless they:

(1) have been determined to be eligible for access under section 3.1 of this order by agency heads or designated officials based upon a favorable adjudication of an appropriate investigation of the employee's background;

(2) have a demonstrated need-to-know; and

(3) have signed an approved nondisclosure agreement.

(d) All employees shall be subject to investigation by an appropriate government authority prior to being granted access to classified information and at any time during the period of access to ascertain whether they continue to meet the requirements for access.

(e)(1) All employees granted access to classified information shall be required as a condition of such access to provide to the employing agency written consent permitting access by an authorized investigative agency, for such time as access to classified information is maintained and for a period of 3 years thereafter, to:

(A) relevant financial records that are maintained by a financial institution as defined in 31 U.S.C. 5312(a) or by a holding company as defined in section 1101(6) of the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401);

(B) consumer reports pertaining to the employee under the Fair Credit Reporting Act (15 U.S.C. 1681a); and

(C) records maintained by commercial entities within the United States pertaining to any travel by the employee outside the United States.

(2) Information may be requested pursuant to employee consent under this section where:

(A) there are reasonable grounds to believe, based on credible information, that the employee or former employee is, or may be, disclosing classified information in an unauthorized manner to a foreign power or agent of a foreign power;

(B) information the employing agency deems credible indicates the employee or former employee has incurred excessive indebtedness or has ac-

quired a level of affluence that cannot be explained by other information; or

(C) circumstances indicate the employee or former employee had the capability and opportunity to disclose classified information that is known to have been lost or compromised to a foreign power or an agent of a foreign power.

(3) Nothing in this section shall be construed to affect the authority of an investigating agency to obtain information pursuant to the Right to Financial Privacy Act, the Fair Credit Reporting Act or any other applicable law.

**Sec. 1.3.** *Financial Disclosure.* (a) Not later than 180 days after the effective date of this order, the head of each agency that originates, handles, transmits, or possesses classified information shall designate each employee, by position or category where possible, who has a regular need for access to classified information that, in the discretion of the agency head, would reveal:

(1) the identity of covert agents as defined in the Intelligence Identities Protection Act of 1982 (50 U.S.C. 421);

(2) technical or specialized national intelligence collection and processing systems that, if disclosed in an unauthorized manner, would substantially negate or impair the effectiveness of the system;

(3) the details of:

(A) the nature, contents, algorithm, preparation, or use of any code, cipher, or cryptographic system or;

(B) the design, construction, functioning, maintenance, or repair of any cryptographic equipment; but not including information concerning the use of cryptographic equipment and services;

(4) particularly sensitive special access programs, the disclosure of which would substantially negate or impair the effectiveness of the information or activity involved; or

(5) especially sensitive nuclear weapons design information (but only for those positions that have been certified as being of a high degree of importance or sensitivity, as described in section 145(f) of the Atomic Energy Act of 1954, as amended).

(b) An employee may not be granted access, or hold a position designated as requiring access, to information described in subsection (a) unless, as a condition of access to such information, the employee:

(1) files with the head of the agency a financial disclosure report, including information with respect to the spouse and dependent children of the employee, as part of all background investigations or reinvestigations;

(2) is subject to annual financial disclosure requirements, if selected by the agency head; and

(3) files relevant information concerning foreign travel, as determined by the Security Policy Board.

(c) Not later than 180 days after the effective date of this order, the Security Policy Board shall develop procedures for the implementation of this section, including a standard financial disclosure form for use by employees under subsection (b) of this section, and agency heads shall identify certain employees, by position or category, who are subject to annual financial disclosure.

**Sec. 1.4.** *Use of Automated Financial Record Data Bases.* As part of all investigations and reinvestigations described in section 1.2(d) of this order, agencies may request the Department of the Treasury, under terms and conditions prescribed by the Secretary of the Treasury, to search automated data bases consisting of reports of currency transactions by financial institutions, international transportation of currency or monetary instruments, foreign bank and financial accounts, transactions under $10,000 that are reported as possible money laundering violations, and records of foreign travel.

Sec. 1.5. *Employee Education and Assistance.* The head of each agency that grants access to classified information shall establish a program for employees with access to classified information to: (a) educate employees about individual responsibilities under this order; and

(b) inform employees about guidance and assistance available concerning issues that may affect their eligibility for access to classified information, including sources of assistance for employees who have questions or concerns about financial matters, mental health, or substance abuse.

### PART 2—ACCESS ELIGIBILITY POLICY AND PROCEDURE

Sec. 2.1. *Eligibility Determinations.* (a) Determinations of eligibility for access to classified information shall be based on criteria established under this order. Such determinations are separate from suitability determinations with respect to the hiring or retention of persons for employment by the government or any other personnel actions.

(b) The number of employees that each agency determines are eligible for access to classified information shall be kept to the minimum required for the conduct of agency functions.

(1) Eligibility for access to classified information shall not be requested or granted solely to permit entry to, or ease of movement within, controlled areas when the employee has no need for access and access to classified information may reasonably be prevented. Where circumstances indicate employees may be inadvertently exposed to classified information in the course of their duties, agencies are authorized to grant or deny, in their discretion, facility access approvals to such employees based on an appropriate level of investigation as determined by each agency.

(2) Except in agencies where eligibility for access is a mandatory condition of employment, eligibility for access to classified information shall only be requested or granted based on a demonstrated, foreseeable need for access. Requesting or approving eligibility in excess of actual requirements is prohibited.

(3) Eligibility for access to classified information may be granted where there is a temporary need for access, such as one-time participation in a classified project, provided the investigative standards established under this order have been satisfied. In such cases, a fixed date or event for expiration shall be identified and access to classified information shall be limited to information related to the particular project or assignment.

(4) Access to classified information shall be terminated when an employee no longer has a need for access.

Sec. 2.2. *Level of Access Approval.* (a) The level at which an access approval is granted for an employee shall be limited, and relate directly, to the level of classified information for which there is a need for access. Eligibility for access to a higher level of classified information includes eligibility for access to information classified at a lower level.

(b) Access to classified information relating to a special access program shall be granted in accordance with procedures established by the head of the agency that created the program or, for programs pertaining to intelligence activities (including special activities but not including military operational, strategic, and tactical programs) or intelligence sources and methods, by the Director of Central Intelligence. To the extent possible and consistent with the national security interests of the United States, such procedures shall be consistent with the standards and procedures established by and under this order.

Sec. 2.3 *Temporary Access to Higher Levels.* (a) An employee who has been determined to be eligible for access to classified information based on favorable adjudication of a completed investigation may be granted temporary access to a higher level where security personnel authorized by the agency head to make access eligibility determinations find that such access:

(1) is necessary to meet operational or contractual exigencies not expected to be of a recurring nature;

(2) will not exceed 180 days; and

(3) is limited to specific, identifiable information that is made the subject of a written access record.

(b) Where the access granted under subsection (a) of this section involves another agency's classified information, that agency must concur before access to its information is granted.

**Sec. 2.4.** *Reciprocal Acceptance of Access Eligibility Determinations.* (a) Except when an agency has substantial information indicating that an employee may not satisfy the standards in section 3.1 of this order, background investi-gations and eligibility determinations conducted under this order shall be mutually and reciprocally accepted by all agencies.

(b) Except where there is substantial information indicating that the employee may not satisfy the standards in section 3.1 of this order, an employee with existing access to a special access program shall not be denied eligibility for access to another special access program at the same sensitivity level as determined personally by the agency head or deputy agency head, or have an existing access eligibility readjudicated, so long as the employee has a need for access to the information involved.

(c) This section shall not preclude agency heads from establishing additional, but not duplicative, investigative or adjudicative procedures for a special access program or for candidates for detail or assignment to their agencies, where such procedures are required in exceptional circumstances to protect the national security.

(d) Where temporary eligibility for access is granted under sections 2.3 or 3.3 of this order or where the determination of eligibility for access is conditional, the fact of such temporary or conditional access shall be conveyed to any other agency that considers affording the employee access to its information.

**Sec. 2.5.** *Specific Access Requirement.* (a) Employees who have been determined to be eligible for access to classified information shall be given access to classified information only where there is a need-to-know that information.

(b) It is the responsibility of employees who are authorized holders of classified information to verify that a prospective recipient's eligibility for access has been granted by an authorized agency official and to ensure that a need-to-know exists prior to allowing such access, and to challenge requests for access that do not appear well-founded.

**Sec. 2.6.** *Access by Non-United States Citizens.* (a) Where there are compelling reasons in furtherance of an agency mission, immigrant alien and foreign national employees who possess a special expertise may, in the discretion of the agency, be granted limited access to classified information only for specific programs, projects, contracts, licenses, certificates, or grants for which there is a need for access. Such individuals shall not be eligible for access to any greater level of classified information than the United States Govern-ment has determined may be releasable to the country of which the subject is currently a citizen, and such limited access may be approved only if the prior 10 years of the subject's life can be appropriately investigated. If there are any doubts concerning granting access, additional lawful investigative procedures shall be fully pursued.

(b) Exceptions to these requirements may be permitted only by the agency head or the senior agency official designated under section 6.1 of this order to further substantial national security interests.

**PART 3—ACCESS ELIGIBILITY STANDARDS**

**Sec. 3.1.** *Standards.* (a) No employee shall be deemed to be eligible for access to classified information merely by reason of Federal service or con-

tracting, licensee, certificate holder, or grantee status, or as a matter of right or privilege, or as a result of any particular title, rank, position, or affiliation.

(b) Except as provided in sections 2.6 and 3.3 of this order, eligibility for access to classified information shall be granted only to employees who are United States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information. A determination of eligibility for access to such information is a discretionary security decision based on judgments by appropriately trained adjudicative personnel. Eligibility shall be granted only where facts and circumstances indicate access to classified information is clearly consistent with the national security interests of the United States, and any doubt shall be resolved in favor of the national security.

(c) The United States Government does not discriminate on the basis of race, color, religion, sex, national origin, disability, or sexual orientation in granting access to classified information.

(d) In determining eligibility for access under this order, agencies may investigate and consider any matter that relates to the determination of whether access is clearly consistent with the interests of national security. No inference concerning the standards in this section may be raised solely on the basis of the sexual orientation of the employee.

(e) No negative inference concerning the standards in this section may be raised solely on the basis of mental health counseling. Such counseling can be a positive factor in eligibility determinations. However, mental health counseling, where relevant to the adjudication of access to classified information, may justify further inquiry to determine whether the standards of subsection (b) of this section are satisfied, and mental health may be considered where it directly relates to those standards.

(f) Not later than 180 days after the effective date of this order, the Security Policy Board shall develop a common set of adjudicative guidelines for determining eligibility for access to classified information, including access to special access programs.

**Sec. 3.2.** *Basis for Eligibility Approval.* (a) Eligibility determinations for access to classified information shall be based on information concerning the applicant or employee that is acquired through the investigation conducted pursuant to this order or otherwise available to security officials and shall be made part of the applicant's or employee's security record. Applicants or employees shall be required to provide relevant information pertaining to their background and character for use in investigating and adjudicating their eligibility for access.

(b) Not later than 180 days after the effective date of this order, the Security Policy Board shall develop a common set of investigative standards for background investigations for access to classified information. These standards may vary for the various levels of access.

(c) Nothing in this order shall prohibit an agency from utilizing any lawful investigative procedure in addition to the investigative requirements set forth in this order and its implementing regulations to resolve issues that may arise during the course of a background investigation or reinvestigation.

**Sec. 3.3.** *Special Circumstances.* (a) In exceptional circumstances where official functions must be performed prior to the completion of the investigative and adjudication process, temporary eligibility for access to classified information may be granted to an employee while the initial investigation is underway. When such eligibility is granted, the initial investigation shall be expedited.

(1) Temporary eligibility for access under this section shall include a justification, and the employee must be notified in writing that further access is expressly conditioned on the favorable completion of the investigation and issuance of an access eligibility approval. Access will be immediately terminated, along with any assignment requiring an access eligibility approval, if such approval is not granted.

(2) Temporary eligibility for access may be granted only by security personnel authorized by the agency head to make access eligibility determinations and shall be based on minimum investigative standards developed by the Security Policy Board not later than 180 days after the effective date of this order.

(3) Temporary eligibility for access may be granted only to particular, identified categories of classified information necessary to perform the lawful and authorized functions that are the basis for the granting of temporary access.

(b) Nothing in subsection (a) shall be construed as altering the authority of an agency head to waive requirements for granting access to classified information pursuant to statutory authority.

(c) Where access has been terminated under section 2.1(b)(4) of this order and a new need for access arises, access eligibility up to the same level shall be reapproved without further investigation as to employees who were determined to be eligible based on a favorable adjudication of an investigation completed within the prior 5 years, provided they have remained employed by the same employer during the period in question, the employee certifies in writing that there has been no change in the relevant information provided by the employee for the last background investigation, and there is no information that would tend to indicate the employee may no longer satisfy the standards established by this order for access to classified information.

(d) Access eligibility shall be reapproved for individuals who were determined to be eligible based on a favorable adjudication of an investigation completed within the prior 5 years and who have been retired or otherwise separated from United States Government employment for not more than 2 years; provided there is no indication the individual may no longer satisfy the standards of this order, the individual certifies in writing that there has been no change in the relevant information provided by the individual for the last background investigation, and an appropriate record check reveals no unfavorable information.

**Sec. 3.4.** *Reinvestigation Requirements.* (a) Because circumstances and characteristics may change dramatically over time and thereby alter the eligibility of employees for continued access to classified information, reinvestigations shall be conducted with the same priority and care as initial investigations.

(b) Employees who are eligible for access to classified information shall be the subject of periodic reinvestigations and may also be reinvestigated if, at any time, there is reason to believe that they may no longer meet the standards for access established in this order.

(c) Not later than 180 days after the effective date of this order, the Security Policy Board shall develop a common set of reinvestigative standards, including the frequency of reinvestigations.

## PART 4—INVESTIGATIONS FOR FOREIGN GOVERNMENTS

**Sec. 4.** *Authority.* Agencies that conduct background investigations, including the Federal Bureau of Investigation and the Department of State, are authorized to conduct personnel security investigations in the United States when requested by a foreign government as part of its own personnel security program and with the consent of the individual.

## PART 5—REVIEW OF ACCESS DETERMINATIONS

**Sec. 5.1.** *Determinations of Need for Access.* A determination under section 2.1(b)(4) of this order that an employee does not have, or no longer has, a need for access is a discretionary determination and shall be conclusive.

**Sec. 5.2.** *Review Proceedings for Denials or Revocations of Eligibility for Access.* (a) Applicants and employees who are determined to not meet the standards for access to classified information established in section 3.1 of this order shall be:

(1) provided as comprehensive and detailed a written explanation of the basis for that conclusion as the national security interests of the United States and other applicable law permit;

(2) provided within 30 days, upon request and to the extent the documents would be provided if requested under the Freedom of Information Act (5 U.S.C. 552) or the Privacy Act (3 U.S.C. 552a), as applicable, any documents, records, and reports upon which a denial or revocation is based;

(3) informed of their right to be represented by counsel or other representative at their own expense; to request any documents, records, and reports as described in section 5.2(a)(2) upon which a denial or revocation is based; and to request the entire investigative file, as permitted by the national security and other applicable law, which, if requested, shall be promptly provided prior to the time set for a written reply;

(4) provided a reasonable opportunity to reply in writing to, and to request a review of, the determination;

(5) provided written notice of and reasons for the results of the review, the identity of the deciding authority, and written notice of the right to appeal;

(6) provided an opportunity to appeal in writing to a high level panel, appointed by the agency head, which shall be comprised of at least three members, two of whom shall be selected from outside the security field. Decisions of the panel shall be in writing, and final except as provided in subsection (b) of this section; and

(7) provided an opportunity to appear personally and to present relevant documents, materials, and information at some point in the process before an adjudicative or other authority, other than the investigating entity, as determined by the agency head. A written summary or recording of such appearance shall be made part of the applicant's or employee's security record, unless such appearance occurs in the presence of the appeals panel described in subsection (a)(6) of this section.

(b) Nothing in this section shall prohibit an agency head from personally exercising the appeal authority in subsection (a)(6) of this section based upon recommendations from an appeals panel. In such case, the decision of the agency head shall be final.

(c) Agency heads shall promulgate regulations to implement this section and, at their sole discretion and as resources and national security considerations permit, may provide additional review proceedings beyond those required by subsection (a) of this section. This section does not require additional proceedings, however, and creates no procedural or substantive rights.

(d) When the head of an agency or principal deputy personally certifies that a procedure set forth in this section cannot be made available in a particular case without damaging the national security interests of the United States by revealing classified information, the particular procedure shall not be made available. This certification shall be conclusive.

(e) This section shall not be deemed to limit or affect the responsibility and power of an agency head pursuant to any law or other Executive order to deny or terminate access to classified information in the interests

of national security. The power and responsibility to deny or terminate access to classified information pursuant to any law or other Executive order may be exercised only where the agency head determines that the procedures prescribed in subsection (a) of this section cannot be invoked in a manner that is consistent with national security. This determination shall be conclusive.

(f)(1) This section shall not be deemed to limit or affect the responsibility and power of an agency head to make determinations of suitability for employment.

(2) Nothing in this section shall require that an agency provide the procedures prescribed in subsection (a) of this section to an applicant where a conditional offer of employment is withdrawn for reasons of suitability or any other reason other than denial of eligibility for access to classified information.

(3) A suitability determination shall not be used for the purpose of denying an applicant or employee the review proceedings of this section where there has been a denial or revocation of eligibility for access to classified information.

## PART 6—IMPLEMENTATION

**Sec. 6.1.** *Agency Implementing Responsibilities.* Heads of agencies that grant employees access to classified information shall: (a) designate a senior agency official to direct and administer the agency's personnel security program established by this order. All such programs shall include active oversight and continuing security education and awareness programs to ensure effective implementation of this order;

(b) cooperate, under the guidance of the Security Policy Board, with other agencies to achieve practical, consistent, and effective adjudicative training and guidelines; and

(c) conduct periodic evaluations of the agency's implementation and administration of this order, including the implementation of section 1.3(a) of this order. Copies of each report shall be provided to the Security Policy Board.

**Sec. 6.2.** *Employee Responsibilities.* (a) Employees who are granted eligibility for access to classified information shall:

(1) protect classified information in their custody from unauthorized disclosure;

(2) report all contacts with persons, including foreign nationals, who seek in any way to obtain unauthorized access to classified information;

(3) report all violations of security regulations to the appropriate security officials; and

(4) comply with all other security requirements set forth in this order and its implementing regulations.

(b) Employees are encouraged and expected to report any information that raises doubts as to whether another employee's continued eligibility for access to classified information is clearly consistent with the national security.

**Sec. 6.3.** *Security Policy Board Responsibilities and Implementation.* (a) With respect to actions taken by the Security Policy Board pursuant to sections 1.3(c), 3.1(f), 3.2(b), 3.3(a)(2), and 3.4(c) of this order, the Security Policy Board shall make recommendations to the President through the Assistant to the President for National Security Affairs for implementation.

(b) Any guidelines, standards, or procedures developed by the Security Policy Board pursuant to this order shall be consistent with those guidelines issued by the Federal Bureau of Investigation in March 1994 on Background Investigations Policy/Guidelines Regarding Sexual Orientation.

Case 1:25-cv-01365-AHA    Document 9-14    Filed 05/21/25    Page 11 of 11
USCA Case #26-5009    Document #2159608    Filed: 02/18/2026    Page 117 of 367

**40254**    **Federal Register** / Vol. 60, No. 151 / Monday, August 7, 1995 / Presidential Documents

(c) In carrying out its responsibilities under this order, the Security Policy Board shall consult where appropriate with the Overseas Security Policy Board. In carrying out its responsibilities under section 1.3(c) of this order, the Security Policy Board shall obtain the concurrence of the Director of the Office of Management and Budget.

**Sec. 6.4.** *Sanctions.* Employees shall be subject to appropriate sanctions if they knowingly and willfully grant eligibility for, or allow access to, classified information in violation of this order or its implementing regulations. Sanctions may include reprimand, suspension without pay, removal, and other actions in accordance with applicable law and agency regulations.

## PART 7—GENERAL PROVISIONS

**Sec. 7.1.** *Classified Information Procedures Act.* Nothing in this order is intended to alter the procedures established under the Classified Information Procedures Act (18 U.S.C. App. 1).

**Sec. 7.2.** *General.* (a) Information obtained by an agency under sections 1.2(e) or 1.3 of this order may not be disseminated outside the agency, except to:

(1) the agency employing the employee who is the subject of the records or information;

(2) the Department of Justice for law enforcement or counterintelligence purposes; or

(3) any agency if such information is clearly relevant to the authorized responsibilities of such agency.

(b) The Attorney General, at the request of the head of an agency, shall render an interpretation of this order with respect to any question arising in the course of its administration.

(c) No prior Executive orders are repealed by this order. To the extent that this order is inconsistent with any provision of any prior Executive order, this order shall control, except that this order shall not diminish or otherwise affect the requirements of Executive Order No. 10450, the denial and revocation procedures provided to individuals covered by Executive Order No. 10865, as amended, or access by historical researchers and former presidential appointees under Executive Order No. 12958 or any successor order.

(d) If any provision of this order or the application of such provision is held to be invalid, the remainder of this order shall not be affected.

(e) This Executive order is intended only to improve the internal management of the executive branch and is not intended to, and does not, create any right to administrative or judicial review, or any other right or benefit or trust responsibility, substantive or procedural, enforceable by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

(f) This order is effective immediately.



THE WHITE HOUSE,
*August 2, 1995.*

[FR Doc. 95–19654
Filed 8–4–95; 12:18 pm]
Billing code 3195–01–P

# EXHIBIT 11

Federal  Register

Vol. 73, No. 128

Wednesday, July 2, 2008

# Presidential Documents

---

Title 3—

The President

### Executive Order 13467 of June 30, 2008

### Reforming Processes Related to Suitability for Government Employment, Fitness for Contractor Employees, and Eligibility for Access to Classified National Security Information

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to ensure an efficient, practical, reciprocal, and aligned system for investigating and determining suitability for Government employment, contractor employee fitness, and eligibility for access to classified information, while taking appropriate account of title III of Public Law 108–458, it is hereby ordered as follows:

PART 1—POLICY, APPLICABILITY, AND DEFINITIONS

**Section 1.1.** *Policy.* Executive branch policies and procedures relating to suitability, contractor employee fitness, eligibility to hold a sensitive position, access to federally controlled facilities and information systems, and eligibility for access to classified information shall be aligned using consistent standards to the extent possible, provide for reciprocal recognition, and shall ensure cost-effective, timely,and efficient protection of the national interest, while providing fair treatment to those upon whom the Federal Government relies to conduct our Nation's business and protect national security.

**Sec. 1.2.** *Applicability.* (a) This order applies to all covered individuals as defined in section 1.3(g), except that:

(i) the provisions regarding eligibility for physical access to federally controlled facilities and logical access to federally controlled information systems do not apply to individuals exempted in accordance with guidance pursuant to the Federal Information Security Management Act (title III of Public Law 107–347) and Homeland Security Presidential Directive 12; and

(ii) the qualification standards for enlistment, appointment, and induction into the Armed Forces pursuant to title 10, United States Code, are unaffected by this order.

(b) This order also applies to investigations and determinations of eligibility for access to classified information for employees of agencies working in or for the legislative or judicial branches when those investigations or determinations are conducted by the executive branch.**Sec. 1.3.** *Definitions.* For the purpose of this order: (a) "Adjudication" means the evaluation of pertinent data in a background investigation, as well as any other available information that is relevant and reliable, to determine whether a covered individual is:

(i) suitable for Government employment;

(ii) eligible for logical and physical access;

(iii) eligible for access to classified information;

(iv) eligible to hold a sensitive position; or

(v) fit to perform work for or on behalf of the Government as a contractor employee.

(b) "Agency" means any "Executive agency" as defined in section 105 of title 5, United States Code, including the "military departments," as defined in section 102 of title 5, United States Code, and any other entity

within the executive branch that comes into possession of classified information or has designated positions as sensitive, except such an entity headed by an officer who is not a covered individual.

(c) ''Classified information'' means information that has been determined pursuant to Executive Order 12958 of April 17, 1995, as amended, or a successor or predecessor order, or the Atomic Energy Act of 1954 (42 U.S.C. 2011 *et seq.*) to require protection against unauthorized disclosure.

(d) ''Continuous evaluation'' means reviewing the background of an individual who has been determined to be eligible for access to classified information (including additional or new checks of commercial databases, Government databases, and other information lawfully available to security officials) at any time during the period of eligibility to determine whether that individual continues to meet the requirements for eligibility for access to classified information.

(e) ''Contractor'' means an expert or consultant (not appointed under section 3109 of title 5, United States Code) to an agency; an industrial or commercial contractor, licensee, certificate holder, or grantee of any agency, including all subcontractors; a personal services contractor; or any other category of person who performs work for or on behalf of an agency (but not a Federal employee).

(f) ''Contractor employee fitness'' means fitness based on character and conduct for work for or on behalf of the Government as a contractor employee.

(g) ''Covered individual'' means a person who performs work for or on behalf of the executive branch, or who seeks to perform work for or on behalf of the executive branch, but does not include:

(i) the President or (except to the extent otherwise directed by the President) employees of the President under section 105 or 107 of title 3, United States Code; or

(ii) the Vice President or (except to the extent otherwise directed by the Vice President) employees of the Vice President under section 106 of title 3 or annual legislative branch appropriations acts.

(h) ''End-to-end automation'' means an executive branch-wide federated system that uses automation to manage and monitor cases and maintain relevant documentation of the application (but not an employment application), investigation, adjudication, and continuous evaluation processes.

(i) ''Federally controlled facilities'' and ''federally controlled information systems'' have the meanings prescribed in guidance pursuant to the Federal Information Security Management Act (title III of Public Law 107–347) and Homeland Security Presidential Directive 12.

(j) ''Logical and physical access'' means access other than occasional or intermittent access to federally controlled facilities or information systems.

(k) ''Sensitive position'' means any position so designated under Executive Order 10450 of April 27, 1953, as amended.

(l) ''Suitability'' has the meaning and coverage provided in 5 CFR Part 731.

PART 2—ALIGNMENT, RECIPROCITY, AND GOVERNANCE

**Sec. 2.1.** *Aligned System.* (a) Investigations and adjudications of covered individuals who require a determination of suitability, eligibility for logical and physical access, eligibility to hold a sensitive position, eligibility for access to classified information, and, as appropriate, contractor employee fitness, shall be aligned using consistent standards to the extent possible. Each successively higher level of investigation and adjudication shall build upon, but not duplicate, the ones below it.

(b) The aligned system shall employ updated and consistent standards and methods, enable innovations with enterprise information technology capabilities and end-to-end automation to the extent practicable, and ensure that relevant information maintained by agencies can be accessed and shared

rapidly across the executive branch, while protecting national security, protecting privacy-related information, ensuring resulting decisions are in the national interest, and providing the Federal Government with an effective workforce.

(c) Except as otherwise authorized by law, background investigations and adjudications shall be mutually and reciprocally accepted by all agencies. An agency may not establish additional investigative or adjudicative requirements (other than requirements for the conduct of a polygraph examination consistent with law, directive, or regulation) that exceed the requirements for suitability, contractor employee fitness, eligibility for logical or physical access, eligibility to hold a sensitive position, or eligibility for access to classified information without the approval of the Suitability Executive Agent or Security Executive Agent, as appropriate, and provided that approval to establish additional requirements shall be limited to circumstances where additional requirements are necessary to address significant needs unique to the agency involved or to protect national security.

**Sec. 2.2.** *Establishment and Functions of Performance Accountability Council.*
(a) There is hereby established a Suitability and Security Clearance Performance Accountability Council (Council).

(b) The Deputy Director for Management, Office of Management and Budget, shall serve as Chair of the Council and shall have authority, direction, and control over the Council's functions. Membership on the Council shall include the Suitability Executive Agent and the Security Executive Agent. The Chair shall select a Vice Chair to act in the Chair's absence. The Chair shall have authority to designate officials from additional agencies who shall serve as members of the Council. Council membership shall be limited to Federal Government employees and shall include suitability and security professionals.

(c) The Council shall be accountable to the President to achieve, consistent with this order, the goals of reform, and is responsible for driving implementation of the reform effort, ensuring accountability by agencies, ensuring the Suitability Executive Agent and the Security Executive Agent align their respective processes, and sustaining reform momentum.

(d) The Council shall:
(i) ensure alignment of suitability, security, and, as appropriate, contractor employee fitness investigative and adjudicative processes;

(ii) hold agencies accountable for the implementation of suitability, security, and, as appropriate, contractor employee fitness processes and procedures;

(iii) establish requirements for enterprise information technology;

(iv) establish annual goals and progress metrics and prepare annual reports on results;

(v) ensure and oversee the development of tools and techniques for enhancing background investigations and the making of eligibility determinations;

(vi) arbitrate disparities in procedures between the Suitability Executive Agent and the Security Executive Agent;

(vii) ensure sharing of best practices; and

(viii) advise the Suitability Executive Agent and the Security Executive Agent on policies affecting the alignment of investigations and adjudications.

(e) The Chair may, to ensure the effective implementation of the policy set forth in section 1.1 of this order and to the extent consistent with law, assign, in whole or in part, to the head of any agency (solely or jointly) any function within the Council's responsibility relating to alignment and improvement of investigations and determinations of suitability, contractor employee fitness, eligibility for logical and physical access, eligibility for access to classified information, or eligibility to hold a sensitive position.

**Sec. 2.3.** *Establishment, Designation, and Functions of Executive Agents.*
(a) There is hereby established a Suitability Executive Agent and a Security Executive Agent.

(b) The Director of the Office of Personnel Management shall serve as the Suitability Executive Agent. As the Suitability Executive Agent, the Director of the Office of Personnel Management will continue to be responsible for developing and implementing uniform and consistent policies and procedures to ensure the effective, efficient, and timely completion of investigations and adjudications relating to determinations of suitability and eligibility for logical and physical access.

(c) The Director of National Intelligence shall serve as the Security Executive Agent. The Security Executive Agent:

(i) shall direct the oversight of investigations and determinations of eligibility for access to classified information or eligibility to hold a sensitive position made by any agency;

(ii) shall be responsible for developing uniform and consistent policies and procedures to ensure the effective, efficient, and timely completion of investigations and adjudications relating to determinations of eligibility for access to classified information or eligibility to hold a sensitive position;

(iii) may issue guidelines and instructions to the heads of agencies to ensure appropriate uniformity, centralization, efficiency, effectiveness, and timeliness in processes relating to determinations by agencies of eligibility for access to classified information or eligibility to hold a sensitive position;

(iv) shall serve as the final authority to designate an agency or agencies to conduct investigations of persons who are proposed for access to classified information to ascertain whether such persons satisfy the criteria for obtaining and retaining access to classified information or eligibility to hold a sensitive position;

(v) shall serve as the final authority to designate an agency or agencies to determine eligibility for access to classified information in accordance with Executive Order 12968 of August 2, 1995;

(vi) shall ensure reciprocal recognition of eligibility for access to classified information among the agencies, including acting as the final authority to arbitrate and resolve disputes among the agencies involving the reciprocity of investigations and determinations of eligibility for access to classified information or eligibility to hold a sensitive position; and

(vii) may assign, in whole or in part, to the head of any agency (solely or jointly) any of the functions detailed in (i) through (vi), above, with the agency's exercise of such assigned functions to be subject to the Security Executive Agent's oversight and with such terms and conditions (including approval by the Security Executive Agent) as the Security Executive Agent determines appropriate.

(d) Nothing in this order shall be construed in a manner that would limit the authorities of the Director of the Office of Personnel Management or the Director of National Intelligence under law.

**Sec. 2.4.** *Additional Functions.* (a) The duties assigned to the Security Policy Board by Executive Order 12968 of August 2, 1995, to consider, coordinate, and recommend policy directives for executive branch security policies, procedures, and practices are reassigned to the Security Executive Agent.

(b) Heads of agencies shall:

(i) carry out any function assigned to the agency head by the Chair, and shall assist the Chair, the Council, the Suitability Executive Agent, and the Security Executive Agent in carrying out any function under sections 2.2 and 2.3 of this order;

(ii) implement any policy or procedure developed pursuant to this order;

(iii) to the extent permitted by law, make available to the Performance Accountability Council, the Suitability Executive Agent, or the Security

Executive Agent such information as may be requested to implement this order;

(iv) ensure that all actions taken under this order take account of the counterintelligence interests of the United States, as appropriate; and

(v) ensure that actions taken under this order are consistent with the President's constitutional authority to:
  (A) conduct the foreign affairs of the United States;
  (B) withhold information the disclosure of which could impair the foreign relations, the national security, the deliberative processes of the Executive, or the performance of the Executive's constitutional duties;
  (C) recommend for congressional consideration such measures as the President may judge necessary or expedient; and
  (D) supervise the unitary executive branch.

PART 3—MISCELLANEOUS

**Sec. 3.** *General Provisions.* (a) Executive Order 13381 of June 27, 2005, as amended, is revoked. Nothing in this order shall:

  (i) supersede, impede, or otherwise affect:
    (A) Executive Order 10450 of April 27, 1953, as amended;
    (B) Executive Order 10577 of November 23, 1954, as amended;
    (C) Executive Order 12333 of December 4, 1981, as amended;
    (D) Executive Order 12829 of January 6, 1993, as amended; or
    (E) Executive Order 12958 of April 17, 1995, as amended; nor
  (ii) diminish or otherwise affect the denial and revocation procedures provided to individuals covered by Executive Order 10865 of February 20, 1960, as amended.

(b) Executive Order 12968 of August 2, 1995 is amended:

  (i) by inserting: "**Sec. 3.5.** *Continuous Evaluation.* An individual who has been determined to be eligible for or who currently has access to classified information shall be subject to continuous evaluation under standards (including, but not limited to, the frequency of such evaluation) as determined by the Director of National Intelligence."; and

  (ii) by striking "the Security Policy Board shall make recommendations to the President through the Assistant to the President for National Security Affairs" in section 6.3(a) and inserting in lieu thereof "the Director of National Intelligence shall serve as the final authority";

  (iii) by striking "Security Policy Board" and inserting in lieu thereof "Security Executive Agent" in each instance;

  (iv) by striking "the Board" in section 1.1(j) and inserting in lieu thereof "the Security Executive Agent"; and

  (v) by inserting "or appropriate automated procedures" in section 3.1(b) after "by appropriately trained adjudicative personnel".

(c) Nothing in this order shall supersede, impede, or otherwise affect the remainder of Executive Order 12968 of August 2, 1995, as amended.

(d) Executive Order 12171 of November 19, 1979, as amended, is further amended by striking "The Center for Federal Investigative Services" in section 1–216 and inserting in lieu thereof "The Federal Investigative Services Division."

(e) Nothing in this order shall be construed to impair or otherwise affect the:

  (i) authority granted by law to a department or agency, or the head thereof; or

  (ii) functions of the Director of the Office of Management and Budget relating to budget, administrative, or legislative proposals.

(f) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(g) Existing delegations of authority made pursuant to Executive Order 13381 of June 27, 2005, as amended, to any agency relating to granting eligibility for access to classified information and conducting investigations shall 13 remain in effect, subject to the exercise of authorities pursuant to this order to revise or revoke such delegation.

(h) If any provision of this order or the application of such provision is held to be invalid, the remainder of this order shall not be affected.

(i) This order is intended only to improve the internal management of the executive branch and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its agencies, instrumentalities, or entities, its officers or employees, or any other person.

THE WHITE HOUSE,
*June 30, 2008.*

[FR Doc. 08–1409
Filed 7–1–08; 11:00 am]
Billing code 3195–W8–P

# EXHIBIT 12



# SECURITY EXECUTIVE AGENT DIRECTIVE 4

## NATIONAL SECURITY ADJUDICATIVE GUIDELINES

### (EFFECTIVE: 08 JUNE 2017)

**A. AUTHORITY:** The National Security Act of 1947, as amended; Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), as amended; Executive Order (EO) 10450, Security Requirements for Government Employment, as amended; EO 12968, Access to Classified Information, as amended; EO 13467, Reforming Processes Related to Suitability for Government Employment, Fitness for Contractor Employees, and Eligibility for Access to Classified National Security Information; EO 13549, Classified National Security Information Program for State, Local, Tribal and Private Sector Entities; Performance Accountability Council memorandum, Assignment of Functions Relating to Coverage of Contractor Employee Fitness in the Federal Investigative Standards, 6 December 2012; and other applicable provisions of law.

**B. PURPOSE:** This Security Executive Agent (SecEA) Directive establishes the single, common adjudicative criteria for all covered individuals who require initial or continued eligibility for access to classified information or eligibility to hold a sensitive position. The Guidelines reflected herein supersede all previously issued national security adjudicative criteria or guidelines.

**C. APPLICABILITY:** This Directive applies to any executive branch agency authorized or designated to conduct adjudications of covered individuals to determine eligibility for initial or continued access to classified national security information or eligibility to hold a sensitive position.

**D. DEFINITIONS:** As used in this Directive, the following terms have the meanings set forth below:

1. "Agency": Any "Executive agency" as defined in Section 105 of Title 5, United States Code (USC), including the "military departments," as defined in Section 102 of Title 5, USC and any other entity within the Executive Branch that comes into possession of classified information or has positions designated as sensitive.

2. "Authorized adjudicative agency": An agency authorized by law, executive order, or designation by the SecEA to determine eligibility for access to classified information in accordance with EO 12968, as amended, or eligibility to hold a sensitive position.

3. "Authorized investigative agency": An agency authorized by law, executive order, or designation by the SecEA to conduct a background investigation of individuals who are proposed for access to classified information or eligibility to hold a sensitive position or to

ascertain whether such individuals continue to satisfy the criteria for retaining access to such information or eligibility to hold such positions.

4. "Classified national security information" or "classified information": Information that has been determined pursuant to EO 13526 or any predecessor or successor order, or the Atomic Energy Act of 1954, as amended, to require protection against unauthorized disclosure.

5. "Covered individual":

a. A person who performs work for or on behalf of the executive branch or who seeks to perform work for or on behalf of the executive branch, but does not include the President or (except to the extent otherwise directed by the President) employees of the President under 3 USC 105 or 107, the Vice President, or (except to the extent otherwise directed by the Vice President) employees of the Vice President under 3 USC 106 or annual legislative branch appropriations acts;

b. A person who performs work for or on behalf of a state, local, tribal, or private sector entity as defined in EO 13549 requiring eligibility for access to classified information;

c. A person working in or for the legislative or judicial branches requiring eligibility for access to classified information and the investigation or determination is conducted by the executive branch, but does not include members of Congress; Justices of the Supreme Court; and Federal judges appointed by the President.

d. Covered individuals are not limited to government employees and include all persons, not excluded under paragraphs (a), (b), or (c) of this definition, who require eligibility for access to classified information or eligibility to hold a sensitive position, including, but not limited to, contractors, subcontractors, licensees, certificate holders, grantees, experts, consultants, and government employees.

6. "Foreign Intelligence Entity": Known or suspected foreign state or non-state organizations or persons that conduct intelligence activities to acquire U.S. information, block or impair U.S. intelligence collection, influence U.S. policy, or disrupt U.S. systems and programs. The term includes foreign intelligence and security services and international terrorists.

7. "National Security Eligibility": Eligibility for access to classified information or eligibility to hold a sensitive position, to include access to sensitive compartmented information, restricted data, and controlled or special access program information.

8. "Sensitive Position": Any position within or in support of an agency in which the occupant could bring about, by virtue of the nature of the position, a material adverse effect on the national security regardless of whether the occupant has access to classified information, and regardless of whether the occupant is an employee, military service member, or contractor.

## E. POLICY:

1. The National Security Adjudicative Guidelines in Appendix A shall be used by all authorized adjudicative agencies when rendering a determination for initial or continued eligibility for access to classified information or initial or continued eligibility to hold a sensitive position.

2.  Appendix B sets forth statutory restrictions on agencies making certain eligibility determinations for access to classified information, as well as waiver and congressional reporting requirements. These amendments to the IRTPA are commonly referred to as the Bond Amendment. By definition, the risk to national security is equivalent for covered individuals with access to classified information and covered individuals occupying a sensitive position. Occupants of sensitive positions could bring about, by virtue of the nature of the position, a material adverse effect on the national security regardless of whether the occupant has access to classified information. Due to the equivalent adverse effect on the national security and to ensure uniformity, consistency, and reciprocity of national security background investigations and adjudications, the statutory restrictions imposed by the Bond Amendment are extended to apply to all covered individuals who require initial or continued eligibility for access to classified information or eligibility to hold a sensitive position. Authorized adjudicative agencies shall maintain a record of the number and type of meritorious waivers granted under Bond Amendment criteria, to include the rationale for each waiver, and shall report this data annually to the SecEA in advance of the annual report to Congress. Authorized adjudicative agencies will also maintain a record of all disqualifications due to Bond Amendment criteria.

3.  Exceptions, as provided for in Appendix C, shall be used when a favorable adjudicative decision to grant initial or continued eligibility for access to classified information or to hold a sensitive position is made, despite failure to meet adjudicative or investigative standards.

4.  Eligibility shall be determined by appropriately trained adjudicative personnel through the evaluation of all information bearing on an individual's loyalty and allegiance to the United States, including any information relevant to strength of character, honesty, discretion, sound judgment, reliability, ability to protect classified or sensitive information, and trustworthiness. Eligibility for access to classified information or eligibility to occupy a sensitive position shall only be granted when the evaluation of all such information demonstrates that such eligibility is clearly consistent with the interests of the United States; any doubt shall be resolved in favor of the national security.

5.  All adjudicative determinations, including any associated exceptions, shall be recorded in either Scattered Castles, the Joint Personnel Adjudication System within the Department of Defense, or the Central Verification System database within U.S. Office of Personnel Management or successor databases, unless authorized by the SecEA to withhold information from the database for national security purposes.

6.  When an adjudicative determination is made to deny or revoke eligibility for access to classified information or eligibility to hold a sensitive position, review proceedings, to the extent they are made available in EO 12968, as amended, Part 5, shall be afforded covered individuals at a minimum.

7.  The agency with adjudicative authority remains responsible for the final determination.

8.  Agencies shall update internal policies and replace existing national security adjudicative criteria or guidelines with the guidelines in Appendix A no later than the effective date of this Directive.

3

9.  This Directive is not intended to, and does not, create any right to administrative or judicial review, or any other right or benefit, or trust responsibility substantive or procedural, enforceable by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

**F.  EFFECTIVE DATE:** This Directive becomes effective 180 days after the date of signature.


_____            10  Dec  2016
Security Executive Agent              Date

# APPENDIX A

## NATIONAL SECURITY ADJUDICATIVE GUIDELINES

## FOR DETERMINING ELIGIBILITY FOR ACCESS TO CLASSIFIED INFORMATION

## OR ELIGIBILITY TO HOLD A SENSITIVE POSITION

### 1. Introduction.

(a) The following National Security Adjudicative Guidelines ("guidelines") are established as the single common criteria for all U.S. Government civilian and military personnel, consultants, contractors, licensees, certificate holders or grantees and their employees, and other individuals who require initial or continued eligibility for access to classified information or eligibility to hold a sensitive position, to include access to sensitive compartmented information, restricted data, and controlled or special access program information (hereafter referred to as "national security eligibility"). These guidelines shall be used by all Executive Branch Agencies when rendering any final national security eligibility determination.

(b) National security eligibility determinations take into account a person's stability, trustworthiness, reliability, discretion, character, honesty, and judgment. Individuals must be unquestionably loyal to the United States. No amount of oversight or security procedures can replace the self-discipline and integrity of an individual entrusted to protect the nation's secrets or occupying a sensitive position. When a person's life history shows evidence of unreliability or untrustworthiness, questions arise as to whether the individual can be relied upon and trusted to exercise the responsibility necessary for working in an environment where protecting the national security is paramount.

(c) The U.S. Government does not discriminate on the basis of race, color, religion, sex, national origin, disability, or sexual orientation in making a national security eligibility determination. No negative inference concerning eligibility under these guidelines may be raised solely on the basis of mental health counseling. No adverse action concerning these guidelines may be taken solely on the basis of polygraph examination technical calls in the absence of adjudicatively significant information.

(d) In accordance with EO 12968, as amended, eligibility for covered individuals shall be granted only when facts and circumstances indicate that eligibility is clearly consistent with the national security interests of the United States, and any doubt shall be resolved in favor of national security.

## 2. The Adjudicative Process.

(a) The adjudicative process is an examination of a sufficient period and a careful weighing of a number of variables of an individual's life to make an affirmative determination that the individual is an acceptable security risk. This is known as the whole-person concept. All available, reliable information about the person, past and present, favorable and unfavorable, should be considered in reaching a national security eligibility determination.

(b) Each case must be judged on its own merits, and the final determination remains the responsibility of the authorized adjudicative agency. Any doubt concerning personnel being considered for national security eligibility will be resolved in favor of the national security.

(c) The ultimate determination of whether the granting or continuing of national security eligibility is clearly consistent with the interests of national security must be an overall common sense judgment based upon careful consideration of the following guidelines, each of which is to be evaluated in the context of the whole person.

    (1) GUIDELINE A: Allegiance to the United States
    (2) GUIDELINE B: Foreign Influence
    (3) GUIDELINE C: Foreign Preference
    (4) GUIDELINE D: Sexual Behavior
    (5) GUIDELINE E: Personal Conduct
    (6) GUIDELINE F: Financial Considerations
    (7) GUIDELINE G: Alcohol Consumption
    (8) GUIDELINE H: Drug Involvement and Substance Misuse
    (9) GUIDELINE I: Psychological Conditions
    (10) GUIDELINE J: Criminal Conduct
    (11) GUIDELINE K: Handling Protected Information
    (12) GUIDELINE L: Outside Activities
    (13) GUIDELINE M: Use of Information Technology

(d) In evaluating the relevance of an individual's conduct, the adjudicator should consider the following factors:

    (1) the nature, extent, and seriousness of the conduct;
    (2) the circumstances surrounding the conduct, to include knowledgeable participation;
    (3) the frequency and recency of the conduct;
    (4) the individual's age and maturity at the time of the conduct;
    (5) the extent to which participation is voluntary;
    (6) the presence or absence of rehabilitation and other permanent behavioral changes;
    (7) the motivation for the conduct;
    (8) the potential for pressure, coercion, exploitation, or duress; and
    (9) the likelihood of continuation or recurrence.

(e) Although adverse information concerning a single criterion may not be sufficient for an unfavorable eligibility determination, the individual may be found ineligible if available information reflects a recent or recurring pattern of questionable judgment, irresponsibility, or unstable behavior. However, a single criterion may be sufficient to make an unfavorable eligibility determination even in the absence of a recent occurrence or a recurring pattern. Notwithstanding the whole-person concept, pursuit of further investigation may be terminated by an appropriate adjudicative agency in the face of reliable, significant, disqualifying, adverse information.

(f) When information of security concern becomes known about an individual who is currently eligible for access to classified information or eligible to hold a sensitive position, the adjudicator should consider whether the individual:

(1) voluntarily reported the information;
(2) was truthful and complete in responding to questions;
(3) sought assistance and followed professional guidance, where appropriate;
(4) resolved or appears likely to favorably resolve the security concern;
(5) has demonstrated positive changes in behavior; and
(6) should have his or her national security eligibility suspended pending final adjudication of the information.

(g) If after evaluating information of security concern, the adjudicator decides the information is serious enough to warrant a recommendation of denial or revocation of the national security eligibility, but the specific risk to national security can be managed with appropriate mitigation measures, an adjudicator may recommend approval to grant initial or continued eligibility for access to classified information or to hold a sensitive position with an exception as defined in Appendix C.

(h) If after evaluating information of security concern, the adjudicator decides that the information is not serious enough to warrant a recommendation of denial or revocation of the national security eligibility, an adjudicator may recommend approval with a warning that future incidents of a similar nature or other incidents of adjudicative concern may result in revocation of national security eligibility.

(i) It must be noted that the adjudicative process is predicated upon individuals providing relevant information pertaining to their background and character for use in investigating and adjudicating their national security eligibility. Any incident of intentional material falsification or purposeful non-cooperation with security processing is of significant concern. Such conduct raises questions about an individual's judgment, reliability, and trustworthiness and may be predictive of their willingness or ability to protect the national security.

7

UNCLASSIFIED

## GUIDELINES

### GUIDELINE A:  ALLEGIANCE TO THE UNITED STATES

3. *The Concern.*  The willingness to safeguard classified or sensitive information is in doubt if there is any reason to suspect an individual's allegiance to the United States.  There is no positive test for allegiance, but there are negative indicators.  These include participation in or support for acts against the United States or placing the welfare or interests of another country above those of the United States.  Finally, the failure to adhere to the laws of the United States may be relevant if the violation of law is harmful to stated U.S. interests.  An individual who engages in acts against the United States or provides support or encouragement to those who do has already demonstrated willingness to compromise national security.

4. *Conditions that could raise a security concern and may be disqualifying include:*

(a) involvement in, support of, training to commit, or advocacy of any act of sabotage, espionage, treason, terrorism, or sedition against the United States;

(b) association or sympathy with persons who are attempting to commit, or who are committing, any of the above acts; and

(c) association or sympathy with persons or organizations that advocate, threaten, or use force or violence, or use any other illegal or unconstitutional means, in an effort to:

   (1) overthrow or influence the U.S. Government or any state or local government;
   (2) prevent Federal, state, or local government personnel from performing their official duties;
   (3) gain retribution for perceived wrongs caused by the Federal, state, or local government; and
   (4) prevent others from exercising their rights under the Constitution or laws of the United States or of any state.

5. *Conditions that could mitigate security concerns include:*

(a) the individual was unaware of the unlawful aims of the individual or organization and severed ties upon learning of these;

(b) the individual's involvement was humanitarian and permitted under U.S. law;

(c) involvement in the above activities occurred for only a short period of time and was attributable to curiosity or academic interest; and

8

(d) the involvement or association with such activities occurred under such unusual circumstances, or so much time has elapsed, that it is unlikely to recur and does not cast doubt on the individual's current reliability, trustworthiness, or allegiance.

## GUIDELINE B: FOREIGN INFLUENCE

6. *The Concern.* Foreign contacts and interests, including, but not limited to, business, financial, and property interests, are a national security concern if they result in divided allegiance. They may also be a national security concern if they create circumstances in which the individual may be manipulated or induced to help a foreign person, group, organization, or government in a way inconsistent with U.S. interests or otherwise made vulnerable to pressure or coercion by any foreign interest. Assessment of foreign contacts and interests should consider the country in which the foreign contact or interest is located, including, but not limited to, considerations such as whether it is known to target U.S. citizens to obtain classified or sensitive information or is associated with a risk of terrorism.

7. *Conditions that could raise a security concern and may be disqualifying include:*

(a) contact, regardless of method, with a foreign family member, business or professional associate, friend, or other person who is a citizen of or resident in a foreign country if that contact creates a heightened risk of foreign exploitation, inducement, manipulation, pressure, or coercion;

(b) connections to a foreign person, group, government, or country that create a potential conflict of interest between the individual's obligation to protect classified or sensitive information or technology and the individual's desire to help a foreign person, group, or country by providing that information or technology;

(c) failure to report or fully disclose, when required, association with a foreign person, group, government, or country;

(d) counterintelligence information, whether classified or unclassified, that indicates the individual's access to classified information or eligibility for a sensitive position may involve unacceptable risk to national security;

(e) shared living quarters with a person or persons, regardless of citizenship status, if that relationship creates a heightened risk of foreign inducement, manipulation, pressure, or coercion;

(f) substantial business, financial, or property interests in a foreign country, or in any foreign-owned or foreign-operated business that could subject the individual to a heightened risk of foreign influence or exploitation or personal conflict of interest;

(g) unauthorized association with a suspected or known agent, associate, or employee of a foreign intelligence entity;

9

(h) indications that representatives or nationals from a foreign country are acting to increase the vulnerability of the individual to possible future exploitation, inducement, manipulation, pressure, or coercion; and

(i) conduct, especially while traveling or residing outside the U.S., that may make the individual vulnerable to exploitation, pressure, or coercion by a foreign person, group, government, or country.

8. *Conditions that could mitigate security concerns include:*

(a) the nature of the relationships with foreign persons, the country in which these persons are located, or the positions or activities of those persons in that country are such that it is unlikely the individual will be placed in a position of having to choose between the interests of a foreign individual, group, organization, or government and the interests of the United States;

(b) there is no conflict of interest, either because the individual's sense of loyalty or obligation to the foreign person, or allegiance to the group, government, or country is so minimal, or the individual has such deep and longstanding relationships and loyalties in the United States, that the individual can be expected to resolve any conflict of interest in favor of the U.S. interest;

(c) contact or communication with foreign citizens is so casual and infrequent that there is little likelihood that it could create a risk for foreign influence or exploitation;

(d) the foreign contacts and activities are on U.S. Government business or are approved by the agency head or designee;

(e) the individual has promptly complied with existing agency requirements regarding the reporting of contacts, requests, or threats from persons, groups, or organizations from a foreign country; and

(f) the value or routine nature of the foreign business, financial, or property interests is such that they are unlikely to result in a conflict and could not be used effectively to influence, manipulate, or pressure the individual.

## GUIDELINE C: FOREIGN PREFERENCE

9. *The Concern.* When an individual acts in such a way as to indicate a preference for a foreign country over the United States, then he or she may provide information or make decisions that are harmful to the interests of the United States. Foreign involvement raises concerns about an individual's judgment, reliability, and trustworthiness when it is in conflict with U.S. national interests or when the individual acts to conceal it. *By itself,* the fact that a U.S. citizen is also a citizen of another country is not disqualifying without an objective showing of such conflict or attempt at concealment. The same is true for a U.S. citizen's exercise of any right or privilege of foreign citizenship and any action to acquire or obtain recognition of a foreign citizenship.

10. *Conditions that could raise a security concern and may be disqualifying include:*

10

(a) applying for and/or acquiring citizenship in any other country;

(b) failure to report, or fully disclose when required, to an appropriate security official, the possession of a passport or identity card issued by any country other than the United States;

(c) failure to use a U.S. passport when entering or exiting the U.S.;

(d) participation in foreign activities, including but not limited to:

    (1) assuming or attempting to assume any type of employment, position, or political office in a foreign government or military organization; and
    (2) otherwise acting to serve the interests of a foreign person, group, organization, or government in any way that conflicts with U.S. national security interests;

(e) using foreign citizenship to protect financial or business interests in another country in violation of U.S. law; and

(f) an act of expatriation from the United States such as declaration of intent to renounce U.S. citizenship, whether through words or actions.

11. *Conditions that could mitigate security concerns include:*

(a) the foreign citizenship is not in conflict with U.S. national security interests;

(b) dual citizenship is based solely on parental citizenship or birth in a foreign country, and there is no evidence of foreign preference;

(c) the individual has expressed a willingness to renounce the foreign citizenship that is in conflict with U.S. national security interests;

(d) the exercise of the rights, privileges, or obligations of foreign citizenship occurred before the individual became a U.S. citizen;

(e) the exercise of the entitlements or benefits of foreign citizenship do not present a national security concern;

(f) the foreign preference, if detected, involves a foreign country, entity, or association that poses a low national security risk;

(g) civil employment or military service was authorized under U.S. law, or the employment or service was otherwise consented to as required by U.S. law; and

(h) any potentially disqualifying activity took place after receiving the approval by the agency head or designee.

11

## GUIDELINE D:  SEXUAL BEHAVIOR

12. *The Concern.*  Sexual behavior that involves a criminal offense; reflects a lack of judgment or discretion; or may subject the individual to undue influence of coercion, exploitation, or duress. These issues, together or individually, may raise questions about an individual's judgment, reliability, trustworthiness, and ability to protect classified or sensitive information. Sexual behavior includes conduct occurring in person or via audio, visual, electronic, or written transmission.  No adverse inference concerning the standards in this Guideline may be raised solely on the basis of the sexual orientation of the individual.

13. *Conditions that could raise a security concern and may be disqualifying include:*

(a) sexual behavior of a criminal nature, whether or not the individual has been prosecuted;

(b) a pattern of compulsive, self-destructive, or high-risk sexual behavior that the individual is unable to stop;

(c) sexual behavior that causes an individual to be vulnerable to coercion, exploitation, or duress; and

(d) sexual behavior of a public nature or that reflects lack of discretion or judgment.

14. *Conditions that could mitigate security concerns include:*

(a) the behavior occurred prior to or during adolescence and there is no evidence of subsequent conduct of a similar nature;

(b) the sexual behavior happened so long ago, so infrequently, or under such unusual circumstances, that it is unlikely to recur and does not cast doubt on the individual's current reliability, trustworthiness, or judgment;

(c) the behavior no longer serves as a basis for coercion, exploitation, or duress;

(d) the sexual behavior is strictly private, consensual, and discreet; and

(e) the individual has successfully completed an appropriate program of treatment, or is currently enrolled in one, has demonstrated ongoing and consistent compliance with the treatment plan, and/or has received a favorable prognosis from a qualified mental health professional indicating the behavior is readily controllable with treatment.

## GUIDELINE E:  PERSONAL CONDUCT

15. *The Concern.*  Conduct involving questionable judgment, lack of candor, dishonesty, or unwillingness to comply with rules and regulations can raise questions about an individual's

12

reliability, trustworthiness, and ability to protect classified or sensitive information. Of special interest is any failure to cooperate or provide truthful and candid answers during national security investigative or adjudicative processes. The following will normally result in an unfavorable national security eligibility determination, security clearance action, or cancellation of further processing for national security eligibility:

(a) refusal, or failure without reasonable cause, to undergo or cooperate with security processing, including but not limited to meeting with a security investigator for subject interview, completing security forms or releases, cooperation with medical or psychological evaluation, or polygraph examination, if authorized and required; and

(b) refusal to provide full, frank, and truthful answers to lawful questions of investigators, security officials, or other official representatives in connection with a personnel security or trustworthiness determination.

16. *Conditions that could raise a security concern and may be disqualifying include:*

(a) deliberate omission, concealment, or falsification of relevant facts from any personnel security questionnaire, personal history statement, or similar form used to conduct investigations, determine employment qualifications, award benefits or status, determine national security eligibility or trustworthiness, or award fiduciary responsibilities;

(b) deliberately providing false or misleading information; or concealing or omitting information, concerning relevant facts to an employer, investigator, security official, competent medical or mental health professional involved in making a recommendation relevant to a national security eligibility determination, or other official government representative;

(c) credible adverse information in several adjudicative issue areas that is not sufficient for an adverse determination under any other single guideline, but which, when considered as a whole, supports a whole-person assessment of questionable judgment, untrustworthiness, unreliability, lack of candor, unwillingness to comply with rules and regulations, or other characteristics indicating that the individual may not properly safeguard classified or sensitive information;

(d) credible adverse information that is not explicitly covered under any other guideline and may not be sufficient by itself for an adverse determination, but which, when combined with all available information, supports a whole-person assessment of questionable judgment, untrustworthiness, unreliability, lack of candor, unwillingness to comply with rules and regulations, or other characteristics indicating that the individual may not properly safeguard classified or sensitive information. This includes, but is not limited to, consideration of:

   (1) untrustworthy or unreliable behavior to include breach of client confidentiality, release of proprietary information, unauthorized release of sensitive corporate or government protected information;
   (2) any disruptive, violent, or other inappropriate behavior;

13

(3) a pattern of dishonesty or rule violations; and

(4) evidence of significant misuse of Government or other employer's time or resources;

(e) personal conduct, or concealment of information about one's conduct, that creates a vulnerability to exploitation, manipulation, or duress by a foreign intelligence entity or other individual or group. Such conduct includes:

(1) engaging in activities which, if known, could affect the person's personal, professional, or community standing;

(2) while in another country, engaging in any activity that is illegal in that country;

(3) while in another country, engaging in any activity that, while legal there, is illegal in the United States;

(f) violation of a written or recorded commitment made by the individual to the employer as a condition of employment; and

(g) association with persons involved in criminal activity.

17. *Conditions that could mitigate security concerns include:*

(a) the individual made prompt, good-faith efforts to correct the omission, concealment, or falsification before being confronted with the facts;

(b) the refusal or failure to cooperate, omission, or concealment was caused or significantly contributed to by advice of legal counsel or of a person with professional responsibilities for advising or instructing the individual specifically concerning security processes. Upon being made aware of the requirement to cooperate or provide the information, the individual cooperated fully and truthfully;

(c) the offense is so minor, or so much time has passed, or the behavior is so infrequent, or it happened under such unique circumstances that it is unlikely to recur and does not cast doubt on the individual's reliability, trustworthiness, or good judgment;

(d) the individual has acknowledged the behavior and obtained counseling to change the behavior or taken other positive steps to alleviate the stressors, circumstances, or factors that contributed to untrustworthy, unreliable, or other inappropriate behavior, and such behavior is unlikely to recur;

(e) the individual has taken positive steps to reduce or eliminate vulnerability to exploitation, manipulation, or duress;

(f) the information was unsubstantiated or from a source of questionable reliability; and

14

(g) association with persons involved in criminal activities was unwitting, has ceased, or occurs under circumstances that do not cast doubt upon the individual's reliability, trustworthiness, judgment, or willingness to comply with rules and regulations.

## GUIDELINE F: FINANCIAL CONSIDERATIONS

18. *The Concern.* Failure to live within one's means, satisfy debts, and meet financial obligations may indicate poor self-control, lack of judgment, or unwillingness to abide by rules and regulations, all of which can raise questions about an individual's reliability, trustworthiness, and ability to protect classified or sensitive information. Financial distress can also be caused or exacerbated by, and thus can be a possible indicator of, other issues of personnel security concern such as excessive gambling, mental health conditions, substance misuse, or alcohol abuse or dependence. An individual who is financially overextended is at greater risk of having to engage in illegal or otherwise questionable acts to generate funds. Affluence that cannot be explained by known sources of income is also a security concern insofar as it may result from criminal activity, including espionage.

19. *Conditions that could raise a security concern and may be disqualifying include:*

(a) inability to satisfy debts;

(b) unwillingness to satisfy debts regardless of the ability to do so;

(c) a history of not meeting financial obligations;

(d) deceptive or illegal financial practices such as embezzlement, employee theft, check fraud, expense account fraud, mortgage fraud, filing deceptive loan statements and other intentional financial breaches of trust;

(e) consistent spending beyond one's means or frivolous or irresponsible spending, which may be indicated by excessive indebtedness, significant negative cash flow, a history of late payments or of non-payment, or other negative financial indicators;

(f) failure to file or fraudulently filing annual Federal, state, or local income tax returns or failure to pay annual Federal, state, or local income tax as required;

(g) unexplained affluence, as shown by a lifestyle or standard of living, increase in net worth, or money transfers that are inconsistent with known legal sources of income;

(h) borrowing money or engaging in significant financial transactions to fund gambling or pay gambling debts; and

(i) concealing gambling losses, family conflict, or other problems caused by gambling.

15

UNCLASSIFIED

20. *Conditions that could mitigate security concerns include:*

(a) the behavior happened so long ago, was so infrequent, or occurred under such circumstances that it is unlikely to recur and does not cast doubt on the individual's current reliability, trustworthiness, or good judgment;

(b) the conditions that resulted in the financial problem were largely beyond the person's control (e.g., loss of employment, a business downturn, unexpected medical emergency, a death, divorce or separation, clear victimization by predatory lending practices, or identity theft), and the individual acted responsibly under the circumstances;

(c) the individual has received or is receiving financial counseling for the problem from a legitimate and credible source, such as a non-profit credit counseling service, and there are clear indications that the problem is being resolved or is under control;

(d) the individual initiated and is adhering to a good-faith effort to repay overdue creditors or otherwise resolve debts;

(e) the individual has a reasonable basis to dispute the legitimacy of the past-due debt which is the cause of the problem and provides documented proof to substantiate the basis of the dispute or provides evidence of actions to resolve the issue;

(f) the affluence resulted from a legal source of income; and

(g) the individual has made arrangements with the appropriate tax authority to file or pay the amount owed and is in compliance with those arrangements.

## GUIDELINE G:  ALCOHOL CONSUMPTION

21. *The Concern.*  Excessive alcohol consumption often leads to the exercise of questionable judgment or the failure to control impulses, and can raise questions about an individual's reliability and trustworthiness.

22. *Conditions that could raise a security concern and may be disqualifying include:*

(a) alcohol-related incidents away from work, such as driving while under the influence, fighting, child or spouse abuse, disturbing the peace, or other incidents of concern, regardless of the frequency of the individual's alcohol use or whether the individual has been diagnosed with alcohol use disorder;

(b) alcohol-related incidents at work, such as reporting for work or duty in an intoxicated or impaired condition, drinking on the job, or jeopardizing the welfare and safety of others, regardless of whether the individual is diagnosed with alcohol use disorder;

16

UNCLASSIFIED

(c) habitual or binge consumption of alcohol to the point of impaired judgment, regardless of whether the individual is diagnosed with alcohol use disorder;

(d) diagnosis by a duly qualified medical or mental health professional (e.g., physician, clinical psychologist, psychiatrist, or licensed clinical social worker) of alcohol use disorder;

(e) the failure to follow treatment advice once diagnosed;

(f) alcohol consumption, which is not in accordance with treatment recommendations, after a diagnosis of alcohol use disorder; and

(g) failure to follow any court order regarding alcohol education, evaluation, treatment, or abstinence.

23. *Conditions that could mitigate security concerns include:*

(a) so much time has passed, or the behavior was so infrequent, or it happened under such unusual circumstances that it is unlikely to recur or does not cast doubt on the individual's current reliability, trustworthiness, or judgment;

(b) the individual acknowledges his or her pattern of maladaptive alcohol use, provides evidence of actions taken to overcome this problem, and has demonstrated a clear and established pattern of modified consumption or abstinence in accordance with treatment recommendations;

(c) the individual is participating in counseling or a treatment program, has no previous history of treatment and relapse, and is making satisfactory progress in a treatment program; and

(d) the individual has successfully completed a treatment program along with any required aftercare, and has demonstrated a clear and established pattern of modified consumption or abstinence in accordance with treatment recommendations.

## GUIDELINE H: DRUG INVOLVEMENT[1] AND SUBSTANCE MISUSE

24. *The Concern.* The illegal use of controlled substances, to include the misuse of prescription and non-prescription drugs, and the use of other substances that cause physical or mental impairment or are used in a manner inconsistent with their intended purpose can raise questions about an individual's reliability and trustworthiness, both because such behavior may lead to physical or psychological impairment and because it raises questions about a person's ability or willingness to comply with laws, rules, and regulations. *Controlled substance* means any

---

[1] Reference Appendix B of this document regarding statutory requirements contained in Public Law 110-118 (Bond Amendment) applicable to this guideline.

17

"controlled substance" as defined in 21 U.S.C. 802. *Substance misuse* is the generic term adopted in this guideline to describe any of the behaviors listed above.

25. *Conditions that could raise a security concern and may be disqualifying include:*

(a) any substance misuse (see above definition);

(b) testing positive for an illegal drug;

(c) illegal possession of a controlled substance, including cultivation, processing, manufacture, purchase, sale, or distribution; or possession of drug paraphernalia;

(d) diagnosis by a duly qualified medical or mental health professional (e.g., physician, clinical psychologist, psychiatrist, or licensed clinical social worker) of substance use disorder;

(e) failure to successfully complete a drug treatment program prescribed by a duly qualified medical or mental health professional;

(f) any illegal drug use while granted access to classified information or holding a sensitive position; and

(g) expressed intent to continue drug involvement and substance misuse, or failure to clearly and convincingly commit to discontinue such misuse.

26. *Conditions that could mitigate security concerns include:*

(a) the behavior happened so long ago, was so infrequent, or happened under such circumstances that it is unlikely to recur or does not cast doubt on the individual's current reliability, trustworthiness, or good judgment;

(b) the individual acknowledges his or her drug involvement and substance misuse, provides evidence of actions taken to overcome this problem, and has established a pattern of abstinence, including, but not limited to:

   (1) disassociation from drug-using associates and contacts;
   (2) changing or avoiding the environment where drugs were used; and
   (3) providing a signed statement of intent to abstain from all drug involvement and substance misuse, acknowledging that any future involvement or misuse is grounds for revocation of national security eligibility;

(c) abuse of prescription drugs was after a severe or prolonged illness during which these drugs were prescribed, and abuse has since ended; and

18

UNCLASSIFIED

(d) satisfactory completion of a prescribed drug treatment program, including, but not limited to, rehabilitation and aftercare requirements, without recurrence of abuse, and a favorable prognosis by a duly qualified medical professional.

## GUIDELINE I: PSYCHOLOGICAL CONDITIONS[2]

27. *The Concern.* Certain emotional, mental, and personality conditions can impair judgment, reliability, or trustworthiness. A formal diagnosis of a disorder is not required for there to be a concern under this guideline. A duly qualified mental health professional (e.g., clinical psychologist or psychiatrist) employed by, or acceptable to and approved by the U.S. Government, should be consulted when evaluating potentially disqualifying and mitigating information under this guideline and an opinion, including prognosis, should be sought. No negative inference concerning the standards in this guideline may be raised solely on the basis of mental health counseling.

28. *Conditions that could raise a security concern and may be disqualifying include:*

(a) behavior that casts doubt on an individual's judgment, stability, reliability, or trustworthiness, not covered under any other guideline and that may indicate an emotional, mental, or personality condition, including, but not limited to, irresponsible, violent, self-harm, suicidal, paranoid, manipulative, impulsive, chronic lying, deceitful, exploitative, or bizarre behaviors;

(b) an opinion by a duly qualified mental health professional that the individual has a condition that may impair judgment, stability, reliability, or trustworthiness;

(c) voluntary or involuntary inpatient hospitalization;

(d) failure to follow a prescribed treatment plan related to a diagnosed psychological/psychiatric condition that may impair judgment, stability, reliability, or trustworthiness, including, but not limited to, failure to take prescribed medication or failure to attend required counseling sessions; and

(e) pathological gambling, the associated behaviors of which may include unsuccessful attempts to stop gambling; gambling for increasingly higher stakes, usually in an attempt to cover losses; concealing gambling losses; borrowing or stealing money to fund gambling or pay gambling debts; and family conflict resulting from gambling.

29. *Conditions that could mitigate security concerns include:*

(a) the identified condition is readily controllable with treatment, and the individual has demonstrated ongoing and consistent compliance with the treatment plan;

---

[2] Reference Appendix B of this document regarding statutory requirements contained in Public Law 110-118 (Bond Amendment) applicable to this guideline.

19

(b) the individual has voluntarily entered a counseling or treatment program for a condition that is amenable to treatment, and the individual is currently receiving counseling or treatment with a favorable prognosis by a duly qualified mental health professional;

(c) recent opinion by a duly qualified mental health professional employed by, or acceptable to and approved by, the U.S. Government that an individual's previous condition is under control or in remission, and has a low probability of recurrence or exacerbation;

(d) the past psychological/psychiatric condition was temporary, the situation has been resolved, and the individual no longer shows indications of emotional instability;

(e) there is no indication of a current problem.

## GUIDELINE J:  CRIMINAL CONDUCT[3]

30. *The Concern.*  Criminal activity creates doubt about a person's judgment, reliability, and trustworthiness.  By its very nature, it calls into question a person's ability or willingness to comply with laws, rules, and regulations.

31. *Conditions that could raise a security concern and may be disqualifying include:*

(a) a pattern of minor offenses, any one of which on its own would be unlikely to affect a national security eligibility decision, but which in combination cast doubt on the individual's judgment, reliability, or trustworthiness;

(b) evidence (including, but not limited to, a credible allegation, an admission, and matters of official record) of criminal conduct, regardless of whether the individual was formally charged, prosecuted, or convicted;

(c) individual is currently on parole or probation;

(d) violation or revocation of parole or probation, or failure to complete a court-mandated rehabilitation program; and

(e) discharge or dismissal from the Armed Forces for reasons less than "Honorable."

32. *Conditions that could mitigate security concerns include:*

(a) so much time has elapsed since the criminal behavior happened, or it happened under such unusual circumstances, that it is unlikely to recur and does not cast doubt on the individual's reliability, trustworthiness, or good judgment;

---

[3] Reference Appendix B of this document regarding statutory requirements contained in Public Law 110-118 (Bond Amendment) applicable to this guideline.

20

(b) the individual was pressured or coerced into committing the act and those pressures are no longer present in the person's life;

(c) no reliable evidence to support that the individual committed the offense; and

(d) there is evidence of successful rehabilitation; including, but not limited to, the passage of time without recurrence of criminal activity, restitution, compliance with the terms of parole or probation, job training or higher education, good employment record, or constructive community involvement.

## GUIDELINE K: HANDLING PROTECTED INFORMATION

33. *The Concern.* Deliberate or negligent failure to comply with rules and regulations for handling protected information—which includes classified and other sensitive government information, and proprietary information—raises doubt about an individual's trustworthiness, judgment, reliability, or willingness and ability to safeguard such information, and is a serious security concern.

34. *Conditions that could raise a security concern and may be disqualifying include:*

(a) deliberate or negligent disclosure of protected information to unauthorized persons, including, but not limited to, personal or business contacts, the media, or persons present at seminars, meetings, or conferences;

(b) collecting or storing protected information in any unauthorized location;

(c) loading, drafting, editing, modifying, storing, transmitting, or otherwise handling protected information, including images, on any unauthorized equipment or medium;

(d) inappropriate efforts to obtain or view protected information outside one's need to know;

(e) copying or modifying protected information in an unauthorized manner designed to conceal or remove classification or other document control markings;

(f) viewing or downloading information from a secure system when the information is beyond the individual's need-to-know;

(g) any failure to comply with rules for the protection of classified or sensitive information;

(h) negligence or lax security practices that persist despite counseling by management; and

(i) failure to comply with rules or regulations that results in damage to the national security, regardless of whether it was deliberate or negligent.

35. *Conditions that could mitigate security concerns include:*

21

(a) so much time has elapsed since the behavior, or it has happened so infrequently or under such unusual circumstances, that it is unlikely to recur and does not cast doubt on the individual's current reliability, trustworthiness, or good judgment;

(b) the individual responded favorably to counseling or remedial security training and now demonstrates a positive attitude toward the discharge of security responsibilities;

(c) the security violations were due to improper or inadequate training or unclear instructions; and

(d) the violation was inadvertent, it was promptly reported, there is no evidence of compromise, and it does not suggest a pattern.

## GUIDELINE L:  OUTSIDE ACTIVITIES

36. *The Concern.*  Involvement in certain types of outside employment or activities is of security concern if it poses a conflict of interest with an individual's security responsibilities and could create an increased risk of unauthorized disclosure of classified or sensitive information.

37. *Conditions that could raise a security concern and may be disqualifying include:*

(a) any employment or service, whether compensated or volunteer, with:

    (1) the government of a foreign country;
    (2) any foreign national, organization, or other entity;
    (3) a representative of any foreign interest; and
    (4) any foreign, domestic, or international organization or person engaged in analysis, discussion, or publication of material on intelligence, defense, foreign affairs, or protected technology; and

(b) failure to report or fully disclose an outside activity when this is required.

38. *Conditions that could mitigate security concerns include:*

(a) evaluation of the outside employment or activity by the appropriate security or counterintelligence office indicates that it does not pose a conflict with an individual's security responsibilities or with the national security interests of the United States; and

(b) the individual terminated the employment or discontinued the activity upon being notified that it was in conflict with his or her security responsibilities.

22

## GUIDELINE M:  USE OF INFORMATION TECHNOLOGY

39. *The Concern.*  Failure to comply with rules, procedures, guidelines, or regulations pertaining to information technology systems may raise security concerns about an individual's reliability and trustworthiness, calling into question the willingness or ability to properly protect sensitive systems, networks, and information.  Information Technology includes any computer-based, mobile, or wireless device used to create, store, access, process, manipulate, protect, or move information.  This includes any component, whether integrated into a larger system or not, such as hardware, software, or firmware, used to enable or facilitate these operations.

40. *Conditions that could raise a security concern and may be disqualifying include:*

(a) unauthorized entry into any information technology system;

(b) unauthorized modification, destruction, or manipulation of, or denial of access to, an information technology system or any data in such a system;

(c) use of any information technology system to gain unauthorized access to another system or to a compartmented area within the same system;

(d) downloading, storing, or transmitting classified, sensitive, proprietary, or other protected information on or to any unauthorized information technology system;

(e) unauthorized use of any information technology system;

(f) introduction, removal, or duplication of hardware, firmware, software, or media to or from any information technology system when prohibited by rules, procedures, guidelines, or regulations or when otherwise not authorized;

(g) negligence or lax security practices in handling information technology that persists despite counseling by management; and

(h) any misuse of information technology, whether deliberate or negligent, that results in damage to the national security.

41. *Conditions that could mitigate security concerns include:*

(a) so much time has elapsed since the behavior happened, or it happened under such unusual circumstances, that it is unlikely to recur and does not cast doubt on the individual's reliability, trustworthiness, or good judgment;

(b) the misuse was minor and done solely in the interest of organizational efficiency and effectiveness;

23

UNCLASSIFIED

(c) the conduct was unintentional or inadvertent and was followed by a prompt, good-faith effort to correct the situation and by notification to appropriate personnel; and

(d) the misuse was due to improper or inadequate training or unclear instructions.

UNCLASSIFIED
JA145

UNCLASSIFIED

# APPENDIX B

### BOND AMENDMENT GUIDANCE

On 28 January 2008, Congress amended the IRTPA of 2004, adding statutory restrictions on certain eligibility determinations and establishing waiver and congressional reporting requirements. These modifications are collectively referred to as the "Bond Amendments" and were made effective on 1 January 2008.[4] For the reasons identified in paragraph E.2 above, application of the Bond Amendment's statutory restrictions will be applied to all adjudications covered under this Directive.

1. **PROHIBITION**:  Heads of agencies are prohibited from granting or renewing national security eligibility for any covered individual who is an unlawful user of a controlled substance or is an addict as defined below.  If an authorized adjudicative agency has a case pending review that involves an unlawful user of a controlled substance or an addict, the statutory prohibition must be applied and the individual will receive the agency's established administrative review procedures.  A meritorious waiver may not be authorized with reference to this prohibition.  For purposes of this prohibition:

(a) an "addict" is any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare; or is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction.

(b) a "controlled substance" means any "controlled substance" as defined in 21 USC 802.

2. **DISQUALIFICATION**:  The Bond Amendment also contains disqualification provisions which apply only to those covered individuals seeking access to Sensitive Compartmented Information (SCI), Special Access Programs (SAP), or Restricted Data (RD).  Heads of agencies may not grant or renew access to SCI, SAP, or RD to a covered individual who:

(a) has been convicted in any court of the U.S. of a crime, was sentenced to imprisonment for a term exceeding one year, and was incarcerated as a result of that sentence for not less than one year;

(b) has been discharged or dismissed from the Armed Forces under dishonorable conditions; or

(c) is determined to be mentally incompetent; an individual is "mentally incompetent" when he or she has been declared mentally incompetent as determined by competency proceedings conducted in a court or administrative agency with proper jurisdiction.

3. **WAIVER STANDARD AND PROCEDURES**:  When a disqualifier reflected in paragraph 2(a) – (c) above exists, the adjudicator will proceed with the adjudication using the appropriate

---

[4] IRTPA of 2004 § 3002, 50 USC § 3343.

25

mitigation conditions found in these adjudicative guidelines. If the adjudicator would have arrived at a favorable decision but for the Bond Amendment disqualification, a meritorious waiver may be appropriate.

(a) Meritorious waivers will be considered an "Exception" to the adjudicative guidelines and will be annotated as a "Waiver" in the adjudicative decision recorded in the appropriate databases listed in para. E.5. Adjudicators will provide a detailed justification for the meritorious waiver in the final adjudicative report.

(b) If, after applying the appropriate mitigating factors listed in these adjudicative guidelines, a meritorious waiver is not appropriate, the SCI, SAP, or RD access will be denied or revoked with a written explanation that cites the adjudicative guidelines applied and the Bond Amendment disqualifier. The authorized adjudicative agency's established administrative review procedures shall be followed in all such cases.

(c) Each authorized adjudicative agency shall maintain a record of the number and type of meritorious waivers granted, to include the rationale for each waiver, and shall report this data annually to the SecEA in advance of the annual report to Congress. Authorized adjudicative agencies will also maintain a record of all disqualifications, broken down by type, due to Bond Amendment requirements.

4. Authorized adjudicative agencies often have no ability to predict whether the covered individual for whom national security eligibility determinations are being made will also require access to SCI, SAP, or RD. Accordingly, the following guidance applies to all national security adjudicative determinations:

(a) All adjudicators will determine whether any of the Bond Amendment disqualifiers in paragraphs 2(a) – (c) apply to the case being adjudicated.

(b) If a disqualifier exists, adjudicators shall annotate that fact in one of the databases identified in paragraph E.5 to ensure that any subsequent requests for access to SCI, SAP, or RD for the individual will undergo appropriate re-adjudication and waiver procedures in meritorious cases.

26

## APPENDIX C

### EXCEPTIONS

Exceptions are an adjudicative decision to grant initial or continued eligibility for access to classified information or to hold a sensitive position despite failure to meet the full adjudicative or investigative standards. The authorized exceptions are defined below and supersede the definitions in Office of Management and Budget memorandum, *Reciprocal Recognition of Existing Personnel Security Clearances*, 14 November 2007.

Waiver (W):
: Eligibility granted or continued despite the presence of substantial issue information that would normally preclude eligibility. Approval authorities may approve a waiver only when the benefit of initial or continued eligibility clearly outweighs any security concerns. A waiver may also require conditions for eligibility as described below.

Condition (C):
: Eligibility granted or continued, despite the presence of issue information that can be partially but not completely mitigated, with the provision that additional security measures shall be required to mitigate the issue(s). Such measures include, but are not limited to, additional security monitoring, access restrictions, submission of periodic financial statements, or attendance at counseling sessions.

Deviation (D):
: Eligibility granted or continued despite either a significant gap in coverage or scope of the investigation. "Significant gap" for this purpose means either complete lack of coverage for a period of six months or longer within the most recent five years investigated or the lack of one or more relevant investigative scope components (e.g., employment checks, financial review, or a subject interview) in its entirety.

Out of Scope (O):
: Reinvestigation is overdue.

27

# EXHIBIT 13

ICPG 704.3

# INTELLIGENCE COMMUNITY POLICY GUIDANCE
## NUMBER 704.3



### DENIAL OR REVOCATION OF ACCESS TO SENSITIVE COMPARTMENTED INFORMATION, OTHER CONTROLLED ACCESS PROGRAM INFORMATION, AND APPEALS PROCESSES

### (EFFECTIVE: 02 OCTOBER 2008)

**A. AUTHORITY:** The National Security Act of 1947, as amended; the Counterintelligence Enhancement Act of 2002, as amended; Executive Order (EO) 12333, as amended; EO 13355; EO 12968, and other applicable provisions of law.

**B. APPLICABILITY:** This directive applies to the Intelligence Community (IC), as defined by the National Security Act of 1947, as amended, and other departments or agencies that may be designated by the President, or designated jointly by the Director of National Intelligence (DNI), and the head of the department or agency concerned, as an element of the IC or those government entities designated to determine eligibility for Sensitive Compartmented Information (SCI) access.

**C. SCOPE:** Determinations regarding eligibility for initial or continued access shall be made in accordance with Intelligence Community Directive (ICD) 704, Personnel Security Standards and Procedures Governing Eligibility for Access to Sensitive Compartmented Information and other Controlled Access Program Information. Subjects who have been considered for and denied initial or continued access to SCI and other controlled access programs pursuant to the provisions of ICD 704 shall, to the extent provided herein, be afforded an opportunity to appeal the denial or revocation of such access.

**D. PROCESS**

1. Subjects whose access has been denied or revoked shall be provided with the following:

   a. A comprehensive written explanation of the basis for the denial or revocation as the national security interests of the United States and other applicable laws permit;

   b. An explanation of the right to be represented by counsel or other representative at their own expense; to request any documents, records or reports upon which the denial or revocation is

ICPG 704.3

based; and to request the entire investigative file as permitted by the national security and applicable law;

     c. Any documents, records and reports upon which a denial or revocation is based to be provided within thirty (30) days of request and to the extent they would be provided if requested under applicable law, to include the Freedom of Information Act (5 U.S.C. 552) or the Privacy Act (5 U.S.C. 552a);

     d. An opportunity to respond, in writing, within forty-five (45) days of receipt of relevant documentation to request a review of the determination;

     e. Written notice of and reasons for the results of the review, the identity of the deciding authority in accordance with operational requirements, and written notice of the right to appeal;

     f. An opportunity to appeal to the Head of their IC Element, who may either make a final determination himself, or appoint a high-level panel which shall be comprised of at least three members, two of whom shall be selected from outside the security arena. Recommendations of the panel shall be complete and in writing. Nothing in this document shall prohibit a Head of an IC Element from personally exercising the appeal authority based upon recommendations from an appeals panel. In such case, the decision of the Head of an IC Element shall be final; and

     g. An opportunity to appear personally before an adjudicative or other authority, other than the investigating entity, as determined by the Head of an IC Element, to present relevant documents, materials, and information. A written summary or recording of such an appearance shall be made a permanent part of the subject's security record. The decision of any appeal panel shall be made a permanent part of the subject's security record.

    2. When the Head of an IC Element, or designee, personally certifies that a procedure set forth herein cannot be made available without damaging national security interests, the particular procedure shall not be made available. This certification shall be conclusive. Should it be determined that the appeal procedures prescribed in this Policy Guidance cannot be invoked in a manner that is consistent with the national security, the individual may be denied an appeal.

    3. The DNI or Principal Deputy DNI, in consultation with the relevant agency head, may take any lawful action(s) regarding a subject's access to SCI or other controlled access program information without regard to the provisions of this or any other regulation or directive.

    5. This document does not create or confer on any person or entity any right to administrative or judicial review of these procedures, their implementation, or decisions or actions rendered there under. Nor does it create or confer any right, benefit, or privilege, whether substantive or procedural, for access to classified national intelligence or create or confer any substantive or procedural right, benefit, or privilege enforceable by any party against the United States or any agency, department, or instrumentality of the executive branch, its officers or employees, for any other person.

**E. EFFECTIVE DATE**: This ICPG is effective on the date of signature.

_David R. Shedd_
Deputy Director of National Intelligence for
   Policy, Plans and Requirements

_October 2, 2008_
Date

2

JA151

Case 1:25-cv-01365-AHA    Document 9-17    Filed 05/21/25    Page 4 of 4
USCA Case #26-5009    Document #2159608    Filed: 02/18/2026    Page 156 of 367

ICPG 704.3

## APPENDIX A – ACRONYMS

ICPG 704.3 -- Denial or Revocation of Access to Sensitive Compartmented Information, other Controlled Access Program Information, and Appeals Processes

| DNI | Director of National Intelligence |
|-----|-----------------------------------|
| EO | Executive Order |
| IC | Intelligence Community |
| ICD | Intelligence Community Directive |
| SCI | Sensitive Compartmented Information |
| ICPG | Intelligence Community Policy Guidance |

JA152

# EXHIBIT 14



Department of Defense
# DIRECTIVE

**NUMBER** 5220.6
January 2, 1992

Administrative Reissuance Incorporating Through Change 4, April 20, 1999
GC, DoD

SUBJECT:  Defense Industrial Personnel Security Clearance Review Program

References:  (a)  DoD Directive 5220.6, subject as above, August 12, 1985 (hereby canceled)
           (b)  DoD 5200.2-R, "Department of Defense Personnel Security Program," January 1987, authorized by DoD Directive 5200.2, December 20, 1979
           (c)  Section 1001 of title 18, United States Code
           (d)  Section 101 <u>et</u> <u>seq</u>. of title 28, United States Code

## 1.  REISSUANCE AND PURPOSE

This Directive reissues reference (a) to update policy, responsibilities, and procedures of the Defense Industrial Personnel Security Clearance Review Program implementing enclosure 1.

## 2.  APPLICABILITY AND SCOPE

This Directive:

    2.1.  Applies to the Office of the Secretary of Defense, the Military Departments, the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Inspector General of the Department of Defense (IG, DoD), and the Defense Agencies (hereafter referred to collectively as "the DoD Components").

    2.2.  By mutual agreement, also extends to other Federal Agencies that include:

        2.2.1.  Department of Agriculture.

*DoDD 5220.6, January 2, 1992*

2.2.2.  Department of Commerce.

2.2.3.  Department of Interior.

2.2.4.  Department of Justice.

2.2.5.  Department of Labor.

2.2.6.  Department of State.

2.2.7.  Department of Transportation.

2.2.8.  Department of Treasury.

2.2.9.  Environmental Protection Agency.

2.2.10.  Federal Emergency Management Agency.

2.2.11.  Federal Reserve System.

2.2.12.  General Accounting Office.

2.2.13.  General Services Administration.

2.2.14.  National Aeronautics and Space Administration.

2.2.15.  National Science Foundation.

2.2.16.  Small Business Administration.

2.2.17.  United States Arms Control and Disarmament Agency.

2.2.18.  United States Information Agency.

2.2.19.  United States International Trade Commission.

2.2.20.  United States Trade Representative.

2.3.  Applies to cases that the Defense Industrial Security Clearance Office (DISCO) forwards to the Defense Office of Hearings and Appeals (DOHA), Defense Legal Services Agency for action under this Directive to determine whether it is clearly

*DoDD 5220.6, January 2, 1992*

consistent with the national interest to grant or continue a security clearance for the applicant.

2.4.  Provides a program that may be extended to other security cases at the direction of the Assistant Secretary of Defense for Command, Control, Communications, and Intelligence (ASD(C3I)).

2.5.  Does not apply to cases in which:

2.5.1.  A security clearance is withdrawn because the applicant no longer has a need for access to classified information;

2.5.2.  An interim security clearance is withdrawn by the DISCO during an investigation; or

2.5.3.  A security clearance is withdrawn for administrative reasons that are without prejudice as to a later determination of whether the grant or continuance of the applicant's security clearance would be clearly consistent with the national interest.

2.6.  Does not apply to cases for access to sensitive compartmented information or a special access program.


3.  <u>DEFINITIONS</u>

3.1.  <u>Applicant</u>.  Any U.S. citizen who holds or requires a security clearance or any immigrant alien who holds or requires a limited access authorization for access to classified information needed in connection with his or her employment in the private sector; any U.S. citizen who is a direct-hire employee or selectee for a position with the North Atlantic Treaty Organization (NATO) and who holds or requires NATO certificates of security clearance or security assurances for access to U.S. or foreign classified information; or any U.S. citizen nominated by the Red Cross or United Service Organizations for assignment with the Military Services overseas.  The term "applicant" does not apply to those U.S. citizens who are seconded to NATO by U.S. Departments and Agencies or to U.S. citizens recruited through such Agencies in response to a request from NATO.

3.2.  <u>Clearance Decision</u>.  A decision made in accordance with this Directive concerning whether it is clearly consistent with the national interest to grant an applicant a security clearance for access to Confidential, Secret, or Top Secret information.  A favorable clearance decision establishes eligibility of the applicant to

*DoDD 5220.6, January 2, 1992*

be granted a security clearance for access at the level governed by the documented need for such access, and the type of investigation specified for that level in DoD 5200.2-R (reference (b)). An unfavorable clearance decision denies any application for a security clearance and revokes any existing security clearance, thereby preventing access to classified information at any level and the retention of any existing security clearance.

4. <u>POLICY</u>

It is DoD policy that:

4.1. All proceedings provided for by this Directive shall be conducted in a fair and impartial manner.

4.2. A clearance decision reflects the basis for an ultimate finding as to whether it is clearly consistent with the national interest to grant or continue a security clearance for the applicant.

4.3. Except as otherwise provided for by E.O. 10865 (enclosure 1) or this Directive, a final unfavorable clearance decision shall not be made without first providing the applicant with:

4.3.1. Notice of specific reasons for the proposed action.

4.3.2. An opportunity to respond to the reasons.

4.3.3. Notice of the right to a hearing and the opportunity to cross-examine persons providing information adverse to the applicant.

4.3.4. Opportunity to present evidence on his or her own behalf, or to be represented by counsel or personal representative.

4.3.5. Written notice of final clearance decisions.

4.3.6. Notice of appeal procedures.

4.4. Actions pursuant to this Directive shall cease upon termination of the applicant's need for access to classified information except in those cases in which:

4.41. A hearing has commenced.

*DoDD 5220.6, January 2, 1992*

    4.4.2.  A clearance decision has been issued; or

    4.4.3.  The applicant's security clearance was suspended and the applicant provided a written request that the case continue.


## 5. RESPONSIBILITIES

    5.1.  The Assistant Secretary of Defense for Command, Control, Communications, and Intelligence shall:

    5.1.1.  Establish investigative policy and adjudicative standards and oversee their application.

    5.1.2.  Coordinate with the General Counsel of the Department of Defense (GC, DoD) on policy affecting clearance decisions.

    5.1.3.  Issue clarifying guidance and instructions as needed.

    5.2.  The General Counsel of the Department of Defense shall:

    5.2.1.  Establish guidance and provide oversight as to legal sufficiency of procedures and standards established by this Directive.

    5.2.2.  Establish the organization and composition of the DOHA.

    5.2.3.  Designate a civilian attorney to be the Director, DOHA.

    5.2.4.  Issue clarifying guidance and instructions as needed.

    5.2.5.  Administer the program established by this Directive.

    5.2.6.  Issue invitational travel orders in appropriate cases to persons to appear and testify who have provided oral or written statements adverse to the applicant relating to a controverted issue.

    5.2.7.  Designate attorneys to be Department Counsels assigned to the DOHA to represent the Government's interest in cases and related matters within the applicability and scope of this Directive.

*DoDD 5220.6, January 2, 1992*

5.2.8.  Designate attorneys to be Administrative Judges assigned to the DOHA.

5.2.9.  Designate attorneys to be Administrative Judge members of the DOHA Appeal Board.

5.2.10.  Provide for supervision of attorneys and other personnel assigned or attached to the DOHA.

5.2.11.  Develop and implement policy established or coordinated with the GC, DoD, in accordance with this Directive.

5.2.12.  Establish and maintain qualitative and quantitative standards for all work by DOHA employees arising within the applicability and scope of this Directive.

5.2.13.  Ensure that the Administrative Judges and Appeal Board members have the requisite independence to render fair and impartial decisions consistent with DoD policy.

5.2.14.  Provide training, clarify policy, or initiate personnel actions, as appropriate, to ensure that all DOHA decisions are made in accordance with policy, procedures, and standards established by this Directive.

5.2.15.  Provide for maintenance and control of all DOHA records.

5.2.16.  Take actions as provided for in subsection 6.2., below, and the additional procedural guidance in enclosure 3.

5.2.17.  Establish and maintain procedures for timely assignment and completion of cases.

5.2.18.  Issue guidance and instructions, as needed, to fulfill the foregoing responsibilities.

5.2.19.  Designate the Director, DOHA to implement paragraphs 5.2.5. through 5.2.18., above, under general guidance of the GC, DoD.

5.3.  The <u>Heads of the DoD Components</u>  shall provide (from resources available to the designated DoD Component) financing, personnel, personnel spaces, office facilities, and related administrative support required by the DOHA.

5.4.  The <u>ASD(C3I)</u> shall ensure that cases within the scope and applicability of this Directive are referred promptly to the DOHA, as required, and that clearance decisions by the DOHA are acted upon without delay.


6.  <u>PROCEDURES</u>

   6.1.  Applicants shall be investigated in accordance with the standards in DoD 5200.2-R (reference (b)).

   6.2.  An applicant is required to give, and to authorize others to give, full, frank, and truthful answers to relevant and material questions needed by the DOHA to reach a clearance decision and to otherwise comply with the procedures authorized by this Directive.  The applicant may elect on constitutional or other grounds not to comply; but refusal or failure to furnish or authorize the providing of relevant and material information or otherwise cooperate at, any stage in the investigation or adjudicative process may prevent the DOHA from making a clearance decision.  If an applicant fails or refuses to:

      6.2.1.  Provide relevant and material information or to authorize others to provide such information; or

      6.2.2.  Proceed in a timely or orderly fashion in accordance with this Directive; or

      6.2.3.  Follow directions of an Administrative Judge or the Appeal Board; then the Director, DOHA, or designee, may revoke any security clearance held by the applicant and discontinue case processing.  Requests for resumption of case processing and reinstatement of a security clearance may be approved by the Director, DOHA, only upon a showing of good cause.  If the request is denied, in whole or in part, the decision is final and bars reapplication for a security clearance for 1 year from the date of the revocation.

   6.3.  Each clearance decision must be a fair and impartial common sense determination based upon consideration of all the relevant and material information and the pertinent criteria and adjudication policy in enclosure 2, including as appropriate:

      6.3.1.  Nature and seriousness of the conduct and surrounding circumstances.

*DoDD 5220.6, January 2, 1992*

6.3.2.  Frequency and recency of the conduct.

6.3.3.  Age of the applicant.

6.3.4.  Motivation of the applicant, and the extent to which the conduct was negligent, willful, voluntary, or undertaken with knowledge of the consequences involved.

6.3.5.  Absence or presence of rehabilitation.

6.3.6.  Probability that the circumstances or conduct will continue or recur in the future;

6.4.  Whenever there is a reasonable basis for concluding that an applicant's continued access to classified information poses an imminent threat to the national interest, any security clearance held by the applicant may be suspended by the ASD(C3I), with the concurrence of the GC, DoD, pending a final clearance decision. This suspension may be rescinded by the same authorities upon presentation of additional information that conclusively demonstrates that an imminent threat to the national interest no longer exists.  Procedures in enclosure 3 shall be expedited whenever an applicant's security clearance has been suspended pursuant to this subsection.

6.5.  Nothing contained in this Directive shall limit or affect the responsibility and powers of the Secretary of Defense or the head of another Department or Agency to deny or revoke a security clearance when the security of the nation so requires.  Such authority may not be delegated and may be exercised only when the Secretary of Defense or the head of another Department or Agency determines that the hearing procedures and other provisions of this Directive cannot be invoked consistent with the national security.  Such a determination shall be conclusive.

6.6.  Additional procedural guidance is in enclosure 3.

*DoDD 5220.6, January 2, 1992*

7. <u>SUMMARY OF CHANGE 4</u>. The changes to this issuance are administrative and update organizational titles and references for accuracy.

8. <u>EFFECTIVE DATE</u>

This Directive is effective March 16, 1992, except those cases in which a statement of reasons has been issued shall be concluded in accordance with DoD Directive 5220.6 (reference (a)).

Donald J. Atwood
Deputy Secretary of Defense

Enclosures - 3
E1.  Executive Order 10865, "Safeguarding Classified Information Within
     Industry," as amended by Executive Order No. 10909 of January 17, 1961,
     Executive Order No. 11382 of November 28, 1967, and Executive Order No.
     12829 of January 6, 1993"
E2.  Paragraph 2-200 and Appendix I, DoD 5200.2-R
E3.  Additional Procedural Guidance

*DoDD 5220.6, January 2, 1992*

E1.  ENCLOSURE 1

EXECUTIVE ORDER 10865*
SAFEGUARDING CLASSIFIED INFORMATION WITHIN INDUSTRY

Source:  The provisions of Executive Order 10865 of Feb. 20, 1960, appear at 25 FR 1583, 3 CFR 1959-1963 Comp., p. 398, unless otherwise noted.

WHEREAS it is mandatory that the United States protect itself against hostile or destructive activities by preventing unauthorized disclosure of classified information relating to the national defense; and

WHEREAS it is a fundamental principle of our Government to protect the interests of individuals against unreasonable or unwarranted encroachment; and

WHEREAS I find that the provisions and procedures prescribed by this order are necessary to assure the preservation of the integrity of classified defense information and to protect the national interest; and

WHEREAS I find that those provisions and procedures recognize the interests of individuals affected thereby and provide maximum possible safeguards to protect such interest:

NOW, THEREFORE, under and by virtue of the authority vested in me by the Constitution and statutes of the United States, and as President of the United States and as Commander in Chief of the Armed Forces of the United States, it is hereby ordered as follows:

*Executive Order 10865, signed by President Eisenhower on Feb. 20, 1960, is hereby reprinted as amended by Executive Order No. 10909 of January 17, 1961, Executive Order No. 11382 of November 28, 1967, and Executive Order No. 12829 of January 6, 1993.  This is an editorial format prepared by the Directorate for Industrial Security Clearance Review as one convenient source for subsequent changes to Executive Order 10865 and is not intended to be used as a definitive legal authority.  This version incorporates amendments through January 6, 1993, by Presidents Dwight D. Eisenhower, Lyndon B.  Johnson and George Bush.

ENCLOSURE 1

*DoDD 5220.6, January 2, 1992*

SECTION 1.  When used in this order, the term "head of a Department" means the Secretary of State, the Secretary of Defense, the Secretary of Transportation, the Secretary of Energy, the Nuclear Regulatory Commission, the Administrator of the National Aeronautics and Space Administration, and, in section 4, the Attorney General.  The term "head of a Department" also means the head of any Department or Agency, including but not limited to those referenced above with whom the Department of Defense makes an agreement to extend regulations prescribed by the Secretary of Defense concerning authorizations for access to classified information pursuant to Executive Order No. 12829.

[Sec. 1 amended by EO 10909 of Jan 17, 1961, 26 FR 508, 3 CFR, 1959-1963 Comp., p. 437; EO 11382 of Nov. 28, 1967, 32 FR 16247, 3 CFR, 1966-1970 Comp., p. 691; EO 12829 of Jan. 6, 1993, 58 FR 3479]

SECTION 2.  An authorization for access to classified information pursuant to Executive Order No. 12829 may be granted by the head of a Department or his designee, including, but not limited to, those officials named in section 8 of this order, to an individual, hereinafter termed an "applicant", for a specific classification category only upon a finding that it is clearly consistent with the national interest to do so.

[Sec. 2 amended by EO 12829 of Jan 6, 1993, 58 F4 3479]

SECTION 3.  Except as provided in section 9 of this order, an authorization for access to a specific classification category may not be finally denied or revoked pursuant to Executive Order 12829 by the head of a Department or his designee, including, but not limited to, those officials named in section 8 of this order, unless the applicant has been given the following:

(1) A written statement of reasons why his access authorization may be denied or revoked, which shall be as comprehensive and detailed as the national security permits.

(2) A reasonable opportunity to reply in writing under oath or affirmation to the statement of reasons.

(3) After he has filed under oath or affirmation a written reply to the statement of reasons, the form and sufficiency of which may be prescribed by regulations issued by the head of the Department concerned, an opportunity to appear personally before the head of the Department concerned or his designee, including, but not limited to, those

ENCLOSURE 1

*DoDD 5220.6, January 2, 1992*

officials named in section 8 of this order, for the purpose of supporting his eligibility for access authorization and to present evidence on his behalf.

(4) A reasonable time to prepare for that appearance.

(5) An opportunity to be represented by counsel.

(6) An opportunity to cross-examine persons either orally or through written interrogatories in accordance with section 4 on matters not relating to the characterization in the statement of reasons of any organization or individual other than the applicant.

(7) A written notice of the final decision in his case which, if adverse, shall specify whether the head of the Department or his designee, including, but not limited to, those officials named in section 8 of this order, found for or against him with respect to each allegation in the statement of reasons.

[Sec. 3 amended by EO 12829 of Jan 6, 1993, 58 FR 3479]

SECTION 4.  (a) An applicant shall be afforded an opportunity to cross-examine persons who have made oral or written statements adverse to the applicant relating to a controverted issue except that any such statement may be received and considered without affording such opportunity in the circumstances described in either of the following paragraphs:

(1) The head of the Department supplying the statement certifies that the person who furnished the information is a confidential informant who has been engaged in obtaining intelligence information for the Government and that disclosure of his identity would be substantially harmful to the national interest.

(2) The head of the Department concerned or his special designee for that particular purpose has preliminarily determined, after considering information furnished by the investigative agency involved as to the reliability of the person and the accuracy of the statement concerned, that the statement concerned appears to be reliable and material, and the head of the Department or such special designee has determined that failure to receive and consider such statement would, in view of the level of access sought, be substantially harmful to the national security and that the person who furnished the information cannot appear to testify (A) due to death, severe illness, or similar cause, in which case the identity of the person and the information to

ENCLOSURE 1

be considered shall be made available to the applicant, or (B) due to some other cause determined by the head of the Department to be good and sufficient.

(b) Whenever procedures under paragraph (1) or (2) of subsection (a) of this section are used (1) the applicant shall be given a summary of the information which shall be as comprehensive and detailed as the national security permits, (2) appropriate consideration shall be accorded to the fact that the applicant did not have an opportunity to cross-examine such person or persons, and (3) a final determination adverse to the applicant shall be made only by the head of the Department based upon his personal review of the case.

SECTION 5.  (a) Records compiled in the regular course of business, or other physical evidence other than investigative reports, may be received and considered subject to rebuttal without authenticating witnesses, provided that such information has been furnished to the Department concerned by an investigative agency pursuant to its responsibilities in connection with assisting the head of the Department concerned to safeguard classified information within industry pursuant to this order.

(b) Records compiled in the regular course of business, or other physical evidence other than investigative reports, relating to a controverted issue which, because they are classified, may not be inspected by the applicant, may be received and considered provided that:  (1) the head of the Department concerned or his special designee for that purpose has made a preliminary determination that such physical evidence appears to be material, (2) the head of the Department concerned or such designee has made a determination that failure to receive and consider such physical evidence would, in view of the level of access sought, be substantially harmful to the national security, and (3) to the extent that the national security permits, a summary or description of such physical evidence is made available to the applicant.  In every such case, information as to the authenticity and accuracy of such physical evidence furnished by the investigative agency involved shall be considered.  In such instances a final determination adverse to the applicant shall be made only by the head of the Department based upon his personal review of the case.

SECTION 6.  The head of a Department of the United States or his representative, may issue, in appropriate cases, invitations and requests to appear and testify in order that the applicant may have the opportunity to cross-examine as provided by this order.  Whenever a witness is so invited or requested to appear and testify at a proceeding and the witness is an officer or employee of the Executive Branch of the Government or a member of the Armed Forces of the United States, and the proceeding involves the activity in connection with which the witness is employed,

*DoDD 5220.6, January 2, 1992*

travel expenses and per diem are authorized as provided by the Standard Government Travel Regulations or the Joint Travel Regulations, as appropriate.  In all other cases (including non-Government employees as well as officers or employees of the Executive Branch of the Government or members of the Armed Forces of the United states not covered by the foregoing sentence), transportation in kind and reimbursement for actual expenses are authorized in an amount not to exceed the amount payable under Standardized Government Travel Regulations.  An Officer or employee of the Executive Branch of the Government or a member of the Armed Forces of the United States who is invited or requested to appear pursuant to this paragraph shall be deemed to be in the performance of his official duties.  So far as the national security permits, the head of the investigative agency involved shall cooperate with the Secretary, the Administrator, or the head of the other Department or Agency, as the case may be, in identifying persons who have made statements adverse to the applicant and in assisting him in making them available for cross-examination. If a person so invited is an officer or employee of the Executive Branch of the Government or a member of the Armed Forces of the United States, the head of the Department or Agency concerned shall cooperate in making that person available for cross-examination.

[Sec. 6 amended by EO 10909 of Jan. 17, 1961, 26 FR 508, 3 CFR, 1959-1963 Comp., p. 437; EO 11382 of Nov. 28, 1967, 32 FR 16247, 3 CFR, 1966-1970 Comp., p. 691; EO 12829 of Jan. 6, 1993, 58 FR 3479]

SECTION 7.  Any determination under this order adverse to an applicant shall be a determination in terms of the national interest and shall in no sense be a determination as to the loyalty of the applicant concerned.

SECTION 8.  Except as otherwise specified in the preceding provisions of this order, any authority vested in the head of a Department by this order may be delegated to the deputy of that Department, or the principal assistant to the head of that Department, as the case may be.

[Sec. 8 amended by EO 10909 of Jan 17, 1961, 26 FR 508, 3 CFR, 1959-1963 Comp., p. 437; EO 11382 of Nov. 28, 1967, 32 FR 16247, 3 CFR, 1966-1970 Comp., p. 691; EO 12829 of Jan. 6, 1993, 58 FR 3479]

SECTION 9.  Nothing contained in this order shall be deemed to limit or affect the responsibility and powers of the head of a Department to deny or revoke access to a specific classification category if the security of the nation so requires.  Such authority may not be delegated and may be exercised only when the head of a

ENCLOSURE 1

*DoDD 5220.6, January 2, 1992*

Department determines that the procedures prescribed in sections 3, 4, and 5 cannot be invoked consistently with the national security and such determination shall be conclusive.

ENCLOSURE 1

*DoDD 5220.6, January 2, 1992*

E2.  ENCLOSURE 2

ADJUDICATIVE GUIDELINES FOR DETERMINING ELIGIBILITY
FOR ACCESS TO CLASSIFIED INFORMATION

E2.1.  INTRODUCTION

The following adjudicative guidelines are established for all U.S. Government civilian and military personnel, consultants, contractors, employees of contractors, licensees, certificate holders or grantees and their employees and other individuals who require access to classified information and/or assignment to sensitive national security positions.  They apply to persons being considered for initial or continued eligibility for assignment to sensitive positions and/or access to classified information, to include Sensitive Compartmented Information (SCI) and Special Access Programs (SAPs) and are to be used by Government Departments and Agencies in all final clearance determinations.

E2.2.  ADJUDICATIVE PROCESS

E2.2.1.  The adjudicative process is an examination of a sufficient period of a person's life to make an affirmative determination that the person is eligible for a security clearance.  Eligibility for access to classified information is predicated upon the individual meeting these personnel security guidelines.  The adjudicative process is the careful weighing of a number of variables known as the whole person concept. Available, reliable information about the person, past and present, favorable and unfavorable, should be considered in reaching a determination.  In evaluating the relevance of an individual's conduct, the adjudicator should consider the following factors:

E2.2.1.1.  The nature, extent, and seriousness of the conduct;

E2.2.1.2.  The circumstances surrounding the conduct, to include knowledgeable participation;

E2.2.1.3.  The frequency and recency of the conduct;

E2.2.1.4.  The individual's age and maturity at the time of the conduct;

E2.2.1.5.  The voluntariness of participation;

ENCLOSURE 2

*DoDD 5220.6, January 2, 1992*

E2.2.1.6.  The presence or absence of rehabilitation and other pertinent behavioral changes;

E2.2.1.7.  The motivation for the conduct;

E2.2.1.8.  The potential for pressure, coercion, exploitation, or duress; and

E2.2.1.9.  The likelihood of continuation or recurrence;

E2.2.2.  Each case must be judged on its own merits, and final determination remains the responsibility of the specific Department or Agency.  Any doubt as to whether access to classified information is clearly consistent with national security will be resolved in favor of the national security.

E2.2.3.  The ultimate determination of whether the granting or continuing of eligibility for a security clearance is clearly consistent with the interests of national security must be an overall common sense determination based upon careful consideration of the following, each of which is to be evaluated in the context of the whole person, as explained further below:

E2.2.3.1.  Guideline A:  Allegiance to the United States

E2.2.3.2.  Guideline B:  Foreign influence

E2.2.3.3.  Guideline C:  Foreign preference

E2.2.3.4.  Guideline D:  Sexual behavior

E2.2.3.5.  Guideline E:  Personal conduct

E2.2.3.6.  Guideline F:  Financial considerations

E2.2.3.7.  Guideline G:  Alcohol consumption

E2.2.3.8.  Guideline H:  Drug involvement

E2.2.3.9.  Guideline I:  Emotional, mental, and personality disorders

E2.2.3.10.  Guideline J:  Criminal conduct

E2.2.3.11.  Guideline K:  Security violations

*DoDD 5220.6, January 2, 1992*

E2.2.3.12.  Guideline L:  Outside activities

E2.2.3.13.  Guideline M:  Misuse of Information Technology Systems

E2.2.4.  Although adverse information concerning a single criterion may not be sufficient for an unfavorable determination, the individual may be disqualified if available information reflects a recent or recurring pattern of questionable judgment, irresponsibility, or emotionally unstable behavior.  Notwithstanding, the whole person concept, pursuit of further investigation may be terminated by an appropriate adjudicative agency in the face of reliable, significant, disqualifying, adverse information.

E2.2.5.  When information of security concern becomes known about an individual who is currently eligible for access to classified information, the adjudicator should consider whether the person:

E2.2.5.1.  Voluntarily reported the information

E2.2.5.2.  Was truthful and complete in responding to questions;

E2.2.5.3.  Sought assistance and followed professional guidance, where appropriate;

E2.2.5.4.  Resolved or appears likely to favorably resolve the security concern;

E2.2.5.5.  Has demonstrated positive changes in behavior and employment;

E2.2.5.6.  Should have his or her access temporarily suspended pending final adjudication of the information.

E2.2.6.  If after evaluating information of security concern, the adjudicator decides that the information is not serious enough to warrant a recommendation of disapproval or revocation of the security clearance, it may be appropriate to recommend approval with a warning that future incidents of a similar nature may result in revocation of access.

ENCLOSURE 2

*DoDD 5220.6, January 2, 1992*

Attachments -13
    E2.A1.  GUIDELINE A, Allegiance to the United States
    E2.A2.  GUIDELINE B, Foreign Influence
    E2.A3.  GUIDELINE C, Foreign Preference
    E2.A4.  GUIDELINE D, Sexual Behavior
    E2.A5.  GUIDELINE E, Personal Conduct
    E2.A6.  GUIDELINE F, Financial Considerations
    E2.A7.  GUIDELINE G, Alcohol Consumption
    E2.A8.  GUIDELINE H, Drug Involvement
    E2.A9.  GUIDELINE I, Emotional, Mental, and Personality Disorders
    E2.A10.  GUIDELINE J, Criminal Conduct
    E2.A11.  GUIDELINE K, Security Violations
    E2.A12.  GUIDELINE L, Outside Activities
    E2.A13.  GUIDELINE M, Misuse of Information Technology Systems

ENCLOSURE 2

E2.A1.  <u>ATTACHMENT 1 TO ENCLOSURE 2</u>

<u>GUIDELINE A</u>
<u>Allegiance to the United States</u>

E2.A1.1.1.  The Concern.  An individual must be of unquestioned allegiance to the United States.  The willingness to safeguard classified information is in doubt if there is any reason to suspect an individuals allegiance to the United States.

E2.A1.1.2.  Conditions that could raise a security concern and may be disqualifying include:

E2.A1.1.2.1.  Involvement in any act of sabotage, espionage, treason, terrorism, sedition, or other act whose aim is to overthrow the Government of the United States or alter the form of Government by unconstitutional means;

E2.A1.1.2.2.  Association or sympathy with persons who are attempting to commit, or who are committing, any of the above acts;

E2.A1.1.2.3.  Association or sympathy with persons or organizations that advocate the overthrow of the United States Government, or any State or subdivision, by force or violence or by other unconstitutional means;

E2.A1.1.2.4.  Involvement in activities which unlawfully advocate or practice the commission of acts of force or violence to prevent others from exercising their rights under the Constitution or laws of the United States or of any State.

E2.A1.1.3.  Conditions that could mitigate security concerns include:

E2.A1.1.3.1.  The individual was unaware of the unlawful aims of the individual or organization and severed ties upon learning of these;

E2.A1.1.3.2.  The individual's involvement was only with the lawful or humanitarian aspects of such an organization;

E2.A1.1.3.3.  Involvement in the above activities occurred for only a short period of time and was attributable to curiosity or academic interest;

E2.A1.1.3.4.  The person has had no recent involvement or association with such activities.

*DoDD 5220.6, January 2, 1992*

E2.A2.  ATTACHMENT 2 TO ENCLOSURE 2

GUIDELINE B
Foreign Influence

E2.A2.1.1.  The Concern:  A security risk may exist when an individual's immediate family, including cohabitants, and other persons to whom he or she may be bound by affection, influence, or obligation are not citizens of the United States or may be subject to duress.  These situations could create the potential for foreign influence that could result in the compromise of classified information.  Contacts with citizens of other countries or financial interests in other countries are also relevant to security determinations if they make an individual potentially vulnerable to coercion, exploitation, or pressure.

E2.A2.1.2.  Conditions that could raise a security concern and may be disqualifying include:

E2.A2.1.2.1.  An immediate family member, or a person to whom the individual has close ties of affection or obligation, is a citizen of, or resident or present in, a foreign country;

E2.A2.1.2.1.  Sharing living quarters with a person or persons, regardless of their citizenship status, if the potential for adverse foreign influence or duress exists;

E2.A2.1.2.3.  Relatives, cohabitants, or associates who are connected with any foreign government;

E2.A2.1.2.4.  Failing to report, where required, associations with foreign nationals;

E2.A2.1.2.5.  Unauthorized association with a suspected or known collaborator or employee of a foreign intelligence service;

E2.A2.1.2.6.  Conduct which may make the individual vulnerable to coercion, exploitation, or pressure by a foreign government;

E2.A2.1.2.7.  Indications that representatives or nationals from a foreign country are acting to increase the vulnerability of the individual to possible future exploitation, coercion or pressure;

*DoDD 5220.6, January 2, 1992*

E2.A2.1.2.8.  A substantial financial interest in a country, or in any foreign-owned or -operated business that could make the individual vulnerable to foreign influence.

E2.A2.1.3.  Conditions that could mitigate security concerns include:

E2.A2.1.3.1.  A determination that the immediate family member(s), (spouse, father, mother, sons, daughters, brothers, sisters), cohabitant, or associate(s) in question are not agents of a foreign power or in a position to be exploited by a foreign power in a way that could force the individual to choose between loyalty to the person(s) involved and the United States;

E2.A2.1.3.2.  Contacts with foreign citizens are the result of official United States Government business;

E2.A2.1.3.3.  Contact and correspondence with foreign citizens are casual and infrequent;

E2.A2.1.3.4.  The individual has promptly reported to proper authorities all contacts, requests, or threats from persons or organizations from a foreign country, as required;

E2.A2.1.3.5.  Foreign financial interests are minimal and not sufficient to affect the individual's security responsibilities.

*DoDD 5220.6, January 2, 1992*

E2.A3.  ATTACHMENT 3 TO ENCLOSURE 2

GUIDELINE C
Foreign Preference

E2.A3.1.1.  The Concern:  When an individual acts in such a way as to indicate a preference for a foreign country over the United States, then he or she may be prone to provide information or make decisions that are harmful to the interests of the United States.

E2.A3.1.2.  Conditions that could raise a security concern and may be disqualifying include:

E2.A3.1.2.1.  The exercise of dual citizenship;

E2.A3.1.2.2.  Possession and/or use of a foreign passport;

E2.A3.1.2.3.  Military service or a willingness to bear arms for a foreign country;

E2.A3.1.2.4.  Accepting educational, medical, or other benefits, such as retirement and social welfare, from a foreign country;

E2.A3.1.2.5.  Residence in a foreign country to meet citizenship requirements;

E2.A3.1.2.6.  Using foreign citizenship to protect financial or business interests in another country;

E2.A3.1.2.7.  Seeking or holding political office in the foreign country;

E2.A3.1.2.8.  Voting in foreign elections; and

E2.A3.1.2.9.  Performing or attempting to perform duties, or otherwise acting, so as to serve the interests of another government in preference to the interests of the United States.

E2.A3.1.3.  Conditions that could mitigate security concerns include:

E2.A3.1.3.1.  Dual citizenship is based solely on parents' citizenship or birth in a foreign country;

ENCLOSURE 2, ATTACHMENT 3

*DoDD 5220.6, January 2, 1992*

E2.A3.1.3.2.  Indicators of possible foreign preference (e.g., foreign military service) occurred before obtaining United States citizenship;

E2.A3.1.3.3.  Activity is sanctioned by the United States;

E2.A3.1.3.4.  Individual has expressed a willingness to renounce dual citizenship.

ENCLOSURE 2, ATTACHMENT 3

*DoDD 5220.6, January 2, 1992*

E2.A4.  ATTACHMENT 4 TO ENCLOSURE 2

GUIDELINE D
Sexual Behavior

E2.A4.1.1.  The Concern:  Sexual behavior is a security concern if it involves a criminal offense, indicates a personality or emotional disorder, may subject the individual to coercion, exploitation, or duress or reflects lack of judgment or discretion.[1]  Sexual orientation or preference may not be used as a basis for or a disqualifying factor in determining a person's eligibility for a security clearance.

E2.A4.1.2.  Conditions that could raise a security concern and may be disqualifying include:

E2.A4.1.2.1.  Sexual behavior of a criminal nature, whether or not the individual has been prosecuted;

E2.A4.1.2.2.  Compulsive or addictive sexual behavior when the person is unable to stop a pattern of self-destructive or high-risk behavior or that which is symptomatic of a personality disorder;

E2.A4.1.2.3.  Sexual behavior that causes an individual to be vulnerable to coercion, exploitation, or duress;

E2.A4.1.2.4.  Sexual behavior of a public nature and/or that which reflects lack of discretion or judgment.

E2.A4.1.3.  Conditions that could mitigate security concerns include:

E2.A4.1.3.1.  The behavior occurred during or prior to adolescence and there is no evidence of subsequent conduct of a similar nature;

E2.A4.1.3.2.  The behavior was not recent and there is no evidence of subsequent conduct of a similar nature;

E2.A4.1.3.3.  There is no other evidence of questionable judgment, irresponsibility, or emotional instability;

---

[1] The adjudicator should also consider guidelines pertaining to criminal conduct (Guideline J) and emotional, mental, and personality disorders (Guideline I) in determining how to resolve the security concerns raised by sexual behavior.

*DoDD 5220.6, January 2, 1992*

E2.A4.1.3.4.  The behavior no longer serves as a basis for coercion, exploitation, or duress.

ENCLOSURE 2, ATTACHMENT 4

*DoDD 5220.6, January 2, 1992*

E2.A5.  <u>ATTACHMENT 5 TO ENCLOSURE 2</u>

<u>GUIDELINE E</u>
<u>PERSONAL CONDUCT</u>

E2.A5.1.1.  <u>The Concern</u>:  Conduct involving questionable judgment, untrustworthiness, unreliability, lack of candor, dishonesty, or unwillingness to comply with rules and regulations could indicate that the person may not properly safeguard classified information.  The following will normally result in an unfavorable clearance action or administrative termination of further processing for clearance eligibility:

E2.A5.1.1.1.  Refusal to undergo or cooperate with required security processing, including medical and psychological testing; or

E2.A5.1.1.2.  Refusal to complete required security forms, releases, or provide full, frank and truthful answers to lawful questions of investigators, security officials or other official representatives in connection with a personnel security or trustworthiness determination.

E2.A5.1.2.  Conditions that could raise a security concern and may be disqualifying also include:

E2.A5.1.2.1.  Reliable, unfavorable information provided by associates, employers, coworkers, neighbors, and other acquaintances;

E2.A5.1.2.2.  The deliberate omission, concealment, or falsification of relevant and material facts from any personnel security questionnaire, personal history statement, or similar form used to conduct investigations, determine employment qualifications, award benefits or status, determine security clearance eligibility or trustworthiness, or award fiduciary responsibilities;

E2.A5.1.2.3.  Deliberately providing false or misleading information concerning relevant and material matters to an investigator, security official, competent medical authority, or other official representative in connection with a personnel security or trustworthiness determination;

E2.A5.1.2.4.  Personal conduct or concealment of information that increases an individual's vulnerability to coercion, exploitation or duress, such as engaging in activities which, if known, may affect the person's personal, professional, or community standing or render the person susceptible to blackmail;

*DoDD 5220.6, January 2, 1992*

E2.A5.1.2.5.  A pattern of dishonesty or rule violations, including violation of any written or recorded agreement made between the individual and the agency;

E2.A5.1.2.6.  Association with persons involved in criminal activity.

E2.A5.1.3.  Conditions that could mitigate security concerns include:

E2.A5.1.3.1.  The information was unsubstantiated or not pertinent to a determination of judgment, trustworthiness, or reliability;

E2.A5.1.3.2.  The falsification was an isolated incident, was not recent, and the individual has subsequently provided correct information voluntarily;

E2.A5.1.3.3.  The individual made prompt, good-faith efforts to correct the falsification before being confronted with the facts;

E2.A5.1.3.4.  Omission of material facts was caused or significantly contributed to by improper or inadequate advice of authorized personnel, and the previously omitted information was promptly and fully provided;

E2.A5.1.3.5.  The individual has taken positive steps to significantly reduce or eliminate vulnerability to coercion, exploitation, or duress;

E2.A5.1.3.6.  A refusal to cooperate was based on advice from legal counsel or other officials that the individual was not required to comply with security processing requirements and, upon being made aware of the requirement, fully and truthfully provided the requested information;

E2.A5.1.3.7.  Association with persons involved in criminal activities has ceased.

ENCLOSURE 2, ATTACHMENT 5

*DoDD 5220.6, January 2, 1992*

E2.A6.  UNDERLINE ATTACHMENT 6 TO ENCLOSURE 2

GUIDELINE F
Financial Considerations

E2.A6.1.1.  The Concern:  An individual who is financially overextended is at risk of having to engage in illegal acts to generate funds.  Unexplained affluence is often linked to proceeds from financially profitable criminal acts.

E2.A6.1.2.  Conditions that could raise a security concern and may be disqualifying include:

E2.A6.1.2.1.  A history of not meeting financial obligations;

E2.A6.1.2.2.  Deceptive or illegal financial practices such as embezzlement, employee theft, check fraud, income tax evasion, expense account fraud, filing deceptive loan statements, and other intentional financial breaches of trust;

E2.A6.1.2.3.  Inability or unwillingness to satisfy debts;

E2.A6.1.2.4.  Unexplained affluence;

E2.A6.1.2.5.  Financial problems that are linked to gambling, drug abuse, alcoholism, or other issues of security concern.

E2.A6.1.3.  Conditions that could mitigate security concerns include:

E2.A6.1.3.1.  The behavior was not recent;

E2.A6.1.3.2.  It was an isolated incident;

E2.A6.1.3.3.  The conditions that resulted in the behavior were largely beyond the person's control (e.g., loss of employment, a business downturn, unexpected medical emergency, or a death, divorce or separation);

E2.A6.1.3.4.  The person has received or is receiving counseling for the problem and there are clear indications that the problem is being resolved or is under control;

E2.A6.1.3.5.  The affluence resulted from a legal source; and

*DoDD 5220.6, January 2, 1992*

E2.A6.1.3.6.  The individual initiated a good-faith effort to repay overdue creditors or otherwise resolve debts.

ENCLOSURE 2, ATTACHMENT 6

E2.A7.  <u>ATTACHMENT 7 TO ENCLOSURE 2</u>

<u>GUIDELINE G</u>
<u>Alcohol Consumption</u>

E2.A7.1.1.  The Concern:  Excessive alcohol consumption often leads to the exercise of questionable judgment, unreliability, failure to control impulses, and increases the risk of unauthorized disclosure of classified information due to carelessness.

E2.A7.1.2.  Conditions that could raise a security concern and may be disqualifying include:

E2.A7.1.2.1.  Alcohol-related incidents away from work, such as driving while under the influence, fighting, child or spouse abuse, or other criminal incidents related to alcohol use;

E2.A7.1.2.2.  Alcohol-related incidents at work, such as reporting for work or duty in an intoxicated or impaired condition, or drinking on the job;

E2.A7.1.2.3.  Diagnosis by a credentialed medical professional (e.g., physician, clinical psychologist, or psychiatrist) of alcohol abuse or alcohol dependence;

E2.A7.1.2.4.  Evaluation of alcohol abuse or alcohol dependence by a licensed clinical social worker who is a staff member of a recognized alcohol treatment program;

E2.A7.1.2.5.  Habitual or binge consumption of alcohol to the point of impaired judgment;

E2.A7.1.2.6.  Consumption of alcohol, subsequent to a diagnosis of alcoholism by a credentialed medical professional and following completion of an alcohol rehabilitation program

E2.A7.1.3.  Conditions that could mitigate security concerns include:

E2.A7.1.3.1.  The alcohol related incidents do not indicate a pattern;

E2.A7.1.3.2.  The problem occurred a number of years ago and there is no indication of a recent problem;

*DoDD 5220.6, January 2, 1992*

E2.A7.1.3.3.  Positive changes in behavior supportive of sobriety;

E2.A7.1.3.4.  Following diagnosis of alcohol abuse or alcohol dependence, the individual has successfully completed inpatient or outpatient rehabilitation along with aftercare requirements, participates frequently in meetings of Alcoholics Anonymous or a similar organization, has abstained from alcohol for a period of at least 12 months, and received a favorable prognosis by a credentialed medical professional or licensed clinical social worker who is a staff member of a recognized alcohol treatment program.

ENCLOSURE 2, ATTACHMENT 7

*DoDD 5220.6, January 2, 1992*

E2.A8.  ATTACHMENT 8 TO ENCLOSURE 2

GUIDELINE H
Drug Involvement

E2.A8.1.1.  The Concern:

E2.A8.1.1.1.  Improper or illegal involvement with drugs, raises questions regarding an individual's willingness or ability to protect classified information.  Drug abuse or dependence may impair social or occupational functioning, increasing the risk of an unauthorized disclosure of classified information

E2.A8.1.1.2.  Drugs are defined as mood and behavior-altering substances, and include:

E2.A8.1.1.2.1.  Drugs, materials, and other chemical compounds identified and listed in the Controlled Substances Act of 1970, as amended (e.g., marijuana or cannabis, depressants, narcotics, stimulants, and hallucinogens); and

E2.A8.1.1.2.2.  Inhalants and other similar substances,

E2.A8.1.1.3.  Drug abuse is the illegal use of a drug or use of a legal drug in a manner that deviates from approved medical direction.

E2.A8.1.2.  Conditions that could raise a security concern and may be disqualifying include:

E2.A8.1.2.1.  Any drug abuse (see above definition);

E2.A8.1.2.2.  Illegal drug possession, including cultivation, processing, manufacture, purchase, sale, or distribution;

E2.A8.1.2.3.  Diagnosis by a credentialed medical professional (e.g., physician, clinical psychologist, or psychiatrist) of drug abuse or drug dependence;

E2.A8.1.2.4.  Evaluation of drug abuse or drug dependence by a licensed clinical social worker who is a staff member of a recognized drug treatment program;

E2.A8.1.2.5.  Failure to successfully complete a drug treatment program prescribed by a credentialed medical professional.  Recent drug involvement, especially following the granting of a security clearance, or an expressed intent not to

*DoDD 5220.6, January 2, 1992*

discontinue use, will almost invariably result in an unfavorable determination.

E2.A8.1.3.  Conditions that could mitigate security concerns include:

E2.A8.1.3.1.  The drug involvement was not recent;

E2.A8.1.3.2.  The drug involvement was an isolated or aberrational event;

E2.A8.1.3.3.  A demonstrated intent not to abuse any drugs in the future;

E2.A8.1.3.4.  Satisfactory completion of a prescribed drug treatment program,  including rehabilitation and aftercare requirements, without recurrence of abuse, and a favorable prognosis  by a credentialed medical professional.

ENCLOSURE 2, ATTACHMENT 8

*DoDD 5220.6, January 2, 1992*

E2.A9.  <u>ATTACHMENT 9 TO ENCLOSURE 2</u>

<u>GUIDELINE I</u>
<u>Emotional, Mental, and Personality Disorders</u>

E2.A9.1.1.  The Concern:  Emotional, mental, and personality disorders can cause a significant deficit in an individuals psychological, social and occupational functioning.  These disorders are of security concern because they may indicate a defect in judgment, reliability or stability.   A credentialed mental health professional (e.g., clinical psychologist or psychiatrist), employed by, acceptable to or approved by the Government, should be utilized in evaluating potentially disqualifying and mitigating information fully and properly, and particularly for consultation with the individual's mental health care provider.

E2.A9.1.2.  Conditions that could raise a security concern and may be disqualifying include:

E2.A9.1.2.1.  An opinion by a credentialed mental health professional that the individual has a condition or treatment that may indicate a defect in  judgment, reliability, or stability;

E2.A9.1.2.2.  Information that suggests that an individual has failed to follow appropriate medical advice relating to treatment of a condition, e.g. failure to take prescribed medication;

E2.A9.1.2.3.  A pattern of high-risk, irresponsible, aggressive, anti-social or emotionally unstable behavior;

E2.A9.1.2.4.  Information that suggests that the individual's current behavior indicates a defect in his or her judgment or reliability.

E2.A9.1.3.  Conditions that could mitigate security concerns include:

E2.A9.1.3.1.  There is no indication of a current problem;

E2.A9.1.3.2.  Recent opinion by a credentialed mental health professional that an individual's previous emotional, mental, or personality disorder is cured, under control or in remission, and has a low probability of recurrence or exacerbation;

*DoDD 5220.6, January 2, 1992*

E2.A9.1.3.3.  The past emotional instability was a temporary condition (e.g., one caused by a death, illness, or marital breakup), the situation has been resolved, and the individual is no longer emotionally unstable.

ENCLOSURE 2, ATTACHMENT 9

*DoDD 5220.6, January 2, 1992*

E2.A10.  ATTACHMENT 10 TO ENCLOSURE 2

GUIDELINE J
Criminal Conduct

E2.A10.1.1.  The Concern:  A history or pattern of criminal activity creates doubt about a person's judgment, reliability and trustworthiness.

E2.A10.1.2.  Conditions that could raise a security concern and may be disqualifying include:

E2.A10.1.2.1.  Allegations or admission of criminal conduct, regardless of whether the person was formally charged;

E2.A10.1.2.2.  A single serious crime or multiple lesser offenses.

E2.A10.1.3.  Conditions that could mitigate security concerns include:

E2.A10.1.3.1.  The criminal behavior was not recent;

E2.A10.1.3.2.  The crime was an isolated incident;

E2.A10.1.3.3.  The person was pressured or coerced into committing the act and those pressures are no longer present in that person's life;

E2.A10.1.3.4.  The person did not voluntarily commit the act and/or the factors leading to the violation are not likely to recur;

E2.A10.1.3.5.  Acquittal;

E2.A10.1.3.6.  There is clear evidence of successful rehabilitation.

*DoDD 5220.6, January 2, 1992*

E2.A11.  <u>ATTACHMENT 11 TO ENCLOSURE 2</u>

<u>GUIDELINE K</u>
<u>Security Violations</u>

E2.A11.1.1.  The Concern:  Noncompliance with security regulations raises doubt about an individual's trustworthiness, willingness, and ability to safeguard classified information.

E2.A11.1.2.  Conditions that could raise a security concern and may be disqualifying include:

E2.A11.1.2.1.  Unauthorized disclosure of classified information;

E2.A11.1.2.2.  Violations that are deliberate or multiple or due to negligence.

E2.A11.1.3.  Conditions that could mitigate security concerns include actions that:

E2.A11.1.3.1.  Were inadvertent;

E2.A11.1.3.2.  Were isolated or infrequent;

E2.A11.1.3.3.  Were due to improper or inadequate training;

E2.A11.1.3.4.  Demonstrate a positive attitude towards the discharge of security responsibilities.

ENCLOSURE 2, ATTACHMENT 11

*DoDD 5220.6, January 2, 1992*

E2.A12.  <u>ATTACHMENT 12 TO ENCLOSURE 2</u>

<u>GUIDELINE L</u>
<u>Outside Activities</u>


E2.A12.1.1.  The Concern:  Involvement in certain types of outside employment or activities is of security concern if it poses a conflict with an individual's security responsibilities and could create an increased risk of unauthorized disclosure of classified information.

E2.A12.1.2.  Conditions that could raise a security concern and may be disqualifying include any service, whether compensated, volunteer, or employment with:

E2.A12.1.2.1.  A foreign country;

E2.A12.1.2.2.  Any foreign national;

E2.A12.1.2.3.  A representative of any foreign interest;

E2.A12.1.2.4.  Any foreign, domestic, or international organization or person engaged in analysis, discussion, or publication of material on intelligence, defense, foreign affairs, or protected technology.

E2.A12.1.3.  Conditions that could mitigate security concerns include:

E2.A12.1.3.1.  Evaluation of the outside employment or activity indicates that it does not pose a conflict with an individual's security responsibilities;

E2.A12.1.3.2.  The individual terminates the employment or discontinues the activity upon being notified that it is in conflict with his or her security responsibilities.

ENCLOSURE 2, ATTACHMENT 12

*DoDD 5220.6, January 2, 1992*

E2.A13.  ATTACHMENT 13 TO ENCLOSURE 2

GUIDELINE M
Misuse of Information Technology Systems

E2.A13.1.1.  The Concern:  Noncompliance with rules, procedures, guidelines or regulations pertaining to information technology systems may raise security concerns about an individual's trustworthiness, willingness, and ability to properly protect classified systems, networks, and information.  Information Technology Systems include all related equipment used for the communication, transmission, processing, manipulation, and storage of classified or sensitive information.

E2.A13.1.2.  Conditions that could raise a security concern and may be disqualifying include:

E2.A13.1.2.1.  Illegal or unauthorized entry into any information technology system;

E2.A13.1.2.2.  Illegal or unauthorized modification, destruction, manipulation, or denial of access to information residing on an information technology system;

E2.A13.1.2.3.  Removal (or use) of hardware, software or media from any information technology system without authorization, when specifically prohibited by rules, procedures, guidelines or regulations;

E2.A13.1.2.4.  Introduction of hardware, software or media into any information technology system without authorization, when specifically prohibited by rules, procedures, guidelines or regulations;

E2.A13.1.3.  Conditions that could mitigate security concerns include:

E2.A13.1.3.1.  The misuse was not recent or significant;

E2.A13.1.3.2.  The conduct was unintentional or inadvertent;

E2.A13.1.3.3.  The introduction or removal of media was authorized;

E2.A13.1.3.4.  The misuse was an isolated event;

ENCLOSURE2, ATTACHMENT 13

*DoDD 5220.6, January 2, 1992*

E2.A13.1.3.5.  The misuse was followed by a prompt, good faith effort to correct the situation.

*DoDD 5220.6, January 2, 1992*

E3.  <u>ENCLOSURE 3</u>

<u>ADDITIONAL PROCEDURAL GUIDANCE</u>

E3.1.1.  When the DISCO cannot affirmatively find that it is clearly consistent with the national interest to grant or continue a security clearance for an applicant, the case shall be promptly referred to the DOHA.

E3.1.2.  Upon referral, the DOHA shall make a prompt determination whether to grant or continue a security clearance, issue a statement of reasons (SOR) as to why it is not clearly consistent with the national interest to do so, or take interim actions, including but not limited to:

E3.1.2.1.  Direct further investigation.

E3.1.2.2.  Propound written interrogatories to the applicant or other persons with relevant information.

E3.1.2.3.  Requiring the applicant to undergo a medical evaluation by a DoD Psychiatric Consultant.

E3.1.2.4.  Interviewing the applicant.

E3.1.3.  An unfavorable clearance decision shall not be made unless the applicant has been provided with a written SOR that shall be as detailed and comprehensive as the national security permits.  A letter of instruction with the SOR shall explain that the applicant or Department Counsel may request a hearing.  It shall also explain the adverse consequences for failure to respond to the SOR within the prescribed time frame.

E3.1.4.  The applicant must submit a detailed written answer to the SOR under oath or affirmation that shall admit or deny each listed allegation.  A general denial or other similar answer is insufficient.  To be entitled to a hearing, the applicant must specifically request a hearing in his or her answer.  The answer must be received by the DOHA within 20 days from receipt of the SOR.  Requests for an extension of time to file an answer may be submitted to the Director, DOHA, or designee, who in turn may grant the extension only upon a showing of good cause.

E3.1.5.  If the applicant does not file a timely and responsive answer to the SOR, the Director, DOHA, or designee, may discontinue processing the case, deny issuance

*DoDD 5220.6, January 2, 1992*

of the requested security clearance, and direct the DISCO to revoke any security clearance held by the applicant.

E3.1.6.  Should review of the applicant's answer to the SOR indicate that allegations are unfounded, or evidence is insufficient for further processing, Department Counsel shall take such action as appropriate under the circumstances, including but not limited to withdrawal of the SOR and transmittal to the Director for notification of the DISCO for appropriate action.

E3.1.7.  If the applicant has not requested a hearing with his or her answer to the SOR and Department Counsel has not requested a hearing within 20 days of receipt of the applicant's answer, the case shall be assigned to the Administrative Judge for a clearance decision based on the written record.  Department Counsel shall provide the applicant with a copy of all relevant and material information that could be adduced at a hearing.  The applicant shall have 30 days from receipt of the information in which to submit a documentary response setting forth objections, rebuttal, extenuation, mitigation, or explanation, as appropriate.

E3.1.8.  If a hearing is requested by the applicant or Department Counsel, the case shall be assigned to the Administrative Judge for a clearance decision based on the hearing record.  Following issuance of a notice of hearing by the Administrative Judge, or designee, the applicant shall appear in person with or without counsel or a personal representative at a time and place designated by the notice of hearing.  The applicant shall have a reasonable amount of time to prepare his or her case.  The applicant shall be notified at least 15 days in advance of the time and place of the hearing, which generally shall be held at a location in the United States within a metropolitan area near the applicant's place of employment or residence.  A continuance may be granted by the Administrative Judge only for good cause. Hearings may be held outside of the United States in NATO cases, or in other cases upon a finding of good cause by the Director, DOHA, or designee.

E3.1.9.  The Administrative Judge may require a pre-hearing conference.

E3.1.10.  The Administrative Judge may rule on questions on procedure, discovery, and evidence and shall conduct all proceedings in a fair, timely, and orderly manner.

E3.1.11.  Discovery by the applicant is limited to non-privileged documents and materials subject to control by the DOHA.  Discovery by Department Counsel after

issuance of an SOR may be granted by the Administrative Judge only upon a showing of good cause.

E3.1.12.  A hearing shall be open except when the applicant requests that it be closed, or when the Administrative Judge determines that there is a need to protect classified information or there is other good cause for keeping the proceeding closed. No inference shall be drawn as to the merits of a case on the basis of a request that the hearing be closed.

E3.1.13.  As far in advance as practical, Department Counsel and the applicant shall serve one another with a copy of any pleading, proposed documentary evidence, or other written communication to be submitted to the Administrative Judge.

E3.1.14.  Department Counsel is responsible for presenting witnesses and other evidence to establish facts alleged in the SOR that have been controverted.

E3.1.15.  The applicant is responsible for presenting witnesses and other evidence to rebut, explain, extenuate, or mitigate facts admitted by the applicant or proven by Department Counsel, and has the ultimate burden of persuasion as to obtaining a favorable clearance decision.

E3.1.16.  Witnesses shall be subject to cross-examination.

E3.1.17.  The SOR may be amended at the hearing by the Administrative Judge on his or her own motion, or upon motion by Department Counsel or the applicant, so as to render it in conformity with the evidence admitted or for other good cause.  When such amendments are made, the Administrative Judge may grant either party's request for such additional time as the Administrative Judge may deem appropriate for further preparation or other good cause.

E3.1.18.  The Administrative Judge hearing the case shall notify the applicant and all witnesses testifying that 18 U.S.C. 1001 (reference (c)) is applicable.

E3.1.19.  The Federal Rules of Evidence (28 U.S.C. 101 et seq. (reference (d)) shall serve as a guide.  Relevant and material evidence may be received subject to rebuttal, and technical rules of evidence may be relaxed, except as otherwise provided herein, to permit the development of a full and complete record.

E3.1.20.  Official records or evidence compiled or created in the regular course of business, other than DoD personnel background reports of investigation (ROI), may be received and considered by the Administrative Judge without authenticating witnesses,

provided that such information has been furnished by an investigative agency pursuant to its responsibilities in connection with assisting the Secretary of Defense, or the Department or Agency head concerned, to safeguard classified information within industry under E.O. 10865 (enclosure 1.).  An ROI may be received with an authenticating witness provided it is otherwise admissible under the Federal Rules of Evidence (28 U.S. C.  101 et seq. (reference (d)).

E3.1.21.  Records that cannot be inspected by the applicant because they are classified may be received and considered by the Administrative Judge, provided the GC, DoD, has:

E3.1.21.1.  Made a preliminary determination that such evidence appears to be relevant and material.

E3.1.21.2.  Determined that failure to receive and consider such evidence would be substantially harmful to the national security.

E3.1.22.  A written or oral statement adverse to the applicant on a controverted issue may be received and considered by the Administrative Judge without affording an opportunity to cross-examine the person making the statement orally, or in writing when justified by the circumstances, only in either of the following circumstances:

E3.1.22.1.  If the head of the Department or Agency supplying the statement certifies that the person who furnished the information is a confidential informant who has been engaged in obtaining intelligence information for the Government and that disclosure of his or her identity would be substantially harmful to the national interest; or

E3.1.22.2.  If the GC, DoD, has determined the statement concerned appears to be relevant, material, and reliable; failure to receive and consider the statement would be substantially harmful to the national security; and the person who furnished the information cannot appear to testify due to the following:

E3.1.22.2.1.  Death, severe illness, or similar cause, in which case the identity of the person and the information to be considered shall be made available to the applicant; or

E3.1.22.2.2.  Some other cause determined by the Secretary of Defense, or when appropriate by the Department or Agency head, to be good and sufficient.

E3.1.23.  Whenever evidence is received under items E3.1.21.  or E3.1.22., above,

the applicant shall be furnished with as comprehensive and detailed a summary of the information as the national security permits. The Administrative Judge and Appeal Board may make a clearance decision either favorable or unfavorable to the applicant based on such evidence after giving appropriate consideration to the fact that the applicant did not have an opportunity to confront such evidence, but any final determination adverse to the applicant shall be made only by the Secretary of Defense, or the Department or Agency head, based on a personal review of the case record.

E3.1.24.  A verbatim transcript shall be made of the hearing. The applicant shall be furnished one copy of the transcript, less the exhibits, without cost.

E3.1.25.  The Administrative Judge shall make a written clearance decision in a timely manner setting forth pertinent findings of fact, policies, and conclusions as to the allegations in the SOR, and whether it is clearly consistent with the national interest to grant or continue a security clearance for the applicant. The applicant and Department Counsel shall each be provided a copy of the clearance decision. In cases in which evidence is received under items E3.1.21.  and E3.1.22., above, the Administrative Judge's written clearance decision may require deletions in the interest of national security.

E3.1.26.  If the Administrative Judge decides that it is clearly consistent with the national interest for the applicant to be granted or to retain a security clearance, the DISCO shall be so notified by the Director, DOHA, or designee, when the clearance decision becomes final in accordance with item E3.1.36., below.

E3.1.27.  If the Administrative Judge decides that it is not clearly consistent with the national interest for the applicant to be granted or to retain a security clearance, the Director, DOHA, or designee, shall expeditiously notify the DISCO, which shall in turn notify the applicant's employer of the denial or revocation of the applicant's security clearance. The letter forwarding the Administrative Judge's clearance decision to the applicant shall advise the applicant that these actions are being taken, and that the applicant may appeal the Administrative Judge's clearance decision.

E3.1.28.  The applicant or Department Counsel may appeal the Administrative Judge's clearance decision by filing a written notice of appeal with the Appeal Board within 15 days after the date of the Administrative Judge's clearance decision. A notice of appeal received after 15 days from the date of the clearance decision shall not be accepted by the Appeal Board, or designated Board Member, except for good cause. A notice of cross-appeal may be filed with the Appeal Board within 10 days of receipt of the notice of appeal. An untimely cross appeal shall not be accepted by the

Appeal Board, or designated Board Member, except for good cause.

E3.1.29.  Upon receipt of a notice of appeal, the Appeal Board shall be provided the case record.  No new evidence shall be received or considered by the Appeal Board.

E3.1.30.  After filing a timely notice of appeal, a written appeal brief must be received by the Appeal Board within 45 days from the date of the Administrative Judge's clearance decision.  The appeal brief must state the specific issue or issues being raised, and cite specific portions of the case record supporting any alleged error.  A written reply brief, if any, must be filed within 20 days from receipt of the appeal brief.  A copy of any brief filed must be served upon the applicant or Department Counsel, as appropriate.

E3.1.31.  Requests for extension of time for submission of briefs may be submitted to the Appeal Board or designated Board Member.  A copy of any request for extension of time must be served on the opposing party at the time of submission. The Appeal Board, or designated Board Member, shall be responsible for controlling the Appeal Board's docket, and may enter an order dismissing an appeal in an appropriate case or vacate such an order upon a showing of good cause.

E3.1.32.  The Appeal Board shall address the material issues raised by the parties to determine whether harmful error occurred.  Its scope of review shall be to determine whether or not:

E3.1.32.1.  The Administrative Judge's findings of fact are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion in light of all the contrary evidence in the same record.  In making this review, the Appeal Board shall give deference to the credibility determinations of the Administrative Judge;

E3.1.32.2.  The Administrative Judge adhered to the procedures required by E.O. 10865 (enclosure 1.) and this Directive; or

E3.1.32.3.  The Administrative Judge's rulings or conclusions are arbitrary, capricious, or contrary to law.

E3.1.33.  The Appeal Board shall issue a written clearance decision addressing the material issues raised on appeal.  The Appeal Board shall have authority to:

E3.1.33.1.  Affirm the decision of the Administrative Judge;

E3.1.33.2.  Remand the case to an Administrative Judge to correct identified error.  If the case is remanded, the Appeal Board shall specify the action to be taken on remand; or

E3.1.33.3.  Reverse the decision of the Administrative Judge if correction of identified error mandates such action.

E3.1.34.  A copy of the Appeal Board's written clearance decision shall be provided to the parties.  In cases in which evidence was received under items E3.1.21. and E3.1.22., above, the Appeal Board's clearance decision may require deletions in the interest of national security.

E3.1.35.  Upon remand, the case file shall be assigned to an Administrative Judge for correction of error(s) in accordance with the Appeal Board's clearance decision.  The assigned Administrative Judge shall make a new clearance decision in the case after correcting the error(s) identified by the Appeal Board.  The Administrative Judge's clearance decision after remand shall be provided to the parties.  The clearance decision after remand may be appealed pursuant to items E3.1.28.  to E3.1.35., above.

E3.1.36.  A clearance decision shall be considered final when:

E3.1.36.1.  A security clearance is granted or continued pursuant to item E3.1.2., above;

E3.1.36.2.  No timely notice of appeal is filed;

E3.1.36.3.  No timely appeal brief is filed after a notice of appeal has been filed;

E3.1.36.4.  The appeal has been withdrawn.

E3.1.36.5.  When the Appeal Board affirms or reverses an Administrative Judge's clearance decision; or

E3.1.36.6.  When a decision has been made by the Secretary of Defense, or the Department or Agency head, under to item E3.1.23., above.  The Director, DOHA, or designee, shall notify the DISCO of all final clearance decisions.

E3.1.37.  An applicant whose security clearance has been finally denied or

*DoDD 5220.6, January 2, 1992*

revoked by the DOHA is barred from reapplication for 1 year from the date of the initial unfavorable clearance decision.

E3.1.38.  A reapplication for a security clearance must be made initially by the applicant's employer to the DISCO and is subject to the same processing requirements as those for a new security clearance application.  The applicant shall thereafter be advised he is responsible for providing the Director, DOHA, with a copy of any adverse clearance decision together with evidence that circumstances or conditions previously found against the applicant have been rectified or sufficiently mitigated to warrant reconsideration.

E3.1.39.  If the Director, DOHA, determines that reconsideration is warranted, the case shall be subject to this Directive for making a clearance decision.

E3.1.40.  If the Director, DOHA, determines that reconsideration is not warranted, the DOHA shall notify the applicant of this decision.  Such a decision is final and bars further reapplication for an additional one year period from the date of the decision rejecting the reapplication.

E3.1.41.  Nothing in this Directive is intended to give an applicant reapplying for a security clearance any greater rights than those applicable to any other applicant under this Directive.

E3.1.42.  An applicant may file a written petition, under oath or affirmation, for reimbursement of loss of earnings resulting from the suspension, revocation, or denial of his or her security clearance.  The petition for reimbursement must include as an attachment the favorable clearance decision and documentation supporting the reimbursement claim.  The Director, DOHA, or designee, may in his or her discretion require additional information from the petitioner.

E3.1.43.  Claims for reimbursement must be filed with the Director, DOHA, or designee, within 1 year after the date the security clearance is granted.  Department Counsel generally shall file a response within 60 days after receipt of applicant's petition for reimbursement and provide a copy thereof to the applicant.

E3.1.44.  Reimbursement is authorized only if the applicant demonstrates by clear and convincing evidence to the Director, DOHA, that all of the following conditions are met:

E3.1.44.1.  The suspension, denial, or revocation was the primary cause of the claimed pecuniary loss; and

ENCLOSURE 3

*DoDD 5220.6, January 2, 1992*

E3.1.44.2.  The suspension, denial, or revocation was due to gross negligence of the Department of Defense at the time the action was taken, and not in any way by the applicant's failure or refusal to cooperate.

E3.1.45.  The amount of reimbursement shall not exceed the difference between the earnings of the applicant at the time of the suspension, revocation, or denial and the applicant's interim earnings, and further shall be subject to reasonable efforts on the part of the applicant to mitigate any loss of earnings.  No reimbursement shall be allowed for any period of undue delay resulting from the applicant's acts or failure to act.  Reimbursement is not authorized for loss of merit raises and general increases, loss of employment opportunities, counsel's fees, or other costs relating to proceedings under this Directive.

E3.1.46.  Claims approved by the Director, DOHA, shall be forwarded to the Department or Agency concerned for payment.  Any payment made in response to a claim for reimbursement shall be in full satisfaction of any further claim against the United States or any Federal Department or Agency, or any of its officers or employees.

E3.1.47.  Clearance decisions issued by Administrative Judges and the Appeal Board shall be indexed and made available in redacted form to the public.

ENCLOSURE 3

# EXHIBIT 15

Standard Form 86
Revised November 2016
U.S. Office of Personnel Management
5 CFR Parts 731, 732, and 736

Form approved:
OMB No. 3206 0005

## QUESTIONNAIRE FOR
## NATIONAL SECURITY POSITIONS

| Section 25 - Investigations and Clearance Record |
|---|

**25.1** Has the U.S. Government (or a foreign government) **EVER** investigated your background and/or granted you a security clearance eligibility/access?     ☐ YES     ☐ NO *(If NO, proceed to 25.2)*

Complete the following if you responded 'Yes' to the U.S. Government (or a foreign government) having investigated your background and/or having granted you a security clearance eligibility/access.

### Entry #1

Provide the investigating agency:

☐ U.S. Department of Defense     ☐ U.S. Department of Homeland Security
☐ U.S. Department of State       ☐ Foreign government (Provide name of government) ▶
☐ U.S. Office of Personnel Management    ☐ I don't know
☐ Federal Bureau of Investigation     ☐ Other (Provide explanation) ▶
☐ U.S. Department of Treasury (Provide name of bureau) ▶

Provide the name of agency that issued the clearance eligibility/access if different from the investigating agency.

| Date the investigation was completed *(Month/Year)* | ☐ I don't know ☐ Est. | Provide the date clearance eligibility/access granted. *(Month/Year)* | ☐ I don't know ☐ Est. |
|---|---|---|---|

Provide the level of clearance eligibility/access granted:

☐ None          ☐ Q
☐ Confidential  ☐ L
☐ Secret        ☐ I don't know
☐ Top Secret    ☐ Issued by foreign country
☐ Sensitive Compartmented Information (SCI)    ☐ Other (Provide explanation) ▶

### Entry #2

Provide the investigating agency:

☐ U.S. Department of Defense     ☐ U.S. Department of Homeland Security
☐ U.S. Department of State       ☐ Foreign government (Provide name of government) ▶
☐ U.S. Office of Personnel Management    ☐ I don't know
☐ Federal Bureau of Investigation     ☐ Other (Provide explanation) ▶
☐ U.S. Department of Treasury (Provide name of bureau) ▶

Provide the name of agency that issued the clearance eligibility/access if different from the investigating agency.

| Date the investigation was completed *(Month/Year)* | ☐ I don't know ☐ Est. | Provide the date clearance eligibility/access granted. *(Month/Year)* | ☐ I don't know ☐ Est. |
|---|---|---|---|

Provide the level of clearance eligibility/access granted:

☐ None          ☐ Q
☐ Confidential  ☐ L
☐ Secret        ☐ I don't know
☐ Top Secret    ☐ Issued by foreign country
☐ Sensitive Compartmented Information (SCI)    ☐ Other (Provide explanation) ▶

**Enter your Social Security Number before going to the next page** ➡

JA205

Standard Form 86
Revised November 2016
U.S. Office of Personnel Management
5 CFR Parts 731, 732, and 736

**QUESTIONNAIRE FOR**
**NATIONAL SECURITY POSITIONS**

Form approved:
OMB No. 3206 0005

| Section 25 - Investigations and Clearance Record - *(Continued)* |
|---|

**25.2**  Have you **EVER** had a security clearance eligibility/access authorization denied, suspended, or revoked? (Note: An administrative downgrade or administrative termination of a security clearance is not a revocation.)    ☐ YES  ☐ NO *(If NO, proceed to 25.3)*

| Complete the following if you responded 'Yes' to having **EVER** had a security clearance eligibility/access authorization denied, suspended, or revoked. | | |
|---|---|---|
| **Entry #1** | | |
| Provide the date security clearance eligibility/access authorization was denied, suspended or revoked. *(Month/Year)*  ☐ Est. | Provide the name of the agency that took the action. | Provide an explanation of the circumstances of the denial,suspension or revocation action. |
| **Entry #2** | | |
| Provide the date security clearance eligibility/access authorization was denied, suspended or revoked. *(Month/Year)*  ☐ Est. | Provide the name of the agency that took the action. | Provide an explanation of the circumstances of the denial,suspension or revocation action. |

**25.3**  Have you **EVER** been debarred from government employment?    ☐ YES  ☐ NO *(If NO, proceed to Section 26)*

| Complete the following if you responded 'Yes' to having **EVER** been debarred from government employment. | | |
|---|---|---|
| **Entry #1** | | |
| Provide the name of the government agency taking debarment action. | Provide the date the debarment occurred. *(Month/Year)*  ☐ Est. | Provide an explanation of the circumstances of the debarment. |
| **Entry #2** | | |
| Provide the name of the government agency taking debarment action. | Provide the date the debarment occurred. *(Month/Year)*  ☐ Est. | Provide an explanation of the circumstances of the debarment. |

**Enter your Social Security Number before going to the next page** ⟶

1          UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLUMBIA
2

3  MARK S. ZAID,                    )
                                    )
4          Plaintiff,               )
                                    )
5      vs.                          ) CASE NO. 1:25-cv-01365-AHA
                                    )
6  EXECUTIVE OFFICE OF THE          )
   PRESIDENT, et al.,               )
7                                   )
           Defendants.              )
8  _____ )

9

                  TRANSCRIPT OF MOTION HEARING
10      **BEFORE THE HONORABLE AMIR H. ALI, DISTRICT JUDGE**
                  Friday - June 27, 2025
11                1:32 p.m. - 3:12 p.m.
                    Washington, DC
12
**BY THE PLAINTIFF:**
13      Lowell and Associates, PLLC
        BY:  ABBE DAVID LOWELL and DAVID A. KOLANSKY
14      1250 H Street, NW, 2nd Floor
        Washington, DC 20005
15
        Koskoff, Koskoff & Bieder, P.C.
16      BY:  MARGARET DONOVAN
        350 Fairfield Avenue
17      Bridgeport, Connecticut 06604

18
**FOR THE DEFENDANTS:**
19      U.S. Department of Justice
        BY:  MICHAEL KENNETH VELCHIK and RICHARD LAWSON
20      950 Pennsylvania Avenue, NW
        Washington, DC 20530
21

22  _____
                  **SONJA L. REEVES**
23              **Registered Diplomate Reporter**
                **Certified Realtime Reporter**
24              **Federal Official Court Reporter**
                333 Constitution Avenue, NW
25                Washington, DC 20001
        Transcript Produced from the Stenographic Record

1              (Call to Order of the Court at 1:32 p.m.)

2              DEPUTY CLERK:  This is Civil Action 25-1365, *Mark Zaid*

3    *versus the Executive Office of the President, et al.*

4              May I have counsel approach the lectern and state your

5    appearance for the record, beginning with plaintiff's counsel.

6              MR. LOWELL:  Good morning, Your Honor.  I'm Abbe

7    Lowell, one of the attorneys representing Mr. Zaid.

8              MS. DONOVAN:  Good afternoon, Your Honor.  Margaret

9    Donovan for Plaintiff Mark Zaid.

10             THE COURT:  Good afternoon.

11             MR. VELCHIK:  Michael Velchik for United States

12   defendants, and with me is Richard Lawson.

13             MR. LOWELL:  For the record, Your Honor, I should have

14   pointed out that Mr. Zaid is with us as well.

15             THE COURT:  And could you introduce the other person

16   at counsel table as well?

17             MR. KOLANSKY:  David Kolansky with Mr. Zaid.

18             THE COURT:  Okay.  Good afternoon, everyone.  And

19   welcome, Mr. Zaid.  I say this any time a client is in the

20   room, but you're always welcome to attend, and I encourage

21   clients to attend court proceedings.  It's your case.  It's

22   your client's case, so always good to have you here.

23             We're here for oral submissions on two pending

24   motions.  Of course, we have plaintiff's motion for a

25   preliminary injunction.  We have got the defendant's pending

JA208

 1   motion to dismiss.

 2        A couple of just preliminary issues.  We do, I

 3   believe, have a public line open in the interest of providing

 4   greater access, which I believe is a good thing.  I think it's

 5   a good thing when people can listen in to this courtroom and

 6   hear the dignity that's afforded to and between counsel, even

 7   in cases raising important issues.

 8        I raise it for two other reasons.  For those listening

 9   in through the public line, just direct you to the chief

10   judge's standing order, which prohibits recording and

11   rebroadcasting.

12        And then for counsel here in the courtroom, I don't

13   anticipate this is going to be an issue, but one of the

14   consequences of having a public line open is that we can't have

15   bench conferences, everything will be going through the line.

16   Usually not an issue in an oral argument, but I just like to be

17   clear.

18        You should anticipate getting roughly 20 to 30 minutes

19   each.  The hiccup is that I have a lot of questions, but you

20   all will manage.  And I'll start with the plaintiff's counsel.

21   If you are going to split time, just be clear up front who is

22   going to address which issues, and I'll do my best to honor

23   that, although I'm sure I will --

24        MR. LOWELL:  That was my plan, Your Honor.  As I said,

25   I'm Abbe Lowell.  I'll be addressing, to the extent that I have

JA209

 1   the ability or you have questions, justiciability, most of the

 2   issues on success of the merits.  I don't know that there will

 3   be much more to say about, for example, balance of equities or

 4   if you have any questions about the relief sought or the bond.

 5        Ms. Donovan will be addressing the harm that exists

 6   for our client, and to the extent it is in response to the

 7   motion to dismiss, the ability to go forward with the claim

 8   based on the bill of attainder.

 9        THE COURT:  Got it.

10        MR. LOWELL:  Do you have a preference to how in my

11   presentation we proceed?  I'm glad to do it --

12        THE COURT:  If you want to take a few minutes at table

13   side, you're welcome to.  I'll let you do that without

14   interrupting you if you want a couple of minutes, but,

15   otherwise, justiciability sounds like a good place to start.

16        MR. LOWELL:  Thank you.  I think it makes sense when

17   you're arguing a case like this to begin on two issues.  One is

18   to make sure that everybody understands what we're claiming.

19   There are six counts.  The six count on bill, as I said,

20   doesn't really apply to the preliminary injunction.  It does in

21   our response to the motion to dismiss.  One of those is based

22   on the statute, and the others are based on constitutional

23   rights.

24        I think the second thing is to make sure that I focus

25   in very specifically on what we're pointing to that the

1    defendants did.  And I have seven things to point to.

2         On February 8th, somehow, the *New York Post* was the

3    means by which the administration decided to tell Mr. Zaid that

4    his clearance was about to be revoked.

5         March 22nd, the Director of National Intelligence,

6    Gabbard tweets to him that -- tweets out loud that the

7    clearance was being revoked based on the president's directive.

8    The same day, the White House issued its memorandum, which is

9    the focus of what we're here to discuss.

10        And then in the last week after that through the end

11   of April, various agencies in seriatim notified Mr. Zaid that

12   he either had no -- that he been revoked or had no access.

13        Finally, in the beginning of May, again Ms.

14   Gabbard appears with a journalist on national television, and

15   in effect, as we have submitted, found the revocation of

16   Mr. Zaid and others' revocations to be fun.  And then that same

17   day, DNI issued a press release publicizing the revocation

18   naming Mr. Zaid specifically, to which the director then

19   re-tweeted.

20        I also think it's important, although we have put it

21   out in paragraph 31 of our complaint, just a few points because

22   of what we're saying is the lack of any process to take away

23   the revocation, it makes sense just for everybody to understand

24   who we're talking about.

25        We're talking about an attorney who has had literally

1    three decades of being one of the premier attorneys in the

2    United States dealing with national security issues in which a

3    classified security clearance is important, and not only

4    important, but essential, and somebody who has been recognized

5    by courts and by Congress and by commentators, and even by

6    judges who have asked for his opinion on the matters that

7    involve the practice that he does, someone who has never had a

8    filter for whether or not his clients are Democrat or

9    Republican and practices in a very unique area.

10            On the preliminary injunction, I'll start with I think

11    what must be the most important issue to get through, which

12    would be the justiciability of this case.  If you comb, as I

13    did in preparation to see you today, all of the defendants'

14    filings you will see that their first answer to literally every

15    one of our allegations and every one of our arguments, not just

16    justiciability, but is that line of defense for that you can't

17    get this case heard by a court because it's not justiciable,

18    citing the *Egan* and *Lee* arguments.  They do that not just for

19    justiciability, but as their first line of defense for

20    discretion in the APA, why the executive order is not vague,

21    why it overcomes the First Amendment rights that we put

22    forward.

23            As I did it, I decided to add it up this morning.

24    Over 40 times they argue that those cases prevent --

25            THE COURT:  Maybe I'll cut you off here because I'm

1    more interested in hearing -- I agree.  I saw them rely on this

2    line of precedent law, and I don't blame them because there is

3    some broad language in those cases, particularly in *Lee*.

4           So tell me, what is it -- *Lee* says pretty clearly that

5    there is a textual commitment to the executive branch, which

6    *Lee* seemed to think on its own even the textual commitment

7    could be enough to make this a political question, and then

8    goes on to independently look at the standards.

9           What was the question that *Lee* found, and obviously it

10   was applying *Egan*, that it found to be committed to the

11   executive branch?

12          MR. LOWELL:  I think the distinction, and it's clear

13   in the language of *Lee* itself, is the lack of justiciability

14   for a court to review the substance, the merits decision in a

15   security clearance proceeding and goes out of its way and uses

16   that word, *Lee's* cite to *Egan* specifically notes that the --

17          THE COURT:  So it's a -- I'm sorry.  It's a substance

18   versus process distinction?

19          MR. LOWELL:  It is, and I think that's the clear mark.

20   And it makes all the difference in the world, because remember

21   right after *Egan* is decided, the very next week, the court, the

22   Supreme Court said it would present a serious constitutional

23   question to deny plaintiffs a judicial forum --

24          THE COURT:  So what's the line you would draw between

25   what's substance and what's process, and how does this map on

1    to this memorandum?

2        MR. LOWELL:  I think one of their issues is *Lee*

3    itself.  Take the idea that what *Lee* was attacking was the

4    efficacy of the polygraph exam, which he said was wrong, not

5    done properly, et cetera, as opposed to the process which got

6    him in a position to get the polygraph exam.

7        THE COURT:  What about this case?  What is it about

8    this case that makes this --

9        MR. LOWELL:  This one is easy, because there's not

10   even a pretense of having any process.  I mean, there is no

11   process.  It was just a sentence that says this will be revoked

12   based on other action that will take place, with that odd

13   phrase "consistent with existing law."

14        So in this case, what could it have been?  We have

15   submitted to you the affidavit, the declaration of one of the

16   key experts in the country on security, Bill Leonard, and in

17   his declaration, he sets out very clearly the number of steps

18   the regulations will require in order to revoke or deny

19   somebody's security, notice, opportunity to understand --

20        THE COURT:  These are the processes laid out in the

21   prior executive orders?

22        MR. LOWELL:  I'm not here, Your Honor, to tell you

23   that a process could be attacked if there is ten steps and they

24   only took six, or that there are ten steps and they took eight.

25   I can't do that.  But I don't have to do that, because in that

 1   process regulation, and all the executive orders that came

 2   before the one that we have challenged --

 3           THE COURT:  A couple questions.  One is just a factual

 4   question.  You referred to the, I guess, emails that Mr. Zaid

 5   got after the memorandum that were indicating that they had

 6   been revoked.  Is there anything in those documents that

 7   indicate that there was a process run by those agencies,

 8   whether you would say it was kind of pretextual and pro forma

 9   or not?

10           MR. LOWELL:  There is no process defined.  In fact,

11   many of them, if not all of them, use as their base reference

12   back to the executive order.  There is nothing that says, for

13   example -- and a good example, I mean, one of the examples is

14   in their brief, the government now injected an argument or line

15   that said something about this was the president's ability to

16   address whether there was a grave risk to the national

17   security.

18           Well, that's interesting, because it's only in a

19   brief.  That phrase "national security" is nowhere to be found

20   in any of the emails, in any of the executive order, and again

21   it's another difference with *Lee*.  In *Lee*, a threat to the

22   national security was mentioned 27 times; Mr. Zaid's, zero.

23           THE COURT:  I just want to understand what aspects of

24   this record lead you to conclude that this is on the process

25   side rather than the substance side.  So one of them it sounds

1   like is that there are these processes in place through which

2   ordinarily security clearances are reviewed and determined,

3   denied, revoked, and those didn't happen and there is nothing

4   in the record that indicates that that happened.

5         That's one.  You're saying that therefore this is

6   about process, not substance.  Anything else?

7         MR. LOWELL:  Well, the absence of something becomes

8   dispositive of whether or not there has been process.  There is

9   nothing other than that there is a sentence that says it's done

10  and the agency is adopting that sentence wholesale --

11        THE COURT:  The reason I ask, so what if the executive

12  order said this -- maybe this will help tease out what I'm

13  interested in.  What if the executive order, instead of saying,

14  "I have determined that it's no longer in the national

15  interest," said something like, "After my own individualized

16  review of security concerns" -- let's just bracket out the

17  national interest challenge -- "After my own individualized

18  review of security concerns, I have determined that Mr. Zaid's

19  security clearance should be revoked," would you still say this

20  is about process, or is it then about substance?

21        MR. LOWELL:  It certainly would make it harder for me

22  to stand at this podium for sure.  There would be two responses

23  in addition to my saying that.

24        First is just because the president says there is a

25  process, it's still able to be reviewed if it's a pretext to

1    the bounds of the president.  The easiest one, the president

2    says, "I have determined that it's not in the national security

3    interest to provide clearances to any person of color," it

4    means that he -- and he could have said, "I have gone through

5    an enormous process and I come to the same conclusion."  That

6    doesn't make it non-reviewable by a court if one could show

7    that there is basis in the Constitution, so it's not absolute

8    whether it's the president doing it or not.

9          And even in the hypothetical you gave me, it depends,

10   would that next sentence be, "And the agencies for which this

11   applies need to now implement what I have just said," quote,

12   "consistent with existing law," or does he put the period

13   before I gave you that sentence?  Because if he does the

14   latter, then it would still be an additional grounds that I

15   could be standing at this podium to challenge what the agencies

16   did.

17          THE COURT:  What would the additional grounds be?

18          MR. LOWELL:  In that case, the agency --

19          THE COURT:  If it was just what I said without any

20   language.

21          MR. LOWELL:  If it was just your phrase without the

22   phrase I added, then the only attack that I think one could do

23   would be to argue that it was based on impermissible

24   constitutional rights being violated.

25          But we're not there.  I know you're teasing it out.  I

JA217

1    get that.  But that's not what he did.  In fact, his executive

2    order actually says the opposite.  It does not say, "I am

3    hereby revoking."  It actually says, "I hereby command the

4    agencies to take additional actions," quote, "consistent with

5    existing law."

6         So your hypothetical takes something twice removed

7    from the reality of this case.

8         THE COURT:  Do you read what happened, what's said in

9    this presidential memorandum to essentially be saying that I

10   have determined that it is no longer in the national interest

11   for Mr. Zaid to have security clearance, and, therefore, that

12   he should not get any of the processes afforded to other

13   people?  Is that essentially how you're reading it?

14        MR. LOWELL:  Hum.  It is certainly the implicit

15   command in what he says, because he does not indicate, for

16   example, and this is one of the other issues, of whether or not

17   that executive order with its own language actually does

18   supersede, actually does take the place of every other

19   executive order that we have pointed out in our briefs, which

20   quite specifically sets out the processes --

21        THE COURT:  I'm not trying to put words in your mouth.

22   I'm still trying to tease out the distinction between process

23   and substance, so if you're saying something more nuanced than

24   what I just said, you should correct me.

25        I'm just curious whether that is essentially your

JA218

1    argument, that he's been denied the processes available to

2    others based on this natural interest comment.

3        MR. LOWELL:  Let's quote the statement.  "I hereby

4    direct every executive department and agency head to take all

5    additional action."  Okay.  He doesn't -- I know we're teasing

6    out, so I know that's not what he actually said and your

7    hypothetical is neither that either.

8        But because he says it the way he does, then you have

9    to look at that next phrase, which is "consistent with existing

10   law."  So his order, if he had simply said, "I hereby revoke

11   Mr. Zaid's security clearance," period, does that implicitly

12   basically say I am denying?  I don't know that it does, Judge,

13   for the reason that I just pointed out.

14       You have these five executive orders.  They are in

15   effect.  He says something which doesn't address the due

16   process aspects or the process, I should say, aspects of those

17   five, all of which are very specific.  His statement standing

18   alone does not do away with those other executive orders.

19       And something of note that the Court I hope will

20   appreciate, just to show you that that order stands as an

21   outlier and doesn't erase those other things, is that each of

22   those executive orders -- and by the way each of the executive

23   orders for the law firms that this court has addressed, all

24   were published in the Federal Register.  Guess which one

25   wasn't?  The one that affects Mr. Zaid.

 1          So I don't think it's simply that he says it and it
 2     implicitly -- I don't think it's implicit you can revoke those
 3     other five.  They exist side by side.
 4          THE COURT:  Can I ask you a question as we're still on
 5     justiciability?  It sounds like we're moving into a little bit
 6     the APA argument, maybe others too.
 7          You rely heavily on the *Perkins Coie*, the *Jenner Block*
 8     and *WilmerHale* decisions.  What do you see as the material
 9     differences between those executive orders and this
10     presidential memorandum and how do they affect --
11          MR. LOWELL:  There are few, and I don't think they are
12     dispositive of our claim.  To begin with, one of the first
13     things that's different about them is that their orders, all of
14     which were published in the correct way, asked for the
15     following:  They are suspended for a review.  And even though
16     they were suspended for a review, notice the word "review" and
17     what the order said, so it does kind of suggest that there will
18     be some process.
19          Nevertheless, the courts found that justiciable, even
20     in midstream.  Mr. Zaid's is different because it was a
21     revocation without a review.  That's one difference.
22          The second difference, of course, is that, and I think
23     it's a distinction without -- a difference without a
24     distinction here, is the fact that it was what they call a
25     categorical.  Everybody that sits in the building called

 1    Perkins or the building called Wilmer or the building called

 2    Jenner, are affected without an individualized review, and that

 3    was the harm that courts have said you can't do that.

 4         On the other hand, Mr. Zaid is among a group, it's not

 5    as big as 200, but it's at least 20 people, and there is no

 6    individualization either, so that's maybe a difference.  The

 7    defendants' counsel argues that that's a big difference.  It's

 8    what they say to you is that the other three judges in this

 9    courthouse ruled the way they did because it was a categorical

10    distinction without individualization, but there is no

11    individualization to Mr. Zaid either, so that's a theoretical

12    difference, but it's not a real one.

13         THE COURT:  I think the argument is in those orders

14    there was a reference to everybody in those law firms having

15    their clearance suspended.  And here there are individuals who

16    are highlighted and does that give rise to an inference that

17    this actually was an individualized review, especially because

18    there are differences between the individuals, right.

19         MR. LOWELL:  Right, but notice how that is impossible

20    -- first of all, there is no reference to the fact that there

21    was an individualized assessment for each of those 19 or 20

22    people.  Whatever the thought or process was to take away the

23    security clearance of Joe Biden is by definition not the same

24    as the one for Mark Zaid.  It just has to be sort of a

25    fortiori.  So there is still that lack of an individualized

1  assessment.

2        And if there was one, it's not presented in a way that

3  comports to the requirements of notice, specificity, the

4  ability to contest, whatever.  But Mr. Leonard, again, and I

5  refer to him because he's seen as one of the most influential

6  of the experts, says it best when he said, as to your question,

7  "Indeed, it is just as a blanket revocation as the executive

8  order of the firms, which would have the exact same effect if

9  it had listed individually the approximate 1,200 employees of

10 that subject firm."

11       What he's basically saying is whether you put the

12 names of a thousand people or in this case 20 people, or even

13 one person, it still is flawed if it doesn't involve the

14 individualized assessment for the individual within the group.

15 So that's a difference without a meaningful distinction, I

16 think.

17       So in effect, the same arguments -- and I did this

18 just to make sure that I had it, and I don't know --

19       THE COURT:  So would your argument be different if it

20 was just Mr. Zaid in the memorandum?  If the memorandum were

21 specific to Mr. Zaid and only had Mr. Zaid in it, but was

22 otherwise the same --

23       MR. LOWELL:  If it was even the only person in the

24 executive order, I believe that the justiciability issue is the

25 same, unless in saying it the president adopted Your Honor's

JA222

1    hypothetical and maybe said "based on a considered set of

2    criteria that," blah, blah, blah, maybe.  But that's not what

3    happened.

4         It is good to note, maybe you have done it already, I

5    went back to see which of the arguments the defendants put

6    forward that are identical to the arguments that were in the

7    *Perkins* case, the *Jenner* case and the *Wilmer*.  And it's not

8    surprising that they have addressed almost all of them, ranging

9    from the right to counsel, to the right of petition.

10        And so consequently, when you get past the issue of

11   whether it can be 100 or a thousand, all of those arguments

12   have been presented.  So the difference between those cases and

13   Mr. Zaid's only exists to the extent that you say -- not you,

14   but the government contends there is a difference between

15   having an order on its face be a thousand versus twenty versus

16   one.  And I reminded myself that the Fifth Amendment due

17   process clause --

18        THE COURT:  Maybe it's not so much the number, right,

19   but how it's articulated.  There might be a difference between

20   saying "all people at a law firm," which seems categorical and

21   group-based versus listing individual names.

22        MR. LOWELL:  Right, so if you agree with Mr. Leonard,

23   as needless to say I do, would you and I have the same

24   conclusion then if instead of saying "all the lawyers at XYZ

25   firm" that has 100 lawyers in it, and just says "the law firm,"

1     but he listed the 100 names, we're in the same ballpark.

2          THE COURT:  Got it.  Understood.  Should we turn to

3     the merits?  Is there anything else you want to submit on the

4     justiciability question?

5          MR. LOWELL:  On justiciability?

6          THE COURT:  Yeah.

7          MR. LOWELL:  I don't think so.

8          THE COURT:  Why don't you tell me, which of your

9     claims do you see as the strongest?

10          MR. LOWELL:  The strongest?  You're asking me, I have

11     three daughters, you want me to tell you which one I think is

12     my favorite, and I really can't do it for them and I pretty

13     much can't do it now.

14          THE COURT:  Well, if you narrowed it down to three,

15     you can narrow it down to three for me.  I'm curious.

16          MR. LOWELL:  If I was going to do the three then, it

17     would seem to me that -- when you think of process in the law,

18     you think of Administrative Procedure Act requirement, and

19     there comes a moment when that process is so flawed that it

20     spills over onto the Fifth Amendment due process clause, so I

21     think they are in tandem in a bit.  But I certainly think that

22     what sets Mr. Zaid's situation apart, distinguishes it from the

23     other cases, is, for example, the effect to try to accomplish

24     what the president wanted to have happen, ignoring the existing

25     body of law.

JA224

1          Some of those executive orders, by the way, are

2     referenced in the statute we told you about in terms of

3     process.  And without doing process, that would be a violation

4     of the APA.

5          The second one I think is one that the courts have

6     said, which is this suffers from Fifth Amendment traditional

7     vagueness.  What does national interest mean?  Every judge that

8     has addressed the issue of the executive orders, all of which

9     use the phrase "national interest," and none of which tie it to

10    national security, have said that's vague where both the people

11    affected and all the other people who will come before the

12    court have no idea what it means and how to adjust their

13    conduct in order to comply and not be sanctioned.  That's a

14    strong of the Fifth Amendment, the vagueness argument as well.

15         I think the next one has to be, because it sets the

16    law firms and Mr. Zaid different from the *Lees* of the world,

17    the *Egans* of the world, the other cases that the defendants

18    cite, is the fact that he represents the attorney-client

19    relationship and the right to have counsel and the ability to

20    petition the courts and Congress.  And so that is something

21    that I think is an incredibly strong pillar on which our

22    challenge is based.

23         In Mr. Zaid's case it's actually compounded, because

24    that's not just a theoretical right to petition, Judge.

25    Mr. Zaid has active cases right now in this courthouse.  What

1    happened in one of them is a good example.  The day or two or

2    week right after the executive order, a case in which he was

3    litigating and was about to get secondary access to the

4    classified information so he could pursue a summary judgment

5    motion, he was denied that.  So it denied his client, who was

6    relying on him, for Mr. Zaid to do his job, which also --

7            THE COURT:  Let me ask you some questions.  You've

8    thought a lot about your claims and so I'm going ask them to

9    you and just get your reaction.

10           Does the correct and appropriate relief differ

11   depending on which claim is found successful, or do you see the

12   same relief following from all of your claims?

13           MR. LOWELL:  The reason the relief is the same is the

14   procedural moment we're in, which is in the preliminary

15   injunction phase, and so if the constitutional claim,

16   whichever, I mean, the right to petition, the right to

17   associate, the right to accept him representing his client's

18   interests and the attorney-client issues, if that succeeds, as

19   we hope and believe it should, or it's the APA, the remedy is

20   always returning the situation to the status quo.  What would

21   that mean in this case?  It would mean that Mr. Zaid is

22   returned to the eligibility that he enjoyed the moment before

23   the executive order was issued.

24           And the reason that's so important, Judge, as we

25   proceed through the rest of the case, is as it stands now,

1    unless we go back to that moment nunc pro tunc that Mr. Zaid

2    will forever have to until we have, or even in the interim,

3    have to put down on his next application for a security

4    clearance that in fact he had been revoked.  So it doesn't

5    matter whether you find us correct on one of our three --

6              THE COURT:  You're not telling me about what the

7    relief is, but it sounds like your answer was yes, that the

8    relief is the same regardless --

9              MR. LOWELL:  That was a longwinded yes.

10             THE COURT:  -- of which claim you succeed on.  You

11   don't see it as limited.

12             MR. LOWELL:  If what the executive branch did violated

13   the First Amendment rights that Mr. Zaid and his clients have,

14   the Fifth Amendment rights --

15             THE COURT:  So that's a yes?

16             MR. LOWELL:  I'm sorry.  Maybe I misunderstood your

17   question.

18             THE COURT:  That's fine.  That's all I want.

19             I know your reading of the presidential memorandum is

20   that it does not supersede the prior executive orders, even

21   though the president could presumably have superseded those

22   prior executive orders.

23             If it explicitly said that it was superseding the

24   prior executive orders, just accept that, which claims would

25   that affect and which would it not affect?  I'll take one off

1    the table.  Seems like it would very much affect your APA

2    claim.

3              MR. LOWELL:  I would think the most impact would be on

4    the APA claim.

5              THE COURT:  Does it impact the others?  Does it impact

6    the First Amendment claim?

7              MR. LOWELL:  On the record that we have in front of us

8    it would not, and the reason was is that whatever he would say

9    in that regard still based on why he did it, clearly stated he

10   was doing this for the retribution that he is exacting against

11   people, and how that impacts those other rights I said, it

12   wouldn't affect those.

13             THE COURT:  And then staying with the APA claim for a

14   moment, what is -- how do you describe the agency action under

15   review here, which is the text of the APA and what is

16   reviewable under the APA?  Under *Franklin*, the president is not

17   an agency, not subject to the APA, so what is the agency

18   action?

19             MR. LOWELL:  As I indicated, once the president spoke,

20   you had each of those individual agencies, the CIA, DNI, others

21   basically robotically taking that executive order and not

22   providing, even what some of their own regulations -- the DoD

23   has a very extensive set of process before you revoke

24   somebody's clearance.  And what they did was they skipped all

25   over that using and referring back to an executive order that

1    does none of that.

2          So taking the president out of it, say it this way.

3    If each of those five or six agencies did in the emails and

4    communications to Mr. Zaid exactly what they did without the

5    EO, each one of them would be subject to an APA claim for the

6    reasons I said.  It doesn't give them any patina of legitimacy

7    because they refer back to an executive order that couldn't be

8    challenged itself under the APA.

9          THE COURT:  What would you make of the response that

10   that essentially is allowing the president's actions, which are

11   unreviewable, to be reviewed under the APA?

12         MR. LOWELL:  You mean if I agreed -- you mean what I

13   said or your hypothetical?

14         THE COURT:  It just seems like if it's true that the

15   president's actions aren't subject to review under the APA, and

16   you're saying, well, that's fine, but in order to implement it,

17   he had to go to agencies to do so, doesn't it essentially kind

18   of render a nullity the notion that the president's action

19   aren't under review?

20         MR. LOWELL:  Only hypothetically, because the record

21   in this case doesn't have your and my exchange in it.  It has

22   the president, as I said to you before, saying each agency and

23   department will take all additional actions, and then it says

24   "consistent with existing law."

25         So we could strip all of the agency requirement.  And

1    theoretically, you're kind of right, that as long as an agency

2    bathes itself in something that the president said and the

3    agency doesn't follow its rules and its regulations and due

4    process clause, then somehow somebody could say, well, really

5    what you have done is made the president subject to the

6    Administrative Procedure Act.

7        But I turn that around and say the president can't

8    save an agency if the president's direction to the agency

9    requires that agency to violate the APA or the due process

10   clause or the other things.  It is a little bit of a tautology,

11   but I flip that around, and, again, luckily -- not luckily --

12   unfortunately, as I should say, the president didn't do it the

13   way that might have given him more grounds to say what he did

14   was proper.

15       THE COURT:  And then sticking with your APA claim, you

16   rely on executive orders and some of the other agency

17   documents.  I noticed that some of the -- well, the executive

18   orders say that they are not creating a judicially enforceable

19   right, and then there was one of the -- it was the intelligence

20   community policy guidance, 704-3, I noticed it says that the

21   Director of National Intelligence can take, quote, "any lawful

22   action," end quote, and that can be, quote, "without regard to

23   the provisions of this or any other regulation or directive,"

24   end quote.  So there is some pretty broad language in there

25   about when policies have to be followed and also whether they

1    are judicially enforceable.  Can you speak to how that impacts

2    the claim?

3            MR. LOWELL:  Only to respond in the way that again --

4    what was the phrase that you repeated to me a moment ago about

5    with the law -- I mean, the reference to the broadness of the

6    law still being in effect doesn't make it unreviewable.  EO

7    standing by itself may or may not convey the right that

8    somebody says, because it says this doesn't convey rights, but,

9    again, it goes back to what happens after that EO is in place.

10           It hasn't been revoked, so the agencies that implement

11   and skip over the process that either the executive order is in

12   effect or their specific regulations like the ones we put in

13   our brief still makes it challengeable.

14           So again, it's a little bit circular to be able to

15   suggest that, but it goes back to the issue of even if the

16   president did it all by himself, depending on how he did it,

17   what his motives were, you can still challenge it under the

18   Constitution as opposed to the APA.

19           THE COURT:  I want to move to procedural due process

20   briefly because I have a question there.

21           How would you -- I understand your position is that

22   there is a liberty interest in the security clearance, or at

23   least can be a liberty interest in the security clearance and

24   here there is.  When is there liberty interest in the security

25   clearance?

1          MR. LOWELL:  I think one of the other, I don't know,

2     blurrings that the defendants' counsel makes is to first the

3     non sequitur that we're arguing that there is a property right

4     to a security clearance, which is not our argument.

5          The security clearance, we have no quarrel with,

6     doesn't necessarily in and of itself per se provide any right

7     that's recognized by the Fifth Amendment's due process clause.

8          However, what has been stated by courts, including

9     ones in this building, is that if the security clearance is the

10    means to take away somebody's ability to pursue their career,

11    and especially why I started by making sure the parameters of

12    Mr. Zaid's career was on the record, then that can become a

13    liberty interest, and the liberty interest is, as in other

14    cases, that which, if it is done improperly, deprives a person

15    of their ability to pursue the career of their choice.  I want

16    to point out when I say that that liberty interest exists to

17    make clear something that maybe you and the folks you work with

18    made clear.

19         The opposite that the government's lawyers put

20    forward, for example, on your question is the cafeteria and

21    restaurant workers.  When I read their brief it disturbed me

22    because they said that the government can revoke a security

23    clearance even without notice and opportunity to be heard, and

24    that's one about, again, somebody's ability to work.

25         I went to the case, as I know you would, it's not

1    about a security clearance at all.  It's about a cook at a

2    military base that was denied the ability to do that.  And so

3    my point about it is if you look further in the case, it says

4    what is applied to the answer to your question, the court said

5    we may assume that the plaintiff could not constitutionally

6    have been excluded if the ground had been patently arbitrary or

7    discriminatory, and that's on a military base where the court

8    said you have the most discretion of somebody to decide who

9    comes on a military base or not.

10          And then, prescient to what we're arguing in the rest

11   of our brief, that she could not have been kept out because she

12   was a Democratic or a Methodist.  You can exclude if entirely

13   rational --

14          THE COURT:  But just help me understand.  So you're

15   not saying there is a per se liberty interest in the security

16   clearance?  It's not that there's some sort of --

17          MR. LOWELL:  Neither property -- yes.  I mean --

18          THE COURT:  Just on liberty.

19          MR. LOWELL:  Inchoate, no.

20          THE COURT:  So there is here because -- just finish

21   that sentence.

22          MR. LOWELL:  The reason that a liberty interest exists

23   in this case is that Mr. Zaid's situation matches identically

24   with the cases that have found a liberty interest to exist.  I

25   don't even mean the three in this courthouse.

1            THE COURT:  Because?  I still want the because.

2            MR. LOWELL:  Given who Mr. Zaid is.

3            THE COURT:  It's because of his ability -- making a

4    living.  Is it the case is about -- it's because in this

5    particular instance, there is an interest in a security

6    clearance, like, related to the significance to his career and

7    ability to make a living?

8            MR. LOWELL:  Because after three decades, he has

9    carved a very, very specialized niche.  And the government when

10   it says "but he can still practice law," is one of their

11   arguments, paren, some kind of law, "he can still go to

12   courthouses," paren, some courthouses.

13           Your Honor, would it be the equivalent of the

14   government saying it's okay for Walter Reed Hospital to take

15   the permission of an oncologist to go into the operating room

16   and say that's okay, because tomorrow he could be a

17   psychiatrist.

18           THE COURT:  And then under that theory, there are

19   other people who are listed in the presidential memorandum.  Is

20   that unique to Mr. Zaid of those people?  I know you don't

21   represent them, so I'm not asking you to state something that

22   would prejudice them or not.

23           MR. LOWELL:  I have to remember the 19.  I certainly

24   believe Mr. Zaid's a lot well situated to argue what I have

25   just said.

JA234

1          THE COURT:  Suppose it mentions, for example,

2    President Biden's family members.  If you're one of President

3    Biden's family members who is not a lawyer, you probably can't

4    bring this due process claim.

5          MR. LOWELL:  Correct.

6          THE COURT:  And maybe even President Biden who is used

7    to getting classified briefings, it's a different claim than

8    saying this is essential to his career and ability to make a

9    living.  Is that accurate?

10         MR. LOWELL:  Yeah.  Actually, without being flippant,

11   as I'm thinking about your question, Mr. Zaid may be the best

12   position of the 19 people to be able to assert this liberty

13   interest given that it's intrinsic to what he did yesterday,

14   the day before, week before, tomorrow, and the next day;

15   whereas, President Biden who may have an interest in continuing

16   to get the PDB may not need that for him to pursue the career

17   he wants, whereas this is a very significant difference.

18         THE COURT:  And then part of the procedural due

19   process claim, as I understand it, is also about the

20   stigmatization of reputation.  Can you tell me what the best

21   evidence you have for that that's in the record is?

22         MR. LOWELL:  Sure.  So in that liberty interest line

23   of cases there is that, if you will, add-on subsection called

24   reputation plus, stigma plus, the case law that we cite, which

25   the elements of which, as you know, it's that in addition to

JA235

1    taking action, a person is defamed, and, by being defamed, the
2    person suffers the stigmatization of whatever just happened.
3          And I think the record shows a few things.  The
4    record, first of all, shows that this wasn't a letter sent to
5    Mr. Zaid or an email.  It was announced on national TV.  It was
6    tweeted.  It was repeatedly sent out publicly, calling him a
7    threat, or whatever the phraseology was, that he was a security
8    lawyer that no longer was able to satisfy the requirements of
9    operating in the national interest.
10          That makes it different than the other cases that the
11   government puts forward where that kind of --
12          THE COURT:  So it's the public nature of it?
13          MR. LOWELL:  The very public.
14          THE COURT:  Anything else?
15          MR. LOWELL:  Yes.  The language that was used, that it
16   was repeated done publicly, that public announcement had no
17   efficacy towards the decision.  You could have taken his -- you
18   could have revoked him and nobody would be the wiser, but
19   that's not what they did, which puts it into the category of
20   those other two legs.
21          And, of course, it's against the background where, for
22   example, the DNI, the Director of National Intelligence could
23   sit there with a national --
24          THE COURT:  I'm just interested really in like what's
25   in the record.  And it sounds like the answer to the

1   stigmatization is it's in the record that it was public.

2          MR. LOWELL:  And what was said, and against the

3   background of the president deciding to give his carrier-outers

4   the ability to have called Mr. Zaid a sleazebag, a traitor,

5   somebody who should be sued, et cetera.  So you didn't have to

6   do that the way it was done.

7          THE COURT:  Can I turn to the First Amendment claim?

8          MR. LOWELL:  Which one of them?  Yes.

9          THE COURT:  Well, that's part of my question.  What is

10  your precise formulation of the First Amendment test that's

11  applicable here?  Is it -- I saw mention of retaliation and the

12  standard for retaliation, and then there is also mention of the

13  right to petition.  Which is it?  Is it both?  Is it them

14  together, combined?  What's the test?

15         MR. LOWELL:  They do spill over each other.  I don't

16  want to suggest that these are silos exactly.  However, in the

17  First Amendment area, I think the strongest point is the right

18  to petition.  I think that's what goes hand in hand, if you

19  will, with the liberty interest of the Fifth Amendment.  This

20  is what he does and this is why he does it, and that's who

21  relies on him to do it, the clients that he has and the clients

22  that he would have.

23         And what they have taken away is both his right to

24  petition the courts, part of that, and also because he has the

25  need to, and again it was deprived of him in midstream, to go

JA237

1    to Congress and represent the people that have that anomalous

2    health issue.  He can't do that any longer.

3            So the First Amendment's strongest leg probably is the

4    right to petition, again, something that even the categorical

5    listing of the entire law firm your three colleagues said

6    violated the right to petition for that interest.

7            THE COURT:  Got it.  On the retaliation theory --

8            MR. LOWELL:  One more point about that, just so I

9    don't leave it.

10           THE COURT:  On the right to petition?

11           MR. LOWELL:  No, on the First Amendment question.  The

12   right that we put forward on speech and association really

13   dovetails the right to petition, because it's his interaction

14   with his clients that affects his ability to petition on their

15   behalf, but if I had to stand on one leg, I'll stand on my

16   right leg, which is the right to petition.

17           THE COURT:  Understood.  But on the kind of more First

18   Amendment retaliation for protected speech and the types of

19   cases, one difference between this case and the law firm

20   executive order cases is that the executive orders in each of

21   those cases had that kind of preamble that some of my

22   colleagues relied upon for the retaliation argument.  You could

23   see the things that -- the actions taken the executive order

24   were responsive to, and that's not in this presidential

25   memorandum, so how does that impact the analysis?

1          MR. LOWELL:  If on Monday the President of the United

2    States calls Mr. Zaid a sleazeball, a traitor, a spy, and

3    should be sued, and on Friday he issues an executive order that

4    doesn't make reference to the fact that he called him a

5    traitor, a spy, a sleazebag, it doesn't matter in the analysis

6    of whether what's being done to Mr. Zaid is being done, as in

7    your colleagues' recitation of those cases, because it was

8    embodied in the executive order.

9          THE COURT:  Does it matter that it's not a Monday to a

10   Friday, but if I recall, it's like 2019 to 2025?

11         MR. LOWELL:  It does to a certain extent.  However,

12   having said that, as to the issue of why he did it, it is very

13   clear from the record, not just however many months before he

14   had made those statements about him, the reason he made those

15   statements about him is every bit as acute as the law firms'

16   claims of retaliation.

17         Mr. Zaid after all was the person who represented the

18   whistleblower that came forward and started the first

19   impeachment of President Trump, of which he tiraded all along.

20   You can't excise that from the record.  Sure, it would be great

21   for my argument to answer your question if President Trump had

22   said, "Because he represented the whistleblower that caused my

23   first impeachment, I hereby do the following things," but that

24   doesn't mean that that's not the clear record of why it

25   happened.  There is no other reason.

1          Let's put it this way.  Here is a good point to

2    remember, that Mr. Zaid's clearance was actually upped in the

3    first Trump administration, and he kept that through 2024, with

4    no blemish, with no change.  So if you have that and then it

5    gets summarily revoked by what I have put forward, then what

6    does the Court look to to see whether it was just as

7    retaliatory as when the preamble of those law firms made that

8    sentence.

9          THE COURT:  Got it.  Understood.  I'm just trying to

10   sort through the different pieces of the record that are relied

11   on by the different versions of the claims.  I mean, it seems

12   to me like the due process, the version of the due process

13   argument you articulated a moment ago and the right to petition

14   claim are two claims that are tied to Mr. Zaid specifically.

15          The retaliation argument under the First Amendment

16   actually seems to benefit from -- I thought maybe your answer

17   would be that if you look at the other names next to Mr. Zaid

18   on the executive order, on the face of the executive order,

19   there are other people for whom there had been similar

20   comments, but I'm just trying to parse exactly the scope of the

21   different claims, both in terms of what's relied on and the

22   types of harm.

23          MR. LOWELL:  You gave a better answer in a way than I

24   I was able to amass, so I'll adopt yours in a way too.

25          THE COURT:  I was just trying to understand.

JA240

 1          MR. LOWELL:  That's a good point, and I hadn't thought

 2     of until you said it.  There is, besides the direction against

 3     Mr. Zaid personally in the record that we are putting forward,

 4     the company he keeps in that executive order does have a common

 5     denominator.  They may not exist in the same address in

 6     Washington as all the lawyers in Perkins or Wilmer, I get that,

 7     but they do have something in common.

 8          Each and every one of them is somebody who has

 9     criticized the president, sued the president, attacked the

10     president or was the president's political opponent.  That is a

11     club that Mr. Zaid is part of that the record should be clear

12     as to the motivation, all of which was retaliation.

13          THE COURT:  Got it.  Let me ask you about vagueness.

14     I know I'm jumping around a lot, but I just have questions on

15     different claims you have asserted.

16          So on vagueness, one of the things that seems tricky

17     on vagueness is that in a way maybe the presidential memorandum

18     gives more guidance than you usually get in a security

19     clearance determination, because I guess they are usually not

20     public, right, so they wouldn't put anyone on notice of what

21     type of conduct to avoid.  Does that undermine your vagueness

22     argument?

23          MR. LOWELL:  If an executive branch person states a

24     reason for an action that triggers either, if I was in the APA

25     land, the APA or the constitutional issues we're putting

1    forward, and puts forward an edict which requires somebody to

2    do something or prevents somebody to do something and use a

3    phrase that has no meaning, like "national interest," then the

4    vagueness requirement has been violated.

5        And again, even though the categorical nature of those

6    other three cases here in the courthouse, each one of the

7    judges have expressly addressed the issue of national interest

8    being meaningless in the context in which it was provided, and

9    so I think the answer has to be that if they re-cobbled it

10   together and said, I have decided to do this for reasons that

11   somebody like Mr. Zaid or the next Mr. Zaid or Ms. Zaid could

12   say, now I know that I'm not supposed to do X.  On the other

13   hand, if that X is to represent a client zealously or to open

14   my mouth as protected, then it wouldn't save it.

15       THE COURT:  I can't recall whether it was going to be

16   you or your colleague, Ms. Donovan, who was going to address

17   the other PI factors.  Let me ask you this question.

18       MR. LOWELL:  Harm is Ms. Donovan.  If you had any

19   questions about the balance of equities --

20       THE COURT:  Well, this can go to a few things.  It

21   probably more directly goes to harm, so if you want to sit down

22   and let her answer it after I ask the question, you're welcome

23   to.

24       You did wait almost two months after the revocation to

25   file a lawsuit, and then a couple weeks after that to file the

JA242

1    PI motion.  Does that suggest some lesser degree of urgency or

2    how do I take that into account?

3        MR. LOWELL:  I'll take your invitation.  I know what

4    the answer is, but I think Ms. Donovan is going to address it,

5    if you will let us do it that way.

6        THE COURT:  Sure, that sounds fine.

7        MR. LOWELL:  I only have one more point on your last

8    question, other than any other questions you want to ask me.

9        I have a question.  I don't know if this is proper,

10   but I have a question I would ask the Court to please ask

11   defendants' counsel, and that would be, in the executive order,

12   if it says "take additional actions consistent with existing

13   law, consistent with existing law," I wonder, given the briefs

14   I read, if it's not the executive orders that came before it,

15   if it's not the Administrative Procedure Act, if it's not the

16   First, Fifth Amendments of the Constitution, would you please

17   ask them what existing law they were referring to?

18       THE COURT:  Okay.  Well, I'll decide what to ask them,

19   but I understand the argument you're making in the question.

20       I do have one other question.  Again, you can decide

21   whether you answer it or your colleague does, but in the

22   interest of not having people jump and down.  This was filed as

23   a preliminary injunction motion, and in a number -- well, in

24   fact I think in all of the law firm cases you cite the

25   preliminary injunction motion was consolidated with the merits.

1           Is there a reason you didn't seek to consolidate the

2  case with the merits, and what's the plaintiff's position on

3  that?

4           MR. LOWELL:  We considered and talked to our counsel

5  across the table about whether it should be in a summary

6  judgment motion, whether it should be combined.  We could have

7  proceeded that way, but given that there were other issues on,

8  for example, the merits of, for example, the bill of attainder

9  and their motion to dismiss, it seemed to me it was better to

10 divide them.

11          On the other hand, depending on what of the issues

12 remain, there might be a limited need for limited discovery and

13 so consequently, it might not have been ready, although --

14          THE COURT:  Can you unpack that for me?  Discovery

15 into what?

16          MR. LOWELL:  It depends on, for example, if there is

17 more to be said about what was communicated to the world about

18 what Mr. Zaid was or did say.  I don't know what would be --

19 what we could pursue on that regard, but I do know that the

20 consideration was made and it seemed to us that it was

21 possible, but there was the possibility that there needed to be

22 more process between the time we asked for an injunction and

23 the time we're ready to seek summary judgment.

24          But we were flexible and still are, so if the Court

25 thinks we're at the point where we could do that, we probably

JA244

1   would.

2         THE COURT:  All right.  Thanks.

3         MR. LOWELL:  Could I just have Court's indulgence so I

4   can ask something from my colleagues before I sit down.  You

5   don't have anything more for me at the moment?

6         THE COURT:  No, that's it.

7      (Pause)

8         MR. LOWELL:  I'm reminded of two things.  One is,

9   again, even though Ms. Donovan will address the issue of why it

10  makes perfect sense given the order of the communications to

11  Mr. Zaid that came one after another over a period of 30 days,

12  I'll let her address that, but I am reminded that from day one

13  the government made it clear that their first move was to file

14  a motion to dismiss, so consequently it seemed to me that given

15  the standards that they would have to do, we were in a position

16  to better argue why our case goes forward.  That was their

17  position.  It wasn't much more complicated than that.

18        THE COURT:  So it wasn't based primarily on some like

19  discovery?

20        MR. LOWELL:  Probably wasn't.  It wasn't based on, oh,

21  I have a list of seven things I need to put in an interrogatory

22  and send it to them.

23        THE COURT:  That's helpful.  Thanks.

24        Ms. Donovan, maybe you could start with the question I

25  asked about how the time taken to file the suit and then seek

1    the PI impacts things.

2         MS. DONOVAN:   Sure, Your Honor.   As my colleague just

3    went over the timeline, this case sort of came to us in drips

4    and drabs, right.   So there was a *New York Post* article in

5    February, which sort of said that the president was going to

6    revoke Mr. Zaid's clearance, but it was not actually revoked.

7         And then there was the Tulsi Gabbard post in the

8    beginning of March that said she was going to revoke his

9    clearance, but it was not actually revoked.   And then there was

10   the March 22nd memorandum, which allegedly formally revoked his

11   clearance, but it still took about ten days for Mr. Zaid to

12   actually see the effects of that.

13        So as much as I would love to file a lawsuit as much

14   as the next lawyer, I don't think that I could have done one

15   just on a single tweet by Tulsi Gabbard in the beginning of

16   March.   And it wasn't until that first week of April that we

17   began to see, oh, the agencies are taking this seriously.   His

18   security clearance really is going to be revoked.

19        So we had that first revocation on April 2nd.   We had

20   another one from a different agency come in on April 9th.   And

21   a third one came in on April 23rd.   So it was not until

22   April 23rd that we really knew all of the agencies who were

23   actually going to make these revocations and we had a list of

24   defendants that we could bring.

25        Now, the other thing that I would say, Your Honor, is

1    we did consider whether or not this was a TRO case.  And I

2    think we were trying to be reasonable and tempered, and we

3    understand that not everything is a hair on fire TRO.  But we

4    are sort of in a time sensitive posture here, and that's why we

5    have moved for preliminary injunction.

6          As soon as Ms. Gabbard appeared on national television

7    and began building out even further our reputation plus claim,

8    that was on May 1st, and I think she re-tweeted something on

9    May 2nd.  We filed the lawsuit by May 5th.  I think it was a

10   Monday following a Friday.

11         So we moved, I think, reasonably fast here.  And I

12   would also note too, one of your questions that you had just

13   asked Attorney Lowell a few moments ago, the law firms had the

14   benefit of a TRO.  They got a TRO immediately after those

15   orders were entered.  The orders were entered and were going to

16   immediately take effect.

17         I think some of the law firm attorneys were getting

18   turned down for meetings with justice department attorneys in

19   terms of entering federal courthouses.  We didn't have the

20   benefit of a TRO, and so when we were going through the process

21   of thinking, okay, we need to file a lawsuit, do we go straight

22   to summary judgment or do we move for a preliminary injunction,

23   do we respond to the government's motion to dismiss, we

24   understand that a summary judgment order could take some time

25   to come to you, I don't know that Mr. Zaid has that amount of

1    time, and so that's part of the path that led us to the

2    preliminary injunction.

3        So I don't think that it really says anything other

4    than we were trying to be reasonable and deliberate and

5    measured as we sort of built our case and established the

6    timeline here.

7        THE COURT:  Okay.  Understood.  I'll let you talk

8    about harm, because I know that was something -- I don't have a

9    lot of questions on harm, but I do have one, specifically with

10   respect to the record as it relates to harm to clients and

11   availability of second choice of counsel.  I know that's an

12   issue the government raises, so to the extent you have anything

13   you can point me to in the record on that, it would be helpful.

14       MS. DONOVAN:  Thank you, Your Honor.  I think you sort

15   of put your finger on it.  We have -- if we're talking just

16   about the preliminary injunction motion here, we have that

17   standard of irreparable harm that we need to make.  And if you

18   have a constitutional harm, you have almost -- it's almost an

19   abstract concept of harm.  If there is some constitutional

20   affront here, the law says that any invasion of constitutional

21   rights is --

22       THE COURT:  I understand the constitutional harm.

23       MS. DONOVAN:  The First Amendment, minimal periods of

24   time.  But to put a finer point on it, and I think this will

25   maybe answer your question, is that there are real people

JA248

1    behind Mark's cases and behind Mark's claims.  He represents

2    real clients, there are active cases, cases in front of you,

3    Your Honor, cases in front of other courts in this district.

4         He represents right now over two dozen anonymous

5    health incident victims, and that's in his declaration at

6    paragraph 42 and 43.  He represents people whose very

7    relationship with the United States government is classified.

8    The fact that he has a client who he knows is -- I'm just

9    throwing an example out here -- he knows is a spy for the CIA,

10   that relationship itself is classified.

11        So for Mr. Zaid to now not be able to access

12   classified information, eventually, if this order stands, he's

13   not going to be able to continue to represent these clients.

14   He's not going to be able to --

15        THE COURT:  What would be most helpful to me right now

16   -- I mean, I have all the submissions on this.  I have reviewed

17   all of the materials -- if there are particular documents in

18   the record you want to point me to or places in the record to

19   look, that's great.  I don't know if this is a harm or you guys

20   would classify it as a merits argument, but it's specifically

21   related to the right to counsel issue, and the government has

22   pointed out that there is -- that part of the argument is that

23   there wouldn't be a second choice of counsel as it relates to

24   the injury there, the harm there.

25        I'm curious -- I know there is one declaration from a

1    client speaking to that, but I'm curious if there is anything

2    else you can point me to.

3         MS. DONOVAN:  Your Honor, I guess I just don't think

4    that it matters whether or not there is a second choice of

5    counsel here.  I think that clients are engaged in active

6    litigation.  I think that they will be prejudiced if they have

7    to change horses in the middle of the race.  I don't think it

8    matters if they found a second counsel.

9         But to the extent it does, we have the Marc

10   Polymeropoulos declaration, that's paragraphs, I want to say

11   it's 13 and 14 and potentially 17, which describe that he

12   doesn't want to go to somebody else.

13        Again, to my co-counsel's point, that's sort of why we

14   laid out the accomplishments and the sort of merits of

15   Mr. Zaid's career.  People want to go to Mr. Zaid because he

16   has experience in this specific area of law.  It's a niche area

17   of law, and there just isn't a huge pool of attorneys to turn

18   to when something like this happens.

19        For example, if there was going to be another

20   whistleblower who may be led to an impeachment hearing, who

21   would that person want to have as an attorney?  Mr. Zaid,

22   right.  He would turn to the very small -- he or she would turn

23   to the very small pool of attorneys who have dealt with

24   whistleblowing clients that led to an impeachment.  What has

25   the president's actions done here?  They have eliminated that

JA250

1    option for future whistleblowers.

2            THE COURT:  I know you were also going to speak to the

3    bill of attainder, which is raised in the motion to dismiss.

4    Can you give me the best argument, ideally with references to

5    the record here, that this is punishment as understood by the

6    bill of attainder?

7            MS. DONOVAN:  Yes, Your Honor.  If I may after this

8    point or right now, could I just make one more point on

9    irreparable harm?

10           THE COURT:  Go for it.

11           MS. DONOVAN:  I just wanted to note that Mr. Zaid, in

12   addition to his clients, he also has to fill out that SF86.  I

13   think we attached that as Exhibit 15.  That's an excerpt of

14   Section 25 of the SF86.  One of the amicus briefs also attaches

15   the entire 135-page document as the SF86.

16           And so once this -- if this memorandum is found

17   unconstitutional, Mr. Zaid still might have to apply for a

18   security clearance in the future, and so that's going to follow

19   him forever, having to mark that revocation.  I think we

20   outlined that the form doesn't even envision the number of

21   revocations that Mr. Zaid would have to list right now, and

22   that's how unreasonable this is.  And I would also note part of

23   the reason --

24           THE COURT:  Can you move to the bill of attainder

25   question I asked you?

1          MS. DONOVAN:  Yes, I will.  So the bill attainder

2    question, Your Honor, was about where in the record --

3          THE COURT:  I would like to know your argument, and if

4    it's with reference to the record, that would be good, as to

5    why this is correctly understood as punishment, as it's

6    understood in the context of the bill of attainder.

7          MS. DONOVAN:  As we allege in our complaint, Your

8    Honor, you're going to look -- to establish punishment, you

9    look at the historical meaning, a lack of a non-punitive

10   purpose and an intent to punish, when you're looking at

11   punishment through the lens of a bill of attainder.

12         So if we're assuming that it does apply to the

13   executive, which I understand the Court has no questions on, if

14   we're just looking at whether or not we have had punishment,

15   those are the three sort of categories you're looking to.

16         So when you look at the historical punishment in the

17   case law, you see that it mirrors the punishment that you have

18   in your record here.  It's not punishment in the sense of

19   lengthy --

20         THE COURT:  Can you just tell me what in the record?

21         MS. DONOVAN:  Yes.  In the record, we discuss that

22   he's going to face reputational consequences, that he's going

23   to be barred from continued representation, and from continuing

24   to pursue a career in the national security sector.  That's in

25   the declaration.  That's in the record.

1        We note in the record the lack of non-punitive purpose

2    and the intent to punish, that's captured by President Trump's

3    labeling of Mr. Zaid as a sleazeball and indicating that he has

4    committed treason.  The record -- what is missing from the

5    record is any cite to a non-punitive purpose, any cite to

6    national security.

7        We also have in the record Director Gabbard's own

8    comments about this, namely that she thought that it was fun,

9    and that she was doing it, I think in our exhibits where she

10   basically captions that the ODNI press release --

11       THE COURT:  Is it the same, and if there is anything

12   different, the same evidence you would rely on for showing that

13   it was retaliatory in the First Amendment context?

14       MS. DONOVAN:  It is largely the same, Your Honor.  I

15   would also say that there is one sort of additional point in

16   the record in addition to the evidence of retaliation here.  We

17   submitted an exhibit of a clip of the Megyn Kelly/Tulsi Gabbard

18   interview.  It was just like a 45-second clip from the

19   interview, but we cite in the record to the entire interview.

20   Later in that interview, Director Gabbard -- and we do put this

21   in our filings -- Director Gabbard actually says that part of

22   the reason why she revoked other people's security clearances

23   and why she was doing this revocation was because these people

24   had committed crimes.  She said this notwithstanding that none

25   of them have been actually prosecuted or arrested for crimes,

1    that they didn't apologize.  Director Gabbard's line about

2    doing this because nobody, quote, "apologized," that is in

3    Exhibit 6.  And because they had never been held accountable.

4         So Director Gabbard is actually quite plainly laying

5    out for the Court and for the public --

6         THE COURT:  Got it.  That's helpful.  Thank you.  I

7    think those are all my questions on harm and the bill of

8    attainder.  I'll hear from the government now.

9         MS. DONOVAN:  Thank you.

10        MR. VELCHIK:  May it please the Court, Michael Velchik

11   for the United States defendants.  I think the Court is

12   familiar with the case.  The government would only just

13   emphasize two points at the start about the case law's holding

14   and reasoning.

15        First, as described in the briefs, we think that DC

16   Circuit precedent controls here, but unlike in other circuits

17   where this Court might be asked to reason by analogy from one

18   case holding that Title VII claims might not be justiciable,

19   here there is controlling precedent for every single one of the

20   claims raised in the suit.

21        And just to go through them systematically, Count 1 is

22   APA claim.  That's foreclosed by *Oryszak*.  Counts 2 through 4

23   are the Fifth Amendment claims, which are not justiciable under

24   *Lee*.  Count 5 is the First Amendment claim that's also not

25   justiciable under *Lee*.  And Count 6, which is the bill of

JA254

1    attainder claim, which was not raised in the motion for

2    preliminary injunction, that is controlled by *Palmieri*, which

3    also dismissed that.

4         And we would just emphasize that not only is every

5    single claim foreclosed by circuit precedent, but even the

6    theory of the case was addressed in those cases, and so the

7    theory seems to be that there is a level of retaliation that

8    motivated the decision to revoke a security clearance, but if

9    the Court looks at *Lee* on both the First Amendment and Fifth

10   Amendment claims, I mean, *Lee* specifically alleged that his

11   security clearance determination was based on protected speech

12   in violation of the First Amendment.

13        Similarly for the Fifth Amendment claim, *Lee* alleged

14   that the revocation --

15        THE COURT:  We should get into *Lee*, because as

16   plaintiff's counsel noted, and I think as your summary just

17   gave, you cite it and rely on it for a number of the claims.

18        Can I just ask you two preliminary questions?  The

19   first is a technical one and I think I know the answer, but I

20   just prefer to ask.  Is there any significance to the fact that

21   this was a presidential memorandum rather than an executive

22   order, from the government's perspective?

23        MR. VELCHIK:  So we cite OLC precedent saying that

24   they both have the same legal effect.  Obviously, there is a

25   difference between law that stems from the Constitution versus

JA255

1    a statute versus something that the president does.  The

2    president can exercise his authorities under different names.

3         We don't think that sort of the nomenclature of

4    calling it a presidential memorandum or executive order has any

5    sort of difference.  And that's been longstanding --

6         THE COURT:  The answer is there is no difference.

7    Okay.  And I took your brief -- again, this is a threshold

8    question that I just want to understand what's in dispute and

9    what's not.

10        I took your brief not to be arguing for dismissal or

11   against a PI on the basis that Mr. Zaid did in fact get process

12   before a revocation.  I know you're making non-justiciability

13   arguments, you're saying he doesn't state a claim, but you're

14   not arguing that he did in fact get process here.

15        MR. VELCHIK:  We don't fully understand the relief

16   that plaintiff is seeking or where this argument is coming

17   from.  The way that we conceive the process is that as the

18   Supreme Court recognized in *Egan*, the Constitution vests the

19   authority to control classified information in the president.

20   He may exercise that directly, and sometimes he does, or he may

21   delegate that to certain inferior principal officers, and he

22   may set out regulations and processes for them to follow when

23   they are exercising his delegated authority.

24        Here, the president personally exercised that

25   authority.  That itself is the decision, that is the final

1  decision under *Lee*.

2          THE COURT:  So let me -- fair enough.  Let me be more

3  precise.  I don't want to misstate your argument.  So to the

4  extent that Mr. Zaid got process, it is the president's direct

5  conclusion that it's not in the national interest for him to

6  have the clearance here, correct?

7          MR. VELCHIK:  Yes.  The president made that decision.

8  He personally exercised his authority rather than delegating

9  it.

10          THE COURT:  And you're not arguing -- let's just

11  separate -- let's go to the indirect, the agencies.  You're not

12  arguing that the agencies in fact conducted the ordinary review

13  process?  This is in the direct presidential category under the

14  government's position?  You're not arguing that the process was

15  offered through the agency processes?

16          MR. VELCHIK:  Correct.  We are arguing that the

17  president has the constitutional authority to directly exercise

18  this constitutional power.  He exercised that.  As part of that

19  exercise, as you will read from the presidential memorandum, he

20  does direct the agencies to implement that decision, to take

21  certain steps, and it is our position that the presidential

22  memorandum is allowed to authorize the implementation of that

23  decision, which they did.

24          We also do not think that the executive orders are

25  guidance documents, otherwise --

1      THE COURT:  What does that mean?  What is the

2 implementation of that decision?  What does that actually

3 involve?  What do the agencies do?

4      MR. VELCHIK:  For example, like physically revoking

5 the security clearance, any of the paperwork associated with

6 it.

7      THE COURT:  So executing it?

8      MR. VELCHIK:  Executing it.

9      THE COURT:  But not engaging in actual individualized

10 review at the agency level?

11     MR. VELCHIK:  Under the presidential memorandum, he

12 did not direct the agencies to conduct a second or further

13 review weighing the costs and benefits, making a

14 recommendation, holding a hearing, allowing -- they did not.

15 The decision had already been made, so they implemented it.

16     THE COURT:  Understood.  On justiciability, I

17 understand you were starting to and want to argue that this

18 case is covered on all fours by *Egan* and *Lee*, but just for a

19 moment, as it relates to security clearances, what is

20 reviewable and what is not reviewable under *Egan* and *Lee*, in

21 the government's view?

22     MR. VELCHIK:  That is an important question.  We don't

23 think this Court necessarily needs to set out a grand theory.

24 We do believe that this falls within the core and the heartland

25 of *Egan* and *Lee*.  But I mean, I can reference some of the other

1   cases that opposing counsel relies on, and I think they sort of

2   flesh out some of the differences.

3        THE COURT:  Let me ask you this question.  The

4   plaintiff stood up and drew a distinction between process and

5   substance.  Do you agree that process is subject to challenge,

6   notwithstanding *Egan* and *Lee?*

7        MR. VELCHIK:  So cases have recognized that certain

8   aspects of the investigatory process may be judicially

9   reviewable.  The distinction that *Egan* and *Lee* drew are whether

10  or not you're attacking the merits of the decision or the

11  actual adjudication on the merits.  The two cases that seem to

12  come up in trying to draw this distinction are *Greenberg* and

13  *Rattigan*.  I think both of them are far afield from what we're

14  dealing with here.

15       THE COURT:  Tell me about *Rattigan*.

16       MR. VELCHIK:  *Rattigan* actually went up to the DC

17  Circuit three times.  The fact pattern involved an FBI employee

18  who alleged that --

19       THE COURT:  I don't need to know the facts.  I want to

20  understand how *Rattigan* affects the test in terms of what is

21  reviewable and what's not reviewable.  What's your position on

22  what *Rattigan* says is reviewable.

23       MR. VELCHIK:  *Rattigan* drew a distinction between

24  those who are in a category with the chain of command making

25  adjudication decisions for security clearances and those who

JA259

1    are not.  Under that fact pattern, there were employees who

2    worked at the FBI that were making allegations against one of

3    their co-workers that allegedly violated Title VII.  They were

4    not part of the staff that made security clearance decisions.

5    They were simply violating Title VII, giving false reports to

6    others who would later make those security clearance decisions.

7         And the plaintiff there didn't challenge whether or

8    not he should have been given a security clearance or not.  He

9    challenged the fact that there were willful, knowing violations

10   of Title VII by other employees not part of the adjudication

11   chain of command.

12        THE COURT:  Which then triggered the security

13   clearance review, right?

14        MR. VELCHIK:  I believe it was part of it, yes.  But

15   that was a distinction.  In a later case --

16        THE COURT:  So why isn't that like this case, where at

17   least if you were to read the executive order to say based on

18   who Mr. Zaid is, I don't think it's in the national interest,

19   whatever that means, for him to have this, and so we're not

20   going to go through the usual process.

21        MR. VELCHIK:  I mean, the distinction is -- I mean,

22   whether the alleged like misconduct is taking place by an

23   adjudicator of the security clearance, the president personally

24   adjudicated the decision.  That's the core of *Egan* and *Lee* and

25   so that's not subject to judicial review.

1          People who would be subject to judicial review are the

2     FBI co-workers making false allegations.  There was a

3     subsequent case, which I think actually elicits the

4     distinction, which was *Foote v. Moniz*, where they found that a

5     psychologist at the Department of Energy, who conducted an

6     interview that went into the adjudication decision, he was

7     sufficiently within the *Rattigan* category of someone actually

8     making these substantive merit decisions to deny or revoke a

9     security clearance, and that was not reviewable, but the

10    president is making the decision himself.

11         THE COURT:  Let's keep it within your reading of

12    *Rattigan* to just be the chain of command.  Let's keep it within

13    the chain of command, have it be exactly the same, it's a memo

14    from the president and it says these 20 people who are

15    Catholics, because they are Catholic -- substitute whatever

16    religion you want in there, it could be Jewish, Muslim,

17    whatever religion you want -- for that reason, it's not in the

18    national interest.  Otherwise, the executive order is all

19    exactly the same.

20         Reviewable under *Egan* or not reviewable?

21         MR. VELCHIK:  Number one, I think that was the fact

22    pattern in *Lee* where Lee actually alleged racial declaration

23    and retaliation.  That's what all the Title VII claims are, and

24    those have been held not to be justiciable.

25         THE COURT:  So your answer is yes now.  I think that

1    was not the government's answer when this was asked in the

2    prior cases.  Your answer is yes unreviewable if the

3    presidential memorandum or executive order says because of the

4    religion, it's not in the national interest?

5         MR. VELCHIK:  I would draw a distinction there.  The

6    test set out in *Lee* was whether or not there were judicially

7    discoverable and manageable standards.  Certainly making

8    discrimination determinations under Title VII or other laws,

9    the Fourteenth Amendment, like, that is within the canon of the

10   judiciary, but once you're making a decision in the context of

11   security clearances, and that includes any number of intangible

12   qualities, loyalty to the United States, discretion, et cetera,

13   it also includes a determination about the risk tolerance of

14   how much risk the executive branch is allowed to tolerate, if

15   the merits decision includes those sorts of decisions and

16   intangible qualities described in *Lee* and *Egan*, and there are

17   also some alleged impermissible motives, we think that those

18   sort of mixed motives would be unreviewable.

19        THE COURT:  Can I just get a yes or a no?  I mean, I'm

20   asking the question if the memorandum, presidential memorandum

21   in this case said, "The following 20 Catholics cannot have

22   security clearance because they are Catholic, and, therefore,

23   it's not in the national interest for them to have the security

24   clearance," and it lists 20 people who are Catholic, you would

25   say reviewable or not reviewable?

1          MR. VELCHIK:  I think the best case for reviewability

2   is if it specifically said there are no national security

3   concerns whatever, but solely for the independent reason that

4   they are, insert whatever protected classification you want, I

5   think that's the clearest case for judicial reviewability,

6   because the court could say, no, the decision was made solely

7   for the reason that is prohibited by law.  I don't need to look

8   into the box or second guess the other components of the merits

9   determination on the security clearance.  Just by the face of

10  the document, you could say, no, only because of this

11  prohibited classification.  I think that's the best case for

12  judicial reviewability.

13         THE COURT:  That's interesting, because the way you

14  framed it, it sounds very much like substance.  It's not even a

15  process substance distinction.  It sounds like you're saying if

16  you can see that the substance is exclusively based on

17  religion, then it's reviewable.

18         MR. VELCHIK:  I think that this is an easy case.

19  There is nothing on the face of this document --

20         THE COURT:  I want you to answer the question that I'm

21  asking you, not jump to some other question or hypothetical in

22  your head.

23         The question I just asked you, the way you framed it,

24  was a matter of substance.  As I understood it, you were saying

25  I am concluding that there is a national security problem

1    because this person is Catholic, and, therefore, it's revoked,

2    you would say that is reviewable?

3         MR. VELCHIK:  I think *Egan* and *Lee* are quite

4    encompassing that the merits are not reviewable.  If I'm

5    looking at the rationale described by Judge Katsas in his

6    opinion at *Lee* emphasizing judicially manageable standards,

7    discoverable standards, I think the best case that such a

8    memorandum would be judicially reviewable would be one that

9    says on the face of the document that it is solely for a reason

10   that is prohibited by law, but I don't think that's the case

11   here.

12        THE COURT:  You think that's stronger than an

13   executive order that says because these people are Catholic

14   then I'm not going to give them the same process as everybody

15   else?  Doesn't that basically combine what you just said, but

16   it's actually easier because it's not substance, it's process?

17        MR. VELCHIK:  I think some of the hypotheticals have a

18   couple of dimensions and there are different ways of

19   distinguishing them along the case law and along the fact

20   patterns here.  One is the sort of categorical versus

21   individualized determination, and I think that is sort of one

22   point of distinction in other cases.

23        Another is the merits versus process, but I think

24   along both dimensions you would have to analyze that question.

25        THE COURT:  Why is the government, and tell me if it's

JA264

1    not, but I had understood in the prior cases involving the law

2    firms when asked the question about whether the president could

3    say revoking security clearances for, again, insert your

4    religion, that the president couldn't do that and it would be

5    reviewable, and now it seems like you're hedging on that or

6    taking a different position.  Why is it different in this case

7    than it was in those cases?

8         MR. VELCHIK:  I was not at those arguments.  Also,

9    we're familiar with the law firm cases, the position of the

10   government that those were not correctly decided and that they

11   are not binding, but I do think the law firm executive orders

12   are distinguishable along two dimensions that are worth

13   emphasizing.

14        The first is you look at reasoning in the courts'

15   opinions.  They do draw an important distinction between

16   individualized determinations versus a categorical or class

17   treatment.  The law firm executive orders just on the face of

18   the documents did not sort of identify every individual, did

19   not suggest that the identities were known of all the

20   individuals who would be affected.  Whereas here this is the

21   paradigmatic example of an individualized determination that

22   specifically names plaintiff, so I think it's distinguishable

23   along that dimension.

24        But I think second another important distinction

25   between the law firm executive orders is that those did not

 1   fully adjudicate the merits of any security clearance

 2   determination.  It said that we would like the agencies to

 3   undertake a further review.  There will be a different

 4   treatment for this class as opposed to another class, but it

 5   did not adjudicate or give a final determination of the

 6   security clearances.  In fact, it expressly held out that the

 7   agency would do that at a later time.

 8          Here, in the presidential memorandum, he's already

 9   concluded the merits determination.  I think that's an

10   important distinction.

11          THE COURT:  Would this case be different if the

12   executive order were written to say I'm not letting these

13   people go through review or revocation process because they are

14   political rivals, I'm just going to go ahead and terminate them

15   because they are political rivals?  Is that a different

16   scenario for you or the same?

17          MR. VELCHIK:  Is that I'm creating a two-track process

18   for --

19          THE COURT:  No, there is no two-track process, he's

20   not saying there is no process.  I'm not going to afford any

21   process to these people who are listed by name because they

22   were political rivals to me.  I understand everybody else gets

23   process, these guys are not going to get any process or any of

24   that individualized review we typically do, security clearance

25   shall be terminated, take actions accordingly.

1          MR. VELCHIK:  I would distinguish between whether the

2    president is personally exercising his authority under *Egan* to

3    control the classified information versus delegating it.  If he

4    personally adjudicates the merits and says I have already

5    decided that these individuals should no longer be granted

6    access to classified information, that is the process the

7    president can exercise personally.

8          I think some of the process concerns might be fleshed

9    out in other hypotheticals where we have a two-track process

10   where agencies are processing applications for one group of

11   people versus another.  But here, the president personally

12   exercised his constitutional authorities.

13         THE COURT:  So if the president says these people,

14   because they are my political rivals, are not going to get

15   process, and I am terminating their security clearance, take

16   actions, you would say -- what would you say?

17         MR. VELCHIK:  I mean, the president is allowed to

18   personally exercise his authority, and if he's adjudicating

19   them on the merits, like he may do so and that is not

20   reviewable under *Egan* and *Lee*, those are expansive rulings, but

21   those are the controlling cases.  Candidly, I think it's also

22   the position that, like, the plaintiff has taken in the past.

23         I believe in 2018 --

24         THE COURT:  This may be an important distinction.

25   Suppose he didn't make clear that he's making the distinction,

1    he's just saying, look, if you get applications for security

2    clearances from people who are my political rivals, see the

3    list, we're not going to give them that process, don't process

4    them, but there is not an actual determination there of

5    something relevant to national security --

6              MR. VELCHIK:  This is much closer to the law firm fact

7    pattern.

8              THE COURT:  And you would say reviewable?  I don't

9    want to get into the law firm fact pattern because you're also

10   fighting the law firm cases.  I just mean the government's

11   position is that --

12             MR. VELCHIK:  I know there is ongoing pending

13   litigation on those law firms and I don't want to speak to

14   those cases.  Certainly I think that that's a much better

15   candidate for reviewability, but this case I think is very

16   different.

17             THE COURT:  Slightly different justiciability

18   question, but Mr. Zaid's preliminary injunction motion started

19   with a description of his standing to bring this case,

20   including injury, causation, redressability, and I know that

21   the government didn't respond to that at all.  I know you have

22   your justiciability argument under *Lee* and *Egan*, but I take it

23   you don't see an issue as to his standing to bring the claims

24   he's bringing?

25             MR. VELCHIK:  That is correct.  We think that

1    justiciability is the best and clearest way to resolve all of

2    these claims.

3            THE COURT:  You're not arguing, you don't see an issue

4    with the plaintiff's standing?

5            MR. VELCHIK:  We did not contest that in the briefs.

6            THE COURT:  All right.  Can you tell me what your

7    position is as to the prior executive orders and regulations as

8    they relate to this presidential memorandum?

9            MR. VELCHIK:  Yes.  First, as I understand it, Article

10   II vests in the president the authority to control and classify

11   information pertaining to national security.  He may exercise

12   that directly or he may delegate that to principal or inferior

13   officers.  He may also set out guidance to his inferior

14   officers about what process to take when they are exercising

15   his delegated authority.

16           Under that framework, the president was able to

17   personally exercise direct constitutional authority here, and

18   so he's certainly not bound by prior executive orders because

19   he is exercising authority pursuant to the Constitution.

20           Second, to the extent there is any conflict between

21   the presidential memorandum and any prior executive orders, we

22   think that the presidential memorandum controls for basic --

23           THE COURT:  What did the president mean then, if

24   that's the accurate understanding, what did he mean then when

25   he said to take action consistent with existing law?  What

1    existing laws is he referring to?

2        MR. VELCHIK:  What the president issues executive

3    orders or presidential memoranda, he frequently will include

4    generic language, such as "consistent with law" or such as at

5    the end of this one, which I think is also relevant, that it

6    does not intend to be or create any right or benefit.  In other

7    contexts, the president is exercising either authority pursuant

8    to the Constitution or a specific statute that Congress has

9    enacted.

10        And so when he is exercising those delegated

11    authorities, "consistent with existing law" is routinely

12    interpreted in the executive branch to say take these actions.

13        THE COURT:  But here, I think part of your argument is

14    that he wasn't exercising any of those delegated authorities.

15        MR. VELCHIK:  In other cases where he's acting

16    pursuant to a statute, "consistent with existing law" means

17    consistent with any applicable statutes that constrain the

18    president's exercise of authority in that particular case, as

19    well as consistent with the Constitution.

20        Here, in this case, because he's acting pursuant to

21    *Egan*, I mean, that phrase, which appears in I think almost

22    every executive order or presidential memorandum, simply refers

23    to consistent with the Constitution, to the extent that there

24    are these limits on his ability to control classified

25    information or act as the executive or commander in chief.

1          But I do think the argument proves a bit much to sort

2     of read into sort of that clause at the end of one sentence to

3     then read out the rest of what is otherwise like a full page

4     document.

5          THE COURT:  What is it exactly that has to be -- so

6     there is no laws that you're saying, no non-constitutional laws

7     that it could be referring to.  So it's telling the agencies to

8     execute this consistent with the Constitution.  What does that

9     mean?  What do they need to do consistent with the

10    Constitution?

11         MR. VELCHIK:  I think that is like a qualifying

12    language that is in the boilerplate that just always directs

13    everyone to not exceed any constitutional limits.  We don't

14    think any of this runs up against the constitutional limits, so

15    that's not much of a limitation in this case, but that is the

16    consistent practice of the executive branch to include --

17         THE COURT:  Tell me if I'm wrong.  I'm not trying to

18    put words in your mouth, but it's boilerplate language that in

19    other contexts has meaning, but here because the president has

20    made the determination in this presidential memorandum under

21    your reading and because there is no judicial review or

22    constitutional application, it doesn't have meaning?

23         MR. VELCHIK:  Yes.  The language is almost always

24    included.  Often in other contexts it does a lot more work.

25    Here, it's not doing as much work.

1          THE COURT:  I'm trying to figure out what work it is.

2     Is the answer here there is the boilerplate language that's not

3     doing any work and that happens sometimes.  If your answer is

4     that it's not doing much work --

5          MR. VELCHIK:  The work is consistent with the

6     president's authorities under the Constitution, or to the

7     extent that there are any statutes that are implicated by,

8     like, any actions taken pursuant to the presidential memorandum

9     here, but I mean the Constitution vests the president with

10    certain authorities, it has certain limits.  They are quite

11    broad.  They are not reviewable in many cases.

12         THE COURT:  Let me just ask, what is it that allows

13    you to so clearly conclude that what it means is only the

14    Constitution as opposed to what it ordinarily means, which is,

15    I would think, Constitution, statutes and applicable

16    regulations and other orders?

17         MR. VELCHIK:  The law generally refers to all three.

18    To the extent that there are applicable regulations, statutes

19    or laws, yes, they could be --

20         THE COURT:  So what is the context that allows you to

21    say, no, actually here is doesn't mean all three?

22         MR. VELCHIK:  I mean, it would refer to any that are

23    applicable, and the question is are there any statutes that are

24    applicable here.  The only two that I have seen raised in the

25    litigation were the congressional statement of purpose in Title

1    50 and then --

2        THE COURT:  I guess what plaintiffs would say is that

3    there are also these prior executive orders and other policy

4    guidance that they cite that are applicable to this context.

5    What is it that makes clear to you that they don't?

6        MR. VELCHIK:  To be clear, we think that all of the

7    actions taken by the president and the agencies implementing

8    the presidential memorandum are consistent with those

9    regulations as well.  Like, all of the executive orders cited,

10   I mean, they all allow for agency heads to implement the

11   president's decisions, because there has been a determination

12   that continued access to classified information is no longer in

13   the national interest, and they also each include the same

14   language that appears at the end of the presidential memorandum

15   that this is not intended to create a benefit or procedural

16   enforceable right.

17       THE COURT:  Okay.  On the substance of the claims on

18   the due process claim, you heard plaintiffs and you have seen

19   in the briefing make a version of the argument that goes to

20   Mr. Zaid's ability to make a living.  Are you -- I didn't see

21   kind of record evidence disputing that or an effort to kind of

22   rebut the evidence that this is significant to his livelihood.

23   Are you disputing that?  What are you or not disputing there?

24       MR. VELCHIK:  As a matter of law, we think that an

25   individual's inability to, like, pursue a particular trade,

1    like, is insufficient under existing case law.  I think the

2    harms that plaintiff personally is suffering as a direct result

3    of the revocation pale in comparison to the fact patterns in

4    other cases.  *Lee* and other cases, *Egan* featured a federal

5    government employee who lost their jobs and could not practice

6    as a result because as a condition of employment they required

7    a security clearance.

8            THE COURT:  Is your argument that there can never be a

9    liberty interest in security clearance?

10           MR. VELCHIK:  I believe every single circuit that has

11   ruled on that question has said so, and I think the one that

12   speaks most particularly to whether or not there can be a

13   liberty interest in a profession or trade was the Ninth Circuit

14   decision in *Dorfmont* by Judge Kozinski.  I believe that fact

15   pattern involved a defense contractor who said that I'm a

16   defense contractor, as a condition of working in this entire

17   industry, I believe it was aerospace defense contracting, I

18   require a security clearance.  The fact that I don't have a

19   clearance means, number one, I've lost the clearance; number

20   two, I've lost my job, but even further, I can't even practice

21   this trade.  And then at length the opinion described why that

22   was insufficient to state a constitutional liberty interest and

23   it also referred to the language in *Egan*, which emphasizes that

24   security clearance is a privilege, no one has a right to it,

25   and, yes, there are certain individuals, particularly those who

1    might want to work in the defense industry or the intelligence

2    community who if they do not have a security clearance, that

3    may affect their ability to follow their chosen profession, but

4    that does not convert what otherwise would be an unreviewable

5    claim to one that is now reviewable.

6            THE COURT:  I was trying to get past the

7    reviewability.

8            MR. VELCHIK:  Would not have a property or liberty

9    interest for purposes of the Fifth Amendment.

10           THE COURT:  So your argument is that per se there

11   is -- there can never be a liberty interest.  I know there is

12   the property interest argument, but I'm focused on liberty

13   interest.  There can never be a liberty interest that is

14   contingent on security clearance?

15           MR. VELCHIK:  There is sort of that legal analysis and

16   then factual to the extent that there is any dispute in the

17   record.  Our understanding of the facts is that plaintiff may

18   still practice law in any state or jurisdiction which he's

19   licensed, he may still argue in any courtroom, make any

20   arguments, and its only in connection with these

21   representations he personally cannot access classified

22   information if he does not have a security clearance, although

23   his clients, if they have other counsel who are cleared or

24   willing to submit to clearance procedures, so I think that even

25   trying to suggest that this case involves an individual not

1    being able to pursue their chosen profession, I think plaintiff

2    is trying to very narrowly describe his practice in order to

3    fit it into that box, but even as a matter of law, we don't

4    think that that asserts a constitutional liberty interest.

5         THE COURT:  You made an argument as it relates to *Lee*

6    and *Egan* as to I think what you kind of captured as two main

7    differences between this case and the law firm cases coming to

8    the merits, the claims themselves.  Are there differences you

9    want to highlight from the law firm cases in this case as it

10   relates to, say, due process, vagueness, First Amendment, right

11   to petition?

12        MR. VELCHIK:  I think the law firm executive orders

13   dealt with four operative sections that I think different

14   courts relied on to different extents.  I think we're happy

15   with the briefs in this case emphasizing the merits arguments.

16   The only point I would add is that we do think that there is

17   like a harm to even have to really engage on the merits if it

18   turns out that this court denies the motion to dismiss and we

19   would have to argue or even present evidence.  For example,

20   like the First Amendment retaliatory claim, if we really are

21   going to look into the mental state of the president or

22   consider the documents he relied upon when making this

23   decision, certainly that would implicate like the separation of

24   powers or executive privilege, and we think that these sort of

25   broader concerns and harms, even from litigation, I think play

JA276

1   an important role in respecting the justiciability holdings

2   holdings in *Egan* and *Lee*.

3         THE COURT:  Okay.  Let me make sure I don't have any

4   other questions for you.

5      (Pause)

6         THE COURT:  I think I have gotten through all of my

7   questions.  Are there any other submissions you want to make?

8         MR. VELCHIK:  May I make one submission in response to

9   your question about whether or not the president could revoke a

10  security clearance, hypothetically, for alleged political

11  motives or retaliation?

12        On August 15, 2018, it's a matter of public record

13  that the *New York Times* reported, and I'll read, "that

14  President Trump was revoking or reviewing security clearances

15  of former officials who have emerged as some of his chief

16  political antagonists," and the relevant quotation is, "I do

17  not question the president's ability to exercise this power."

18        That quote was attributed to Mark Zaid, a longtime

19  Washington lawyer who handles security clearance.  He made

20  various policy arguments against that, noting that it's an

21  abuse of the exercise of his power for political purposes, he

22  called it an authoritarian action, not an American one, but at

23  least to the legal question, quote, "I do not question the

24  president's ability to exercise this power," and I do think

25  that if this Court is being asked to weigh in on the

1    justiciability or potentially the merits of questions or

2    hypotheticals like that, we would respectfully ask that the

3    Court take judicial notice of the article published in the *New*

4    *York Times* titled "Little Known Justice Department Official

5    Makes Trump Security Clearance List" by Katie Brenner where

6    plaintiff was actually arguing the exact opposite years before

7    this lawsuit was brought.

8         THE COURT:  Thank you for your submissions.

9         Go ahead.  You can respond.

10        MR. LOWELL:  Let me start with the last piece, taking

11   a sentence out of Mr. Zaid's comments of 2018, when he was

12   talking about the ultimate authority of a substantive decision

13   versus the way the president got to that is exactly the

14   distinction that we are putting forward for the entire day that

15   we have been arguing here today, so that one is pretty easy.

16        I have listened to the government and I have heard

17   them say that the existing law that the memorandum refers to

18   initially was just the Constitution, which I'm not thinking

19   it's sufficient, but I'm happy to rest on it.  If it is, the

20   existing law as I asked is the Bill of Rights, is the

21   protections that we put forward, then our argument that what

22   the president did if he did it himself, to use your

23   hypothetical, is bounded by those provisions, and that is the

24   existing law and we have put forward a strong argument that he

25   violated what the government a moment ago says is the existing

1   law.

2            If it's the Constitution, but then he changed, and I'm

3   not sure what as I'm standing here I now understand the

4   government thinks the existing law references to, but that

5   certainly, that was an important concession, I believe.

6            The next thing is I hadn't thought about your question

7   about the difference between it being a memorandum and an

8   executive order, but I think that reflects what I said about

9   why is it that the executive orders, which are in place, all

10  are in the Federal Register, which provides notice and gives

11  people the sense of what their rights and their process will

12  be, and this one isn't.  I don't know that it means that a

13  president can issue a memo, but on the issue of whether those

14  executive orders were superseded in some fashion, I think that

15  bears on that.

16           What bears particularly on that was counsel's point

17  that the actions of the president, to use his phrase, quote,

18  "are consistent with the executive orders," I think if you just

19  look at any of them and their A, B, C, D, E, F requirements,

20  that's just not right.  Whatever else those executive orders

21  do, they have process that wasn't put into place here.

22           I think your question to him about if the executive

23  order said I'm not going to allow process for anybody who is a

24  Catholic, still hasn't been responded to.  The president could

25  do something in the power of the president delegated to the

1    president, but if there is record evidence or the ability to

2    argue that what he did is not unbounded because he could not

3    say I'm not giving -- I have decided to revoke all, and you

4    pick it, could be Catholics, could being Methodists in the

5    cafeteria workers, or your hypothetical about Catholics, but

6    what if it was the same, anybody who has asserted their right

7    to free speech, that's equally violative.  It's not an

8    unbounded right he has anymore so than any other separation of

9    powers, speech or debate, taking some property without just

10   compensation.  That is the bounds that a president has to

11   operate on.

12        As to the livelihood, liberty interest issue, I wanted

13   to make sure that I reminded the Court, it's in our brief, but

14   I can say it more succinctly, to look at the line of cases in

15   *Doe versus Austin*, which, besides saying nobody starts with a

16   property interest, but ignores the court's *Doe versus Austin*

17   saying it disagrees that a broad assertion because a federal

18   agency's revocation of a security clearance may give rise to

19   due process claims for injury to the liberty interest, so when

20   counsel asks the Court to look at the cases that he says are on

21   all fours, make sure that not only you look at *Doe versus*

22   *Austin* --

23        THE COURT:  I have those cases.

24        MR. LOWELL:  It cites four other cases of this circuit

25   that say the same thing.

1          I think maybe the last thing I should say, because

2   counsel for the government said, and I think the phrase was the

3   Court can conclude this case on the justiciability of *Egan*,

4   which he said is either on all fours or this case is controlled

5   by, and whatever he says here differs from what the solicitor

6   general said in *Egan* itself.  When the solicitor general wrote

7   in the brief that caused *Egan* to be decided the following.

8          It says you can examine in a security clearance

9   context, quote, "whether the agency had procedures for

10  revocation and whether the procedures were followed,"

11  including, it goes on, "whether or not the person involved was

12  afforded procedural protections," end quote.

13         So if the government stands and falls on what they say

14  is the mandate of *Egan*, then the government's concession about

15  what we are actually putting forward, which is to determine

16  whether the agency in this case had procedures and whether they

17  were followed is all that I think I need to conclude with.

18         And I appreciate the Court's time in considering our

19  papers and argument.  Any other questions?

20         THE COURT:  No more questions for you.  I actually

21  would like to hear the government's response to the solicitor

22  general's position on *Egan* really briefly.

23         As I understand it, the argument is that in *Egan*,

24  there was an explicit recognition that there is this kind of

25  distinction between substance and process.  Has the

1    government's position on that changed?

2         MR. VELCHIK:  Are you referencing to the solicitor

3    general's arguments prior to the decision in *Egan*?

4         THE COURT:  Yes.

5         MR. VELCHIK:  I think the position of the United

6    States government would reflect whatever the court decided.  I

7    know that the government's position may change before and after

8    cases are decided.  I'm not familiar with the principle that

9    the government is bound by submissions in prior cases prior to

10   their decision.  We would look at the language in *Egan*.

11        THE COURT:  I'm not making an argument about you being

12   bound in terms of what you can say.  I'm asking whether it's

13   changed in substance from what was articulated to the Court in

14   advocating --

15        MR. VELCHIK:  I think the distinction between

16   substantive process would probably track the latest case law

17   from the DC Circuit, so I would look to the *Greenberg* and

18   *Rattigan* decisions to the extent that they talk about the

19   investigatory process that was at issue in *Greenberg*, where

20   they alleged discrete harms that didn't flow from the

21   adjudication decision, we discussed *Rattigan*.

22        THE COURT:  Got it, so it would be articulated through

23   the description you gave of *Greenberg* and *Rattigan*.

24        MR. VELCHIK:  I think that's the appropriate

25   distinction.

1          THE COURT:  Appreciate that.

2          Appreciate counsels' submissions.  I know I went a

3  little longer than I had intended to with each side, but it's

4  been helpful to me.  And I appreciate the thoughtful answers

5  and responses to my questions.

6          We can go ahead and adjourn.

7      (Proceedings concluded at 3:12 p.m.)

8

9                      CERTIFICATE

10     I, Sonja L. Reeves, Federal Official Court Reporter in and
   for the United States District Court of the District of
11 Columbia, do hereby certify that the foregoing transcript is a
   true and accurate transcript from the original stenographic
12 record in the above-entitled matter and that the transcript
   page format is in conformance with the regulations of the
13 Judicial Conference of the United States.

14     Dated this 2nd day of July, 2025.

15

16                     /s/ Sonja L. Reeves
                       SONJA L. REEVES, RDR-CRR
17                     FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25

## /

**/s** [1] - 77:16

## 0

**06604** [1] - 1:17

## 1

**1** [1] - 48:21
**1,200** [1] - 16:9
**100** [3] - 17:11, 17:25, 18:1
**1250** [1] - 1:14
**13** [1] - 44:11
**135-page** [1] - 45:15
**14** [1] - 44:11
**15** [2] - 45:13, 71:12
**17** [1] - 44:11
**19** [3] - 15:21, 28:23, 29:12
**1:25-cv-01365-AHA** [1] - 1:5
**1:32** [2] - 1:11, 2:1
**1st** [1] - 41:8

## 2

**2** [1] - 48:22
**20** [7] - 3:18, 15:5, 15:21, 16:12, 55:14, 56:21, 56:24
**200** [1] - 15:5
**20001** [1] - 1:25
**20005** [1] - 1:14
**2018** [3] - 61:23, 71:12, 72:11
**2019** [1] - 33:10
**2024** [1] - 34:3
**2025** [3] - 1:10, 33:10, 77:14
**20530** [1] - 1:20
**22nd** [2] - 5:5, 40:10
**23rd** [2] - 40:21, 40:22
**25** [1] - 45:14
**25-1365** [1] - 2:2
**27** [2] - 1:10, 9:22
**2nd** [4] - 1:14, 40:19, 41:9, 77:14

## 3

**30** [2] - 3:18, 39:11
**31** [1] - 5:21
**333** [1] - 1:24
**350** [1] - 1:16
**3:12** [2] - 1:11, 77:7

## 4

**4** [1] - 48:22
**40** [1] - 6:24
**42** [1] - 43:6
**43** [1] - 43:6
**45-second** [1] - 47:18

## 5

**5** [1] - 48:24
**50** [1] - 67:1
**5th** [1] - 41:9

## 6

**6** [2] - 48:3, 48:25

## 7

**704-3** [1] - 24:20

## 8

**8th** [1] - 5:2

## 9

**950** [1] - 1:20
**9th** [1] - 40:20

## A

**ABBE** [1] - 1:13
**Abbe** [2] - 2:6, 3:25
**ability** [20] - 4:1, 4:7, 9:15, 16:4, 19:19, 26:10, 26:15, 26:24, 27:2, 28:3, 28:7, 29:8, 31:4, 32:14, 64:24, 67:20, 69:3, 71:17, 71:24, 74:1
**able** [10] - 10:25, 25:14, 29:12, 30:8, 34:24, 43:11, 43:13, 43:14, 63:16, 70:1
**above-entitled** [1] - 77:12
**absence** [1] - 10:7
**absolute** [1] - 11:7
**abstract** [1] - 42:19
**abuse** [1] - 71:21
**accept** [2] - 20:17, 21:24
**access** [7] - 3:4, 5:12, 20:3, 43:11, 61:6, 67:12, 69:21
**accomplish** [1] - 18:23

**accomplishments** [1] - 44:14
**accordingly** [1] - 60:25
**account** [1] - 37:2
**accountable** [1] - 48:3
**accurate** [3] - 29:9, 63:24, 77:11
**Act** [3] - 18:18, 24:6, 37:15
**act** [1] - 64:25
**acting** [2] - 64:15, 64:20
**Action** [1] - 2:2
**action** [10] - 8:12, 13:5, 22:14, 22:18, 23:18, 24:22, 30:1, 35:24, 63:25, 71:22
**actions** [13] - 12:4, 23:10, 23:15, 23:23, 32:23, 37:12, 44:25, 60:25, 61:16, 64:12, 66:8, 67:7, 73:17
**active** [3] - 19:25, 43:2, 44:5
**actual** [3] - 52:9, 53:11, 62:4
**acute** [1] - 33:15
**add** [3] - 6:23, 29:23, 70:16
**add-on** [1] - 29:23
**added** [1] - 11:22
**addition** [4] - 10:23, 29:25, 45:12, 47:16
**additional** [7] - 11:14, 11:17, 12:4, 13:5, 23:23, 37:12, 47:15
**address** [8] - 3:22, 9:16, 13:15, 35:5, 36:16, 37:4, 39:9, 39:12
**addressed** [5] - 13:23, 17:8, 19:8, 36:7, 49:6
**addressing** [2] - 3:25, 4:5
**adjourn** [1] - 77:6
**adjudicate** [2] - 60:1, 60:5
**adjudicated** [1] - 54:24
**adjudicates** [1] - 61:4
**adjudicating** [1] - 61:18
**adjudication** [5] - 53:11, 53:25, 54:10, 55:6, 76:21

**adjudicator** [1] - 54:23
**adjust** [1] - 19:12
**administration** [2] - 5:3, 34:3
**Administrative** [3] - 18:18, 24:6, 37:15
**adopt** [1] - 34:24
**adopted** [1] - 16:25
**adopting** [1] - 10:10
**advocating** [1] - 76:14
**aerospace** [1] - 68:17
**affect** [6] - 14:10, 21:25, 22:1, 22:12, 69:3
**affected** [3] - 15:2, 19:11, 59:20
**affects** [3] - 13:25, 32:14, 53:20
**affidavit** [1] - 8:15
**afford** [1] - 60:20
**afforded** [3] - 3:6, 12:12, 75:12
**affront** [1] - 42:20
**afield** [1] - 53:13
**afternoon** [3] - 2:8, 2:10, 2:18
**agencies** [20] - 5:11, 9:7, 11:10, 11:15, 12:4, 22:20, 23:3, 23:17, 25:10, 40:17, 40:22, 51:11, 51:12, 51:20, 52:3, 52:12, 60:2, 61:10, 65:7, 67:7
**agency** [21] - 10:10, 11:18, 13:4, 22:14, 22:17, 23:22, 23:25, 24:1, 24:3, 24:8, 24:9, 24:16, 40:20, 51:15, 52:10, 60:7, 67:10, 75:9, 75:16
**agency's** [1] - 74:18
**ago** [4] - 25:4, 34:13, 41:13, 72:25
**agree** [3] - 7:1, 17:22, 53:5
**agreed** [1] - 23:12
**ahead** [3] - 60:14, 72:9, 77:6
**al** [2] - 1:6, 2:3
**ALI** [1] - 1:10
**allegations** [3] - 6:15, 54:2, 55:2
**allege** [1] - 46:7
**alleged** [8] - 49:10, 49:13, 53:18, 54:22, 55:22, 56:17, 71:10,

**76:20
**allegedly** [2] - 40:10, 54:3
**allow** [2] - 67:10, 73:23
**allowed** [3] - 51:22, 56:14, 61:17
**allowing** [2] - 23:10, 52:14
**allows** [2] - 66:12, 66:20
**almost** [6] - 17:8, 36:24, 42:18, 64:21, 65:23
**alone** [1] - 13:18
**amass** [1] - 34:24
**Amendment** [27] - 6:21, 17:16, 18:20, 19:6, 19:14, 21:13, 21:14, 22:6, 31:7, 31:10, 31:17, 31:19, 32:11, 32:18, 34:15, 42:23, 47:13, 48:23, 48:24, 49:9, 49:10, 49:12, 49:13, 56:9, 69:9, 70:10, 70:20
**Amendment's** [2] - 26:7, 32:3
**Amendments** [1] - 37:16
**American** [1] - 71:22
**amicus** [1] - 45:14
**AMIR** [1] - 1:10
**amount** [1] - 41:25
**analogy** [1] - 48:17
**analysis** [3] - 32:25, 33:5, 69:15
**analyze** [1] - 58:24
**announced** [1] - 30:5
**announcement** [1] - 30:16
**anomalous** [1] - 32:1
**anonymous** [1] - 43:4
**answer** [20] - 6:14, 21:7, 27:4, 30:25, 33:21, 34:16, 34:23, 36:9, 36:22, 37:4, 37:21, 42:25, 49:19, 50:6, 55:25, 56:1, 56:2, 57:20, 66:2, 66:3
**answers** [1] - 77:4
**antagonists** [1] - 71:16
**anticipate** [2] - 3:13, 3:18
**APA** [20] - 6:20, 14:6, 19:4, 20:19, 22:1, 22:4, 22:13, 22:15,

22:16, 22:17, 23:5,
23:8, 23:11, 23:15,
24:9, 24:15, 25:18,
35:24, 35:25, 48:22
 **apart** [1] - 18:22
**apologize** [1] - 48:1
**apologized** [1] - 48:2
**appearance** [1] - 2:5
**appeared** [1] - 41:6
**applicable** [7] -
31:11, 64:17, 66:15,
66:18, 66:23, 66:24,
67:4
**application** [2] -
21:3, 65:22
**applications** [2] -
61:10, 62:1
**applied** [1] - 27:4
**applies** [1] - 11:11
**apply** [3] - 4:20,
45:17, 46:12
**applying** [1] - 7:10
**appreciate** [5] -
13:20, 75:18, 77:1,
77:2, 77:4
**approach** [1] - 2:4
**appropriate** [2] -
20:10, 76:24
**approximate** [1] -
16:9
**April** [6] - 5:11,
40:16, 40:19, 40:20,
40:21, 40:22
**arbitrary** [1] - 27:6
**area** [4] - 6:9, 31:17,
44:16
**argue** [8] - 6:24,
11:23, 28:24, 39:16,
52:17, 69:19, 70:19,
74:2
**argues** [1] - 15:7
**arguing** [12] - 4:17,
26:3, 27:10, 50:10,
50:14, 51:10, 51:12,
51:14, 51:16, 63:3,
72:6, 72:15
**argument** [33] - 3:16,
9:14, 13:1, 14:6,
15:13, 16:19, 19:14,
26:4, 32:22, 33:21,
34:13, 34:15, 35:22,
37:19, 43:20, 43:22,
45:4, 46:3, 50:16,
51:3, 62:22, 64:13,
65:1, 67:19, 68:8,
69:10, 69:12, 70:5,
72:21, 72:24, 75:19,
75:23, 76:11
**arguments** [13] -
6:15, 6:18, 16:17,

17:5, 17:6, 17:11,
28:11, 50:13, 59:8,
69:20, 70:15, 71:20,
76:3
 **arrested** [1] - 47:25
**Article** [1] - 63:9
**article** [2] - 40:4,
72:3
**articulated** [4] -
17:19, 34:13, 76:13,
76:22
**aspects** [4] - 9:23,
13:16, 53:8
**assert** [1] - 29:12
**asserted** [2] - 35:15,
74:6
**assertion** [1] - 74:17
**asserts** [1] - 70:4
**assessment** [3] -
15:21, 16:1, 16:14
**associate** [1] - 20:17
**associated** [1] - 52:5
**Associates** [1] - 1:13
**association** [1] -
32:12
**assume** [1] - 27:5
**assuming** [1] - 46:12
**attached** [1] - 45:13
**attaches** [1] - 45:14
**attack** [1] - 11:22
**attacked** [2] - 8:23,
35:9
**attacking** [1] - 8:3,
53:10
**attainder** [10] - 4:8,
38:8, 45:3, 45:6,
45:24, 46:1, 46:6,
46:11, 48:8, 49:1
**attend** [2] - 2:20,
2:21
**attorney** [4] - 5:25,
19:18, 20:18, 44:21
**Attorney** [1] - 41:13
**attorney-client** [2] -
19:18, 20:18
**attorneys** [6] - 2:7,
6:1, 41:17, 41:18,
44:17, 44:23
**attributed** [1] - 71:18
**August** [1] - 71:12
**Austin** [3] - 74:15,
74:16, 74:22
**authoritarian** [1] -
71:22
**authorities** [6] -
50:2, 61:12, 64:11,
64:14, 66:6, 66:10
**authority** [14] -
50:19, 50:23, 50:25,
51:8, 51:17, 61:2,

61:18, 63:10, 63:15,
63:17, 63:19, 64:7,
64:18, 72:12
 **authorize** [1] - 51:22
**availability** [1] -
42:11
**available** [1] - 13:1
**Avenue** [3] - 1:16,
1:20, 1:24
**avoid** [1] - 35:21

## B

**background** [2] -
30:21, 31:3
**balance** [2] - 4:3,
36:19
**ballpark** [1] - 18:1
**barred** [1] - 46:23
**base** [4] - 9:11, 27:2,
27:7, 27:9
**based** [16] - 4:8,
4:21, 4:22, 5:7, 8:12,
11:23, 13:2, 17:1,
17:21, 19:22, 22:9,
39:18, 39:20, 49:11,
54:17, 57:16
**basic** [1] - 63:22
**basis** [2] - 11:7,
50:11
**bathes** [1] - 24:2
**bears** [2] - 73:15,
73:16
**become** [1] - 26:12
**becomes** [1] - 10:7
**BEFORE** [1] - 1:10
**began** [2] - 40:17,
41:7
**begin** [2] - 4:17,
14:12
**beginning** [4] - 2:5,
5:13, 40:8, 40:15
**behalf** [1] - 32:15
**behind** [2] - 43:1
**bench** [1] - 3:15
**benefit** [5] - 34:16,
41:14, 41:20, 64:6,
67:15
**benefits** [1] - 52:13
**best** [9] - 3:22, 16:6,
29:11, 29:20, 45:4,
57:1, 57:11, 58:7,
63:1
**better** [4] - 34:23,
38:9, 39:16, 62:14
**between** [21] - 3:6,
7:24, 12:22, 14:9,
15:18, 17:12, 17:14,
17:19, 32:19, 38:22,
49:25, 53:4, 53:23,

59:15, 59:25, 61:1,
63:20, 70:7, 73:7,
75:25, 76:15
 **Biden** [3] - 15:23,
29:6, 29:15
**Biden's** [2] - 29:2,
29:3
**Bieder** [1] - 1:15
**big** [2] - 15:5, 15:7
**bill** [11] - 4:8, 4:19,
38:8, 45:3, 45:6,
45:24, 46:1, 46:6,
46:11, 48:7, 48:25
**Bill** [2] - 8:16, 72:20
**binding** [1] - 59:11
**bit** [6] - 14:5, 18:21,
24:10, 25:14, 33:15,
65:1
**blah** [3] - 17:2
**blame** [1] - 7:2
**blanket** [1] - 16:7
**blemish** [1] - 34:4
**Block** [1] - 14:7
**blurrings** [1] - 26:2
**body** [1] - 18:25
**boilerplate** [3] -
65:12, 65:18, 66:2
**bond** [1] - 4:4
**bound** [3] - 63:18,
76:9, 76:12
**bounded** [1] - 72:23
**bounds** [2] - 11:1,
74:10
**box** [2] - 57:8, 70:3
**bracket** [1] - 10:16
**branch** [7] - 7:5,
7:11, 21:12, 35:23,
56:14, 64:12, 65:16
**Brenner** [1] - 72:5
**Bridgeport** [1] - 1:17
**brief** [9] - 9:14, 9:19,
25:13, 26:21, 27:11,
50:7, 50:10, 74:13,
75:7
**briefing** [1] - 67:19
**briefings** [1] - 29:7
**briefly** [2] - 25:20,
75:22
**briefs** [6] - 12:19,
37:13, 45:14, 48:15,
63:5, 70:15
**bring** [4] - 29:4,
40:24, 62:19, 62:23
**bringing** [1] - 62:24
**broad** [4] - 7:3,
24:24, 66:11, 74:17
**broader** [1] - 70:25
**broadness** [1] - 25:5
**brought** [1] - 72:7
**building** [5] - 14:25,

15:1, 26:9, 41:7
 **built** [1] - 42:5
**BY** [4] - 1:12, 1:13,
1:16, 1:19

## C

**cafeteria** [2] - 26:20,
74:5
**candidate** [1] - 62:15
**candidly** [1] - 61:21
**cannot** [2] - 56:21,
69:21
**canon** [1] - 56:9
**captions** [1] - 47:10
**captured** [2] - 47:2,
70:6
**career** [8] - 26:10,
26:12, 26:15, 28:6,
29:8, 29:16, 44:15,
46:24
**carrier** [1] - 31:3
**carrier-outers** [1] -
31:3
**carved** [1] - 28:9
**case** [62] - 2:21,
2:22, 4:17, 6:12, 6:17,
8:7, 8:8, 8:14, 11:18,
12:7, 16:12, 17:7,
19:23, 20:2, 20:21,
20:25, 23:21, 26:25,
27:3, 27:23, 28:4,
29:24, 32:19, 38:2,
39:16, 40:3, 41:1,
42:5, 46:17, 48:12,
48:13, 48:18, 49:6,
52:18, 54:15, 54:16,
55:3, 56:21, 57:1,
57:5, 57:11, 57:18,
58:7, 58:10, 58:19,
59:6, 60:11, 62:15,
62:19, 64:18, 64:20,
65:15, 68:1, 69:25,
70:7, 70:9, 70:15,
75:3, 75:4, 75:16,
76:16
**CASE** [1] - 1:5
**cases** [45] - 3:7,
6:24, 7:3, 17:12,
18:23, 19:17, 19:25,
26:14, 27:24, 29:23,
30:10, 32:19, 32:20,
32:21, 33:7, 36:6,
37:24, 43:1, 43:2,
43:3, 49:6, 53:1, 53:7,
53:11, 56:2, 58:22,
59:1, 59:7, 59:9,
61:21, 62:10, 62:14,
64:15, 66:11, 68:4,
70:7, 70:9, 74:14,

74:20, 74:23, 74:24, 76:8, 76:9

**categorical** [7] - 14:25, 15:9, 17:20, 32:4, 36:5, 58:20, 59:16

**categories** [1] - 46:15

**category** [4] - 30:19, 51:13, 53:24, 55:7

**Catholic** [6] - 55:15, 56:22, 56:24, 58:1, 58:13, 73:24

**Catholics** [4] - 55:15, 56:21, 74:4, 74:5

**causation** [1] - 62:20

**caused** [2] - 33:22, 75:7

**certain** [7] - 33:11, 50:21, 51:21, 53:7, 66:10, 68:25

**certainly** [9] - 10:21, 12:14, 18:21, 28:23, 56:7, 62:14, 63:18, 70:23, 73:5

**CERTIFICATE** [1] - 77:9

**Certified** [1] - 1:23

**certify** [1] - 77:11

**cetera** [3] - 8:5, 31:5, 56:12

**chain** [4] - 53:24, 54:11, 55:12, 55:13

**challenge** [6] - 10:17, 11:15, 19:22, 25:17, 53:5, 54:7

**challengeable** [1] - 25:13

**challenged** [3] - 9:2, 23:8, 54:9

**change** [3] - 34:4, 44:7, 76:7

**changed** [3] - 73:2, 76:1, 76:13

**chief** [3] - 3:9, 64:25, 71:15

**choice** [4] - 26:15, 42:11, 43:23, 44:4

**chosen** [2] - 69:3, 70:1

**CIA** [2] - 22:20, 43:9

**Circuit** [4] - 48:16, 53:17, 68:13, 76:17

**circuit** [3] - 49:5, 68:10, 74:24

**circuits** [1] - 48:16

**circular** [1] - 25:14

**cite** [10] - 7:16, 19:18, 29:24, 37:24, 47:5, 47:19, 49:17,

49:23, 67:4

**cited** [1] - 67:9

**cites** [1] - 74:24

**citing** [1] - 6:18

**Civil** [1] - 2:2

**claim** [27] - 4:7, 14:12, 20:11, 20:15, 21:10, 22:2, 22:4, 22:6, 22:13, 23:5, 24:15, 25:2, 29:4, 29:7, 29:19, 31:7, 34:14, 41:7, 48:22, 48:24, 49:1, 49:5, 49:13, 50:13, 67:18, 69:5, 70:20

**claiming** [1] - 4:18

**claims** [21] - 18:9, 20:8, 20:12, 21:24, 33:16, 34:11, 34:14, 34:21, 35:15, 43:1, 48:18, 48:20, 48:23, 49:10, 49:17, 55:23, 62:23, 63:2, 67:17, 70:8, 74:19

**class** [3] - 59:16, 60:4

**classification** [2] - 57:4, 57:11

**classified** [12] - 6:3, 20:4, 29:7, 43:7, 43:10, 43:12, 50:19, 61:3, 61:6, 64:24, 67:12, 69:21

**classify** [2] - 43:20, 63:10

**clause** [6] - 17:17, 18:20, 24:4, 24:10, 26:7, 65:2

**clear** [13] - 3:17, 3:21, 7:12, 7:19, 26:17, 26:18, 33:13, 33:24, 35:11, 39:13, 61:25, 67:5, 67:6

**Clearance** [1] - 72:5

**clearance** [58] - 5:4, 5:7, 6:3, 7:15, 10:19, 12:11, 13:11, 15:15, 15:23, 21:4, 22:24, 25:22, 25:23, 25:25, 26:4, 26:5, 26:9, 26:23, 27:1, 27:16, 28:6, 34:2, 35:19, 40:6, 40:9, 40:11, 40:18, 45:18, 49:8, 49:11, 51:6, 52:5, 54:4, 54:6, 54:8, 54:13, 54:23, 55:9, 56:22, 56:24, 57:9, 60:1, 60:24, 61:15, 68:7, 68:9, 68:18,

68:19, 68:24, 69:2, 69:14, 69:22, 69:24, 71:10, 71:19, 74:18, 75:8

**clearances** [10] - 10:2, 11:3, 47:22, 52:19, 53:25, 56:11, 59:3, 60:6, 62:2, 71:14

**cleared** [1] - 69:23

**clearest** [2] - 57:5, 63:1

**clearly** [4] - 7:4, 8:17, 22:9, 66:13

**CLERK** [1] - 2:2

**client** [8] - 2:19, 4:6, 19:18, 20:5, 20:18, 36:13, 43:8, 44:1

**client's** [2] - 2:22, 20:17

**clients** [13] - 2:21, 6:8, 21:13, 31:21, 32:14, 42:10, 43:2, 43:13, 44:5, 44:24, 45:12, 69:23

**clip** [2] - 47:17, 47:18

**closer** [1] - 62:6

**club** [1] - 35:11

**co** [3] - 44:13, 54:3, 55:2

**co-counsel's** [1] - 44:13

**co-workers** [2] - 54:3, 55:2

**cobbled** [1] - 36:9

**Coie** [1] - 14:7

**colleague** [3] - 36:16, 37:21, 40:2

**colleagues** [3] - 32:5, 32:22, 39:4

**colleagues'** [1] - 33:7

**color** [1] - 11:3

**COLUMBIA** [1] - 1:1

**Columbia** [1] - 77:11

**comb** [1] - 6:12

**combine** [1] - 58:15

**combined** [2] - 31:14, 38:6

**coming** [2] - 50:16, 70:7

**command** [6] - 12:3, 12:15, 53:24, 54:11, 55:12, 55:13

**commander** [1] - 64:25

**comment** [1] - 13:2

**commentators** [1] - 6:5

**comments** [3] -

34:20, 47:8, 72:11

**commitment** [2] - 7:5, 7:6

**committed** [3] - 7:10, 47:4, 47:24

**common** [2] - 35:4, 35:7

**communicated** [1] - 38:17

**communications** [2] - 23:4, 39:10

**community** [2] - 24:20, 69:2

**company** [1] - 35:4

**comparison** [1] - 68:3

**compensation** [1] - 74:10

**complaint** [2] - 5:21, 46:7

**complicated** [1] - 39:17

**comply** [1] - 19:13

**components** [1] - 57:8

**comports** [1] - 16:3

**compounded** [1] - 19:23

**conceive** [1] - 50:17

**concept** [1] - 42:19

**concerns** [5] - 10:16, 10:18, 57:3, 61:8, 70:25

**concession** [2] - 73:5, 75:14

**conclude** [4] - 9:24, 66:13, 75:3, 75:17

**concluded** [2] - 60:9, 77:7

**concluding** [1] - 57:25

**conclusion** [3] - 11:5, 17:24, 51:5

**condition** [2] - 68:6, 68:16

**conduct** [3] - 19:13, 35:21, 52:12

**conducted** [2] - 51:12, 55:5

**Conference** [1] - 77:13

**conferences** [1] - 3:15

**conflict** [1] - 63:20

**conformance** [1] - 77:12

**Congress** [4] - 6:5, 19:20, 32:1, 64:8

**congressional** [1] - 66:25

**Connecticut** [1] - 1:17

**connection** [1] - 69:20

**consequences** [2] - 3:14, 46:22

**consequently** [3] - 17:10, 38:13, 39:14

**consider** [2] - 41:1, 70:22

**consideration** [1] - 38:20

**considered** [2] - 17:1, 38:4

**considering** [1] - 75:18

**consistent** [20] - 8:13, 11:12, 12:4, 13:9, 23:24, 37:12, 37:13, 63:25, 64:4, 64:11, 64:16, 64:17, 64:19, 64:23, 65:8, 65:9, 65:16, 66:5, 67:8, 73:18

**consolidate** [1] - 38:1

**consolidated** [1] - 37:25

**Constitution** [18] - 1:24, 11:7, 25:18, 37:16, 49:25, 50:18, 63:19, 64:8, 64:19, 64:23, 65:8, 65:10, 66:6, 66:9, 66:14, 66:15, 72:18, 73:2

**constitutional** [19] - 4:22, 7:22, 11:24, 20:15, 35:25, 42:18, 42:19, 42:20, 42:22, 51:17, 51:18, 61:12, 63:17, 65:6, 65:13, 65:14, 65:22, 68:22, 70:4

**constitutionally** [1] - 27:5

**constrain** [1] - 64:17

**contends** [1] - 17:14

**contest** [2] - 16:4, 63:5

**context** [7] - 36:8, 46:6, 47:13, 56:10, 66:20, 67:4, 75:9

**contexts** [3] - 64:7, 65:19, 65:24

**contingent** [1] - 69:14

**continue** [1] - 43:13

**continued** [2] - 46:23, 67:12

**continuing** [2] -

29:15, 46:23

**contracting** [1] - 68:17

**contractor** [2] - 68:15, 68:16

**control** [4] - 50:19, 61:3, 63:10, 64:24

**controlled** [1] - 49:2, 75:4

**controlling** [2] - 48:19, 61:21

**controls** [2] - 48:16, 63:22

**convert** [1] - 69:4

**convey** [2] - 25:7, 25:8

**cook** [1] - 27:1

**core** [2] - 52:24, 54:24

**correct** [6] - 12:24, 14:14, 20:10, 21:5, 51:6, 62:25

**Correct** [2] - 29:5, 51:16

**correctly** [2] - 46:5, 59:10

**costs** [1] - 52:13

**counsel** [22] - 2:4, 2:5, 2:16, 3:6, 3:12, 3:20, 15:7, 17:9, 19:19, 26:2, 37:11, 38:4, 42:11, 43:21, 43:23, 44:5, 44:8, 49:16, 53:1, 69:23, 74:20, 75:2

**counsel's** [2] - 44:13, 73:16

**counsels'** [1] - 77:2

**Count** [2] - 48:21, 48:25

**count** [2] - 4:19, 48:24

**country** [1] - 8:16

**counts** [2] - 4:19, 48:22

**couple** [5] - 3:2, 4:14, 9:3, 36:25, 58:18

**course** [3] - 2:24, 14:22, 30:21

**Court** [23] - 1:24, 2:1, 7:22, 13:19, 34:6, 37:10, 38:24, 46:13, 48:5, 48:10, 48:11, 48:17, 49:9, 50:18, 52:23, 71:25, 72:3, 74:13, 74:20, 75:3, 76:13, 77:10, 77:10

**court** [12] - 2:21, 6:17, 7:14, 7:21, 11:6,

13:23, 19:12, 27:4, 27:7, 57:6, 70:18, 76:6

**COURT** [128] - 1:1, 2:10, 2:15, 2:18, 4:9, 4:12, 6:25, 7:17, 7:24, 8:7, 8:20, 9:3, 9:23, 10:11, 11:17, 11:19, 12:8, 12:21, 14:4, 15:13, 16:19, 17:18, 18:2, 18:6, 18:8, 18:14, 20:7, 21:6, 21:10, 21:15, 21:18, 22:5, 22:13, 23:9, 23:14, 24:15, 25:19, 27:14, 27:18, 27:20, 28:1, 28:3, 28:18, 29:1, 29:6, 29:18, 30:12, 30:14, 30:24, 31:7, 31:9, 32:7, 32:10, 32:17, 33:9, 34:9, 34:25, 35:13, 36:15, 36:20, 37:6, 37:18, 38:14, 39:2, 39:6, 39:18, 39:23, 42:7, 42:22, 43:15, 45:2, 45:10, 45:24, 46:3, 46:20, 47:11, 48:6, 49:15, 50:6, 51:2, 51:10, 52:1, 52:7, 52:9, 52:16, 53:3, 53:15, 53:19, 54:12, 54:16, 55:11, 55:25, 56:19, 57:13, 57:20, 58:12, 58:25, 60:11, 60:19, 61:13, 61:24, 62:8, 62:17, 63:3, 63:6, 63:23, 64:13, 65:5, 65:17, 66:1, 66:12, 66:20, 67:2, 67:17, 68:8, 69:6, 69:10, 70:5, 71:3, 71:6, 72:8, 74:23, 75:20, 76:4, 76:11, 76:22, 77:1, 77:17

**court's** [1] - 74:16

**Court's** [2] - 39:3, 75:18

**courthouse** [4] - 15:9, 19:25, 27:25, 36:6

**courthouses** [3] - 28:12, 41:19

**courtroom** [3] - 3:5, 3:12, 69:19

**courts** [2] - 6:5, 14:19, 15:3, 19:5, 19:20, 26:8, 31:24, 43:3, 70:14

**courts'** [1] - 59:14

**covered** [1] - 52:18

**create** [2] - 64:6, 67:15

**creating** [2] - 24:18, 60:17

**crimes** [2] - 47:24, 47:25

**criteria** [1] - 17:2

**criticized** [1] - 35:9

**CRR** [1] - 77:16

**curious** [4] - 12:25, 18:15, 43:25, 44:1

**cut** [1] - 6:25

# D

**Dated** [1] - 77:14

**daughters** [1] - 18:11

**DAVID** [2] - 1:13

**David** [1] - 2:17

**days** [2] - 39:11, 40:11

**DC** [7] - 1:11, 1:14, 1:20, 1:25, 48:15, 53:16, 76:17

**dealing** [2] - 6:2, 53:14

**dealt** [2] - 44:23, 70:13

**debate** [1] - 74:9

**decades** [2] - 6:1, 28:8

**decide** [3] - 27:8, 37:18, 37:20

**decided** [10] - 5:3, 6:23, 7:21, 36:10, 59:10, 61:5, 74:3, 75:7, 76:6, 76:8

**deciding** [1] - 31:3

**decision** [23] - 7:14, 30:17, 49:8, 50:25, 51:1, 51:7, 51:20, 51:23, 52:2, 52:15, 53:10, 54:24, 55:6, 55:10, 56:10, 56:15, 57:6, 68:14, 70:23, 72:12, 76:3, 76:10, 76:21

**decisions** [8] - 14:8, 53:25, 54:4, 54:6, 55:8, 56:15, 67:11, 76:18

**declaration** [7] - 8:15, 8:17, 43:5, 43:25, 44:10, 46:25, 55:22

**defamed** [2] - 30:1

**defendant's** [1] -

2:25

**DEFENDANTS** [1] - 1:18

**defendants** [6] - 2:12, 5:1, 17:5, 19:17, 40:24, 48:11

**Defendants** [1] - 1:7

**defendants'** [4] - 6:13, 15:7, 26:2, 37:11

**defense** [6] - 6:16, 6:19, 68:15, 68:16, 68:17, 69:1

**defined** [1] - 9:10

**definition** [1] - 15:23

**degree** [1] - 37:1

**delegate** [2] - 50:21, 63:12

**delegated** [5] - 50:23, 63:15, 64:10, 64:14, 73:25

**delegating** [2] - 51:8, 61:3

**deliberate** [1] - 42:4

**Democrat** [1] - 6:8

**Democratic** [1] - 27:12

**denied** [3] - 10:3, 13:1, 20:5, 27:2

**denies** [1] - 70:18

**denominator** [1] - 35:5

**deny** [3] - 7:23, 8:18, 55:8

**denying** [1] - 13:12

**Department** [3] - 1:19, 55:5, 72:4

**department** [3] - 13:4, 23:23, 41:18

**deprived** [1] - 31:25

**deprives** [1] - 26:14

**DEPUTY** [1] - 2:2

**describe** [3] - 22:14, 44:11, 70:2

**described** [4] - 48:15, 56:16, 58:5, 68:21

**description** [2] - 62:19, 76:23

**determination** [12] - 35:19, 49:11, 56:13, 57:9, 58:21, 59:21, 60:2, 60:5, 60:9, 62:4, 65:20, 67:11

**determinations** [2] - 56:8, 59:16

**determine** [1] - 75:15

**determined** [5] - 10:2, 10:14, 10:18, 11:2, 12:10

**differ** [1] - 20:10

**difference** [18] - 7:20, 9:21, 14:21, 14:22, 14:23, 15:6, 15:7, 15:12, 16:15, 17:12, 17:14, 17:19, 29:17, 32:19, 49:25, 50:5, 50:6, 73:7

**differences** [5] - 14:9, 15:18, 53:2, 70:7, 70:8

**different** [23] - 14:13, 14:20, 16:19, 19:16, 29:7, 30:10, 34:10, 34:11, 34:21, 35:15, 40:20, 47:12, 50:2, 58:18, 59:6, 60:3, 60:11, 60:15, 62:16, 62:17, 70:13, 70:14

**differs** [1] - 75:5

**dignity** [1] - 3:6

**dimension** [1] - 59:23

**dimensions** [3] - 58:18, 58:24, 59:12

**Diplomate** [1] - 1:23

**direct** [8] - 3:9, 13:4, 51:4, 51:13, 51:20, 52:12, 63:17, 68:2

**direction** [2] - 24:8, 35:2

**directive** [2] - 5:7, 24:23

**directly** [4] - 36:21, 50:20, 51:17, 63:12

**Director** [7] - 5:5, 24:21, 30:22, 47:7, 47:20, 47:21, 48:4

**director** [2] - 5:18, 48:1

**directs** [1] - 65:12

**disagrees** [1] - 74:17

**discoverable** [2] - 56:7, 58:7

**discovery** [3] - 38:12, 38:14, 39:19

**discrete** [1] - 76:20

**discretion** [3] - 6:20, 27:8, 56:12

**discrimination** [1] - 56:8

**discriminatory** [1] - 27:7

**discuss** [2] - 5:9, 46:21

**discussed** [1] - 76:21

**dismiss** [8] - 3:1, 4:7, 4:21, 38:9, 39:14, 41:23, 45:3, 70:18

**dismissal** [1] - 50:10
**dismissed** [1] - 49:3
**dispositive** [2] - 10:8, 14:12
**dispute** [2] - 50:8, 69:16
**disputing** [3] - 67:21, 67:23
**distinction** [26] - 7:12, 7:18, 12:22, 14:23, 14:24, 15:10, 16:15, 53:4, 53:9, 53:12, 53:23, 54:15, 54:21, 55:4, 56:5, 57:15, 58:22, 59:15, 59:24, 60:10, 61:24, 61:25, 72:14, 75:25, 76:15, 76:25
**distinguish** [1] - 61:1
**distinguishable** [2] - 59:12, 59:22
**distinguishes** [1] - 18:22
**distinguishing** [1] - 58:19
**district** [1] - 43:3
**District** [2] - 77:10
**DISTRICT** [3] - 1:1, 1:1, 1:10
**disturbed** [1] - 26:21
**divide** [1] - 38:10
**DNI** [3] - 5:17, 22:20, 30:22
**document** [5] - 45:15, 57:10, 57:19, 58:9, 65:4
**documents** [6] - 9:6, 24:17, 43:17, 51:25, 59:18, 70:22
**DoD** [1] - 22:22
**Doe** [3] - 74:15, 74:16, 74:21
**done** [11] - 8:5, 10:9, 17:4, 24:5, 26:14, 30:16, 31:6, 33:6, 40:14, 44:25
**Donovan** [7] - 2:9, 4:5, 36:16, 36:18, 37:4, 39:9, 39:24
**DONOVAN** [13] - 1:16, 2:8, 40:2, 42:14, 42:23, 44:3, 45:7, 45:11, 46:1, 46:7, 46:21, 47:14, 48:9
**Dorfmont** [1] - 68:14
**dovetails** [1] - 32:13
**down** [7] - 18:14, 18:15, 21:3, 36:21, 37:22, 39:4, 41:18
**dozen** [1] - 43:4
**drabs** [1] - 40:4
**draw** [4] - 7:24, 53:12, 56:5, 59:15
**drew** [3] - 53:4, 53:9, 53:23
**drips** [1] - 40:3
**due** [14] - 13:15, 17:16, 18:20, 24:3, 24:9, 25:19, 26:7, 29:4, 29:18, 34:12, 67:18, 70:10, 74:19

## E

**easier** [1] - 58:16
**easiest** [1] - 11:1
**easy** [3] - 8:9, 57:18, 72:15
**edict** [1] - 36:1
**effect** [9] - 5:15, 13:15, 16:8, 16:17, 18:23, 25:6, 25:12, 41:16, 49:24
**effects** [1] - 40:12
**efficacy** [2] - 8:4, 30:17
**effort** [1] - 67:21
**Egan** [30] - 6:18, 7:10, 7:16, 7:21, 50:18, 52:18, 52:20, 52:25, 53:6, 53:9, 54:24, 55:20, 56:16, 58:3, 61:2, 61:20, 62:22, 64:21, 68:4, 68:23, 70:6, 71:2, 75:3, 75:6, 75:7, 75:14, 75:22, 75:23, 76:3, 76:10
**Egans** [1] - 19:17
**eight** [1] - 8:24
**either** [8] - 5:12, 13:7, 15:6, 15:11, 25:11, 35:24, 64:7, 75:4
**elements** [1] - 29:25
**elicits** [1] - 55:3
**eligibility** [1] - 20:22
**eliminated** [1] - 44:25
**email** [1] - 30:5
**emails** [3] - 9:4, 9:20, 23:3
**embodied** [1] - 33:8
**emerged** [1] - 71:15
**emphasize** [2] - 48:13, 49:4
**emphasizes** [1] - 68:23
**emphasizing** [3] - 58:6, 59:13, 70:15
**employee** [2] - 53:17, 68:5
**employees** [3] - 16:9, 54:1, 54:10
**employment** [1] - 68:6
**enacted** [1] - 64:9
**encompassing** [1] - 58:4
**encourage** [1] - 2:20
**end** [7] - 5:10, 24:22, 24:24, 64:5, 65:2, 67:14, 75:12
**Energy** [1] - 55:5
**enforceable** [3] - 24:18, 25:1, 67:16
**engage** [1] - 70:17
**engaged** [1] - 44:5
**engaging** [1] - 52:9
**enjoyed** [1] - 20:22
**enormous** [1] - 11:5
**entered** [2] - 41:15
**entering** [1] - 41:19
**entire** [3] - 32:5, 45:15, 47:19, 68:16, 72:14
**entirely** [1] - 27:12
**entitled** [1] - 77:12
**envision** [1] - 45:20
**EO** [3] - 23:5, 25:6, 25:9
**equally** [1] - 74:7
**equities** [2] - 4:3, 36:19
**equivalent** [1] - 28:13
**erase** [1] - 13:21
**especially** [2] - 15:17, 26:11
**essential** [2] - 6:4, 29:8
**essentially** [5] - 12:9, 12:13, 12:25, 23:10, 23:17
**establish** [1] - 46:8
**established** [1] - 42:5
**et** [5] - 1:6, 2:3, 8:5, 31:5, 56:12
**eventually** [1] - 43:12
**evidence** [7] - 29:21, 47:12, 47:16, 67:21, 67:22, 70:19, 74:1
**exact** [2] - 16:8, 72:6
**exacting** [1] - 22:10
**exactly** [7] - 23:4, 31:16, 34:20, 55:13, 55:19, 65:5, 72:13
**exam** [2] - 8:4, 8:6
**examine** [1] - 75:8
**example** [17] - 4:3, 9:13, 12:16, 18:23, 20:1, 26:20, 29:1, 30:22, 38:8, 38:16, 43:9, 44:19, 52:4, 59:21, 70:19
**examples** [1] - 9:13
**exceed** [1] - 65:13
**excerpt** [1] - 45:13
**exchange** [1] - 23:21
**excise** [1] - 33:20
**exclude** [1] - 27:12
**excluded** [1] - 27:6
**exclusively** [1] - 57:16
**execute** [1] - 65:8
**executing** [2] - 52:7, 52:8
**executive** [76] - 6:20, 7:5, 7:11, 8:21, 9:1, 9:12, 9:20, 10:11, 10:13, 12:1, 12:17, 12:19, 13:4, 13:14, 13:18, 13:22, 14:9, 16:7, 16:24, 19:1, 19:8, 20:2, 20:23, 21:12, 21:20, 21:22, 21:24, 22:21, 22:25, 23:7, 24:16, 24:17, 25:11, 32:20, 32:23, 33:3, 33:8, 34:18, 35:4, 35:23, 37:11, 37:14, 46:13, 49:21, 50:4, 51:24, 54:17, 55:18, 56:3, 56:14, 58:13, 59:11, 59:17, 59:25, 60:12, 63:7, 63:18, 63:21, 64:2, 64:12, 64:22, 64:25, 65:16, 67:3, 67:9, 70:12, 70:24, 73:8, 73:9, 73:14, 73:18, 73:20, 73:22
**EXECUTIVE** [1] - 1:6
**Executive** [1] - 2:3
**exercise** [12] - 50:2, 50:20, 51:17, 51:19, 61:7, 61:18, 63:11, 63:17, 64:18, 71:17, 71:21, 71:24
**exercised** [4] - 50:24, 51:8, 51:18, 61:12
**exercising** [7] - 50:23, 61:2, 63:14, 63:19, 64:7, 64:10, 64:14
**Exhibit** [2] - 45:13, 48:3
**exhibit** [1] - 47:17
**exhibits** [1] - 47:9
**exist** [3] - 14:3, 27:24, 35:5
**existing** [19] - 8:13, 11:12, 12:5, 13:9, 18:24, 23:24, 37:12, 37:13, 37:17, 63:25, 64:1, 64:11, 64:16, 68:1, 72:17, 72:20, 72:24, 72:25, 73:4
**exists** [4] - 4:5, 17:13, 26:16, 27:22
**expansive** [1] - 61:20
**experience** [1] - 44:16
**experts** [2] - 8:16, 16:6
**explicit** [1] - 75:24
**explicitly** [1] - 21:23
**expressly** [2] - 36:7, 60:6
**extensive** [1] - 22:23
**extent** [13] - 3:25, 4:6, 17:13, 33:11, 42:12, 44:9, 51:4, 63:20, 64:23, 66:7, 66:18, 69:16, 76:18
**extents** [1] - 70:14

## F

**face** [7] - 17:15, 34:18, 46:22, 57:9, 57:19, 58:9, 59:17
**fact** [24] - 9:10, 12:1, 14:24, 15:20, 19:18, 21:4, 33:4, 37:24, 43:8, 49:20, 50:11, 50:14, 51:12, 53:17, 54:1, 54:9, 55:21, 58:19, 60:6, 62:6, 62:9, 68:3, 68:14, 68:18
**factors** [1] - 36:17
**facts** [2] - 53:19, 69:17
**factual** [2] - 9:3, 69:16
**fair** [1] - 51:2
**Fairfield** [1] - 1:16
**falls** [2] - 52:24, 75:13
**false** [2] - 54:5, 55:2
**familiar** [3] - 48:12, 59:9, 76:8
**family** [2] - 29:2, 29:3
**far** [1] - 53:13

**fashion** [1] - 73:14
**fast** [1] - 41:11
**favorite** [1] - 18:12
**FBI** [3] - 53:17, 54:2, 55:2
**featured** [1] - 68:4
**February** [2] - 5:2, 40:5
**Federal** [3] - 13:24, 73:10, 77:10
**federal** [4] - 1:24, 41:19, 68:4, 74:17
**FEDERAL** [1] - 77:17
**few** [6] - 4:12, 5:21, 14:11, 30:3, 36:20, 41:13
**Fifth** [12] - 17:16, 18:20, 19:6, 19:14, 21:14, 26:7, 31:19, 37:16, 48:23, 49:9, 49:13, 69:9
**fighting** [1] - 62:10
**figure** [1] - 66:1
**file** [6] - 36:25, 39:13, 39:25, 40:13, 41:21
**filed** [2] - 37:22, 41:9
**filings** [2] - 6:14, 47:21
**fill** [1] - 45:12
**filter** [1] - 6:8
**final** [2] - 50:25, 60:5
**finally** [1] - 5:13
**fine** [3] - 21:18, 23:16, 37:6
**finer** [1] - 42:24
**finger** [1] - 42:19
**finish** [1] - 27:20
**fire** [1] - 41:3
**firm** [18] - 16:10, 17:20, 17:25, 32:5, 32:19, 37:24, 41:17, 59:9, 59:11, 59:17, 59:25, 62:6, 62:9, 62:10, 70:7, 70:9, 70:12
**firms** [8] - 13:23, 15:14, 16:8, 19:16, 34:7, 41:13, 59:2, 62:13
**firms'** [1] - 33:15
**first** [17] - 6:14, 6:19, 10:24, 14:12, 15:20, 26:2, 30:4, 33:18, 33:23, 34:3, 39:13, 40:16, 40:19, 48:15, 49:19, 59:14, 63:9
**First** [18] - 6:21, 21:13, 22:6, 31:7, 31:10, 31:17, 32:3, 32:11, 32:17, 34:15,

37:16, 42:23, 47:13, 48:24, 49:9, 49:12, 70:10, 70:20
**fit** [1] - 70:3
**five** [4] - 13:14, 13:17, 14:3, 23:3
**flawed** [2] - 16:13, 18:19
**flesh** [1] - 53:2
**fleshed** [1] - 61:8
**flexible** [1] - 38:24
**flip** [1] - 24:11
**flippant** [1] - 29:10
**Floor** [1] - 1:14
**flow** [1] - 76:20
**focus** [2] - 4:24, 5:9
**focused** [1] - 69:12
**folks** [1] - 26:17
**follow** [4] - 24:3, 45:18, 50:22, 69:3
**followed** [3] - 24:25, 75:10, 75:17
**following** [6] - 14:15, 20:12, 33:23, 41:10, 56:21, 75:7
**Foote** [1] - 55:4
**FOR** [2] - 1:1, 1:18
**foreclosed** [2] - 48:22, 49:5
**foregoing** [1] - 77:11
**forever** [2] - 21:2, 45:19
**form** [1] - 45:20
**forma** [1] - 9:8
**formally** [1] - 40:10
**format** [1] - 77:12
**former** [1] - 71:15
**formulation** [1] - 31:10
**fortiori** [1] - 15:25
**forum** [1] - 7:23
**forward** [16] - 4:7, 6:22, 17:6, 26:20, 30:11, 32:12, 33:18, 34:5, 35:3, 36:1, 39:16, 72:14, 72:21, 72:24, 75:15
**four** [2] - 70:13, 74:24
**fours** [3] - 52:18, 74:21, 75:4
**Fourteenth** [1] - 56:9
**framed** [2] - 57:14, 57:23
**framework** [1] - 63:16
**Franklin** [1] - 22:16
**free** [1] - 74:7
**frequently** [1] - 64:3
**Friday** [4] - 1:10,

33:3, 33:10, 41:10
**front** [4] - 3:21, 22:7, 43:2, 43:3
**full** [1] - 65:3
**fully** [2] - 50:15, 60:1
**fun** [2] - 5:16, 47:8
**future** [2] - 45:1, 45:18

## G

**Gabbard** [9] - 5:6, 5:14, 40:7, 40:15, 41:6, 47:17, 47:20, 47:21, 48:4
**Gabbard's** [2] - 47:7, 48:1
**general** [2] - 75:6
**general's** [2] - 75:22, 76:3
**generally** [1] - 66:17
**generic** [1] - 64:4
**given** [8] - 24:13, 28:2, 29:13, 37:13, 38:7, 39:10, 39:14, 54:8
**glad** [1] - 4:11
**government** [21] - 9:14, 17:14, 26:22, 28:9, 28:14, 30:11, 39:13, 42:12, 43:7, 43:21, 48:8, 48:12, 58:25, 59:10, 62:21, 68:5, 72:16, 72:25, 73:4, 75:2, 75:13, 76:6, 76:9
**government's** [11] - 26:19, 41:23, 49:22, 51:14, 52:21, 56:1, 62:10, 75:14, 75:21, 76:1, 76:7
**grand** [1] - 52:23
**granted** [1] - 61:5
**grave** [1] - 9:16
**great** [2] - 33:20, 43:19
**greater** [1] - 3:4
**Greenberg** [4] - 53:12, 76:17, 76:19, 76:23
**ground** [1] - 27:6
**grounds** [3] - 11:14, 11:17, 24:13
**group** [4] - 15:4, 16:14, 17:21, 61:10
**group-based** [1] - 17:21
**guess** [6] - 9:4, 13:24, 35:19, 44:3, 57:8, 67:2

**guidance** [5] - 24:20, 35:18, 51:25, 63:13, 67:4
**guys** [2] - 43:19, 60:23

## H

**hair** [1] - 41:3
**hand** [5] - 15:4, 31:18, 36:13, 38:11
**handles** [1] - 71:19
**happy** [2] - 70:14, 72:19
**harder** [1] - 10:21
**harm** [17] - 4:5, 15:3, 34:22, 36:18, 36:21, 42:8, 42:9, 42:10, 42:17, 42:18, 42:19, 42:22, 43:19, 43:24, 45:9, 48:7, 70:17
**harms** [1] - 68:2, 70:25, 76:20
**head** [2] - 13:4, 57:22
**heads** [1] - 67:10
**health** [2] - 32:2, 43:5
**hear** [3] - 3:6, 48:8, 75:21
**heard** [4] - 6:17, 26:23, 67:18, 72:16
**HEARING** [1] - 1:9
**hearing** [3] - 7:1, 44:20, 52:14
**heartland** [1] - 52:24
**heavily** [1] - 14:7
**hedging** [1] - 59:5
**held** [3] - 48:3, 55:24, 60:6
**help** [2] - 10:12, 27:14
**helpful** [5] - 39:23, 42:13, 43:15, 48:6, 77:4
**hereby** [6] - 12:3, 13:3, 13:10, 33:23, 77:11
**hiccup** [1] - 3:19
**highlight** [1] - 70:9
**highlighted** [1] - 15:16
**himself** [3] - 25:16, 55:10, 72:22
**historical** [2] - 46:9, 46:16
**holding** [3] - 48:13, 48:18, 52:14
**holdings** [2] - 71:1, 71:2

**honor** [1] - 3:22
**Honor** [15] - 2:6, 2:8, 2:13, 3:24, 8:22, 28:13, 40:2, 40:25, 42:14, 43:3, 44:3, 45:7, 46:2, 46:8, 47:14
**Honor's** [1] - 16:25
**HONORABLE** [1] - 1:10
**hope** [2] - 13:19, 20:19
**horses** [1] - 44:7
**Hospital** [1] - 28:14
**House** [1] - 5:8
**huge** [1] - 44:17
**hum** [1] - 12:14
**hypothetical** [8] - 11:9, 12:6, 13:7, 17:1, 23:13, 57:21, 72:23, 74:5
**hypothetically** [2] - 23:20, 71:10
**hypotheticals** [3] - 58:17, 61:9, 72:2

## I

**idea** [2] - 8:3, 19:12
**ideally** [1] - 45:4
**identical** [1] - 17:6
**identically** [1] - 27:23
**identify** [1] - 59:18
**identities** [1] - 59:19
**ignores** [1] - 74:16
**ignoring** [1] - 18:24
**II** [1] - 63:10
**immediately** [2] - 41:14, 41:16
**impact** [4] - 22:3, 22:5, 32:25
**impacts** [2] - 22:11, 25:1, 40:1
**impeachment** [4] - 33:19, 33:23, 44:20, 44:24
**impermissible** [2] - 11:23, 56:17
**implement** [5] - 11:11, 23:16, 25:10, 51:20, 67:10
**implementation** [2] - 51:22, 52:2
**implemented** [1] - 52:15
**implementing** [1] - 67:7
**implicate** [1] - 70:23
**implicated** [1] - 66:7

**implicit** [2] - 12:14, 14:2
**implicitly** [2] - 13:11, 14:2
**important** [13] - 3:7, 5:20, 6:3, 6:4, 6:11, 20:24, 52:22, 59:15, 59:24, 60:10, 61:24, 71:1, 73:5
**impossible** [1] - 15:19
**improperly** [1] - 26:14
**inability** [1] - 67:25
**inchoate** [1] - 27:19
**incident** [1] - 43:5
**include** [3] - 64:3, 65:16, 67:13
**included** [1] - 65:24
**includes** [3] - 56:11, 56:13, 56:15
**including** [3] - 26:8, 62:20, 75:11
**incredibly** [1] - 19:21
**Indeed** [1] - 16:7
**independent** [1] - 57:3
**independently** [1] - 7:8
**indicate** [2] - 9:7, 12:15
**indicated** [1] - 22:19
**indicates** [1] - 10:4
**indicating** [2] - 9:5, 47:3
**indirect** [1] - 51:11
**individual** [5] - 16:14, 17:21, 22:20, 59:18, 69:25
**individual's** [1] - 67:25
**individualization** [1] - 15:6, 15:10, 15:11
**individualized** [12] - 10:15, 10:17, 15:2, 15:17, 15:21, 15:25, 16:14, 52:9, 58:21, 59:16, 59:21, 60:24
**individually** [1] - 16:9
**individuals** [5] - 15:15, 15:18, 59:20, 61:5, 68:25
**indulgence** [1] - 39:3
**industry** [2] - 68:17, 69:1
**inference** [1] - 15:16
**inferior** [1] - 50:21, 63:12, 63:13
**influential** [1] - 16:5

**information** [9] - 20:4, 43:12, 50:19, 61:3, 61:6, 63:11, 64:25, 67:12, 69:22
**injected** [1] - 9:14
**injunction** [13] - 2:25, 4:20, 6:10, 20:15, 37:23, 37:25, 38:22, 41:5, 41:22, 42:2, 42:16, 49:2, 62:18
**injury** [3] - 43:24, 62:20, 74:19
**insert** [2] - 57:4, 59:3
**instance** [1] - 28:5
**instead** [2] - 10:13, 17:24
**insufficient** [2] - 68:1, 68:22
**intangible** [2] - 56:11, 56:16
**intelligence** [2] - 24:19, 69:1
**Intelligence** [3] - 5:5, 24:21, 30:22
**intend** [1] - 64:6
**intended** [2] - 67:15, 77:3
**intent** [2] - 46:10, 47:2
**interaction** [1] - 32:13
**interest** [45] - 3:3, 10:15, 10:17, 11:3, 12:10, 13:2, 19:7, 19:9, 25:22, 25:23, 25:24, 26:13, 26:16, 27:15, 27:22, 27:24, 28:5, 29:13, 29:15, 29:22, 30:9, 31:19, 32:6, 36:3, 36:7, 37:22, 51:5, 54:18, 55:18, 56:4, 56:23, 67:13, 68:9, 68:13, 68:22, 69:9, 69:11, 69:12, 69:13, 70:4, 74:12, 74:16, 74:19
**interested** [3] - 7:1, 10:13, 30:24
**interesting** [2] - 9:18, 57:13
**interests** [1] - 20:18
**interim** [1] - 21:2
**interpreted** [1] - 64:12
**interrogatory** [1] - 39:21
**interrupting** [1] - 4:14
**interview** [5] - 47:18,

47:19, 47:20, 55:6
**intrinsic** [1] - 29:13
**introduce** [1] - 2:15
**invasion** [1] - 42:20
**investigatory** [2] - 53:8, 76:19
**invitation** [1] - 37:3
**involve** [3] - 6:7, 16:13, 52:3
**involved** [3] - 53:17, 68:15, 75:11
**involves** [1] - 69:25
**involving** [1] - 59:1
**irreparable** [2] - 42:17, 45:9
**issue** [19] - 3:13, 3:16, 6:11, 16:24, 17:10, 19:8, 25:15, 32:2, 33:12, 36:7, 39:9, 42:12, 43:21, 62:23, 63:3, 73:13, 74:12, 76:19
**issued** [3] - 5:8, 5:17, 20:23
**issues** [14] - 3:2, 3:7, 3:22, 4:2, 4:17, 6:2, 8:2, 12:16, 20:18, 33:3, 35:25, 38:7, 38:11, 64:2
**itself** [9] - 7:13, 8:3, 23:8, 24:2, 25:7, 26:6, 43:10, 50:25, 75:6

**J**

**Jenner** [3] - 14:7, 15:2, 17:7
**Jewish** [1] - 55:16
**job** [2] - 20:6, 68:20
**jobs** [1] - 68:5
**Joe** [1] - 15:23
**journalist** [1] - 5:14
**judge** [1] - 19:7
**JUDGE** [1] - 1:10
**Judge** [5] - 13:12, 13:19, 20:24, 58:5, 68:14
**judge's** [1] - 3:10
**judges** [3] - 6:6, 15:8, 36:7
**judgment** [5] - 20:4, 38:6, 38:23, 41:22, 41:24
**judicial** [7] - 7:23, 54:25, 55:1, 57:5, 57:12, 65:21, 72:3
**Judicial** [1] - 77:13
**judicially** [6] - 24:18, 25:1, 53:8, 56:6, 58:6, 58:8

**judiciary** [1] - 56:10
**July** [1] - 77:14
**jump** [2] - 37:22, 57:21
**jumping** [1] - 35:14
**June** [1] - 1:10
**jurisdiction** [1] - 69:18
**Justice** [2] - 1:19, 72:4
**justice** [1] - 41:18
**justiciability** [18] - 4:1, 4:15, 6:12, 6:16, 6:19, 7:13, 14:5, 16:24, 18:4, 18:5, 50:12, 52:16, 62:17, 62:22, 63:1, 71:1, 72:1, 75:3
**justiciable** [6] - 6:17, 14:19, 48:18, 48:23, 48:25, 55:24

**K**

**Katie** [1] - 72:5
**Katsas** [1] - 58:5
**keep** [2] - 55:11, 55:12
**keeps** [1] - 35:4
**Kelly/Tulsi** [1] - 47:17
**KENNETH** [1] - 1:19
**kept** [2] - 27:11, 34:3
**key** [1] - 8:16
**kind** [12] - 9:8, 14:17, 23:17, 24:1, 28:11, 30:11, 32:17, 32:21, 67:21, 70:6, 75:24
**knowing** [1] - 54:9
**known** [1] - 59:19
**Known** [1] - 72:4
**knows** [2] - 43:8, 43:9
**KOLANSKY** [2] - 1:13, 2:17
**Kolansky** [1] - 2:17
**Koskoff** [2] - 1:15
**Kozinski** [1] - 68:14

**L**

**labeling** [1] - 47:3
**lack** [5] - 5:22, 7:13, 15:25, 46:9, 47:1
**laid** [2] - 8:20, 44:14
**land** [1] - 35:25
**language** [14] - 7:3, 7:13, 11:20, 12:17, 24:24, 30:15, 64:4, 65:12, 65:18, 65:23,

66:2, 67:14, 68:23, 76:10
**largely** [1] - 47:14
**last** [4] - 5:10, 37:7, 72:10, 75:1
**latest** [1] - 76:16
**latter** [1] - 11:14
**law** [63] - 7:2, 8:13, 11:12, 12:5, 13:10, 13:23, 15:14, 17:20, 17:25, 18:17, 18:25, 19:16, 23:24, 25:5, 25:6, 28:10, 28:11, 29:24, 32:5, 32:19, 33:15, 34:7, 37:13, 37:17, 37:24, 41:13, 41:17, 42:20, 44:16, 44:17, 46:17, 49:25, 57:7, 58:10, 58:19, 59:1, 59:9, 59:11, 59:17, 59:25, 62:6, 62:9, 62:10, 62:13, 63:25, 64:4, 64:11, 64:16, 66:17, 67:24, 68:1, 69:18, 70:3, 70:7, 70:9, 70:12, 72:17, 72:20, 72:24, 73:1, 73:4, 76:16
**law's** [1] - 48:13
**lawful** [1] - 24:21
**laws** [5] - 56:8, 64:1, 65:6, 66:19
**LAWSON** [1] - 1:19
**Lawson** [1] - 2:12
**lawsuit** [5] - 36:25, 40:13, 41:9, 41:21, 72:7
**lawyer** [4] - 29:3, 30:8, 40:14, 71:19
**lawyers** [4] - 17:24, 17:25, 26:19, 35:6
**laying** [1] - 48:4
**lead** [1] - 9:24
**least** [4] - 15:5, 25:23, 54:17, 71:23
**leave** [1] - 32:9
**lectern** [1] - 2:4
**led** [3] - 42:1, 44:20, 44:24
**Lee** [34] - 6:18, 7:3, 7:4, 7:6, 7:9, 7:13, 8:2, 8:3, 9:21, 48:24, 48:25, 49:9, 49:10, 49:13, 49:15, 51:1, 52:18, 52:20, 52:25, 53:6, 53:9, 54:24, 55:22, 56:6, 56:16, 58:3, 58:6, 61:20, 62:22, 68:4, 70:5, 71:2

**Lee's** [1] - 7:16
**Lees** [1] - 19:16
**leg** [3] - 32:3, 32:15, 32:16
**legal** [3] - 49:24, 69:15, 71:23
**legitimacy** [1] - 23:6
**legs** [1] - 30:20
**length** [1] - 68:21
**lengthy** [1] - 46:19
**lens** [1] - 46:11
**Leonard** [3] - 8:16, 16:4, 17:22
**lesser** [1] - 37:1
**letter** [1] - 30:4
**letting** [1] - 60:12
**level** [2] - 49:7, 52:10
**liberty** [23] - 25:22, 25:23, 25:24, 26:13, 26:16, 27:15, 27:18, 27:22, 27:24, 29:12, 29:22, 31:19, 68:9, 68:13, 68:22, 69:8, 69:11, 69:12, 69:13, 70:4, 74:12, 74:19
**licensed** [1] - 69:19
**limitation** [1] - 65:15
**limited** [3] - 21:11, 38:12
**limits** [4] - 64:24, 65:13, 65:14, 66:10
**line** [12] - 3:3, 3:9, 3:14, 3:15, 6:16, 6:19, 7:2, 7:24, 9:14, 29:22, 48:1, 74:14
**List** [1] - 72:5
**list** [4] - 39:21, 40:23, 45:21, 62:3
**listed** [4] - 16:9, 18:1, 28:19, 60:21
**listen** [1] - 3:5
**listened** [1] - 72:16
**listening** [1] - 3:8
**listing** [2] - 17:21, 32:5
**lists** [1] - 56:24
**literally** [2] - 5:25, 6:14
**litigating** [1] - 20:3
**litigation** [4] - 44:6, 62:13, 66:25, 70:25
**livelihood** [2] - 67:22, 74:12
**living** [4] - 28:4, 28:7, 29:9, 67:20
**longstanding** [1] - 50:5
**longtime** [1] - 71:18
**longwinded** [1] - 21:9

**look** [19] - 7:8, 13:9, 27:3, 34:6, 34:17, 43:19, 46:8, 46:9, 46:16, 57:7, 59:14, 62:1, 70:21, 73:19, 74:14, 74:20, 74:21, 76:10, 76:17
**looking** [4] - 46:10, 46:14, 46:15, 58:5
**looks** [1] - 49:9
**lost** [3] - 68:5, 68:19, 68:20
**loud** [1] - 5:6
**love** [1] - 40:13
**Lowell** [4] - 1:13, 2:7, 3:25, 41:13
**LOWELL** [68] - 1:13, 2:6, 2:13, 3:24, 4:10, 4:16, 7:12, 7:19, 8:2, 8:9, 8:22, 9:10, 10:7, 10:21, 11:18, 11:21, 12:14, 13:3, 14:11, 15:19, 16:23, 17:22, 18:5, 18:7, 18:10, 18:16, 20:13, 21:9, 21:12, 21:16, 22:3, 22:7, 22:19, 23:12, 23:20, 25:3, 26:1, 27:17, 27:19, 27:22, 28:2, 28:8, 28:23, 29:5, 29:10, 29:22, 30:13, 30:15, 31:2, 31:8, 31:15, 32:8, 32:11, 33:1, 33:11, 34:23, 35:1, 35:23, 36:18, 37:3, 37:7, 38:4, 38:16, 39:3, 39:8, 39:20, 72:10, 74:24
**loyalty** [1] - 56:12
**luckily** [1] - 24:11

## M

**main** [1] - 70:6
**manage** [1] - 3:20
**manageable** [2] - 56:7, 58:6
**mandate** [1] - 75:14
**map** [1] - 7:25
**Marc** [1] - 44:9
**March** [4] - 5:5, 40:8, 40:10, 40:16
**Margaret** [1] - 2:8
**MARGARET** [1] - 1:16
**mark** [2] - 7:19, 45:19
**Mark** [4] - 2:2, 2:9, 15:24, 71:18

**MARK** [1] - 1:3
**Mark's** [1] - 43:1
**matches** [1] - 27:23
**material** [1] - 14:8
**materials** [1] - 43:17
**matter** [8] - 21:5, 33:5, 33:9, 57:24, 67:24, 70:3, 71:12, 77:12
**matters** [3] - 6:6, 44:4, 44:8
**mean** [30] - 8:10, 9:13, 19:7, 20:16, 20:21, 23:12, 25:5, 27:17, 27:25, 33:24, 34:11, 43:16, 49:10, 52:1, 52:25, 54:21, 56:19, 61:17, 62:10, 63:23, 63:24, 64:21, 65:9, 66:9, 66:21, 66:22, 67:10
**meaning** [4] - 36:3, 46:9, 65:19, 65:22
**meaningful** [1] - 16:15
**meaningless** [1] - 36:8
**means** [10] - 5:3, 11:4, 19:12, 26:10, 54:19, 64:16, 66:13, 66:14, 68:19, 73:12
**measured** [1] - 42:5
**meetings** [1] - 41:18
**Megyn** [1] - 47:17
**members** [2] - 29:2, 29:3
**memo** [2] - 55:13, 73:13
**memoranda** [1] - 64:3
**memorandum** [33] - 5:8, 8:1, 9:5, 12:9, 14:10, 16:20, 21:19, 28:19, 32:25, 35:17, 40:10, 45:16, 49:21, 50:4, 51:19, 51:22, 52:11, 56:3, 56:20, 58:8, 60:8, 63:8, 63:21, 63:22, 64:22, 65:20, 66:8, 67:8, 67:14, 72:17, 73:7
**mental** [1] - 70:21
**mention** [2] - 31:11, 31:12
**mentioned** [1] - 9:22
**mentions** [1] - 29:1
**merit** [1] - 55:8
**merits** [22] - 4:2, 7:14, 18:3, 37:25, 38:2, 38:8, 43:20,

44:14, 53:10, 53:11, 56:15, 57:8, 58:4, 58:23, 60:1, 60:9, 61:4, 61:19, 70:8, 70:15, 70:17, 72:1
**Methodist** [1] - 27:12
**Methodists** [1] - 74:4
**MICHAEL** [1] - 1:19
**Michael** [2] - 2:11, 48:10
**middle** [1] - 44:7
**midstream** [2] - 14:20, 31:25
**might** [9] - 17:19, 24:13, 38:12, 38:13, 45:17, 48:17, 48:18, 61:8, 69:1
**military** [3] - 27:2, 27:7, 27:9
**minimal** [1] - 42:23
**minutes** [3] - 3:18, 4:12, 4:14
**mirrors** [1] - 46:17
**misconduct** [1] - 54:22
**missing** [1] - 47:4
**misstate** [1] - 51:3
**misunderstood** [1] - 21:16
**mixed** [1] - 56:18
**moment** [10] - 18:19, 20:14, 20:22, 21:1, 22:14, 25:4, 34:13, 39:5, 52:19, 72:25
**moments** [1] - 41:13
**Monday** [3] - 33:1, 33:9, 41:10
**Moniz** [1] - 55:4
**months** [2] - 33:13, 36:24
**morning** [2] - 2:6, 6:23
**most** [7] - 4:1, 6:11, 16:5, 22:3, 27:8, 43:15, 68:12
**motion** [17] - 2:24, 3:1, 4:7, 4:21, 20:5, 37:1, 37:23, 37:25, 38:6, 38:9, 39:14, 41:23, 42:16, 45:3, 49:1, 62:18, 70:18
**MOTION** [1] - 1:9
**motions** [1] - 2:24
**motivated** [1] - 49:8
**motivation** [1] - 35:12
**motives** [1] - 25:17, 56:17, 56:18, 71:11
**mouth** [3] - 12:21, 36:14, 65:18

**move** [4] - 25:19, 39:13, 41:22, 45:24
**moved** [2] - 41:5, 41:11
**moving** [1] - 14:5
**MR** [116] - 2:6, 2:11, 2:13, 2:17, 3:24, 4:10, 4:16, 7:12, 7:19, 8:2, 8:9, 8:22, 9:10, 10:7, 10:21, 11:18, 11:21, 12:14, 13:3, 14:11, 15:19, 16:23, 17:22, 18:5, 18:7, 18:10, 18:16, 20:13, 21:9, 21:12, 21:16, 22:3, 22:7, 22:19, 23:12, 23:20, 25:3, 26:1, 27:17, 27:19, 27:22, 28:2, 28:8, 28:23, 29:5, 29:10, 29:22, 30:13, 30:15, 31:2, 31:8, 31:15, 32:8, 32:11, 33:1, 33:11, 34:23, 35:1, 35:23, 36:18, 37:3, 37:7, 38:4, 38:16, 39:3, 39:8, 39:20, 40:10, 49:23, 50:15, 51:7, 51:16, 52:4, 52:8, 52:11, 52:22, 53:7, 53:16, 53:23, 54:14, 54:21, 55:21, 56:5, 57:1, 57:18, 58:3, 58:17, 59:8, 60:17, 61:1, 61:17, 62:6, 62:12, 62:25, 63:5, 63:9, 64:2, 64:15, 65:11, 65:23, 66:5, 66:17, 66:22, 67:6, 67:24, 68:10, 69:8, 69:15, 70:12, 71:8, 72:10, 74:24, 76:2, 76:5, 76:15, 76:24
**MS** [12] - 2:8, 40:2, 42:14, 42:23, 44:3, 45:7, 45:11, 46:1, 46:7, 46:21, 47:14, 48:9
**Muslim** [1] - 55:16
**must** [1] - 6:11

## N

**name** [1] - 60:21
**namely** [1] - 47:8
**names** [6] - 16:12, 17:21, 18:1, 34:17, 50:2, 59:22
**naming** [1] - 5:18
**narrow** [1] - 18:15

**narrowed** [1] - 18:14
**narrowly** [1] - 70:2
**National** [3] - 5:5, 24:21, 30:22
**national** [30] - 5:14, 6:2, 9:16, 9:19, 9:22, 10:14, 10:17, 11:2, 12:10, 19:7, 19:9, 19:10, 30:5, 30:9, 30:23, 36:3, 36:7, 41:6, 46:24, 47:6, 51:5, 54:18, 55:18, 56:4, 56:23, 57:2, 57:25, 62:5, 63:11, 67:13
**natural** [1] - 13:2
**nature** [2] - 30:12, 36:5
**necessarily** [2] - 26:6, 52:23
**need** [11] - 11:11, 29:16, 31:25, 38:12, 39:21, 41:21, 42:17, 53:19, 57:7, 65:9, 75:17
**needed** [1] - 38:21
**needless** [1] - 17:23
**needs** [1] - 52:23
**never** [5] - 6:7, 48:3, 68:8, 69:11, 69:13
**nevertheless** [1] - 14:19
**New** [4] - 5:2, 40:4, 71:13, 72:3
**next** [10] - 7:21, 11:10, 13:9, 19:15, 21:3, 29:14, 34:17, 36:11, 40:14, 73:6
**niche** [2] - 28:9, 44:16
**Ninth** [1] - 68:13
**NO** [1] - 1:5
**nobody** [3] - 30:18, 48:2, 74:15
**nomenclature** [1] - 50:3
**non** [7] - 11:6, 26:3, 46:9, 47:1, 47:5, 50:12, 65:6
**non-constitutional** [1] - 65:6
**non-justiciability** [1] - 50:12
**non-punitive** [3] - 46:9, 47:1, 47:5
**non-reviewable** [1] - 11:6
**none** [3] - 19:9, 23:1, 47:24
**note** [6] - 13:19,

17:4, 41:12, 45:11, 45:22, 47:1
**noted** [1] - 49:16
**notes** [1] - 7:16
**nothing** [4] - 9:12, 10:3, 10:9, 57:19
**notice** [8] - 8:19, 14:16, 15:19, 16:3, 26:23, 35:20, 72:3, 73:10
**noticed** [2] - 24:17, 24:20
**notified** [1] - 5:11
**noting** [1] - 71:20
**notion** [1] - 23:18
**notwithstanding** [2] - 47:24, 53:6
**nowhere** [1] - 9:19
**nuanced** [1] - 12:23
**nullity** [1] - 23:18
**number** [8] - 8:17, 17:18, 37:23, 45:20, 49:17, 56:11, 68:19
**Number** [1] - 55:21
**nunc** [1] - 21:1
**NW** [3] - 1:14, 1:20, 1:24

## O

**obviously** [2] - 7:9, 49:24
**odd** [1] - 8:12
**ODNI** [1] - 47:10
**OF** [3] - 1:1, 1:6, 1:9
**offered** [1] - 51:15
**Office** [1] - 2:3
**OFFICE** [1] - 1:6
**officers** [3] - 50:21, 63:13, 63:14
**Official** [3] - 1:24, 72:4, 77:10
**OFFICIAL** [1] - 77:17
**officials** [1] - 71:15
**often** [1] - 65:24
**OLC** [1] - 49:23
**once** [3] - 22:19, 45:16, 56:10
**oncologist** [1] - 28:15
**one** [82] - 2:7, 3:13, 4:17, 4:21, 6:1, 6:15, 8:2, 8:9, 8:15, 9:2, 9:3, 9:13, 9:25, 10:5, 11:1, 11:6, 11:22, 12:16, 13:24, 13:25, 14:12, 14:21, 15:12, 15:24, 16:2, 16:5, 16:13, 17:16, 18:11, 19:5, 19:15, 20:1,

21:5, 21:25, 23:5, 24:19, 26:1, 26:24, 28:10, 29:2, 31:8, 32:8, 32:15, 32:19, 35:8, 35:16, 36:6, 37:7, 37:20, 39:8, 39:11, 39:12, 40:14, 40:20, 40:21, 41:12, 42:9, 43:25, 45:8, 45:14, 47:15, 48:17, 48:19, 49:19, 54:2, 55:21, 58:8, 58:20, 58:21, 61:10, 64:5, 65:2, 68:11, 68:19, 68:24, 69:5, 71:8, 71:22, 72:15, 73:12
**ones** [2] - 25:12, 26:9
**ongoing** [1] - 62:12
**open** [3] - 3:3, 3:14, 36:13
**operate** [1] - 74:11
**operating** [2] - 28:15, 30:9
**operative** [1] - 70:13
**opinion** [3] - 6:6, 58:6, 68:21
**opinions** [1] - 59:15
**opponent** [1] - 35:10
**opportunity** [2] - 8:19, 26:23
**opposed** [4] - 8:5, 25:18, 60:4, 66:14
**opposing** [1] - 53:1
**opposite** [3] - 12:2, 26:19, 72:6
**option** [1] - 45:1
**oral** [2] - 2:23, 3:16
**Order** [1] - 2:1
**order** [46] - 3:10, 6:20, 8:18, 9:12, 9:20, 10:12, 10:13, 12:2, 12:17, 12:19, 13:10, 13:20, 14:17, 16:8, 16:24, 17:15, 19:13, 20:2, 20:23, 22:21, 22:25, 23:7, 23:16, 25:11, 32:20, 32:23, 33:3, 33:8, 34:18, 35:4, 37:11, 39:10, 41:24, 43:12, 49:22, 50:4, 54:17, 55:18, 56:3, 58:13, 60:12, 64:22, 70:2, 73:8, 73:23
**orders** [36] - 8:21, 9:1, 13:14, 13:18, 13:22, 13:23, 14:9, 14:13, 15:13, 19:1, 19:8, 21:20, 21:22,

21:24, 24:16, 24:18, 32:20, 37:14, 41:15, 51:24, 59:11, 59:17, 59:25, 63:7, 63:18, 63:21, 64:3, 66:16, 67:3, 67:9, 70:12, 73:9, 73:14, 73:18, 73:20
**ordinarily** [2] - 10:2, 66:14
**ordinary** [1] - 51:12
**original** [1] - 77:11
**Oryszak** [1] - 48:22
**others'** [1] - 5:16
**otherwise** [6] - 4:15, 16:22, 51:25, 55:18, 65:3, 69:4
**outers** [1] - 31:3
**outlier** [1] - 13:21
**outlined** [1] - 45:20
**overcomes** [1] - 6:21
**own** [6] - 7:6, 10:15, 10:17, 12:17, 22:22, 47:7

## P

**P.C** [1] - 1:15
**p.m** [4] - 1:11, 2:1, 77:7
**page** [2] - 65:3, 77:12
**pale** [1] - 68:3
**Palmieri** [1] - 49:2
**papers** [1] - 75:19
**paperwork** [1] - 52:5
**paradigmatic** [1] - 59:21
**paragraph** [2] - 5:21, 43:6
**paragraphs** [1] - 44:10
**parameters** [1] - 26:11
**paren** [2] - 28:11, 28:12
**parse** [1] - 34:20
**part** [13] - 29:18, 31:9, 31:24, 35:11, 42:1, 43:22, 45:22, 47:21, 51:18, 54:4, 54:10, 54:14, 64:13
**particular** [4] - 28:5, 43:17, 64:18, 67:25
**particularly** [4] - 7:3, 68:12, 68:25, 73:16
**past** [3] - 17:10, 61:22, 69:6
**patently** [1] - 27:6
**path** [1] - 42:1

**patina** [1] - 23:6
**pattern** [6] - 53:17, 54:1, 55:22, 62:7, 62:9, 68:15
**patterns** [2] - 58:20, 68:3
**Pause** [2] - 39:7, 71:5
**PDB** [1] - 29:16
**pending** [3] - 2:23, 2:25, 62:12
**Pennsylvania** [1] - 1:20
**people** [30] - 3:5, 12:13, 15:5, 15:22, 16:12, 17:20, 19:10, 19:11, 22:11, 28:19, 28:20, 29:12, 32:1, 34:19, 37:22, 42:25, 43:6, 44:15, 47:23, 55:1, 55:14, 56:24, 58:13, 60:13, 60:21, 61:11, 61:13, 62:2, 73:11
**people's** [1] - 47:22
**per** [3] - 26:6, 27:15, 69:10
**perfect** [1] - 39:10
**period** [3] - 11:12, 13:11, 39:11
**periods** [1] - 42:23
**Perkins** [4] - 14:7, 15:1, 17:7, 35:6
**permission** [1] - 28:15
**person** [12] - 2:15, 11:3, 16:13, 16:23, 26:14, 30:1, 30:2, 33:17, 35:23, 44:21, 58:1, 75:11
**personally** [12] - 35:3, 50:24, 51:8, 54:23, 61:2, 61:4, 61:7, 61:11, 61:18, 63:17, 68:2, 69:21
**perspective** [1] - 49:22
**pertaining** [1] - 63:11
**petition** [15] - 17:9, 19:20, 19:24, 20:16, 31:13, 31:18, 31:24, 32:4, 32:6, 32:10, 32:13, 32:14, 32:16, 34:13, 70:11
**phase** [1] - 20:15
**phrase** [11] - 8:13, 9:19, 11:21, 11:22, 13:9, 19:9, 25:4, 36:3, 64:21, 73:17, 75:2

phraseology [1] - 30:7
physically [1] - 52:4
PI [4] - 36:17, 37:1, 40:1, 50:11
pick [1] - 74:4
piece [1] - 72:10
pieces [1] - 34:10
pillar [1] - 19:21
place [8] - 4:15, 8:12, 10:1, 12:18, 25:9, 54:22, 73:9, 73:21
places [1] - 43:18
plainly [1] - 48:4
Plaintiff [2] - 1:4, 2:9
plaintiff [10] - 27:5, 50:16, 53:4, 54:7, 59:22, 61:22, 68:2, 69:17, 70:1, 72:6
PLAINTIFF [1] - 1:12
plaintiff's [6] - 2:7, 2:24, 3:20, 38:2, 49:16, 63:4
plaintiffs [3] - 7:23, 67:2, 67:18
plan [1] - 3:24
play [1] - 70:25
PLLC [1] - 1:13
plus [3] - 29:24, 41:7
podium [2] - 10:22, 11:15
point [20] - 5:1, 26:16, 27:3, 31:17, 32:8, 34:1, 35:1, 37:7, 38:25, 42:13, 42:24, 43:18, 44:2, 44:13, 45:8, 47:15, 58:22, 70:16, 73:16
pointed [4] - 2:14, 12:19, 13:13, 43:22
pointing [1] - 4:25
points [2] - 5:21, 48:13
policies [1] - 24:25
policy [3] - 24:20, 67:3, 71:20
political [10] - 7:7, 35:10, 60:14, 60:15, 60:22, 61:14, 62:2, 71:10, 71:16, 71:21
polygraph [2] - 8:4, 8:6
Polymeropoulos [1] - 44:10
pool [2] - 44:17, 44:23
position [18] - 8:6, 25:21, 29:12, 38:2, 39:15, 39:17, 51:14, 51:21, 53:21, 59:6,

59:9, 61:22, 62:11, 63:7, 75:22, 76:1, 76:5, 76:7
possibility [1] - 38:21
possible [1] - 38:21
Post [2] - 5:2, 40:4
post [1] - 40:7
posture [1] - 41:4
potentially [2] - 44:11, 72:1
power [5] - 51:18, 71:17, 71:21, 71:24, 73:25
powers [2] - 70:24, 74:9
practice [7] - 6:7, 28:10, 65:16, 68:5, 68:20, 69:18, 70:2
practices [1] - 6:9
preamble [2] - 32:21, 34:7
precedent [5] - 7:2, 48:16, 48:19, 49:5, 49:23
precise [1] - 31:10, 51:3
prefer [1] - 49:20
preference [1] - 4:10
prejudice [1] - 28:22
prejudiced [1] - 44:6
preliminary [14] - 2:25, 3:2, 4:20, 6:10, 20:14, 37:23, 37:25, 41:5, 41:22, 42:2, 42:16, 49:2, 49:18, 62:18
premier [1] - 6:1
preparation [1] - 6:13
prescient [1] - 27:10
present [2] - 7:22, 70:19
presentation [1] - 4:11
presented [2] - 16:2, 17:12
PRESIDENT [1] - 1:6
President [10] - 2:3, 29:2, 29:6, 29:15, 33:1, 33:19, 33:21, 47:2, 71:14
President's [55] - 10:24, 11:1, 11:8, 16:25, 18:24, 21:21, 22:16, 22:19, 23:2, 23:22, 24:2, 24:5, 24:7, 24:12, 25:16, 31:3, 35:9, 35:10, 40:5, 50:1, 50:2,

50:19, 50:24, 51:7, 51:17, 54:23, 55:10, 55:14, 59:2, 59:4, 61:2, 61:7, 61:11, 61:13, 61:17, 63:10, 63:16, 63:23, 64:2, 64:7, 65:19, 66:9, 67:7, 70:21, 71:9, 72:13, 72:22, 73:13, 73:17, 73:24, 73:25, 74:19, 75:25, 76:16, 76:19
president's [14] - 5:7, 9:15, 23:10, 23:15, 23:18, 24:8, 35:10, 44:25, 51:4, 64:18, 66:6, 67:11, 71:17, 71:24
presidential [24] - 12:9, 14:10, 21:19, 28:19, 32:24, 35:17, 49:21, 50:4, 51:13, 51:19, 51:21, 52:11, 56:3, 56:20, 60:8, 63:8, 63:21, 63:22, 64:3, 64:22, 65:20, 66:8, 67:8, 67:14
press [2] - 5:17, 47:10
presumably [1] - 21:21
pretense [1] - 8:10
pretext [1] - 10:25
pretextual [1] - 9:8
pretty [4] - 7:4, 18:12, 24:24, 72:15
prevent [1] - 6:24
prevents [1] - 36:2
primarily [1] - 39:18
principal [2] - 50:21, 63:12
principle [1] - 76:8
privilege [2] - 68:24, 70:24
pro [2] - 9:8, 21:1
problem [1] - 57:25
procedural [5] - 20:14, 25:19, 29:18, 67:15, 75:12
Procedure [3] - 18:18, 24:6, 37:15
procedures [4] - 69:24, 75:9, 75:10, 75:16
proceed [2] - 4:11, 20:25
proceeded [1] - 38:7
proceeding [1] - 7:15
proceedings [1] - 2:21

Proceedings [1] - 77:7
process [76] - 5:22, 7:18, 7:25, 8:5, 8:10, 8:11, 8:23, 9:1, 9:7, 9:10, 9:24, 10:6, 10:8, 10:20, 10:25, 11:5, 12:22, 13:16, 14:18, 15:22, 17:17, 18:17, 18:19, 18:20, 19:3, 22:23, 24:4, 24:9, 25:11, 25:19, 26:7, 29:4, 29:19, 34:12, 38:22, 41:20, 50:11, 50:14, 50:17, 51:4, 51:13, 51:14, 53:4, 53:5, 53:8, 54:20, 57:15, 58:14, 58:16, 58:23, 60:13, 60:17, 60:19, 60:20, 60:21, 60:23, 61:6, 61:8, 61:9, 61:15, 62:3, 63:14, 67:18, 70:10, 73:11, 73:21, 73:23, 74:19, 75:25, 76:16, 76:19
processes [7] - 8:20, 10:1, 12:12, 12:20, 13:1, 50:22, 51:15
processing [1] - 61:10
Produced [1] - 1:25
profession [3] - 68:13, 69:3, 70:1
prohibited [3] - 57:7, 57:11, 58:10
prohibits [1] - 3:10
proper [2] - 24:14, 37:9
properly [1] - 8:5
property [6] - 26:3, 27:17, 69:8, 69:12, 74:9, 74:16
prosecuted [1] - 47:25
protected [4] - 32:18, 36:14, 49:11, 57:4
protections [2] - 72:21, 75:12
proves [1] - 65:1
provide [2] - 11:3, 26:6
provided [1] - 36:8
provides [1] - 73:10
providing [2] - 3:3, 22:22
provisions [2] - 24:23, 72:23
psychiatrist [1] -

28:17
psychologist [1] - 55:5
public [10] - 3:3, 3:9, 3:14, 30:12, 30:13, 30:16, 31:1, 35:20, 48:5, 71:12
publicizing [1] - 5:17
publicly [2] - 30:6, 30:16
published [3] - 13:24, 14:14, 72:3
punish [2] - 46:10, 47:2
punishment [8] - 45:5, 46:5, 46:8, 46:11, 46:14, 46:16, 46:17, 46:18
punitive [1] - 46:9, 47:1, 47:5
purpose [4] - 46:10, 47:1, 47:5, 66:25
purposes [2] - 69:9, 71:21
pursuant [5] - 63:19, 64:7, 64:16, 64:20, 66:8
pursue [8] - 20:4, 26:10, 26:15, 29:16, 38:19, 46:24, 67:25, 70:1
put [21] - 5:20, 6:21, 11:12, 12:21, 16:11, 17:5, 21:3, 25:12, 26:19, 32:12, 34:1, 34:5, 35:20, 39:21, 42:15, 42:24, 47:20, 65:18, 72:21, 72:24, 73:21
puts [3] - 30:11, 30:19, 36:1
putting [4] - 35:3, 35:25, 72:14, 75:15

Q

qualifying [1] - 65:11
qualities [2] - 56:12, 56:16
quarrel [1] - 26:5
questions [19] - 3:19, 4:1, 4:4, 9:3, 20:7, 35:14, 36:19, 37:8, 41:12, 42:9, 46:13, 48:7, 49:18, 71:4, 71:7, 72:1, 75:19, 75:20, 77:5
quite [4] - 12:20, 48:4, 58:3, 66:10
quo [1] - 20:20

**quotation** [1] - 71:16
**quote** [13] - 11:11, 12:4, 13:3, 24:21, 24:22, 24:24, 48:2, 71:18, 71:23, 73:17, 75:9, 75:12

# R

**race** [1] - 44:7
**racial** [1] - 55:22
**raise** [1] - 3:8
**raised** [4] - 45:3, 48:20, 49:1, 66:24
**raises** [1] - 42:12
**raising** [1] - 3:7
**ranging** [1] - 17:8
**rather** [3] - 9:25, 49:21, 51:8
**rational** [1] - 27:13
**rationale** [1] - 58:5
**Rattigan** [11] - 53:13, 53:15, 53:16, 53:20, 53:22, 53:23, 55:7, 55:12, 76:18, 76:21, 76:23
**RDR** [1] - 77:16
**RDR-CRR** [1] - 77:16
**re** [3] - 5:19, 36:9, 41:8
**re-cobbled** [1] - 36:9
**re-tweeted** [2] - 5:19, 41:8
**reaction** [1] - 20:9
**read** [8] - 12:8, 26:21, 37:14, 51:19, 54:17, 65:2, 65:3, 71:13
**reading** [4] - 12:13, 21:19, 55:11, 65:21
**ready** [2] - 38:13, 38:23
**real** [3] - 15:12, 42:25, 43:2
**reality** [1] - 12:7
**really** [11] - 4:20, 18:12, 24:4, 30:24, 32:12, 40:18, 40:22, 42:3, 70:17, 70:20, 75:22
**Realtime** [1] - 1:23
**reason** [17] - 10:11, 13:13, 20:13, 20:24, 22:8, 27:22, 33:14, 33:25, 35:24, 38:1, 45:23, 47:22, 48:17, 55:17, 57:3, 57:7, 58:9
**reasonable** [2] - 41:2, 42:4

**reasonably** [1] - 41:11
**reasoning** [2] - 48:14, 59:14
**reasons** [3] - 3:8, 23:6, 36:10
**rebroadcasting** [1] - 3:11
**rebut** [1] - 67:22
**recitation** [1] - 33:7
**recognition** [1] - 75:24
**recognized** [6] - 4, 26:7, 50:18, 53:7
**recommendation** [1] - 52:14
**Record** [1] - 1:25
**record** [40] - 2:5, 2:13, 9:24, 10:4, 22:7, 23:20, 26:12, 29:21, 30:3, 30:4, 30:25, 31:1, 33:13, 33:20, 33:24, 34:10, 35:3, 35:11, 42:10, 42:13, 43:18, 45:5, 46:2, 46:4, 46:18, 46:20, 46:21, 46:25, 47:1, 47:4, 47:5, 47:7, 47:16, 47:19, 67:21, 69:17, 71:12, 74:1, 77:12
**recording** [1] - 3:10
**redressability** [1] - 62:20
**Reed** [1] - 28:14
**Reeves** [2] - 77:10, 77:16
**REEVES** [1] - 1:22, 77:16
**refer** [3] - 16:5, 23:7, 66:22
**reference** [7] - 9:11, 15:14, 15:20, 25:5, 33:4, 46:4, 52:25
**referenced** [1] - 19:2
**references** [2] - 45:4, 73:4
**referencing** [1] - 76:2
**referred** [2] - 9:4, 68:23
**referring** [4] - 22:25, 37:17, 64:1, 65:7
**refers** [3] - 64:22, 66:17, 72:17
**reflect** [1] - 76:6
**reflects** [1] - 73:8
**regard** [3] - 22:9, 24:22, 38:19
**regardless** [1] - 21:8

**Register** [2] - 13:24, 73:10
**Registered** [1] - 1:23
**regulation** [2] - 9:1, 24:23
**regulations** [10] - 8:18, 22:22, 24:3, 25:12, 50:22, 63:7, 66:16, 66:18, 67:9, 77:12
**relate** [1] - 63:8
**related** [2] - 28:6, 43:21
**relates** [5] - 42:10, 43:23, 52:19, 70:5, 70:10
**relationship** [3] - 19:19, 43:7, 43:10
**release** [2] - 5:17, 47:10
**relevant** [3] - 62:5, 64:5, 71:16
**relied** [3] - 32:22, 34:10, 34:21, 70:14, 70:22
**relief** [7] - 4:4, 20:10, 20:12, 20:13, 21:7, 21:8, 50:15
**relies** [2] - 31:21, 53:1
**religion** [3] - 55:16, 55:17, 56:4, 57:17, 59:4
**rely** [5] - 7:1, 14:7, 24:16, 47:12, 49:17
**relying** [1] - 20:6
**remain** [1] - 38:12
**remedy** [1] - 20:19
**remember** [3] - 7:20, 28:23, 34:2
**reminded** [4] - 17:16, 39:8, 39:12, 74:13
**removed** [1] - 12:6
**render** [1] - 23:18
**repeated** [2] - 25:4, 30:16
**repeatedly** [1] - 30:6
**reported** [1] - 71:13
**Reporter** [4] - 1:23, 1:23, 1:24, 77:10
**REPORTER** [1] - 77:17
**reports** [1] - 54:5
**represent** [4] - 28:21, 32:1, 36:13, 43:13
**representation** [1] - 46:23
**representations** [1] - 69:21

**represented** [2] - 33:17, 33:22
**representing** [2] - 2:7, 20:17
**represents** [4] - 19:18, 43:1, 43:4, 43:6
**Republican** [1] - 6:9
**reputation** [3] - 29:20, 29:24, 41:7
**reputational** [1] - 46:22
**require** [2] - 8:18, 68:18
**required** [1] - 68:6
**requirement** [3] - 18:18, 23:25, 36:4
**requirements** [3] - 16:3, 30:8, 73:19
**requires** [2] - 24:9, 36:1
**resolve** [1] - 63:1
**respect** [1] - 42:10
**respectfully** [1] - 72:2
**respecting** [1] - 71:1
**respond** [4] - 25:3, 41:23, 62:21, 72:9
**responded** [1] - 73:24
**response** [5] - 4:6, 4:21, 23:9, 71:8, 75:21
**responses** [2] - 10:22, 77:5
**responsive** [1] - 32:24
**rest** [4] - 20:25, 27:10, 65:3, 72:19
**restaurant** [1] - 26:21
**result** [2] - 68:2, 68:6
**retaliation** [12] - 31:11, 31:12, 32:7, 32:18, 32:22, 33:16, 34:15, 35:12, 47:16, 49:7, 55:23, 71:11
**retaliatory** [3] - 34:7, 47:13, 70:20
**retribution** [1] - 22:10
**returned** [1] - 20:22
**returning** [1] - 20:20
**review** [22] - 7:14, 10:16, 10:18, 14:15, 14:16, 14:21, 15:2, 15:17, 22:15, 23:15, 23:19, 51:12, 52:10, 52:13, 54:13, 54:25, 55:1, 60:3, 60:13,

60:24, 65:21
**reviewability** [5] - 57:1, 57:5, 57:12, 62:15, 69:7
**reviewable** [22] - 11:6, 22:16, 52:20, 53:9, 53:21, 53:22, 55:9, 55:20, 56:25, 57:17, 58:2, 58:4, 58:8, 59:5, 61:20, 62:8, 66:11, 69:5
**reviewed** [4] - 10:2, 10:25, 23:11, 43:16
**reviewing** [1] - 71:14
**revocation** [15] - 5:15, 5:17, 5:23, 14:21, 16:7, 36:24, 40:19, 45:19, 47:23, 49:14, 50:12, 60:13, 68:3, 74:18, 75:10
**revocations** [1] - 5:16, 40:23, 45:21
**revoke** [11] - 8:18, 13:10, 14:2, 22:23, 26:22, 40:6, 40:8, 49:8, 55:8, 71:9, 74:3
**revoked** [17] - 5:4, 5:7, 5:12, 8:11, 9:6, 10:3, 10:19, 21:4, 25:10, 30:18, 34:5, 40:6, 40:9, 40:10, 40:18, 47:22, 58:1
**revoking** [4] - 12:3, 52:4, 59:3, 71:14
**RICHARD** [1] - 1:19
**Richard** [1] - 2:12
**rights** [9] - 4:23, 6:21, 11:24, 21:13, 21:14, 22:11, 25:8, 42:21, 73:11
**Rights** [1] - 72:20
**rise** [2] - 15:16, 74:18
**risk** [3] - 9:16, 56:13, 56:14
**rivals** [5] - 60:14, 60:15, 60:22, 61:14, 62:2
**robotically** [1] - 22:21
**role** [1] - 71:1
**room** [2] - 2:20, 28:15
**roughly** [1] - 3:18
**routinely** [1] - 64:11
**ruled** [2] - 15:9, 68:11
**rules** [1] - 24:3
**rulings** [1] - 61:20
**run** [1] - 9:7

**runs** [1] - 65:14

## S

**sanctioned** [1] - 19:13
**satisfy** [1] - 30:8
**save** [2] - 24:8, 36:14
**saw** [2] - 7:1, 31:11
**scenario** [1] - 60:16
**scope** [1] - 34:20
**se** [3] - 26:6, 27:15, 69:10
**second** [11] - 4:24, 14:22, 19:5, 42:11, 43:23, 44:4, 44:8, 52:12, 57:8, 59:24, 63:20
**secondary** [1] - 20:3
**Section** [1] - 45:14
**sections** [1] - 70:13
**sector** [1] - 46:24
**Security** [1] - 72:5
**security** [72] - 6:2, 6:3, 7:15, 8:16, 8:19, 9:17, 9:19, 9:22, 10:2, 10:16, 10:18, 10:19, 11:2, 12:11, 13:11, 15:23, 19:10, 21:3, 25:22, 25:23, 25:24, 26:4, 26:5, 26:9, 26:22, 27:1, 27:15, 28:5, 30:7, 35:18, 40:18, 45:18, 46:24, 47:6, 47:22, 49:8, 49:11, 52:5, 52:19, 53:25, 54:4, 54:6, 54:8, 54:12, 54:23, 55:9, 56:11, 56:22, 56:23, 57:2, 57:9, 57:25, 59:3, 60:1, 60:6, 60:24, 61:15, 62:1, 62:5, 63:11, 68:7, 68:9, 68:18, 68:24, 69:2, 69:14, 69:22, 71:10, 71:14, 71:19, 74:18, 75:8
**see** [17] - 6:13, 6:14, 14:8, 17:5, 18:9, 20:11, 21:11, 32:23, 34:6, 40:12, 40:17, 46:17, 57:16, 62:2, 62:23, 63:3, 67:20
**seek** [3] - 38:1, 38:23, 39:25
**seeking** [1] - 50:16
**seem** [2] - 18:17, 53:11
**send** [1] - 39:22
**sense** [5] - 4:16,

5:23, 39:10, 46:18, 73:11
**sensitive** [1] - 41:4
**sent** [2] - 30:4, 30:6
**sentence** [9] - 8:11, 10:9, 10:10, 11:10, 11:13, 27:21, 34:8, 65:2, 72:11
**separate** [1] - 51:11
**separation** [2] - 70:23, 74:8
**sequitur** [1] - 26:3
**seriatim** [1] - 5:11
**serious** [1] - 7:22
**seriously** [1] - 40:17
**set** [6] - 17:1, 22:23, 50:22, 52:23, 56:6, 63:13
**sets** [4] - 8:17, 12:20, 18:22, 19:15
**seven** [2] - 5:1, 39:21
**SF86** [3] - 45:12, 45:14, 45:15
**shall** [1] - 60:25
**show** [2] - 11:6, 13:20
**showing** [1] - 47:12
**shows** [2] - 30:3, 30:4
**side** [6] - 4:13, 9:25, 14:3, 77:3
**significance** [2] - 28:6, 49:20
**significant** [2] - 29:17, 67:22
**silos** [1] - 31:16
**similar** [1] - 34:19
**similarly** [1] - 49:13
**simply** [4] - 13:10, 14:1, 54:5, 64:22
**single** [4] - 40:15, 48:19, 49:5, 68:10
**sit** [3] - 30:23, 36:21, 39:4
**sits** [1] - 14:25
**situated** [1] - 28:24
**situation** [3] - 18:22, 20:20, 27:23
**six** [4] - 4:19, 8:24, 23:3
**skip** [1] - 25:11
**skipped** [1] - 22:24
**sleazebag** [1] - 31:4, 33:5
**sleazeball** [1] - 33:2, 47:3
**slightly** [1] - 62:17
**small** [2] - 44:22, 44:23
**solely** [3] - 57:3,

57:6, 58:9
**solicitor** [4] - 75:5, 75:6, 75:21, 76:2
**someone** [2] - 6:7, 55:7
**sometimes** [2] - 50:20, 66:3
**SONJA** [1] - 1:22, 77:16
**Sonja** [2] - 77:10, 77:16
**soon** [1] - 41:6
**sorry** [2] - 7:17, 21:16
**sort** [23] - 15:24, 27:16, 34:10, 40:3, 40:5, 41:4, 42:5, 42:14, 44:13, 44:14, 46:15, 47:15, 50:3, 50:5, 53:1, 56:18, 58:20, 58:21, 59:18, 65:1, 65:2, 69:15, 70:24
**sorts** [1] - 56:15
**sought** [1] - 4:4
**sounds** [8] - 4:15, 9:25, 14:5, 21:7, 30:25, 37:6, 57:14, 57:15
**speaking** [1] - 44:1
**speaks** [1] - 68:12
**specialized** [1] - 28:9
**specific** [5] - 13:17, 16:21, 25:12, 44:16, 64:8
**specifically** [10] - 4:25, 5:18, 7:16, 12:20, 34:14, 42:9, 43:20, 49:10, 57:2, 59:22
**specificity** [1] - 16:3
**speech** [5] - 32:12, 32:18, 49:11, 74:7, 74:9
**spill** [1] - 31:15
**spills** [1] - 18:20
**split** [1] - 3:21
**spy** [3] - 33:2, 33:5, 43:9
**staff** [1] - 54:4
**stand** [1] - 10:22, 32:15
**standard** [2] - 31:12, 42:17
**standards** [5] - 7:8, 39:15, 56:7, 58:6, 58:7
**standing** [3] - 3:10, 11:15, 13:17, 25:7, 62:19, 62:23, 63:4,

73:3
**stands** [4] - 13:20, 20:25, 43:12, 75:13
**start** [6] - 3:20, 4:15, 6:10, 39:24, 48:13, 72:10
**started** [3] - 26:11, 33:18, 62:18
**starting** [1] - 52:17
**starts** [1] - 74:15
**state** [6] - 2:4, 28:21, 50:13, 68:22, 69:18, 70:21
**statement** [3] - 13:3, 13:17, 66:25
**statements** [2] - 33:14, 33:15
**States** [9] - 2:11, 6:2, 33:2, 43:7, 48:11, 56:12, 76:6, 77:10, 77:13
**states** [1] - 35:23
**STATES** [1] - 1:1
**status** [1] - 20:20
**statute** [5] - 4:22, 19:2, 50:1, 64:8, 64:16
**statutes** [5] - 64:17, 66:7, 66:15, 66:18, 66:23
**staying** [1] - 22:13
**stems** [1] - 49:25
**Stenographic** [1] - 1:25
**stenographic** [1] - 77:11
**steps** [4] - 8:17, 8:23, 8:24, 51:21
**sticking** [1] - 24:15
**stigma** [1] - 29:24
**stigmatization** [3] - 29:20, 30:2, 31:1
**still** [20] - 10:19, 10:25, 11:14, 12:22, 14:4, 15:25, 16:13, 22:9, 25:6, 25:13, 25:17, 28:1, 28:10, 28:11, 38:24, 40:11, 45:17, 69:18, 69:19, 73:24
**stood** [1] - 53:4
**straight** [1] - 41:21
**Street** [1] - 1:14
**strip** [1] - 23:25
**strong** [3] - 19:14, 19:21, 72:24
**stronger** [1] - 58:12
**strongest** [4] - 18:9, 18:10, 31:17, 32:3
**subject** [8] - 16:10,

22:17, 23:5, 23:15, 24:5, 53:5, 54:25, 55:1
**submission** [1] - 71:8
**submissions** [6] - 2:23, 43:16, 71:7, 72:8, 76:9, 77:2
**submit** [2] - 18:3, 69:24
**submitted** [3] - 5:15, 8:15, 47:17
**subsection** [1] - 29:23
**subsequent** [1] - 55:3
**substance** [16] - 7:14, 7:17, 7:25, 9:25, 10:6, 10:20, 12:23, 53:5, 57:14, 57:15, 57:16, 57:24, 58:16, 67:17, 75:25, 76:13
**substantive** [3] - 55:8, 72:12, 76:16
**substitute** [1] - 55:15
**succeed** [1] - 21:10
**succeeds** [1] - 20:18
**success** [1] - 4:2
**successful** [1] - 20:11
**succinctly** [1] - 74:14
**sued** [3] - 31:5, 33:3, 35:9
**suffering** [1] - 68:2
**suffers** [2] - 19:6, 30:2
**sufficient** [1] - 72:19
**sufficiently** [1] - 55:7
**suggest** [6] - 14:17, 25:15, 31:16, 37:1, 59:19, 69:25
**suit** [2] - 39:25, 48:20
**summarily** [1] - 34:5
**summary** [6] - 20:4, 38:5, 38:23, 41:22, 41:24, 49:16
**supersede** [2] - 12:18, 21:20
**superseded** [2] - 21:21, 73:14
**superseding** [1] - 21:23
**suppose** [2] - 29:1, 61:25
**supposed** [1] - 36:12
**Supreme** [2] - 7:22, 50:18
**surprising** [1] - 17:8

JA295

**suspended** [3] - 14:15, 14:16, 15:15
**systematically** [1] - 48:21

# T

**table** [4] - 2:16, 4:12, 22:1, 38:5
**tandem** [1] - 18:21
**tautology** [1] - 24:10
**tease** [2] - 10:12, 12:22
**teasing** [2] - 11:25, 13:5
**technical** [1] - 49:19
**television** [2] - 5:14, 41:6
**tempered** [1] - 41:2
**ten** [3] - 8:23, 8:24, 40:11
**terminate** [1] - 60:14
**terminated** [1] - 60:25
**terminating** [1] - 61:15
**terms** [5] - 19:2, 34:21, 41:19, 53:20, 76:12
**test** [4] - 31:10, 31:14, 53:20, 56:6
**text** [1] - 22:15
**textual** [2] - 7:5, 7:6
**THE** [131] - 1:1, 1:6, 1:10, 1:12, 1:18, 2:10, 2:15, 2:18, 4:9, 4:12, 6:25, 7:17, 7:24, 8:7, 8:20, 9:3, 9:23, 10:11, 11:17, 11:19, 12:8, 12:21, 14:4, 15:13, 16:19, 17:18, 18:2, 18:6, 18:8, 18:14, 20:7, 21:6, 21:10, 21:15, 21:18, 22:5, 22:13, 23:9, 23:14, 24:15, 25:19, 27:14, 27:18, 27:20, 28:1, 28:3, 28:18, 29:1, 29:6, 29:18, 30:12, 30:14, 30:24, 31:7, 31:9, 32:7, 32:10, 32:17, 33:9, 34:9, 34:25, 35:13, 36:15, 36:20, 37:6, 37:18, 38:14, 39:2, 39:6, 39:18, 39:23, 42:7, 42:22, 43:15, 45:2, 45:10, 45:24, 46:3, 46:20, 47:11, 48:6, 49:15, 50:6, 51:2,
51:10, 52:1, 52:7, 52:9, 52:16, 53:3, 53:15, 53:19, 54:12, 54:16, 55:11, 55:25, 56:19, 57:13, 57:20, 58:12, 58:25, 60:11, 60:19, 61:13, 61:24, 62:8, 62:17, 63:3, 63:6, 63:23, 64:13, 65:5, 65:17, 66:1, 66:12, 66:20, 67:2, 67:17, 68:8, 69:6, 69:10, 70:5, 71:3, 71:6, 72:8, 74:23, 75:20, 76:4, 76:11, 76:22, 77:1
**themselves** [1] - 70:8
**theoretical** [2] - 15:11, 19:24
**theoretically** [1] - 24:1
**theory** [5] - 28:18, 32:7, 49:6, 49:7, 52:23
**therefore** [4] - 10:5, 12:11, 56:22, 58:1
**thinking** [3] - 29:11, 41:21, 72:18
**thinks** [2] - 38:25, 73:4
**third** [1] - 40:21
**thoughtful** [1] - 77:4
**thousand** [3] - 16:12, 17:11, 17:15
**threat** [2] - 9:21, 30:7
**three** [15] - 6:1, 15:8, 18:11, 18:14, 18:15, 18:16, 21:5, 27:25, 28:8, 32:5, 36:6, 46:15, 53:17, 66:17, 66:21
**threshold** [1] - 50:7
**throwing** [1] - 43:9
**tie** [1] - 19:9
**tied** [1] - 34:14
**timeline** [2] - 40:3, 42:6
**tiraded** [1] - 33:19
**Title** [7] - 48:18, 54:3, 54:5, 54:10, 55:23, 56:8, 66:25
**titled** [1] - 72:4
**today** [2] - 6:13, 72:15
**together** [2] - 31:14, 36:10
**tolerance** [1] - 56:13
**tolerate** [1] - 56:14
**tomorrow** [2] -
28:16, 29:14
**took** [5] - 8:24, 40:11, 50:7, 50:10
**towards** [1] - 30:17
**track** [4] - 60:17, 60:19, 61:9, 76:16
**trade** [3] - 67:25, 68:13, 68:21
**traditional** [1] - 19:6
**traitor** [3] - 31:4, 33:2, 33:5
**transcript** [3] - 77:11, 77:11, 77:12
**TRANSCRIPT** [1] - 1:9
**Transcript** [1] - 1:25
**treason** [1] - 47:4
**treatment** [2] - 59:17, 60:4
**tricky** [1] - 35:16
**triggered** [1] - 54:12
**triggers** [1] - 35:24
**TRO** [5] - 41:1, 41:3, 41:14, 41:20
**true** [2] - 23:14, 77:11
**Trump** [5] - 33:19, 33:21, 34:3, 71:14, 72:5
**Trump's** [1] - 47:2
**try** [1] - 18:23
**trying** [13] - 12:21, 12:22, 34:9, 34:20, 34:25, 41:2, 42:4, 53:12, 65:17, 66:1, 69:6, 69:25, 70:2
**Tulsi** [2] - 40:7, 40:15
**tunc** [1] - 21:1
**turn** [6] - 18:2, 24:7, 31:7, 44:17, 44:22
**turned** [1] - 41:18
**turns** [1] - 70:18
**TV** [1] - 30:5
**tweet** [1] - 40:15
**tweeted** [3] - 5:19, 30:6, 41:8
**tweets** [2] - 5:6
**twenty** [1] - 17:15
**twice** [1] - 12:6
**two** [20] - 2:23, 3:8, 4:17, 10:22, 20:1, 30:20, 34:14, 36:24, 39:8, 43:4, 48:13, 49:18, 53:11, 59:12, 60:17, 60:19, 61:9, 66:24, 68:20, 70:6
**two-track** [3] - 60:17, 60:19, 61:9
**type** [1] - 35:21
**types** [2] - 32:18, 34:22
**typically** [1] - 60:24

# U

**U.S** [1] - 1:19
**ultimate** [1] - 72:12
**unbounded** [2] - 74:2, 74:8
**unconstitutional** [1] - 45:17
**under** [27] - 22:14, 22:16, 23:8, 23:11, 23:15, 23:19, 25:17, 28:18, 34:15, 48:23, 48:25, 50:2, 51:1, 51:13, 52:11, 52:20, 54:1, 55:20, 56:8, 61:2, 61:20, 62:22, 63:16, 65:20, 66:6, 68:1
**undermine** [1] - 35:21
**Understood** [2] - 32:17, 52:16
**understood** [8] - 18:2, 34:9, 42:7, 45:5, 46:5, 46:6, 57:24, 59:1
**undertake** [1] - 60:3
**unfortunately** [1] - 24:12
**unique** [2] - 6:9, 28:20
**United** [9] - 2:11, 6:2, 33:1, 43:7, 48:11, 56:12, 76:5, 77:10, 77:13
**UNITED** [1] - 1:1
**unless** [2] - 16:25, 21:1
**unlike** [1] - 48:16
**unpack** [1] - 38:14
**unreasonable** [1] - 45:22
**unreviewable** [5] - 23:11, 25:6, 56:2, 56:18, 69:4
**up** [6] - 3:21, 6:23, 53:4, 53:12, 53:16, 65:14
**upped** [1] - 34:2
**urgency** [1] - 37:1
**uses** [1] - 7:15
**usual** [1] - 54:20

# V

**vague** [2] - 6:20,
19:10
**vagueness** [8] - 19:7, 19:14, 35:13, 35:16, 35:17, 35:21, 36:4, 70:10
**various** [2] - 5:11, 71:20
**VELCHIK** [49] - 1:19, 2:11, 48:10, 49:23, 50:15, 51:7, 51:16, 52:4, 52:8, 52:11, 52:22, 53:7, 53:16, 53:23, 54:14, 54:21, 55:21, 56:5, 57:1, 57:18, 58:3, 58:17, 59:8, 60:17, 61:1, 61:17, 62:6, 62:12, 62:25, 63:5, 63:9, 64:2, 64:15, 65:11, 65:23, 66:5, 66:17, 66:22, 67:6, 67:24, 68:10, 69:8, 69:15, 70:12, 71:8, 76:2, 76:5, 76:15, 76:24
**Velchik** [2] - 2:11, 48:10
**version** [2] - 34:12, 67:19
**versions** [1] - 34:11
**versus** [16] - 2:3, 7:18, 17:15, 17:21, 49:25, 50:1, 58:20, 58:23, 59:16, 61:3, 61:11, 72:13, 74:15, 74:16, 74:21
**vests** [3] - 50:18, 63:10, 66:9
**victims** [1] - 43:5
**view** [1] - 52:21
**VII** [6] - 48:18, 54:3, 54:5, 54:10, 55:23, 56:8
**violate** [1] - 24:9
**violated** [6] - 11:24, 21:12, 32:6, 36:4, 54:3, 72:25
**violating** [1] - 54:5
**violation** [2] - 19:3, 49:12
**violations** [1] - 54:9
**violative** [1] - 74:7
**vs** [1] - 1:5

# W

**wait** [1] - 36:24
**Walter** [1] - 28:14
**wants** [1] - 29:17
**Washington** [6] - 1:11, 1:14, 1:20, 1:25,

35:6, 71:19

**ways** [1] - 58:18
**week** [5] - 5:10, 7:21,
20:2, 29:14, 40:16
**weeks** [1] - 36:25
**weigh** [1] - 71:25
**weighing** [1] - 52:13
**welcome** [4] - 2:19,
2:20, 4:13, 36:22
**whereas** [2] - 29:15,
29:17
**Whereas** [1] - 59:20
**whichever** [1] -
20:16
**whistleblower** [3] -
33:18, 33:22, 44:20
**whistleblowers** [1] -
45:1
**whistleblowing** [1] -
44:24
**White** [1] - 5:8
**wholesale** [1] - 10:10
**willful** [1] - 54:9
**willing** [1] - 69:24
**Wilmer** [3] - 15:1,
17:7, 35:6
**WilmerHale** [1] -
14:8
**wiser** [1] - 30:18
**wonder** [1] - 37:13
**word** [2] - 7:16,
14:16
**words** [2] - 12:21,
65:18
**workers** [4] - 26:21,
54:3, 55:2, 74:5
**world** [4] - 7:20,
19:16, 19:17, 38:17
**worth** [1] - 59:12
**written** [1] - 60:12
**wrote** [1] - 75:6

## X

**XYZ** [1] - 17:24

## Y

**years** [1] - 72:6
**yesterday** [1] - 29:13
**York** [4] - 5:2, 40:4,
71:13, 72:4

## Z

**ZAID** [1] - 1:3
**Zaid** [56] - 2:2, 2:7,
2:9, 2:14, 2:17, 2:19,
5:3, 5:11, 5:16, 5:18,
9:4, 12:11, 13:25,

15:4, 15:11, 15:24,
16:20, 16:21, 19:16,
19:25, 20:6, 20:21,
21:1, 21:13, 23:4,
28:2, 28:20, 29:11,
30:5, 31:4, 33:2, 33:6,
33:17, 34:14, 34:17,
35:3, 35:11, 36:11,
38:18, 39:11, 40:11,
41:25, 43:11, 44:15,
44:21, 45:11, 45:17,
45:21, 47:3, 50:11,
51:4, 54:18, 71:18
**Zaid's** [16] - 9:22,
10:18, 13:11, 14:20,
17:13, 18:22, 19:23,
26:12, 27:23, 28:24,
34:2, 40:6, 44:15,
62:18, 67:20, 72:11
**zealously** [1] - 36:13
**zero** [1] - 9:22

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARK S. ZAID, ESQ.                          *
                                            *
    Plaintiff,                          *
                                            *
    v.                                  *    Civil Action No. 25-01365 (AHA)
                                            *
EXECUTIVE OFFICE OF THE                     *
PRESIDENT et. al.                           *
                                            *
    Defendants.                         *
                                            *
*   *   *   *   *   *   *   *   *   *   *   *   *

## SUPPLEMENTAL DECLARATION OF MARK S. ZAID, ESQ.

I, MARK ZAID, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a person over eighteen (18) years of age and competent to testify. I make this Declaration on personal knowledge and in further support of the Plaintiff's Motion for a Preliminary Injunction, Dkt. 9 (filed May 21, 2025), and all related filings.

2. I am the Plaintiff in this action.

3. Since oral arguments were held before this Court on the pending Motion on June 27, 2025, I have been contacted by nearly two dozen prospective clients whose matters will likely require access to classified information in order to properly address their representation.

4. To my understanding, I was specifically sought out as legal counsel due to my expertise in national security matters.

5. Without a security clearance, and having been deprived of the due process normally available to all others who face security clearance suspensions and revocations, I will be unable to zealously advocate for the best interests of those prospective clients when and if their issues require access to classified information.

6. I still have not been provided any reason by any of the Defendant agencies for the sudden revocation of my clearance, other than the citations to the March 22, 2025 Memorandum included in the original filings in this case. Nor have I been provided any opportunity to appeal the outcome. Thus, I am also unable to provide any explanation to prospective clients about why my clearance was revoked, or when or if I may reapply for one.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true to the best of my knowledge.

Date:   August 5, 2025

_____
Mark S. Zaid, Esq.

2

JA299

# Exhibit 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK S. ZAID, ESQ. | * |
| | * |
|     Plaintiff, | * |
| | * |
|     v. | *    Civil Action No. 25-01365 (AHA) |
| | * |
| EXECUTIVE OFFICE OF THE | * |
| PRESIDENT et. al. | * |
| | * |
|     Defendants. | * |
| | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**SECOND SUPPLEMENTAL DECLARATION OF MARK S. ZAID, ESQ.**

I, MARK ZAID, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a person over eighteen (18) years of age and competent to testify. I make this Declaration on personal knowledge and in further support of the Plaintiff's Motion for a Preliminary Injunction, Dkt. 9 (filed May 21, 2025), and all related filings.

2. I am the Plaintiff in this action. Since the last update to the Court, I have been continually impacted through new circumstances by the Defendants' unlawful actions.

3. For example, as part of my regular representation of federal government victims of Anomalous Health Incidents (colloquially known as "Havana Syndrome"), a matter that I have been handling for more than a dozen years, I often relied upon my lawful and authorized access to classified information. On December 2, 2025, I accompanied one of my clients for a Transcribed Interview with the House Permanent Select Committee on Intelligence ("HPSCI"). That session was required to be unclassified because of the Defendants' actions revoking my security clearance. While for that client an unclassified meeting substantially covered the information in question, another client's Transcribed Interview is scheduled for December 15, 2025. That interview, however, will be handled nearly all in the classified arena and I have been

JA301

prohibited from attending or participating during those portions. Previously, I routinely attended and participated in my clients' classified (up to the TOP SECRET level) interviews and meetings with this Committee. The client who will be interviewed next week has specifically requested that I be in attendance to properly and zealously advocate for their rights, particularly as a whistleblower making protected disclosures. Indeed, the interview dates and location were specifically modified to accommodate my participation, to no avail.

4.    The HPSCI has indicated an interest in potentially interviewing other clients of mine, most of whom would need to testify in a classified setting. These clients also prefer my attendance and participation and, for some, have been hesitant to agree to cooperate without my personal representation.

5.    I am also regularly approached by potential clients whose representation would require my authorized access to classified information, and I have to re-direct them to other counsel.

6.    I still have not been provided any reason by any of the Defendant agencies for the sudden revocation of my clearance, other than the citations to the March 22, 2025 Memorandum included in the original filings in this case. Nor have I been provided any opportunity to appeal the outcome.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true to the best of my knowledge.

Date:   December 12, 2025

_____
Mark S. Zaid, Esq.

2

JA302

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARK S. ZAID, *Esq.*,

       *Plaintiff*,

  v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

       *Defendants*.

Civil Action No. 25-01365 (AHA)

<u>**Memorandum Opinion and Order**</u>

The Constitution forbids government officials from using their power to retaliate against people for their speech, and that is so even when the speech is critical of the government. Eighty years ago, the Supreme Court captured that foundational promise in this way: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Last year, the Supreme Court put it like this: A government official cannot "use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).

This case involves the government's retribution against a lawyer because he represented whistleblowers and other clients who complained about the government, carried out by summarily canceling the attorney's security clearance without any of the process that is afforded to others. In defending its actions, the government does not meaningfully rebut that the decision to deny this attorney the usual process was based on his prior legal work for clients adverse to the government.

The government instead asserts, emphasizes, and repeats that the executive branch has exclusive power to determine who meets the requirements for security clearance. *See Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (observing that "the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch"). That is well established, but does not answer the question in this case. It is equally well established that the executive branch's exclusive power to determine *who* satisfies the eligibility criteria for security clearance does not mean it can conduct that determination *however* it wants and free from the Constitution's limits. As Judge Randolph aptly laid out in this context over thirty years ago:

> All questions of government are ultimately questions of ends and means. The end may be legitimate, its accomplishment may be entrusted solely to the President, yet the judiciary still may properly scrutinize the manner in which the objective is to be achieved. Suppose the President has unlimited and judicially unreviewable constitutional power to determine which Executive Branch employees will be given access to the nation's secrets. No one would suggest the government therefore could, despite the Fourth Amendment, conduct random searches without warrants in the hope of uncovering information about employees seeking security clearances. Still less would anyone consider such unconstitutional searches and seizures to be immune from judicial review. The government may have considerable leeway to determine what information it needs from employees holding security clearances and how to go about getting it. But a large measure of discretion gives rise to judicial deference, not immunity from judicial review of constitutional claims.

*Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 290 (D.C. Cir. 1993). That guidance is sound, and it is binding.

Because the plaintiff here has shown he is likely to succeed on multiple claims, that he has been irreparably harmed, and that the equities and public interest favor injunctive relief, this court joins the several others in this district that have enjoined the government from using the summary revocation of security clearances to penalize lawyers for representing people adverse to it. *See Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105 (D.D.C. 2025); *Jenner & Block LLP*

*v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76 (D.D.C. 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127 (D.D.C. 2025); *Susman Godfrey LLP v. Exec. Off. of the President*, 789 F. Supp. 3d 15 (D.D.C. 2025).

## I.    Background

Mark S. Zaid is an attorney who specializes in national security law, and whose practice is founded on representing current and former federal employees, military servicemembers, and government contractors. ECF No. 1 ¶¶ 1, 9, 22. This has included advising whistleblowers making complaints against the government and forming a nonprofit that facilitates pro bono representation for whistleblowers. *Id.* ¶¶ 1, 31. Because Zaid's practice relates to military, intelligence, and law enforcement, including providing counsel to current and former employees of the Central Intelligence Agency, Department of Defense, Defense Counterintelligence and Security Agency, and the Office of the Director of National Intelligence, giving competent advice requires him to access, review, and discuss classified material. *Id.* ¶ 9; ECF No. 9-2 ¶ 5. Zaid has accordingly held security clearance for over two decades, and been granted access to classified information through case-specific authorizations during the past three decades. ECF No. 9-2 ¶ 5, 16–22.

In recent years, Zaid has represented multiple government whistleblowers in settings disfavored by the present administration. In 2019, Zaid began representing a whistleblower in the intelligence community who complained about the President's interactions with Ukrainian President Volodymyr Zelensky. ECF No. 1 ¶ 34; ECF No. 9-2 ¶ 23. Zaid's representation included advising the whistleblower on how to bring the complaint to the proper authorities, protect their anonymity, and avoid retaliation. ECF No. 9-2 ¶ 23. The complaint ultimately resulted in the House of Representatives adopting articles of impeachment against the President. *Id.*; ECF No. 1 ¶ 34. When Zaid's representation of the whistleblower became public, the President publicly rebuked him, including by showing Zaid's photo at a 2019 rally and calling him a "sleazeball." ECF No. 1

¶ 36; ECF No. 9-2 ¶ 25. The President later said: "And [the whistleblower's] lawyer, who said the worst things possibly two years ago, he should be sued and maybe for treason. Maybe for treason, but he should be sued. His lawyer is a disgrace." ECF No. 1 ¶ 37; ECF No. 9-2 ¶ 26.

More recently, in February 2025, Zaid filed a lawsuit against the government on behalf of several Federal Bureau of Investigation employees to protect them from being targeted for work they did investigating the January 6 attack on the U.S. Capitol. ECF No. 1 ¶ 40. Four days later, a news source reported the President was planning to target Zaid, among others, by revoking his security clearance. *Id.* ¶ 39; ECF No. 9-2 ¶ 28. The next month, the Director of National Intelligence announced on social media that she had revoked Zaid's and others' security clearances and access to classified information. ECF No. 1 ¶ 41; ECF No. 9-5. And on March 22, 2025, the President issued a presidential memorandum to executive agency heads that included Zaid among a list of people for whom access to classified information was "no longer in the national interest." ECF No. 1 ¶ 44; ECF No. 9-6 at 1. The memorandum directed "every executive department and agency head to take all additional action as necessary and consistent with existing law to revoke any active security clearances held by the aforementioned individuals and to immediately rescind their access to classified information." ECF No. 1 ¶ 44; ECF No. 9-6 at 1.

In the days and weeks that followed, Zaid received letters from the relevant agencies stating they had revoked his security clearance and would deny him access to classified information, including documents he had filed on behalf of current clients. ECF No. 1 ¶¶ 47–51; ECF No. 9-2 ¶¶ 31–34, 43; ECF No. 9-7 (letter from Defense Counterintelligence and Security Agency); ECF No. 9-8 (letter from Central Intelligence Agency); ECF No. 9-9 (email from Office of the Director of National Intelligence). In an interview, the Director of National Intelligence expressly

mentioned revoking Zaid's clearance and agreed the recent revocations had been "fun." ECF No.

1 ¶ 52; ECF No. 9-2 ¶ 35.

Zaid filed this lawsuit against the Executive Office of the President, the Department of

Defense, the Defense Counterintelligence and Security Agency, the Central Intelligence Agency,

the Office of the Director of National Intelligence, and the United States. He claims the revocation

of his clearance without any process violated the First and Fifth Amendments, the Administrative

Procedure Act ("APA"), and the Constitution's prohibition on bills of attainder. ECF No. 1 ¶¶ 55–

92. Zaid moves for a preliminary injunction, and the government moves to dismiss the complaint.

ECF Nos. 9, 22.

## II.    Discussion

In its motion to dismiss and preliminary injunction opposition, the government argues that

Zaid's claims are not justiciable under *Department of Navy v. Egan*, 484 U.S. 518 (1988), because

they relate to the revocation of a security clearance. *See* ECF No. 22-1 at 5–17. The court therefore

starts with that threshold question before considering the merits of each motion.

### A.    Zaid's Claims Are Justiciable Because They Challenge The Means Of Revoking His Clearance—Namely, The Denial Of Any Individualized Assessment—Not The Substance Of An Individualized Assessment

The government acknowledges it chose to revoke Zaid's security clearance without any of

the process it usually affords but argues the legality of its summary revocation is "a quintessential

political question" that cannot be reviewed by federal courts. *Id.* at 2. However, its position is

premised on ignoring binding precedent that says otherwise, including simply omitting relevant

caselaw from the motion to dismiss and preliminary injunction opposition. That precedent has

rejected the proposition that "all security-clearance decisions are immune from judicial review,"

recognizing a distinction between the executive branch's "discretionary judgments regarding a

particular employee's security clearance" (not reviewable) and claims that "relate to the

constitutionality of the methods used" to make such judgments (reviewable). *Greenberg*, 983 F.2d at 289–90; *see also Rattigan v. Holder*, 689 F.3d 764, 768, 770 (D.C. Cir. 2012) (explaining that the bar on judicial review "covers only security clearance-related decisions made by trained Security Division personnel" and does not apply to claims that do not require review of "whether the plaintiff's continued access to classified information was clearly consistent with national security"). As the D.C. Circuit has recognized, to insulate the latter category—claims challenging the legality of process used—from court review "would be to endorse untenable, and far-reaching, restrictions on judicial review of governmental actions." *Greenberg*, 983 F.2d at 290. Here, none of Zaid's claims challenge or otherwise ask the court to review an individualized national security determination—to the contrary, they challenge the legality of denying him any such individualized review. That kind of claim is one the court can, and therefore must, review. *See Jenner*, 784 F. Supp. 3d at 101 ("The Constitution does not tolerate such judicial abdication.").

Because the government's argument is premised on a selective account of precedent, the court starts with a more complete one. In *Department of Navy v. Egan*, 484 U.S. 518, the Supreme Court considered the "narrow question" of whether the Merit Systems Protection Board "has authority by statute to review the substance of an underlying decision to deny or revoke a security clearance in the course of reviewing an adverse action." *Id*. at 520. There, the plaintiff lost his job at a naval facility because he had been denied a required security clearance based on his criminal record. *Id.* at 521–22. The relevant agency had denied the plaintiff's security clearance under standard procedures, which included the opportunity to respond to the denial and provide favorable information about his character, after which the denial was upheld. *Id.* at 521–24. On appeal, the Federal Circuit held the Board had authority to review the merits of the agency's security clearance determination. *Id.* at 525. The Supreme Court disagreed. Citing the President's Article II authority

"to classify and control access to information bearing on national security," the Supreme Court explained that "no one has a 'right' to a security clearance" which is granted "only when 'clearly consistent with the interests of the national security.'" *Id.* at 527–28 (quoting Exec. Order No. 10,450, §§ 2, 7, 18 Fed. Reg. 2489, 2489, 2491 (Apr. 27, 1953)). The court reasoned that this determination represents "an attempt to predict [an individual's] possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, he might compromise sensitive information," and that such predictive judgment "must be made by those with the necessary expertise in protecting classified information." *Id.* at 528–29. The court held the Board lacked authority to review such decisions, explaining that "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Id.* at 529. In so holding, the court took as a given that the Board could review certain issues related to the security clearance determination, including, "review of the fact of denial, of the position's requirement of security clearance, and of the satisfactory provision of the requisite procedural protections." *Id.* at 526.

The D.C. Circuit has since considered how *Egan*'s reasoning about the Merit Systems Protection Board applies to federal court review of claims relating to the denial of security clearance. In doing so, the circuit has recognized that the separation of powers and competency concerns discussed in *Egan* foreclose court review of claims that challenge the merits of a security clearance determination, but support court review of claims challenging the legality of the process used. Or, as the circuit itself described in the wake of *Egan*, it has distinguished between challenges to "ends and means." *Greenberg*, 983 F.2d at 290. So the circuit has held and reiterated that *Egan*'s reasoning forecloses court review of Title VII claims that "challenge the basis for [the] decision to

revoke [the plaintiff's] security clearance." *Lee*, 120 F.4th at 886–87 (discussing *Ryan v. Reno*, 168 F.3d 520 (D.C. Cir. 1999)). The circuit has similarly held that *Egan*'s reasoning forecloses APA review of an agency's determination of "'what constitutes an acceptable margin of error in assessing the potential risk' to national security inherent in granting any particular individual access to classified information." *Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009) (quoting *Egan*, 484 U.S. at 529). And, applying the same principle, the circuit has held *Egan*'s reasoning forecloses review of "constitutional challenges to adverse clearance decisions" because "federal courts generally may not second-guess the political branches' discretionary judgments about matters of national security." *Lee*, 120 F.4th at 887, 891. Citing to *Egan*'s reasoning and the eligibility standards agencies use to make individualized clearance determinations, *see* Exec. Order No. 12,968, 60 Fed. Reg. 40245, 40250 (Aug. 2, 1995), the circuit explained that reviewing constitutional challenges to such determinations would require "doing what *Egan* said is not reasonably possible"—second guessing the agencies' "predictive judgment" about the individual. *Lee*, 120 F.4th at 893–94 (quoting *Egan*, 484 U.S. at 529). The court accordingly held these discretionary clearance assessments raise a political question that cannot be resolved by federal courts because "at least absent congressional action to restrict executive discretion in this area, there are no manageable standards to support judicial review of clearance decisions." *Id*. at 891.

The D.C. Circuit has, at the same time, consistently recognized "[i]t is simply not the case that all security-clearance decisions are immune from judicial review." *Greenberg*, 983 F.2d at 289; *see also Lee*, 120 F.4th at 891 ("Of course, not every case touching on national security lies beyond judicial cognizance."). In particular, the circuit has held that claims challenging the legality of the process used to deny a security clearance do not implicate *Egan*'s concerns about nonexpert review of national security assessments but, rather, ask courts to resolve questions that are germane

to courts. In *Greenberg*, the circuit considered whether courts could review a claim that certain questions asked in the security clearance process violated the Fifth Amendment privilege against self-incrimination and the constitutional right to privacy. 983 F.2d at 287–90. The court rejected the government's argument that *Egan* foreclosed such claims, explaining that the plaintiffs were not challenging "discretionary judgments regarding a particular employee's security clearance," but rather "the constitutionality of the methods used to gather information on which such judgments presumably will be based." *Id*. at 290. In *Rattigan*, the circuit similarly held that courts may review a Title VII claim that a security clearance review was prompted by a government employee's knowing provision of false information. 689 F.3d at 770. The circuit explained that "*Egan*'s absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel and does not preclude all review of decisions by other FBI employees who merely report security concerns." *Id*. at 768. Because the Title VII claim at issue did not require the court to make any judgment "as to whether the plaintiff's continued access to classified information was clearly consistent with national security," it could "coexist with *Egan*." *Id*. at 770.

Here, all of Zaid's claims challenge the means of revoking his clearance—specifically, the decision to deny him the process afforded to others. Zaid does not challenge the merits of any individualized national security assessment; he challenges the government's decision to deprive him of such individualized assessment of his eligibility for clearance. It is undisputed that the presidential memorandum directed agencies to "revoke any active security clearances" and "immediately rescind" Zaid's access to classified information and that the relevant agencies then did so without any of the individualized security assessment they would ordinarily afford. ECF No. 9-6 at 1; ECF No. 1 ¶ 44; *see* ECF No. 40 at 51 (acknowledging agencies revoked Zaid's

clearance without any process). Based on the preliminary injunction record, the court finds the government has not conducted any individualized assessment of Zaid's eligibility for security clearance. It instead denied Zaid the process and individualized assessment afforded to others because of his prior representation of whistleblowers and other clients in matters that were adverse to the government. This procedural harm exists "regardless of how the government might have resolved any particular application." *Lee*, 120 F.4th at 893 (citing *Greenberg*, 983 F.2d at 291–95); *see also Wilmer*, 784 F. Supp. 3d at 149 (finding court review of security clearance revocations appropriate where law firm challenged "the President's process—or lack thereof—in suspending the firm's employees' security clearances").

Because Zaid's claims all challenge the legality of revoking his security clearance without meaningful process, they go only to the "methods used" to revoke his clearance. *Greenberg*, 983 F.2d at 290. That is, in contrast to cases where "all of [the plaintiff's] claims challenge the basis for DOJ's decision to revoke [their] security clearance," none of Zaid's claims challenge the basis for a security clearance determination. *Lee*, 120 F.4th at 887. His claims do not require the court to make any type of "predictive judgment" that is associated with individualized national security assessments. *Id.* at 893 (quoting *Egan*, 484 U.S. at 529). Nor do they require the court to override decisions "made by trained Security Division personnel," the only sort of decision the "absolute bar on judicial review covers." *Rattigan*, 689 F.3d at 768; *see also Egan*, 484 U.S. at 529 (reasoning that "[p]redictive judgment[s]" about who can be trusted with classified information "must be made by those with the necessary expertise").

As mentioned, the government's principal approach here has been to offer an expansive reading of the cases it likes (*Egan* and *Lee*) and to leave out the cases it doesn't (*Greenberg* and *Rattigan*). Confronted with the latter cases, the government's response is twofold. First, it all but

asks this court to narrow those cases to their particular facts. *See* ECF No. 33 at 6, 9 (limiting *Greenberg* to "'methods and processes' that violated the Fourth Amendment" and *Rattigan* to whether "the correct component" of an agency made the clearance decision). But this court is required to faithfully apply precedent. *See Ramos v. Louisiana*, 590 U.S. 83, 125 n.6 (2020) ("In the American system of *stare decisis*, the result and the reasoning each independently have precedential force, and courts are therefore bound to follow both the result and the reasoning of a prior decision." (Kavanaugh, J., concurring in part)). That precedent rejected the government's expansive position as "untenable, and far reaching." *Greenberg*, 983 F.2d at 290. And even the cases the government selectively quotes from recognize the line between "ends and means." *Id.*; *see Lee*, 120 F.4th at 893 (explaining courts remain available to adjudicate claims that do not "seek review of 'discretionary judgments' regarding the merits of any 'particular employee's security clearance'" (quoting *Greenberg*, 983 F.2d at 290)).

This understanding of the law is also the uniform understanding in this district. *See, e.g.*, *Jenner*, 784 F. Supp. 3d at 100 ("In short, while the merits of any individual security clearance decision are unreviewable, courts may hear 'constitutional claims arising from the clearance revocation *process.*'" (quoting *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 183 (3d Cir. 2010))); *Wilmer*, 784 F. Supp. 3d at 148–49 (holding that challenges to "the President's process— or lack thereof—in suspending the firm's employees' security clearances," in contrast to "the merits of any individual's suspension," are judicially reviewable); *Susman*, 789 F. Supp. 3d at 38 (holding that "*Lee* does not extend so broadly as to foreclose [the plaintiff's] constitutional challenges to Defendants' blanket revocation of its employees' security clearances divorced from national security concerns"); *Perkins Coie*, 783 F. Supp. 3d at 145 (holding that challenges to the President's application of "a discriminatory policy to a group of individuals during the *process* of

making" security clearance decisions "are proper for judicial review"). Indeed, in *Egan* itself, the

government emphasized that court review would remain appropriate in these circumstances:

> We agree with the Board that it may examine whether the agency *made* such a [security clearance] determination, that is, whether the agency had procedures for denying or revoking clearances and whether the procedures were followed. The Board also could, in an appropriate case, find that a determination was not validly made because the employee was not afforded procedural protections guaranteed to him by the agency's regulations (such as notice, a statement of reasons for the proposed denial or revocation, and an opportunity to respond).

Brief for the Petitioner, *Egan*, 484 U.S. 518 (No. 86-1552), 1987 WL 880362, at *24–25.

The government, second, asks the court to just construe the presidential memorandum as

an individualized national security assessment. But the court finds the memorandum was not based

on any such assessment. It is undisputed that no government agency conducted an assessment of

Zaid's eligibility for clearance, and the memorandum itself does not purport to make any national

security assessment—in fact, it does not mention national security at all. *See* ECF No. 9-6. The

memorandum instead directs agencies to summarily revoke Zaid's clearance based on the

"national interest," which courts have consistently recognized as distinct from and more nebulous

than a particular determination about national security. *Id.* at 1; *see Perkins Coie*, 783 F. Supp. 3d

at 144 ("When the government does not even claim that a general policy about security clearances

was motivated by national security, judicial review of that policy could not threaten unduly

entangling the judicial branch in questions of national security."); *Wilmer*, 784 F. Supp. 3d at 149

(explaining precedent "does not require the Court to give unlimited deference to the broad concept

of national interest"). The memorandum's invocation of the phrase "national interest" to deny Zaid

any process does not implicate the separation of powers concerns present when the executive

branch has exercised its expertise to make an individualized national security assessment. *See Lee*,

120 F.4th at 889 ("The political question doctrine applies perhaps most vigorously to issues

bearing on national security."); *see also Perkins Coie*, 783 F. Supp. 3d at 144 (explaining that

declining court review "simply because the Executive branch invoked 'the national interest' would represent a breathtaking expansion of executive power at the expense of the constitutionally mandated role of the judicial branch and the concomitant safeguards for the individual rights of Americans").

Nothing in the memorandum indicates that it reflects any government official's expert assessment or predictive judgment. *See Lee*, 120 F.4th at 893; Exec. Order. No. 12,968, 60 Fed. Reg. at 40250 (providing that eligibility for access to classified information entails "appropriate investigation" of whether an individual's "personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment"). And the government does not argue the decision to summarily revoke Zaid's clearance was based on anything other than his prior representations of clients in matters adverse to the government. This court accordingly rejects the government's effort to recast its decision to revoke Zaid's clearance without process—without any individualized assessment—as an individualized national security assessment. *See Perkins Coie*, 783 F. Supp. 3d at 143 (noting that "each case relied upon by the government in which the challenged individual security clearance decision was found to be non-justiciable involved a challenge to an individualized process conducted by expert agency examiners that included consideration of articulable findings directly pertinent to the individual with the clearance").

Zaid's claims thus ask this court to determine whether the Constitution or other federal law makes it illegal to deny him the standard, individualized process afforded to others. These are not political questions; they are legal ones. *See Jenner*, 784 F. Supp. 3d at 101 ("Reviewing this process raises none of the concerns that make individual security-clearance determinations nonjusticiable."). And declining to consider them would be the very sort of judicial abdication that

precedent forbids. *Greenberg*, 983 F.2d at 290 (declining to endorse such "untenable, and far-reaching, restrictions on judicial review of governmental actions"); *see also Gill v. U.S. Dep't of Just.*, 875 F.3d 677, 685 (D.C. Cir. 2017) (Tatel, J., concurring) ("In my view, if [the plaintiff] could show that the government has a policy or practice of treating Muslims or naturalized citizens differently, his equal protection claims, like the claims at issue in *Greenberg*, would not be barred by *Egan*.").

### B.  Zaid Is Entitled To Preliminary Injunctive Relief

"A preliminary injunction is an extraordinary remedy never awarded as of right" and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). The plaintiff must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The court accordingly considers each of these factors.

#### 1.  Zaid Is Likely To Succeed On Multiple Claims

Based on the record at this stage, Zaid has shown he is likely to succeed, at a minimum, on his claims that the government's summary revocation of his security clearance and access to classified information violated the First Amendment, procedural due process, and the right to counsel.

##### a.  Zaid Is Likely To Show That The Summary Revocation Of His Clearance Violated The First Amendment

Zaid argues that summarily revoking his clearance as a response to his representation of whistleblowers and other clients in legal matters disfavored by the administration violated the First Amendment. *See* ECF No. 1 ¶¶ 68–74; ECF No. 9-1 at 27–31. The court agrees.

"The First Amendment prohibits government from 'abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 605–06 (2021) (quoting U.S. Const. amend. I). And to the same ends, the First Amendment prohibits government officials from retaliating against people for engaging in these protected activities. *See Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) ("As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." (cleaned up)). To prevail on a First Amendment retaliation claim, a plaintiff must show "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). This requires the plaintiff to show that the adverse action was based on a "forbidden motive" and that "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences." *Nieves*, 587 U.S. at 398.

The government does not appear to dispute that the first two requirements are satisfied, and they clearly are. When Zaid petitioned the government and courts on behalf of whistleblowers and other clients, he was engaging in activity the First Amendment protects. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542–43 (2001) (recognizing that "advocacy by . . . attorney[s] to the courts" is protected by the First Amendment). And the adverse action here—revoking a person's security clearance—is more than sufficient to constitute retaliatory action. *Cf. Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) (noting the First Amendment protects against "even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to

punish her for exercising her free speech rights" (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990))). Zaid has further supported this showing with evidence of the significant consequences for his practice as an attorney in the national security space. *See, e.g.*, ECF No. 9-2 ¶¶ 44–46 (attesting that summary revocation has hampered Zaid's ability to advocate for clients and has caused him to turn down new clients); ECF No. 42-1 ¶¶ 3–5 (attesting that summary revocation has diminished Zaid's ability to zealously advocate for prospective clients whose matters will likely require access to classified information).

The record also shows Zaid will likely establish the final requirement, that his protected expression, petitioning on behalf of people or in matters disfavored by the government, is what caused the government to summarily revoke his clearance. The President expressed repeated, public displeasure with Zaid—calling him a "sleazeball" and saying he should be sued for "treason"—and expressly tied it to his representation of a government whistleblower. ECF No. 9-2 ¶¶ 25–26. The record also shows that the decision to summarily revoke Zaid's clearance took place just days after Zaid filed a lawsuit against the government on behalf of FBI employees to protect them from being targeted for their work related to the January 6 attack on the U.S. Capitol. ECF No. 1 ¶ 40. And that decision was made just days apart from several other presidential orders found to be targeting attorneys based on their choice of clients. *See Perkins Coie*, 783 F. Supp. 3d at 150–65; *Jenner*, 784 F. Supp. 3d at 94–99; *Wilmer*, 784 F. Supp. 3d at 150–152; *Susman*, 789 F. Supp. 3d at 41–48. Based on the preliminary injunction record, the court finds that Zaid's representation of whistleblowers and other clients adverse to the government was the sole reason for summarily revoking his security clearance.

The government does not meaningfully contest that this is a "forbidden motive," but posits that Zaid's clearance might have been summarily revoked based on the "obvious non-retaliatory

grounds" of protecting classified information. ECF No. 22-1 at 26. The court finds that assertion

is not credible or supported by the record. That explanation appears nowhere in the presidential

memorandum, which summarily directed agencies to revoke security clearances without any

mention of concerns related to protecting classified information. *See* ECF No. 9-6. The

government unquestionably has a weighty interest in the protection of classified information, but

those interests were not at play here. *See, e.g.*, *Jenner*, 784 F. Supp. 3d at 102 (concluding that

executive order directing officials to suspend security clearances held by law firm employees "does

not engage in the sort of 'legitimate consideration of speech' . . . that might sometimes be

necessary to keep classified information in safe hands" (quoting *Reichle v. Howards*, 566 U.S.

658, 668 (2012))).[1]

Zaid has accordingly shown he is likely to succeed in showing that the summary revocation

of his security clearance violated the First Amendment.

> b. *Zaid Is Likely To Show That The Summary Revocation Of His Clearance Violated Procedural Due Process*

Zaid also argues that revoking his security clearance without process violated procedural

due process. To succeed on this claim, a plaintiff must show: (i) government action depriving him

of a protected interest in life, liberty, or property, and (ii) inadequate process. *Reed v. Goertz*, 598

U.S. 230, 236 (2023).

---

[1]    The government repeats its argument that the court cannot consider whether the government acted with "forbidden motive" in this context under *Egan* and *Lee*, noting that the court concluded the plaintiff's First Amendment claim in *Lee* was not reviewable. ECF No. 22-1 at 26. That argument fails for the same reasons already discussed: applicable precedent, including *Lee*, forbids an inquiry as to the merits of a revocation decision; it does not forbid inquiry into the legality of process used. Indeed, *Lee* was explicit about this, reasoning that the plaintiff's First Amendment claim was not reviewable because, like the plaintiff's other claims, it "rest[ed] on injuries arising from the revocation and challenge[d] its substantive basis." *Lee*, 120 F.4th at 895.

Zaid argues the government's summary revocation of his security clearance deprived him of a liberty interest, citing to several cases in this circuit recognizing that one can have a liberty interest in their clearance. *See* ECF No. 9-1 at 25; *see, e.g.*, *Doe v. Austin*, No. 22-cv-3474, 2024 WL 864270, at *12 (D.D.C. Feb. 29, 2024) (explaining that "a federal agency's revocation of a security clearance may give rise to a due process claim for injury to a *liberty* interest"). The D.C. Circuit has held that a liberty interest is implicated where government action changes a plaintiff's status, including by excluding him from "employment opportunities" or precluding him from pursuing his "chosen career." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1527–28 (D.C. Cir. 1994); *see also Greene v. McElroy*, 360 U.S. 474, 492 (1959) (revocation of a security clearance possibly implicates Fifth Amendment liberty interest where action "has seriously affected, if not destroyed, [plaintiff's] ability to obtain employment in the aeronautics field").

To show a deprivation of this type of liberty interest, a plaintiff must show the government "both altered his status and stigmatized his reputation." *Doe v. Cheney*, 885 F.2d 898, 910 (D.C. Cir. 1989). Zaid has introduced credible evidence of both. He has introduced evidence that because of the summary revocation he can no longer maintain his national security practice of representing current and former government employees whose cases involve classified information. ECF No. 9-2 ¶¶ 44–46; ECF No. 42-1 ¶¶ 3–5, ECF No. 50-1 ¶¶ 3–4. The summary revocation has interfered with Zaid's ongoing attorney-client relationships because he is no longer able to access classified information or use classified information he previously learned. ECF No. 1 ¶¶ 50–51, 54; ECF No. 9-2 ¶ 43. For example, following the summary revocation of his security clearance, Zaid was denied access to a whistleblower complaint he helped his client file, which has hindered his representation of that client. ECF No. 9-2 ¶ 43. Zaid has also turned down numerous clients who have approached him for representation since the summary revocation and during the pendency of

this litigation. *Id.* ¶ 46; ECF No. 50-1 ¶ 5; *see Doe v. Casey*, 796 F.2d 1508, 1523 (D.C. Cir. 1986) (change in status includes "foreclosing the employee's future employment opportunities"), *aff'd in part, rev'd in part sub nom. Webster v. Doe*, 486 U.S. 592 (1988). The court finds based on the preliminary injunction record that the summary revocation of Zaid's clearance concretely and dramatically impedes his ability to pursue his chosen career as a national security attorney. The court accordingly concludes Zaid has shown this government action effected a "change in status" that implicates a liberty interest. *Kartseva*, 37 F.3d at 1527; *Casey*, 796 F.2d at 1523.

Zaid has also shown stigmatization of his reputation that goes beyond revocation of the security clearance itself. Unlike the typical clearance revocation, the decision here was announced publicly, after comments at the highest levels that described Zaid as a "sleazeball" who may have committed "treason." ECF No. 9-2 ¶¶ 25–26. Before the presidential memorandum was even issued, the Director of National Intelligence stated in a social media post that she had revoked Zaid's security clearance. *Id.* ¶ 29. And in conjunction with the summary revocation, the Director issued a press release stating that the people losing their clearances, which included Zaid, had "abused public trust for political purposes." ECF No. 9-11. The Director went on to discuss the summary revocation, mentioning Zaid by name, during a publicly accessible interview. ECF No. 1 ¶ 52; ECF No. 9-2 ¶ 35. The court finds that these accusations of untrustworthiness and dishonesty, alongside the summary revocation, stigmatized Zaid's reputation. *See Doe v. U.S. Dep't of Just.*, 753 F.2d 1092, 1111–12 (D.C. Cir. 1985) (government stigmatized plaintiff's reputation where plaintiff "was discharged on the basis of allegations of unprofessional conduct and dishonesty, and the charges were allegedly disseminated to prospective employers, public and private"); *cf. Cheney*, 885 F.2d at 910 (reasoning that agency's actions were not stigmatizing where it "did not make public accusations that will damage [the plaintiff's] standing and associations in

the community"). Zaid has accordingly shown that the government infringed a protected liberty interest.

The government's arguments to the contrary are not persuasive. First, it cites cases recognizing that one cannot have a property interest in a security clearance. *See* ECF No. 22-1 at 20–21. But Zaid asserts impairment of a liberty interest, not a property interest. Second, the government advances an absolute rule that no individual can have a liberty interest in his security clearance. ECF No. 22-1 at 20. But, as explained, numerous courts have rejected that absolute rule. *See Austin*, 2024 WL 864270, at *12 ("Defendant argues that Plaintiff could not have a protected interest in a security clearance. The Court disagrees with that broad assertion.") (collecting cases); *see also Cheney*, 885 F.2d at 909 (recognizing the availability of a liberty interest due process claim in the security clearance revocation context but holding that such a claim was "untenable" on the facts presented); *Ranger v. Tenet*, 274 F. Supp. 2d 1, 9–10 (D.D.C. 2003) (holding that plaintiff plausibly alleged procedural due process claim based on the government's revocation of his security clearance). And, irrespective of whether there can be a liberty interest in a security clearance in the abstract, the government does not dispute that a liberty interest is impaired when government action alters status—including by excluding the plaintiff from employment opportunities or precluding him from pursuing his chosen career—and stigmatizes the plaintiff's reputation. *See Cheney*, 885 F.2d at 910; *Kartseva*, 37 F.3d at 1527.

Third, the government argues that revoking someone's security clearance does not itself show reputational harm. ECF No. 22-1 at 22–23. That seems fair enough. *See Cafeteria & Rest. Workers Union, Loc. 473*, 367 U.S. 886, 898 (1961) (observing that revocation of an identification badge for failure to meet security requirements does not "bestow a badge of disloyalty or infamy"); *Molerio v. FBI*, 749 F.2d 815, 824 (D.C. Cir. 1984) (observing that being "denied [clearance] on

unspecified grounds in no way implies disloyalty or any other repugnant characteristic"). But this is, again, a superficial response. As set forth above, Zaid's argument is not that revocation in the abstract harmed his reputation, but that the government's summary revocation of his clearance with speeches, press releases, and interviews accusing him of disloyalty, including a contemporaneous press release stating that he had "abused public trust for political purposes," harmed his reputation.

Upon recognition of a liberty interest, due process analysis typically proceeds to whether the government afforded sufficient process before depriving the plaintiff of the interest. *See, e.g.*, *Ranger*, 274 F. Supp. 2d at 9 ("In addition to satisfying *Cheney*'s two-part test, [the plaintiff] must establish that he was deprived of his liberty interest without due process of law."). But the government does not argue Zaid was afforded any process before his clearance was revoked. *See* ECF No. 40 at 51 (acknowledging the relevant agencies revoked Zaid's clearance without conducting any individualized process). The court accordingly concludes Zaid is likely to succeed in showing that the government deprived him of a liberty interest without due process of law. *See Ranger*, 274 F. Supp. 2d at 9 (holding that plaintiff stated a procedural due process claim where CIA did not afford plaintiff "a meaningful opportunity to contest the basis for its decision to revoke his security clearance"); *cf. Cheney*, 885 F.2d at 910 (holding that plaintiff received appropriate process where he received notice of agency's concerns, submitted voluntarily to psychiatric exam, received consideration by a board of appraisal, submitted written materials in his defense, and had an interview with the agency director).

c.  *Zaid Is Likely To Show That The Summary Revocation Of His Clearance Violated The Right To Counsel*

Zaid argues that the summary revocation of his clearance because of his prior work for clients adverse to the government has also interfered with, and in some cases prevented, his

representation of current and prospective clients in matters adverse to the government, depriving them of their Fifth Amendment right to counsel of their choice. *See* ECF No. 1 ¶¶ 83–88; ECF No. 9-1 at 31–33. The court agrees. A litigant's right to counsel in civil cases includes the right to the counsel of their choice and, while that right is not absolute and can be overridden when compelling reasons exist, the sole reason here—avenging counsel's representations of the very same types of clients who are adverse to the government—is not a legitimate, let alone a compelling, reason.

The Supreme Court recognized "[t]he invalidity of a governmental attempt to deny counsel to a civil litigant" over ninety years ago. *Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873 (D.C. Cir. 1984) (citing *Powell v. Alabama*, 287 U.S. 45, 68–69 (1932)). "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell*, 287 U.S. at 68–69. For example, "[i]f in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." *Id.* at 69. Courts have long recognized the "right to choose counsel without interference by officialdom" in civil cases inherent in the Fifth Amendment's guarantee of due process. *Am. Airways Charters*, 746 F.2d at 872; *see McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, 1262 (5th Cir. 1983) (recognizing that civil litigants "have a right to be represented by counsel and this ordinarily implies a right to lawyers of their choice"); *Ky. W. Va. Gas Co. v. Pa. Pub. Util. Comm'n*, 837 F.2d 600, 618 (3d Cir. 1988) (same); *In re BellSouth Corp.*, 334 F.3d 941, 955 (11th Cir. 2003) (same); *see also Muniz v. Meese*, 115 F.R.D. 63, 66 n.11 (D.D.C. 1987) (recognizing "the violation of civil liberties that is implied by a government intrusion into [citizens'] right to select and to be represented by counsel of their choice"). The right to counsel of choice must be balanced against the government's interests, and

it "may be overridden when 'compelling reasons exist.'" *McCuin*, 714 F.2d at 1263 (quoting

*Bottaro v. Hatton Assocs.*, 680 F.2d 895, 897 (2d Cir. 1982)); *see also In re BellSouth Corp.*, 334

F.3d at 956 (recognizing that "a litigant's freedom to hire the lawyer of his choice can be

overridden if a court finds that the choice would interfere with the orderly administration of

justice").

      Zaid has shown his clients have been deprived of their chosen counsel without compelling

reason. The court credits Zaid's evidence that the summary revocation of his security clearance

has prevented him from zealously representing his clients in pending cases against the government.

ECF No. 9-2 ¶¶ 43–45. This includes requiring him to disregard classified information he has

learned in the course of those representations and which is necessary to those representations. ECF

No. 1 ¶¶ 49–50. One of Zaid's clients attests that the summary revocation of Zaid's security

clearance "has deprived [him] of [Zaid's] unique qualifications and expertise, and of [his] choice

of counsel." ECF No. 9-3 ¶ 17. The client states that "[t]here is no other attorney [he] trust[s] who

has the type of experience on [anomalous health incident] matters, let alone holding authorized

access to classified information, besides Mr. Zaid." *Id.* The summary revocation of Zaid's security

clearance has also prevented Zaid from participating in classified portions of his client's interview

with a legislative committee despite his client's specific request that Zaid be present to represent

them. ECF No. 50-1 ¶ 3. By summarily revoking the clearance essential to these representations,

the government has forced his clients to litigate their cases without the benefit of their chosen

counsel. ECF No. 9-2 ¶ 43.[2]

---

[2]   The government does not contest that Zaid has third party standing to assert his client's due
process right to counsel; he plainly does. *See* ECF No. 40 at 62–63; *see also U.S. Dep't of Lab. v.
Triplett*, 494 U.S. 715, 720–21 (1990) (concluding that lawyer had third party standing to assert
due process right to obtain legal representation on behalf of clients); *Caplin & Drysdale, Chartered*

The government has little to say in response to this claim. It largely returns to its threshold argument that *Egan* forecloses any court review, which is incorrect for reasons explained. ECF No. 22-1 at 25; *see supra* Part II.A. To be sure, no one could doubt the government has a "compelling interest in withholding national security information from unauthorized persons in the course of executive business." *Egan*, 484 U.S. at 527 (quotation marks and citation omitted). So, no one could reasonably dispute that the executive branch's expert determination that a lawyer's security clearance or access to classified information is no longer consistent with national security would justify the accompanying effect on the availability of the lawyer to serve as counsel in cases requiring such clearance or access. Just as the state and courts have a compelling interest in limiting counsel to those who are admitted to the relevant jurisdiction and those who lack a conflict of interest, the government's interest in protecting national security can surely justify the effect of limiting the universe of counsel. But here, the summary revocation of Zaid's security clearance was not based on any national security interest. Instead, on this record, the government's sole interest was retribution against an attorney for representing clients adverse to the government. That is not a legitimate governmental interest, and it cannot override the right of Zaid's clients to their chosen counsel. *See Custom Retaining Walls, LLC v. Parton*, No. 23-cv-316, 2024 WL 3223688, at *4, 6 (W.D. Tex. May 10, 2024) (holding that there was "no compelling reason to override Plaintiffs' right to counsel of their choice" where the government required clients to file ethics complaints against their chosen counsel as a condition to reconsideration, seemingly because of chosen counsel's success in a different suit against the government).[3]

---

*v. United States*, 491 U.S. 617, 623 n.3 (1989) (concluding that law firm had third party standing to challenge statute's restriction on criminal defendants' right to counsel).

[3]    The government also asserts that Zaid's right to counsel claim should be dismissed because Zaid has failed to show that his clients lack a second choice of counsel. ECF No. 22-1 at 25–26.

The court accordingly concludes that Zaid is likely to succeed in showing that the summary revocation of his security clearance violated his clients' Fifth Amendment right to counsel of their choice. *See Susman*, 789 F. Supp. 3d at 53–54 (holding executive order violates the Fifth Amendment right to counsel "because governmental attempts to deny counsel to a civil litigant are invalid" (cleaned up)); *Perkins Coie*, 783 F. Supp. 3d at 168–71 (holding executive order violates Fifth Amendment right to counsel where it "would adversely impact plaintiff's representations of clients in civil matters involving the government").

### 2. *Zaid Has Shown Irreparable Harm*

The court also finds Zaid has shown irreparable harm absent preliminary injunctive relief— indeed he has shown multiple independent forms of irreparable harm. Both personal constitutional deprivations Zaid has substantiated at this stage are of the type courts recognize as irreparable. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). So too does "a violation of Fifth Amendment due process rights . . . support[] injunctive relief." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." (alteration in original)); *Mills v. District of Columbia*, 571 F.3d

---

But the case the government cites merely recognizes that the right to counsel of choice "must be balanced against the government's interest in the fair, orderly, and effective administration of the courts which, in a given case, may require an accused to resort to his second choice of counsel." *United States v. Koblitz*, 803 F.2d 1523, 1528 (11th Cir. 1986). As explained, here the government lacks any legitimate interest that could override Zaid's clients' right to their chosen counsel.

1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (cleaned up)).

In addition to his constitutional injuries, Zaid has shown harm to his reputation, including accusations of disloyalty from the nation's highest offices that directly threaten his standing as a national security lawyer. ECF No. 9-2 ¶¶ 25–26, 29, 35–37; *see Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (holding that irreparable harm was apparent where defendant's conduct "could not fail to damage [plaintiff's] good name"); *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017) ("Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction."); *Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (collecting cases). Zaid has also attested that the likely unlawful summary revocation of his clearance would need to be disclosed on future security clearance applications. ECF No. 9-2 ¶ 47.

Zaid has also substantiated that his clients are being denied their chosen counsel. As described, Zaid has introduced credible evidence that he cannot properly advise current clients because he is precluded from accessing classified material and using classified information, including information that he learned in the course of the representations. *See id.* ¶¶ 43–45; ECF No. 1 ¶¶ 49–50. Zaid has also introduced evidence showing that his clients would like him to represent them in pending matters requiring access to classified information, but the summary revocation of the clearance necessary for these representations denies them that choice. *See* ECF No. 9-3 ¶ 17; ECF No. 50-1 ¶ 3–4. Such interference with the attorney-client relationships is precisely the type of harm that is "beyond remediation" by a court after the fact. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see Emons Indus., Inc. v. Liberty Mut. Ins. Co.*, 749 F. Supp. 1289, 1293 (S.D.N.Y. 1990) (holding that forcing a client to

forgo its counsel of choice "would be irreparable, as it would be impossible to quantify the harm suffered, and therefore impossible to compensate for it with money damages").

The government does not dispute that denial of these rights is irreparable harm. It instead first returns to its legal argument that Zaid "does not have a right to a security clearance, much less a justiciable First Amendment right." ECF No. 22-1 at 31. That argument is mistaken for the reasons explained, and it does not rebut Zaid's showing of irreparable harm. Second, the government argues that "the fact that Plaintiff has waited nearly two months to seek a preliminary injunction" undercuts Zaid's claim of irreparable harm. *Id.* at 32. But as the government acknowledges, a delay in filing is "not determinative." *Id*. The D.C. Circuit has instructed that "a delay in filing is not a proper basis for denial of a preliminary injunction." *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). Here, the government has not offered any credible reason why the delay in filing affects the particular types of irreparable harm at issue, and the court finds the delay does not detract from the harms shown.

3. *The Balance Of The Equities And The Public Interest Favor A Preliminary Injunction*

The balance of the equities and the public interest generally "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (explaining that the government's "harm and the public interest are one and the same, because the government's interest *is* the public interest"). Here, those factors also favor Zaid. As the D.C. Circuit has explained, "enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668. And there are strong public interests in enjoining the kind of retaliatory action at issue here, which has the potential to substantially chill lawyers in their representation of clients in proceedings adverse to the government. *See Perkins Coie*, 783 F. Supp. 3d at 180 (noting strong interest of firm and clients, "as well as the American legal system and the public more broadly, in issuance of an

injunction to protect the independence of counsel to represent their clients vigorously and zealously, without fear of retribution from the government simply for doing the job of a lawyer"); *Jenner*, 784 F. Supp. 3d at 115 (noting that retaliatory action "casts a chill over the whole of the legal profession, leaving lawyers around the country weighing the necessity of vigorous representation against the peril of crossing the federal government").

The government again gestures vaguely at "national security interests." ECF No. 22-1 at 33. However, neither in the presidential memorandum nor otherwise has any expert agency official made any national security assessment concerning Zaid, or even purported to justify the summary revocation on that basis. The balance of the equities and the public interest weigh in Zaid's favor. The court will therefore order preliminary injunctive relief.[4]

---

[4]    The court's conclusion that Zaid is entitled to preliminary relief is premised on application of the legal claims discussed to the specific record in this case, including evidence developed as to Zaid's work as a national security lawyer, his representation of clients who have petitioned the government, reprisal for those representations, reputational injury, and interference with client representations. The relief accordingly addresses the summary revocation of Zaid's security clearance and no one else's.

The government argues that although Zaid has named the United States as a defendant, any relief afforded to Zaid must name the specific federal officials who are enjoined. ECF No. 22-1 at 33–34 (citing 5 U.S.C. § 702). Zaid has submitted a proposed order naming the officials against whom relief should run, ECF No. 31-2, satisfying the requirement that injunctions against the United States "specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance." 5 U.S.C. § 702; *see, e.g.*, *Jenner*, 784 F. Supp. 3d at 116 ("Section 702 does require Jenner eventually to list the individual federal officers it seeks to enjoin; it just need not do so in the caption of the complaint.").

The government asks the court to impose an appropriate bond, but does not support its request with any showing of concrete economic injury. *See N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) ("In cases where the government is the enjoined party and no concrete economic injury is established, as is the case here, courts routinely waive the bond requirement."). The court accordingly finds it appropriate to impose a nominal injunction bond of $1. *See Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 31–32 (D.D.C. 2025) (ordering the plaintiff to post a nominal bond of $1 where the defendants had not shown that they would "suffer any 'material monetary injury' from the proposed injunction" (citation omitted)).

**C. The Complaint States A Claim For The Remaining Counts**

Along with its opposition to the preliminary injunction motion, the government moves to dismiss the complaint for failure to state a claim under Rule 12(b)(6). To survive dismissal for failure to state a claim, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The court "must take all the factual allegations in the complaint as true," though it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

For the reasons above, Zaid has plausibly alleged violations of the First Amendment, procedural due process, and the right to counsel. Zaid's remaining claims—under the APA, void for vagueness doctrine, and the Bill of Attainder clause—are also plausibly alleged at this stage. The court therefore denies the government's motion to dismiss.

*1. Zaid Plausibly Alleges The Summary Revocation Of His Clearance Violated The APA*

The APA requires courts to "hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, the agency defendants do not dispute that their summary revocation of Zaid's security clearance is final agency action.

The parties dispute whether Zaid has plausibly alleged that this action was contrary to law. An agency action is contrary to law when the agency does not "act in accordance with the law governing" its particular action. *Sissel v. Wormuth*, 77 F.4th 941, 947 (D.C. Cir. 2023); *see N. Am.'s Bldg. Trades Unions*, 783 F. Supp. 3d at 310 (holding agency action was contrary to law because it "flatly contradict[ed] the unambiguous requirements of [an executive order] and its

implementing regulations"); *E. Band of Cherokee Indians v. U.S. Dep't of the Interior*, 534 F.

Supp. 3d 86, 97 (D.D.C. 2021) (explaining that "[a]gency action is obviously 'not in accordance

with law' if it violates some extant federal statute or regulation").

Zaid argues the agency defendants' summary revocation of his security clearance and

access to classified information was contrary to law because it failed to comply with applicable

regulations and executive orders. ECF No. 1 ¶ 57. Executive Order 10865 provides that classified

access "may not be finally denied or revoked" without a written statement of reasons, an

opportunity to respond and appear before the revoking authority, and an opportunity to cross-

examine adverse witnesses. Exec. Order No. 10,865, § 3, 25 Fed. Reg. 1583, 1583 (Feb. 20, 1960).

Executive Order 12968 sets forth similar procedures. Exec. Order No. 12,968, § 5, 60 Fed. Reg.

40245, 40252 (Aug. 2, 1995). And Executive Order 13467 provides agencies "may not establish

additional investigative or adjudicative requirements." Exec. Order No. 13,467, § 2.1(c), 73 Fed.

Reg. 38103, 38105 (June 30, 2008). As for regulations, the Director of National Intelligence

published the SEAD-4 directive, which establishes the "single, common adjudicative criteria" for

clearance eligibility. Off. of the Dir. of Nat'l Intel., Security Executive Agent Directive 4: National

Security Adjudicative Guidelines, at 1 (2017). The directive reinforces that individuals facing

denial or revocation of a security clearance should receive the protections outlined in Executive

Order 12968. *Id.* at 3. Intelligence Community Policy Guidance 704-3, which governs denial or

revocation of access to sensitive information, guarantees written notice, the right to counsel, an

opportunity to respond, and an opportunity to appeal. Off. of the Dir. of Nat'l Intel., Intelligence

Community Policy Guidance Number 704.3, at 1–2 (2008). And Department of Defense Directive

5220.6 provides for an opportunity to respond, a hearing, the right to counsel, and the right to

present evidence before a final unfavorable clearance decision is made. Dep't of Def., Directive Number 5220.6, at 4 (1992).

The agency defendants do not dispute that they did not follow these procedures to revoke Zaid's clearance. They, first, reiterate that the summary security clearance revocation is not reviewable, citing *Oryszak*, 576 F.3d 522. ECF No. 22-1 at 17–18; *see Oryszak*, 576 F.3d at 525 (holding that *Egan*'s reasoning forecloses APA review of an agency's determination of "'what constitutes an acceptable margin of error in assessing the potential risk' to national security inherent in granting any particular individual access to classified information" (quoting *Egan*, 484 U.S. at 529)). But, as described above, Zaid does not ask the court to review the merits of his summary security clearance revocation under the APA, which would be foreclosed by *Egan* and *Oryszak*. Zaid alleges the process followed—or more accurately, the lack of process—in revoking his clearance did not comply with existing regulations and procedures and therefore ran afoul of the APA. That challenge to the process or "means" of revoking his clearance is suitable for court review. *Greenberg*, 983 F.2d at 290.

The agency defendants argue, second, that their decision to revoke Zaid's clearance without any of the process required by existing executive orders and regulations is not contrary to law because their actions followed the presidential memorandum and, according to the agency defendants, those orders and regulations "do not apply to decisions by the President to revoke an individual's security clearance nor cases, like here, where the agencies are not making any independent or legally distinct determination." ECF No. 22-1 at 18. According to the agency defendants, the presidential memorandum "supersedes any Executive Branch regulations on which [Zaid] relies." *Id.* at 19. But the presidential memorandum did not purport to supersede anything; to the contrary, it expressly directed agency heads to act "consistent with existing law." ECF No.

1 ¶ 44. The above executive orders, rules, and regulations governing security clearances are all

"existing law," and the agency defendants concede they were not followed. *See* ECF No. 40 at 51;

*N. Am.'s Bldg. Trades Unions*, 783 F. Supp. 3d at 310 ("Agencies are bound to follow binding

executive orders unless rescinded or overridden through lawful procedures." (citing *Ass'n for*

*Women in Sci. v. Califano*, 566 F.2d 339, 344 (D.C. Cir. 1977); *Bldg. & Const. Trades Dep't, AFL-*

*CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002))). Zaid has accordingly stated a claim that the

agency defendants' summary revocation of his security clearance violated the APA.[5]

### 2. *Zaid Plausibly Alleges The Summary Revocation Of His Clearance Violated The Void For Vagueness Doctrine*

Zaid argues the standard applied to explain why his clearance would be revoked without

process—that it is not in the "national interest"—violates the prohibition on vague laws. ECF No.

1 ¶¶ 75–82. "A fundamental principle in our legal system is that laws which regulate persons or

entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television*

*Stations, Inc.*, 567 U.S. 239, 253 (2012). "A conviction or punishment fails to comply with due

process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary

intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages

seriously discriminatory enforcement.'" *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 304

---

[5]    Zaid also argues the agency defendants acted arbitrarily and capriciously by denying him the usual process afforded to others without any reasoned or legitimate explanation and by revoking his clearance without any consideration of the factors required by law. ECF No. 1 ¶ 58; *see also Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (explaining that an agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). Given the court's conclusion that Zaid has stated an APA claim and given that Zaid's arbitrary and capricious argument is premised on the same agency action and administrative record, the court need not separately analyze that argument at this stage.

(2008)). The void for vagueness doctrine addresses at least two due process concerns: "first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54.

The presidential memorandum here was one of a series of presidential orders targeting lawyers and law firms—specifically ones that "in one way or another, did not bow to the current presidential administration's political orthodoxy,"—by, among other things, revoking and suspending security clearances "without individualized explanation, consideration, or opportunity to be heard." *Jenner*, 784 F. Supp. 3d at 88, 101. Each of those presidential orders purported to summarily suspend security clearances not based on criteria used to assess national security risk, but in the name of the broad concept of "national interest." *See Perkins Coie*, 783 F. Supp. 3d at 128; *Jenner*, 784 F. Supp. 3d at 90; *Wilmer*, 784 F. Supp. 3d at 138; *Susman*, 789 F. Supp. 3d at 30. Like the executive orders, the presidential memorandum here does not purport to define "national interest," nor does it give Zaid or any other individual who holds or wishes to hold a security clearance any guidance as to how to avoid summary revocation of their clearance. The standard thus "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *Fox*, 567 U.S. at 253 (citation omitted).

The government argues that the void for vagueness doctrine does not apply because the presidential memorandum does not proscribe any conduct—it merely initiates a process to revoke security clearances. ECF No. 22-1 at 24. But the memorandum directs agency heads to take adverse action against Zaid and the other individuals listed. *See* ECF No. 1 ¶ 44. And the memorandum does not provide any notice to Zaid or anyone else with a security clearance as to "how [they]

should act in the future to avoid these sanctions." *Wilmer*, 784 F. Supp. 3d at 165. The memorandum leaves it to Zaid and others "to predict which causes . . . the President personally dislikes and then steer clear of those causes." *Id.* at 166. That is the kind of chilling effect the void for vagueness doctrine is designed to prevent. *See Fox*, 567 U.S. at 253–54 ("When speech is involved, rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech."); *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) ("The vagueness of [a regulation of speech] raises special First Amendment concerns because of its obvious chilling effect on free speech."). Consistent with the other courts in this district to consider whether the "national interest" standard for summary revocation of security clearances satisfies the Constitution's prohibition on vague laws, the court concludes Zaid has stated a vagueness claim. *See Perkins Coie*, 783 F. Supp. 3d at 177 (finding executive order void for vagueness where it left law firm "to guess at what is and is not permissible in the government's view, while already facing the threat of adverse actions during the guessing"); *Wilmer*, 784 F. Supp. 3d at 166 (holding "the Order fails to provide 'fair notice of conduct that is forbidden or required'" (quoting *Fox*, 567 U.S. at 253)); *Susman*, 789 F. Supp. 3d at 52 (holding that "[b]ecause the Order threatens penalties without sufficiently defining the conduct that triggers liability, it is unconstitutionally vague").

### 3. Zaid Plausibly Alleges The Summary Revocation Of His Clearance Violated The Bill Of Attainder Clause

Finally, the complaint asserts a violation of the Constitution's Bill of Attainder clause. ECF No. 1 ¶¶ 89–92. Article I, section 9 of the Constitution states: "No Bill of Attainder or ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. The next section states: "No State shall . . . pass any Bill of Attainder." U.S. Const. art. I, § 10, cl. 1. Zaid alleges the presidential memorandum's summary revocation of his security clearance functions as a bill of attainder by

singling him out by name for punishment, including damage to his reputation and livelihood as a national security lawyer. ECF No. 1 ¶ 91.

The government moves to dismiss this claim, arguing, first, that the Constitution's prohibition on bills of attainder applies only to the legislative branch, not the executive branch. ECF No. 22-1 at 29. But as Zaid points out, other protections lodged in Article I, including the prohibitions on titles of nobility and suspending the writ of habeas corpus, are logically applied to the President as well. *See* ECF No. 30 at 23–24. Professor Aaron H. Caplan's amicus brief details the history of attainder under English law, the Framers' loathing of such practices, and the Framers' understanding that English and early American law did not permit the king or a state governor to impose attainder unilaterally. ECF No. 27-1 at 2–5; *see, e.g.*, The Federalist No. 44, at 282 (James Madison) (Clinton Rossiter ed., 1961) (describing bills of attainder as "contrary to the first principles of the social compact"). Based on this history, which the government does not rebut, it is hard to imagine the Framers would have prohibited legislative bills of attainder while leaving the executive branch free to attaint whomever it likes. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 144 (1951) (Black, J., concurring) ("I cannot believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution."); *Peters v. Hobby*, 349 U.S. 331, 352 (1955) (Douglas, J., concurring) ("An administrative agency—the creature of Congress—certainly cannot exercise powers that Congress itself is barred from asserting."); *see also Perkins Coie*, 783 F. Supp. 3d at 173 n.36 (assumption that attainder prohibitions apply only to legislative branch is "called into question, particularly where executive orders appear to stand in for laws, by the constitutional text, which, in art. I, § 9, cl. 3, does not expressly limit the prohibition to the Congress, and then, in the following section

10 applies the prohibition to the States, as well as consideration of the history of bills of attainder").[6]

The government argues, second, that the presidential memorandum is not a bill of attainder because it does not impose punishment. ECF No. 22-1 at 29. The D.C. Circuit has recognized that "a law is prohibited under the bill of attainder clause 'if it (1) applies with specificity, and (2) imposes punishment.'" *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (citation omitted). Although the government does not dispute the memorandum singles out Zaid, satisfying the requisite specificity, it claims the revocation of security clearance "cannot constitute a punishment." ECF No. 22-1 at 29. But binding precedent rejects that rigid approach. The Supreme Court held by 1866 that "a forbidden attainder could embrace '[t]he deprivation of any rights, civil or political, previously enjoyed,' if the attending circumstances and causes of the deprivation demonstrated that the deprivation amounted to 'punishment.'" *Foretich*, 351 F.3d at 1217 (alteration in original) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 320 (1866)). The "list of punishments forbidden by the Bill of Attainder Clause has expanded to include bars to participation by individuals or groups in specific employments or professions." *Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*, 468 U.S. 841, 852 (1984); *see also id*. n.9 (collecting cases involving profession-based disadvantages or constraints).

---

[6]    The government cites several cases for the general proposition that bills of attainder are legislative acts. ECF No. 33 at 20. It is no doubt true that most challenges have arisen in that context. But none of the government's cases suggest that the executive branch is at liberty to issue bills of attainder and, to the contrary, some cases expressly acknowledge the Constitution may demand a more nuanced approach. *See Dehainaut v. Pena*, 32 F.3d 1066, 1070–71 (7th Cir. 1994) ("[T]he Supreme Court has not directly ruled either way on the applicability of the attainder ban to actions of executive and administrative agencies, and an argument can be made for analyzing each case functionally rather than structurally."); *id.* at 1071 ("[I]t is a conceivable step to also view an agency policy interpreting the language of a presidential directive issued pursuant to statutory authority as the functional equivalent of a legislative enactment for bill of attainder purposes." (citation omitted)).

Here, the government asks the court to presume the presidential memorandum was issued for the "obvious nonpunitive purpose" of "protect[ing] classified information." ECF No. 22-1 at 29–30. But to do so would be to ignore Zaid's allegations, which must be taken as true as they relate to the motion to dismiss. On those allegations, the memorandum was issued not based on any legitimate purpose or concern, but as retribution for Zaid's representation of whistleblowers and other clients in matters adverse to the government. ECF No. 1 ¶¶ 72–73; *see Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 476 (1977) (explaining that where no legitimate purpose is apparent, "it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers"). Zaid also alleges that this retribution has prevented him from fulfilling his ethical obligations to advocate for the very same category of clients and "damaged his reputation and livelihood as a national security lawyer." ECF No. 1 ¶ 91. So, while it is undoubtedly true that a denial of security clearance will generally not be punishment, here Zaid has plausibly alleged the memorandum imposes punishment. *See Nixon*, 433 U.S. at 475 ("Our treatment of the scope of the Clause has never precluded the possibility that new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee."); *Perkins Coie*, 783 F. Supp. 3d at 173 n.36 (observing that executive order was in many ways "indistinguishable from a bill of attainder" insofar as it "targets plaintiff specifically, finds facts and declares plaintiff guilty of 'racial discrimination,' 'unethical' and 'egregious' conduct, and imposes multiple forms of punitive adverse actions, without notice or other judicial process protections"). Accordingly, Zaid has plausibly alleged that the summary revocation of his security clearance pursuant to the presidential memorandum violated the Bill of Attainder clause.

## III.    Conclusion

For these reasons, the court grants in part and denies in part Zaid's motion for preliminary injunction, ECF No. 9, and denies the government's motion to dismiss, ECF No. 22. Zaid asks for

a preliminary injunction requiring the defendants to "immediately and fully restore" his security

clearance and access to classified information. ECF No. 31-2 at 2. The court crafts interim relief

tailored to Zaid's particular showing on this record, including the specific claims likely to succeed,

irreparable harm, and equities. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580

(2017) (acknowledging that the court "need not grant the total relief sought by the applicant but

may mold its decree to meet the exigencies of the particular case"). Here, Zaid has substantiated

that he is entitled to preliminary relief regarding the summary revocation of his security clearance

by the Defense Counterintelligence and Security Agency, the Central Intelligence Agency, and the

Office of the Director of National Intelligence, and denials of his access to and ability to use

classified information pursuant to the presidential memorandum. This does not include any

revocation or other lapse in security clearance or access to classified information independent of

the presidential memorandum and pursuant to ordinary agency process and applicable law.

Consistent with this opinion, the court orders:

- The Executive Office of the President; White House Chief of Staff; White House
  Deputy Chief of Staff; Department of Defense; Secretary of Defense; Deputy
  Secretary of Defense; Defense Counterintelligence and Security Agency; Director
  of the Defense Counterintelligence and Security Agency; Deputy Director of the
  Defense Counterintelligence and Security Agency; Central Intelligence Agency;
  Director of the Central Intelligence Agency; Deputy Director of the Central
  Intelligence Agency; Office of the Director of National Intelligence; Director of
  National Intelligence; Principal Deputy Director of National Intelligence; and the
  United States of America, and their officers, agents, employees, and attorneys, are
  enjoined from giving effect to security clearance revocations or denials of access

to or the ability to use classified information made pursuant to the March 22, 2025,

Presidential Memorandum entitled "Rescinding Security Clearances and Access to

Classified Information from Specified Individuals" as to Mark S. Zaid, including

security clearance revocations by the Defense Counterintelligence and Security

Agency, the Central Intelligence Agency, and the Office of the Director of National

Intelligence. *See* ECF No. 9-7; ECF No. 9-8; ECF No. 9-9. Nothing in this order

shall bar the defendants from suspending or revoking any security clearance or

access to classified information for reasons independent of the presidential

memorandum and pursuant to ordinary agency process and applicable law.

The preliminary injunction shall not go into effect for twenty-one days, until January 13,

2026, to provide the government with the opportunity to consider next steps, including whether to

appeal. The defendants shall file a status report by December 30, 2025, advising the court of their

proposed next steps.

AMIR H. ALI
United States District Judge

Date:    December 23, 2025

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARK S. ZAID, ESQ.,

    *Plaintiff*,

    v.

EXECUTIVE OFFICE OF THE PRESIDENT,
*et* al.,

    *Defendants*.

Civil Action No. 25-1365 (AHA)

**NOTICE OF APPEAL**

Defendants—Executive Office of the President, Department of Defense, Defense Counterintelligence and Security Agency, Central Intelligence Agency, Office of the Director of National Intelligence, and United States of America—respectfully provide notice that they hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Court's December 23, 2025, Order (ECF 52), which granted in part Plaintiff Mark Zaid's Motion for a Preliminary Injunction, denied Defendants' Motion to Dismiss, and entered a preliminary injunction against Defendants.

Dated: January 6, 2025
      Washington DC

Respectfully submitted,

*/s/ Michael K. Velchik*
MICHAEL K VELCHIK (DC Bar #187249)
Senior Counsel
United States Department of Justice
Civil Division
950 Pennsylvania Ave
Washington, DC 20530
Tel: (202) 860-8388
Email: michael.velchik@usdoj.gov

*Attorney for Defendants*

JA342

1                   UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3   MARK S. ZAID,                    )
                                     )
4            Plaintiff,              )
                                     )
5        vs.                         ) CASE NO. 1:25-cv-01365-AHA
                                     )
6   EXECUTIVE OFFICE OF THE          )
    PRESIDENT, et al.,               )
7                                    )
             Defendants.             )
8   _____    )

9


10                  TRANSCRIPT OF STATUS CONFERENCE
            **BEFORE THE HONORABLE AMIR H. ALI, DISTRICT JUDGE**
11                  Wednesday - January 7, 2026
                    4:03 p.m. - 4:22 p.m.
12                      Washington, DC

13  **FOR THE PLAINTIFF:**
         Lowell & Associates, PLLC
14       BY:  ABBE DAVID LOWELL and DAVID A. KOLANSKY
         1250 H Street, NW, Suite 250
15       Washington, DC 20005

16       Koskoff, Koskoff & Bieder, P.C.
         BY:  MARGARET DONOVAN
17       350 Fairfield Avenue
         Bridgeport, Connecticut 06604
18
         Democracy Defenders Fund
19       BY:  JOSHUA GABRIEL KOLB
         600 Pennsylvania Avenue, SE, Suite 15180
20       Washington, DC 20003

21
    _____
22                      **SONJA L. REEVES**
                    **Registered Diplomate Reporter**
23                   **Certified Realtime Reporter**
                   **Federal Official Court Reporter**
24                   333 Constitution Avenue, NW
                       Washington, DC 20001
25        Transcript Produced from the Stenographic Record



                          JA343

1    **FOR THE DEFENDANTS:**
        United States Department of Justice
2        BY:  ABHISHEK KAMBLI and MICHAEL K. VELCHIK
        950 Pennsylvania Avenue, NW
3        Washington, DC 20530

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to Order of the Court at 4:03 p.m.)
 2              DEPUTY CLERK:  This is Civil Action 25-1365, *Mark Zaid
 3   versus the Executive Office of the President, et al.*
 4              May I have counsel approach the lectern and state your
 5   appearance for the record, beginning with plaintiff's counsel.
 6              MR. LOWELL:  Good afternoon.  This is Abbe Lowell and
 7   David Kolansky of Lowell & Associates, and Margaret Donovan of
 8   the Koskoff firm on behalf of the plaintiff, Mark Zaid, who is
 9   here at the table.  And Josh Kolb of Democracy Defenders.
10              THE COURT:  Good afternoon, Mr. Lowell.  Good
11   afternoon to all of you.  Good afternoon, Mr. Zaid.  I always
12   say whenever a party is in the room, you're more than welcome,
13   as you know, to attend proceedings, and that goes for all
14   clients.
15              MR. KAMBLI:  Good afternoon, Your Honor.  Abhishek
16   Kambli and Michael Velchik for all the defendants.
17              THE COURT:  Good afternoon to both of you as well.
18   We're here on a status conference, which may be brief.  Famous
19   last words some might say.
20              You all have my preliminary injunction decision, and
21   you have had it for a couple weeks at this point.
22              Just give me a moment.  Let me kind of set the table
23   and tell you where I understand things are, and then I'm
24   obviously interested in hearing what the parties have come to.
25              I set the date of the injunction off by 21 days to
```

1  give the government the time to make a decision and also for us

2  to air out any issues that might come out in advance.

3        I have the government's status report.  I understand

4  that it plans to appeal and has filed its notice of appeal.  My

5  focus is on the next steps before this Court, particularly as

6  it relates to further litigation and anything related to the

7  injunction itself.

8        I imagine the latter itself is relatively

9  straightforward, given, at least as I understand it, the

10  government has been complying with several similar injunctions

11  in the law firm cases, and I haven't seen any kind of practical

12  concerns raised in this case in the status reports.

13        As to litigation, I did see the government requested

14  that the Court hold the case in abeyance pending appeal.  I

15  understand that to be a proposal to hold the case in abeyance

16  as it relates to litigation deadlines, responsive pleadings,

17  perhaps meet and confer report.  I want to hear the parties'

18  views on that.  I know you will have conferred on that.

19        One thing I wanted to put out there and give the

20  parties notice of, we had had, I think, a prior request from

21  plaintiff's counsel at some point to move ahead to just

22  judgment on the merits.  And the issue has come up in the

23  teleconference we had in October, and I think it came up in the

24  original PI hearing as to what discovery there even is in this

25  case, and I think both parties have kind of said there isn't

1    any.  Plaintiffs saying that at the original PI hearing and

2    defendants saying that, I think, in the teleconference.  I

3    understand the defendants' position was that we should move

4    past the PI since it had been briefed at that point, and that's

5    how plaintiff proceeded.

6         I do think it might be helpful to hear the parties'

7    positions on just moving to the merits, and perhaps that would

8    be a cleaner way to proceed, and, if so, what type of briefing

9    the parties would want on that.

10        Maybe another way to put it is what are we holding in

11   abeyance?  Theoretically, it's discovery, but if neither party

12   thinks it's needed, what are we holding in abeyance?

13        With all that on the table, I asked the parties to

14   confer on next steps.  Mr. Lowell, it looked like you were

15   ready to come up first.  I don't know if you all had a plan.

16        MR. LOWELL:  We did what Your Honor asked us to do.

17   We conferred with the government on a few topics, all of which

18   you have put into your order.

19        Let me start with the first one, which you just ended

20   with.  The issue of abeyance really depends, and we're still

21   fleshing this out, on, as you just said, what does abeyance

22   mean?  And so there are potential pieces of abeyance.

23        One would be, is there going to be any claim that

24   needs discovery, and, if so, would that be in abeyance?  And

25   the second is should we move to the final judgment?

1          We theoretically told the government we didn't have a

2  problem with abeyance defined in the following way:  One, we

3  may want to amend the complaint to add a cause, and, if that's

4  the case, that doesn't have to be part of abeyance because

5  nothing necessarily has to happen.

6          THE COURT:  Is that the Privacy Act cause that was

7  referred to?

8          MR. LOWELL:  Yes.  So it might be that.

9          Secondly, in terms of then discovery, that might

10 involve discovery, but we don't necessarily have to start that.

11         And then the third piece is whether we would move to a

12 judgment, but I want to not answer the third part until we

13 decide about whether we're going to seek to amend.  If we were,

14 then the question would become whether or not there can still

15 be -- move forward on the final judgment.

16         If the government's preference is, yes, it doesn't

17 include the amendment, but we don't want to proceed on

18 discovery while the case is pending on appeal, and, therefore,

19 we don't want to see whether or not there should be briefing on

20 a motion for summary judgment, we could probably say okay to

21 that.

22         That dovetails over to the next issue, which was your

23 second piece, which is, to use your phrase, how is the

24 injunction going to be in effect.  You gave them 21 days,

25 which, by my math, is over on Tuesday, the 13th, I think.

1          Today in our conference they told us that they were

2     going to, quote, "obey the injunction."  I asked them what that

3     meant, and they answered that they were going to obey the

4     injunction, to which I said, "What does that mean?"

5          Coming to the podium, counsel for the government said,

6     because I asked them on the phone, I said, "Generally, an

7     injunction restores a party to the status quo ante.  Status quo

8     ante here is that Mr. Zaid has his security clearances intact,

9     restored, et cetera, and that he can go about his business of

10    representing his clients, one of whom needs him in this coming

11    week.

12         Coming in they said they will do that.  It's a

13    question of how to do it with the agencies involved.  I would

14    like a little clarification from the Court as to what that

15    entails and whether it will happen before the 13th, as your

16    order says, because then it kind of depends on what else has to

17    happen in this courtroom if they are saying there is something

18    that I'm not following.

19         My understanding may be, and this is something I would

20    also ask the Court to inquire about, if possible, is whether

21    they are saying that what we're doing here is we're going to

22    restore the status quo, but we're immediately taking up the

23    idea that we are pondering with our agency clients to now begin

24    a process to either suspend or to seek the revocation of

25    Mr. Zaid's clearance for some other reason that they didn't

1    have the first time and they didn't do the right way the first

2    time.  That also may implicate whether we want there to be any

3    other proceedings in the district court, because if they are

4    doing that, you can imagine we would have something to say as

5    to whether that's a real event or not.

6            I need a little clarification from the government on

7    what it means by obeying the injunction and restoring the

8    status quo, and whether or not that is what their true intent

9    is, because that also implicates the last part of your order,

10   which I know it's not your issue, but you want to hear about

11   it, which is what are we going to do on the appeal.  Is it

12   going to be expedited?  Are we going to do what?  Are we

13   joining with the other cases?

14           That we can work out with them.  We started to have

15   that conversation.  It depends a little bit about my other two

16   pieces.

17           THE COURT:  That's helpful.  Let's stick with the

18   definition of abeyance question for a moment, in part because I

19   want to hear from the government.  My initial reaction is I

20   take the government at its words when it says it will obey the

21   injunction first.

22           Two, it doesn't seem to me that complicated to hold

23   certain deadlines in abeyance if that's the way we go.  There

24   is the moving to judgment option as well, while also making

25   clear that compliance with the injunction is required and if

```
 1    there is any issue of compliance, that could still be litigated
 2    pending the appeal, so I think that could probably be
 3    satisfied.
 4          Again, just to be frank with everybody, I'm reticent
 5    to get into compliance issues before compliance issues arise.
 6    And that might be frustrating to some, but it's just the nature
 7    of how courts operate.
 8          And so I'm happy to kind of hear more about that.
 9    Obviously, part of the reason of this, as I said, this period
10    is to give an opportunity to air out these sorts of issues.
11    It's a completely appropriate thing to raise.  I'll hear the
12    government out on that.
13          But just sticking for a moment with the abeyance
14    question, I'm going to ask the government this for obvious
15    reasons, but what's your understanding coming out of the
16    conversation with the government on the definition of abeyance?
17    Have you guys reached a meeting of the minds on that?
18          MR. LOWELL:  Prior to my remembering that there is the
19    possibility, as I said, to reserve the ability to amend, we
20    understood abeyance meant there would not be us seeking
21    discovery in this interim while the case is on appeal, and that
22    we would not be seeking at this point moving ahead to final
23    judgment and a motion for summary judgment.  That's what it
24    meant to us.
25          THE COURT:  Let me hear from the government then on
```

1     those questions.  Let's start with what happens before this

2     Court as it relates to holding deadlines in abeyance and what

3     you understand to be the agreement.  It sounds like there might

4     be some question for the plaintiff on amendment.

5          MR. KAMBLI:  Amendment was not part of our

6     conversation, but, yeah, the intent is to pause all deadlines,

7     including motions for summary judgment.

8          We are seeking expedited briefing on the appeal, so I

9     think that will answer the merits, so we just wanted to avoid

10    duplicative briefing if the DC Circuit is going to decide it

11    soon enough.

12         THE COURT:  The duplicative briefing point is that it

13    would be duplicative to brief it to the circuit but then also

14    have briefing pending on the merits here?  I think I understand

15    that point.

16         Well, and then maybe I can turn quickly at least to

17    the compliance with the injunction.  Tell me the government's

18    position with that.

19         MR. KAMBLI:  We intend to follow the Court's order.

20    We're going to -- the plan is to restore the status quo, unless

21    the agencies have an independent reason, another Presidential

22    Memorandum to do something, which I can't foreclose, throughout

23    the pendency of the appeal, but barring that, the intent is to

24    restore the status quo and his clearance prior to the

25    Presidential Memorandum.

1          THE COURT:  One of my goals in having the period right

2    now to talk about what compliance looks like -- and I'm not

3    hearing from you all that you're going to turn this into

4    emergency posture where you come to me at the last second and

5    say, "I want a stay of your injunction," and go all the way up

6    and do that.

7          MR. KAMBLI:  Yeah, we're not seeking a stay.

8          THE COURT:  I just wanted to make sure.  That would be

9    kind of inconsistent with the process, how it's unfolded.

10          How do you propose -- now that you have heard

11    plaintiff's wrinkle about amendment, maybe you haven't had time

12    to think about it, how would that fit into what you have come

13    up with?

14          MR. KAMBLI:  Yes, Your Honor.  We would have to put a

15    little more thought into that.  We don't have any issue with

16    them amending their complaint and then just holding any

17    deadlines in abeyance in response to that while the appeal is

18    pending.

19          Given the expedited nature of the briefing, before

20    anything serious is due, we might be able to get a decision

21    from the DC Circuit anyway.

22          THE COURT:  Okay.  When you reference, as it relates

23    to the injunction, anything independent -- obviously, my

24    injunction recognized that it is specific to the types of

25    claims that were found to likely succeed, at least by me, and

```
 1    that it's not enjoining an independent basis.  Are you
 2    referring to an existing independent basis for these or a
 3    future process?
 4           MR. KAMBLI:  Your Honor, I'm not aware of any
 5    immediate plans one way or the other, but I don't want to
 6    foreclose that process.
 7           THE COURT:  I just want to make sure there's not
 8    something you have in mind that you could offer me now that
 9    would be useful.
10           MR. KAMBLI:  There is nothing I can offer now.
11           THE COURT:  Let me hear from Mr. Lowell then.  It
12    sounds like the only wrinkle left, unless I'm mistaken, I guess
13    there is two for me, one for you, I suppose.
14           The two for me are amendment and how that impacts
15    holding the case in abeyance and what deadlines, and whether to
16    proceed on the merits.  It sounds like you all are fine not
17    proceeding on the merits.  I want to think about that a little
18    bit, but I did want to give you all notice of that, that I am
19    thinking about that, today.
20           Let me hear what you propose on the amendment
21    question.
22           MR. LOWELL:  On the proposal that I just heard, even
23    if we were to amend, then I don't have an issue and a problem
24    with they not having to respond, either by a motion or
25    response.  We can hold that, quote, "in abeyance," so that's
```

how one would resolve that.  Again, if that was a problem, we
could bring the Privacy Act, I suppose, as a standalone case,
but then it might likely be consolidated maybe.

Anyway, I think the easiest thing is if we decide that
we are going to amend, what I understand the government saying
is they don't have a problem with that as long as they don't
have to respond, that's part of the abeyance, and that would be
fine with us.

As to the judgment issue, if the Court is going to
think about it, that's fine.  I understand the problem of these
being legal issues that are simultaneously being litigated
before you and before the panel of the Court of Appeals.
Because that is mostly a legal issue, that makes some sense
perhaps that we don't go to judgment, but if the Court prefers
otherwise, we're prepared to respond on whatever schedule you
put before us for that, partially because, again, it's the same
issue, so we know how to litigate that.  I think it's up to you
at this point on that one.

And then I have a third point when you're there.

THE COURT:  All right.  I want to hear your third
point, but on the amendment question, how long do you need to
move to amend?

MR. LOWELL:  I think we would decide that in the next
two weeks.

THE COURT:  Okay.  All right.  Is the government fine

1    with giving them two weeks to file their motion for leave to

2    amend?  You all can tell me then whether you oppose leave.

3    That piece wouldn't be stayed, but we would be doing this on

4    the understanding, at least as it relates to amendment of the

5    complaint, that you wouldn't be filing a responsive pleading

6    after that.

7          MR. KAMBLI:  No objection to that.

8          MR. LOWELL:  That works with, again, that one

9    asterisk.  The asterisk is that phrase that you inquired of the

10   government counsel about that I noted too, which is unless the

11   agencies have some independent reason in order to be in

12   compliance, I guess that's in the compliance mode in which we

13   have the ability to come before the Court again should there be

14   a glitch in "I'm going to comply with the injunction."  I just

15   don't know what that means.

16         And so I'm going to just take that as we can't bind

17   any of these agencies, but you asked the right question, which

18   I was going to ask, which is, if that's the case, is it based

19   on something that was in existence as we have been dealing with

20   this for the last X months, or is it something new, which makes

21   no sense given that Mr. Zaid has not been operating.  I just

22   don't know what that means.  And maybe I'm just being overly

23   cautious.

24         THE COURT:  I understand why you would be cautious for

25   your client.  I heard government counsel tell me he's got no

```
 1   basis to think right now that there is an independent basis for
 2   doing so or plan to do that.  I take his word as a
 3   representation made to me in court.
 4        I think what you do have is a case that was founded on
 5   flawed process, right, and the injunction therefore explicitly
 6   tailored to flawed process and necessarily needing to
 7   acknowledge the possibility of a non-flawed process that's run.
 8        In other words, I think what you complained of was, to
 9   put it simply, not having an individualized assessment, and so
10   the injunction is limited to that and it's not going to stop
11   the government from running national security the way that is
12   lawful and constitutional to do so, right.  And it's obviously
13   a sensitive area.
14        I take counsel just to be using the language that is
15   in the injunction.  Is that accurate, Counsel?
16        MR. KAMBLI:  Yes, Your Honor.  We're just leaving open
17   the possibility that if they do do that, that's allowed by the
18   injunction.
19        THE COURT:  With no current plan that you're aware of
20   to do so?
21        MR. KAMBLI:  I don't have any personal knowledge of
22   that.
23        MR. LOWELL:  This is a little cart-and-horse
24   situation, so I'll leave the cart behind the horse for the
25   moment and we'll see where that goes.
```

JA357

```
 1          THE COURT:  I understand the interest for both parties
 2   to proceed cautiously here and make sure you're preserving the
 3   arguments you have to preserve, but I think you're going to
 4   have to wait for an issue like that to be presented before you
 5   can present it to me and before I can do anything with it.
 6          MR. LOWELL:  That makes sense.  So we are committed to
 7   making that decision and act or not act, and let the Court and
 8   counsel know in two weeks or fewer days about the issue of
 9   amendment.
10          We understand that that would still allow them not to
11   have to respond in any fashion, answer or motion to dismiss.
12          We understand that they are moving to appeal.
13          We understand they are not moving to stay in front of
14   you or in front of the Court of Appeals.
15          And then the Court will decide if it wants a schedule
16   for any other pleading, which we will conform with.
17          Does that sort of summarize correctly, I hope?
18          THE COURT:  You were speaking pretty quickly there.
19   I'm going to let my words speak for what I have said, and I
20   don't think I need to go with your summary.  I don't think I
21   need to adopt your summary.
22          I feel like we have reached a point right now -- this
23   was a pretty efficient hearing.  I said it was famous last
24   words at the outset, but actually not last words at all.
25          Is there anything else for me to address today?
```

```
 1          MR. KAMBLI:  No, Your Honor, other than, you said in

 2   the order that the parties may want to discuss scheduling for

 3   the briefing.  We have complied with that as well.

 4          THE COURT:  Do you have a proposal?  You guys are

 5   still talking about that?

 6          MR. LOWELL:  Yes.

 7          THE COURT:  You guys can propose that to the Court of

 8   Appeals, and it will be up to them what sort of schedule they

 9   proceed on.

10          MR. LOWELL:  Would you give me a moment to consult

11   with client and co-counsel before I say if we have any other

12   issue?

13          THE COURT:  Sure.

14          MR. LOWELL:  It will take 30 seconds.

15     (Pause)

16          MR. LOWELL:  Took less than 30 seconds.  We're done.

17   I don't have any other issues to raise with the Court.

18          THE COURT:  Thanks, Mr. Lowell.

19          Anything else from the government?

20          MR. KAMBLI:  No, Your Honor.

21          THE COURT:  Let me take these submissions under

22   advisement.  I appreciate the time put into the status reports

23   and into your conferencing with one other and into this

24   hearing.  I'll issue an order with how we'll proceed in the

25   case.
```

1          We can adjourn.

2      (Proceedings concluded at 4:22 p.m.)

3

4                        CERTIFICATE

5      I, Sonja L. Reeves, Federal Official Court Reporter in and
   for the United States District Court of the District of
6  Columbia, do hereby certify that the foregoing transcript is a
   true and accurate transcript from the original stenographic
7  record in the above-entitled matter and that the transcript
   page format is in conformance with the regulations of the
8  Judicial Conference of the United States.

9      Dated this 9th day of January, 2026.

10

11                      /s/ Sonja L. Reeves
                        SONJA L. REEVES, RDR-CRR
12                      FEDERAL OFFICIAL COURT REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MARK S. ZAID, ESQ.                          *
                                            *
    Plaintiff,                          *
                                            *
    v.                                  *        Civil Action No. 25-01365 (AHA)
                                            *
EXECUTIVE OFFICE OF THE                     *
PRESIDENT <u>et. al.</u>                    *
                                            *
    Defendants.                         *
                                            *
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>PLAINTIFF'S STATUS REPORT</u>

During the Status Conference held on January 7, 2026, the Court directed and Plaintiff's counsel agreed that we would advise the Court and counsel within "two weeks or fewer" about the issue of amendment, specifically whether Plaintiff intended to add a Privacy Act cause of action to his Complaint in this case.  1/07/26 Tr. at 16:6-9.

Plaintiff does not intend to move for leave to amend at this time[1], and as discussed during the Status Conference, Plaintiff consents to staying all further proceedings in this Court pending resolution of the matter on appeal, unless or in the event that something new arises regarding Mr. Zaid's clearance status or access that would prompt the parties to come back to the Court.

---

[1] However, consistent with the statute of limitations, Plaintiff reserves the right to pursue that claim in the future.

1

JA361

Dated: January 21, 2026

/s/ Abbe David Lowell
Abbe David Lowell (D.C. Bar #358651)
David A. Kolansky (NY Bar #5887765)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
Tel: (202) 964-6110
Fax: (202) 964-6116
alowellpublicoutreach@lowellandassociates.com
dkolansky@lowellandassociates.com

/s/ Margaret M. Donovan
Margaret M. Donovan (D.C. Bar #CT0026)
Christopher M. Mattei (*pro hac vice*)
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com
cmattei@koskoff.com

Respectfully Submitted,

/s/ Norman L. Eisen
Norman L. Eisen (D.C. Bar #435051)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue, SE, #15180
Washington, D.C. 20003
Tel: (202) 594-9958
norman@statedemocracydefenders.org

*Counsel for Plaintiff Mark S. Zaid*

2

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system.


*/s/   Abhishek Kambli*

ABHISHEK KAMBLI