**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

MARK ZAID,

Plaintiff-Appellee,

v.

EXECUTIVE OFFICE OF THE PRESIDENT, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

**BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES
UNION, AMERICAN CIVIL LIBERTIES UNION OF THE
DISTRICT OF COLUMBIA, KNIGHT FIRST AMENDMENT
INSTITUTE AT COLUMBIA UNIVERSITY, ELECTRONIC
FRONTIER FOUNDATION, AND RUTHERFORD INSTITUTE IN
SUPPORT OF APPELLEE AND AFFIRMANCE**

Laura K. Follansbee
Arthur B. Spitzer
Scott Michelman
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION OF THE
   DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
Tel.: (202) 457-0800
Email: lfollansbee@acludc.org
     aspitzer@acludc.org
     smichelman@acludc.org

Brian Hauss
Ashley Gorski
Hina Shamsi
Ben Wizner
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
Email: bhauss@aclu.org
     agorski@aclu.org
     hshamsi@aclu.org
     bwizner@aclu.org

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

### A. Parties and *Amici*

To the best of counsel's knowledge, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief of Defendants-Appellants, except for the following: *amici curiae* American Civil Liberties Union, American Civil Liberties Union of the District of Columbia, Knight First Amendment Institute at Columbia University, Electronic Frontier Foundation, and Rutherford Institute, which file this brief in support of Plaintiff-Appellee.

### B. Corporate Disclosure Statement

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, *amici* certify that they are non-profit corporations that defend civil rights and civil liberties in the United States, defend the freedoms of speech and the press, and provide legal assistance to individuals whose constitutional rights have been threatened or violated, and educate the public about constitutional and human rights issues affecting their freedoms. *Amici* further certify that they have no parent corporations and that, as they

issue no stock, no publicly held corporation owns 10 percent or more of any stock in *amici*.

## C.    Rulings Under Review

References to the rulings at issue appear in the Brief for Defendants-Appellants.

## D.    Related Cases

This case has not previously been before this Court or any court other than the district court. Undersigned counsel is aware of the following related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C): No. 25-5241, *Perkins Coie LLP v. United States Department of Justice, et al.*; No. 25-5265, *Jenner & Block LLP v. United States Department of Justice, et al.*; No. 25-5277, *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President, et al.*; No. 25-5310, *Susman Godfrey LLP v. Executive Office of the President, et al.*

*/s/ Arthur B. Spitzer*
Arthur B. Spitzer

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND CORPORATE DISCLOSURE STATEMENT ....................................i

TABLE OF AUTHORITIES..................................................................iii

GLOSSARY OF ABBREVIATIONS ......................................................... x

STATEMENTS OF INTEREST OF *AMICI CURIAE* ............................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 1

ARGUMENT...................................................................................... 7

I. The Court Should Not Abdicate Review of Unconstitutional Conduct Simply Because It Concerns a Security Clearance........7

    A. *The Constitution's Text Does Not Preclude Judicial Review of Security Clearance Matters*.......................9

    B. *The Constitution's Structure Gives the Judiciary an Essential Role in Reviewing the Constitutionality of Executive Branch Conduct*....................................10

    C. *Congress's Exercise of its Article I Power in the Security Clearance Context Confirms That the President's Power is Not Plenary*.............................11

    D. *Precedent Supports Judicial Review of Unconstitutional Actions by the Political Branches, Even in a National Security Context*.........................15

    E. *The Judiciary is Well-Equipped to Adjudicate Mr. Zaid's Constitutional Claims*...........................18

    F. Egan *Does Not Preclude Review of Mr. Zaid's Claim*.................................................................19

    G. *Misreading* Egan *and* Lee *to Foreclose Review Would Invite Further Abuse*.................................23

II. The Presidential Memorandum Unconstitutionally Retaliates Against Mr. Zaid for His Legal Advocacy on Behalf of Whistleblowers..................................................................25

III. The Retaliation Against Mr. Zaid Violates Separation of Powers and Due Process...............................................29

CONCLUSION....................................................................34

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases***          **Page(s)**

*Abel v. United States,*
362 U.S. 217 (1960) ......................................................... 30

*Abramski v. United States,*
573 U.S. 169 (2014) ........................................................ 13

*Aref v. Lynch,*
833 F.3d 242 (D.C. Cir. 2016) ........................................ 26

*Banks v. York,*
515 F. Supp. 2d 89 (D.D.C. 2007) .................................. 26

*BEG Invs., LLC v. Alberti,*
144 F. Supp. 3d 16 (D.D.C. 2015) .................................. 28

*Borough of Duryea, Pa. v. Guarnieri,*
564 U.S. 379 (2011) ........................................................ 26

*Boumediene v. Bush,*
553 U.S. 723 (2008) ................................................. 16, 31

*Cheek v. United States,*
858 F.2d 1330 (8th Cir. 1988) ....................................... 33

***Dep't of Navy v. Egan,***
484 U.S. 518 (1988) .................................... 4, 7, 9, 19, 21, 22

*Doe v. District of Columbia,*
697 F.2d 1115 (D.C. Cir. 1983) ...................................... 33

*Gill v. United States Dep't of Just.,*
875 F.3d 677 (D.C. Cir. 2017) ........................................ 21

---

* Authorities chiefly relied upon are designated with asterisks.

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006) ...................................................................... 17

*Hamdi v. Rumsfeld,*
542 U.S. 507 (2004) ...................................................................... 16

*Harmon v. Thornburgh,*
878 F.2d 484 (D.C. Cir. 1989) ...................................................... 24

*Hartman v. Moore,*
547 U.S. 250 (2006) ...................................................................... 25

*Hill v. White,*
321 F.3d 1334 (11th Cir. 2003) ...................................................... 8

*Home Bldg. & Loan Ass'n v. Blaisdell,*
290 U.S. 398 (1934) ...................................................................... 15

*Jacobs v. Schiffer,*
204 F. 3d 259 (D.C. Cir. 2000) ...................................................... 13

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
341 U.S. 123 (1951) ...................................................................... 28

*Korematsu v. United States,*
323 U.S. 214 (1944) ...................................................................... 17

*Lee v. Garland,*
120 F.4th 880 (D.C. Cir. 2024) ...................................................... 22

*Legal Servs. Corp. v. Velazquez,*
531 U.S. 533 (2001) ............................................ 26, 27, 29, 31, 32

*Lozman v. City of Riviera Beach,*
585 U.S. 87 (2018) ........................................................................ 25

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803) ..................................................... 9, 17

*N.Y. Times Co. v. United States,*
403 U.S. 713 (1971) ....................................................................... 30

*\*Nat'l Fed'n of Fed. Emps. v. Greenberg,*
983 F.2d 286 (D.C. Cir. 1993) ................................................... 8, 20, 22

*Oryszak v. Sullivan,*
576 F.3d 522 (D.C. Cir. 2009) ........................................................... 20

*Powell v. Alabama,*
287 U.S. 45 (1932) ............................................................................ 33

*Rogers v. Tennessee,*
532 U.S. 451 (2001) .......................................................................... 25

*Ryan v. Reno,*
168 F.3d 520 (D.C. Cir. 1999) ........................................................... 20

*Schneider v. New Jersey,*
308 U.S. 147 (1939) .......................................................................... 16

*Susman Godfrey LLP v. Exec. Off. of President,*
789 F. Supp. 3d 15 (D.D.C. 2025) ....................................................... 3

*Thomas v. Collins,*
323 U.S. 516 (1945) .......................................................................... 26

*Trump v. Hawaii,*
585 U.S. 667 (2018) .......................................................................... 17

*United States ex rel. Carey v. Rundle,*
409 F.2d 1210 (3d Cir. 1969).............................................................. 33

*United States v. Gonzalez-Lopez,*
548 U.S. 140 (2006) .......................................................................... 33

*United States v. Robel,*
389 U.S. 258 (1967) ..................................................................... 15, 16

*Webster v. Doe*,
486 U.S. 592 (1988) ................................................. 18, 19, 20

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ................................................. 11, 15, 30

*\*Zaid v. Exec. Off. of President,*
2025 WL 3724884 (D.D.C. Dec. 23, 2025) ................................. 6, 23, 28

**Statutes**

18 U.S.C. app. 3 §§ 1-16 ............................................... 14

50 U.S.C. ch. 45 subch. III ........................................... 14

50 U.S.C. § 1801 *et seq.* ............................................. 14

50 U.S.C. § 3091 ...................................................... 13

50 U.S.C. § 3341(j) ................................................... 5, 12

50 U.S.C. § 3342 ...................................................... 11

**Other Authorities**

1 Annals of Cong. 457 (1789) (J. Madison)
(Joseph Gales ed., 1834) ............................................ 29

*Addressing Remedial Action by Paul Weiss*, Executive Order 14244,
90 Fed. Reg. 13685 (Mar. 21, 2025) ................................. 3, 4

*Holding Former Government Officials Accountable for Election
Interference and Improper Disclosure of Sensitive Governmental
Information*, The White House (Jan. 20, 2025),
https://www.whitehouse.gov/presidential-actions/2025/01/holding-
former-government-officials-accountablefor-election-interference-and-
improper-disclosure-of-sensitive-governmental-information/. ............ 1

Jason Rathod, *Not Peace, but A Sword:* Navy v. Egan *and the Case Against Judicial Abdication in Foreign Affairs*,
59 Duke L.J. 595 (2009) ........................................................................ 24

Matthew Goldstein, *Two Law Firms File for Permanent Relief From Trump's Executive Orders*, N.Y. Times (Apr. 8, 2025), https://www.nytimes.com/2025/04/08/business/jenner-block-trump-filing.html ....................................................................... 27, 32

*Rescinding Security Clearances and Access to Classified Information from Specified Individuals*, The White House (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/rescinding-security-clearances-and-access-to-classified-information-from-specified-individuals/ ....................................................... 2, 18

Richard H. Fallon, Jr., *Of Legislative Courts, Administrative Agencies, and Article III*,
101 Harv. L. Rev. 915 (1988) ............................................................... 11

S. REP. NO. 113-120 (2013) ....................................................................... 13

*Security Clearance FAQs*, ClearedJobs.Net, https://clearedjobs.net/security-clearance-faqs ................................... 10

2 Diary & Autobiography of John Adams 79 (L.H. Butterfield ed., 1961) (entry of March 5, 1773). .................................................................. 30

The Federalist No. 51 (James Madison) (Clinton Rossiter ed., 1961) ..................................................................... 10

## Constitutional Provisions

U.S. Const., Amend. I ................................................................................. 9
U.S. Const., Art. I, § 8 ............................................................................. 10

# GLOSSARY OF ABBREVIATIONS

Central Intelligence Agency........................................................ CIA

National Security Agency ......................................................... NSA

Merit Systems Protection Board............................................... MSPB

## STATEMENTS OF INTEREST OF *AMICI CURIAE*

The Statements of Interest of the *Amici Curiae* are set out in the Addendum.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

On the day he was inaugurated, President Trump ordered that "any current or active clearances held by" Leon Panetta, James Clapper Jr., Michael Hayden, John Brennan, and 46 others be revoked "[e]ffective immediately." Presidential Action, Jan. 20, 2025.[2] It is self-evident that the former Secretary of Defense, Director of National Intelligence, Directors of the Central Intelligence Agency ("CIA") and National Security Agency ("NSA"), and White House Chief of Staff, did not suddenly become security risks on the afternoon of January 20, 2025. It is equally self-evident that there was no investigation or process between noon on January 20 and the time the Presidential Action was signed.

---

[1] Counsel of record for all parties have been notified of *amici curiae*'s intent to file this brief and have consented to its filing. Under Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* state that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

[2] https://perma.cc/54UJ-P4JU.

A few weeks later, President Trump "direct[ed] every executive department and agency head . . . to revoke any active security clearances held by" another group of named individuals "and to immediately rescind their access to classified information." That list included Hillary Clinton, Kamala Harris, Elizabeth Cheney, former Secretary of State Antony Blinken, New York Attorney General Letitia James, former President Joseph Biden, "and any other member of Joseph R. Biden Jr.'s family." Presidential Memorandum, Mar. 22, 2025.[3] That list also included Plaintiff-Appellee Mark Zaid, an attorney who represents national security whistleblowers and other clients in cases involving classified information. *Id.* It is apparent that these individuals had not suddenly become security risks, and that no investigation or process was involved in making the decision to "immediately" revoke their security clearances.

President Trump also issued five Executive Orders directing the immediate suspension of any security clearances held by any individuals

___

[3] https://perma.cc/8YJL-GUGH.

at each of five prominent law firms.[4] As with his earlier orders, it is evident that every individual at each of these law firms had not suddenly become a security risk, and that no investigation or process was involved in making the decision to "immediately" suspend their security clearances. Indeed, aside from a few named individuals, President Trump had no idea who at these firms held security clearances.

If proof is required that the President's orders were not grounded in any deliberative processes regarding national security risk—or on any actual concern about national security—it is found in Executive Order 14244, 90 Fed. Reg. 13685 (Mar. 21, 2025), titled "Addressing Remedial Action by Paul Weiss." In that order, President Trump "hereby revoke[d] Executive Order 14237," including its suspension of security clearances, just one week later. As that Executive Order makes clear, there was no process, and no finding, that all the employees at Paul Weiss who were suddenly deemed security risks on March 14 were no longer security risks on March 21. Rather, their clearances were restored simply because Paul Weiss had "agreed to a number of policy changes to promote

---

[4] *See Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 29 (D.D.C. 2025) (citing the relevant Executive Orders).

equality, justice, and the principles that keep our Nation strong, including . . . dedicating the equivalent of $40 million in pro bono legal services during my term in office to support [certain] causes." *Id.*, 90 Fed. Reg. at 13685.

This Court should affirm the district court's preliminary injunction. The Constitution's text and structure, together with longstanding legislation and precedent, confirm that this Court can review the constitutional claims presented here, even when the government tries to evade review under the guise of national security. Despite the Department of Justice's insistence, *Dep't of Navy v. Egan*, 484 U.S. 518 (1988), does not preclude review of Mr. Zaid's claims that the Executive unconstitutionally revoked his security clearance, without process, in retaliation for his protected speech and petitioning. *Egan* was a narrow decision regarding the Merit Systems Protection Board's ("MSPB's") statutory authority to review the substance of a security clearance decision. *Id.* at 520. Neither *Egan* nor its progeny bar courts from adjudicating colorable constitutional claims just because they concern security clearances.

4

And in fact, Congress, pursuant to its Article I powers, has circumscribed the President's authority in this realm, providing that retaliation against government employees for national security whistleblowing, or for assisting such whistleblowers, is not a lawful basis for the revocation of a security clearance. 50 U.S.C. § 3341(j). Although Mr. Zaid is not a government employee, this statute belies the Justice Department's assertion of plenary executive authority over the issues in this case, and there is no reason to believe that Congress intended to allow retaliation against private counsel in the same position.

Refusing even to review Mr. Zaid's claims would not only countenance the unconstitutional conduct here but would also invite further abuse of the security clearance process as a tool of naked retaliation.

On the merits, the President's Memorandum revoking Mr. Zaid's security clearance is a textbook case of First Amendment retaliation. The constitutional violation here is so obvious that it transcends the difficult factual or legal inquiries that might arise in other cases. Mr. Zaid's speech and petitioning on behalf of government whistleblowers is protected under the First Amendment, the summary revocation of his

security clearance would chill a person of ordinary firmness, and the district court correctly found "that Zaid's representation of whistleblowers and other clients adverse to the government was the sole reason for summarily revoking his security clearance." *Zaid v. Exec. Off. of President*, 2025 WL 3724884, at *8 (D.D.C. Dec. 23, 2025).

The President's unconstitutional retaliation against Mr. Zaid also threatens the independence of the judiciary by chilling attorneys who would represent individuals challenging government conduct. When attorneys are deterred from taking on clients or making their most powerful arguments for fear of unlawful retribution, the integrity of the judicial process will suffer. In a similar vein, the President's Memorandum also violates the right to counsel guaranteed by the Fifth and Sixth Amendments, giving the government an unfettered veto over the selection of counsel in cases involving classified material.

In a case with such high stakes and such clear constitutional impropriety, the Court should accede to the President's assertion of unfettered power to punish his political enemies, and their lawyers, under the pretext of protecting national security.

**ARGUMENT**

I. **The Court Should Not Abdicate Review of Unconstitutional Conduct Simply Because It Concerns a Security Clearance**

"I hereby find that all women are governed by uncontrollable emotions and are therefore inherently untrustworthy. I likewise hereby find that all Roman Catholics are required to obey what they believe are the infallible rulings of the Pope and thereby have divided loyalties. I therefore direct all agencies that have issued security clearances to women or Roman Catholics to immediately suspend and revoke all such clearances." Executive Order 99999 (April 1, 2027).

According to the Department of Justice, such an action would lie within the President's plenary power to safeguard the nation's secrets. And courts would lack the authority to review his action because judges do not have "the necessary expertise" to make "[p]redictive judgment[s]" about a person's suitability for a security clearance. DOJ Br. at 15–16 (quoting *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988)).

Indeed, under the Justice Department's reasoning, the President would have unreviewable discretion to violate not only the First but also the Fourth and Fifth Amendments in making security clearance decisions. If the Executive conducted security-clearance investigations via unconstitutional searches or waterboarding, no court could interfere, because "[t]o review the initial stages of a security clearance determination is to review the basis of the determination itself regardless

7

of how the issue is characterized." DOJ Br. at 18 (quoting *Hill v. White*, 321 F.3d 1334, 1336 (11th Cir. 2003)). But this Court long ago found that proposition untenable: "No one would suggest the government therefore could, despite the Fourth Amendment, conduct random searches without warrants in the hope of uncovering information about employees seeking security clearances. Still less would anyone consider such unconstitutional searches and seizures to be immune from judicial review." *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 290 (D.C. Cir. 1993).

This case involves just such a challenge. The government does not seriously dispute that Mr. Zaid's security clearance was revoked to punish him for his constitutionally protected speech and petitioning, not because he failed an individualized security assessment. The Constitution's text and structure, together with longstanding legislation and precedent regarding the interplay of constitutional rights and national security, make clear that the courts should not deny review of claims like Mr. Zaid's simply because they arise in the security clearance context.

### A. The Constitution's Text Does Not Preclude Judicial Review of Security Clearance Matters

Article III grants the Judiciary the authority and, importantly, the duty to "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). And the First Amendment expressly protects Mr. Zaid's right "to petition the Government for a redress of grievances." U.S. Const., Amend. I.

By contrast, the Justice Department's claim of exclusive and unreviewable presidential authority with respect to security clearances has far shakier textual grounding. The Department's position rests on *Egan,* which found that the President derives broad discretion over security clearances "primarily" from his position as Commander in Chief of the military forces. *Egan*, 484 U.S. at 527. But the President is not Commander in Chief of the Department of State, the Department of Justice, the Department of Homeland Security, the Department of Energy, the Department of Commerce, the National Aeronautics and Space Administration, the Tennessee Valley Authority, or the Peace Corps, all of which (among many other federal agencies) require security

clearances for certain personnel.[5] Indeed, only Congress can decide whether "[t]o raise and support Armies" and whether "[t]o provide and maintain a Navy," U.S. Const., Art. I, § 8, without which the President would be Commander in Chief of nothing. And Congress, not the President, has the constitutional power to "make Rules for the Government and Regulation of the land and naval forces." *Id*. The responsibility for protecting national security—including secret information—is thus shared by the legislative and executive branches.

B. *The Constitution's Structure Gives the Judiciary an Essential Role in Reviewing the Constitutionality of Executive Branch Conduct*

As every civics student learns, "the great security against a gradual concentration of the several powers in the same department consists in giving . . . each department the necessary constitutional means and personal motives to resist encroachments of the others." The Federalist No. 51, at 321–22 (James Madison) (Clinton Rossiter ed., 1961). "The underlying constitutional conception is that wielders of governmental power must be subject to the limits of law, and that the applicable limits

---

[5] *See, e.g., Security Clearance FAQs*, ClearedJobs.Net, https://clearedjobs.net/security-clearance-faqs (last accessed March 27, 2026).

should be determined, not by those institutions whose authority is in question, but by an impartial judiciary." Richard H. Fallon, Jr., *Of Legislative Courts, Administrative Agencies, and Article III*, 101 Harv. L. Rev. 915, 938 (1988). Such checks and balances "diffuse[] power the better to secure liberty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). Whatever the force of the President's inferred Article II power over security clearances, it should at least be constrained by the judiciary's unambiguous duty to adjudicate the constitutionality of executive actions—including the denial of procedure—that harm individuals like Mr. Zaid.

C.   *Congress's Exercise of its Article I Power in the Security Clearance Context Confirms That the President's Power is Not Plenary*

Congress has affirmatively asserted that it has Article I authority over security clearance matters. For example, it has provided that "[n]ecessary background investigations and eligibility determinations" should be completed for prospective members of presidential transition teams before each presidential election, 50 U.S.C. § 3342—meaning that President Trump, notwithstanding his Article II authority, could not lawfully refuse to conduct background investigations and eligibility

11

determinations for members of the Democratic candidate's prospective transition team before the 2028 election.

Likewise, Congress has explicitly provided that retaliation for whistleblowing is not a lawful basis for the revocation of a security clearance:

> (1) Agency personnel . . . shall not take . . . any action with respect to any employee's security clearance or access determination in retaliation for—
>
> . . .
>
> (D) . . . any lawful disclosure in conjunction with—
> (i) the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation;
> (ii) testimony for or otherwise lawfully assisting any individual in the exercise of any right referred to in clause (i)[.]

50 U.S.C. § 3341(j). While this provision expressly applies only to government employees who exercise whistleblower rights or assist others in doing so, Congress certainly did not condone retaliation against private counsel assisting whistleblowers and it would undercut the statutory design if the government could retaliate by revoking the clearance of a whistleblower's *lawyer* instead.[6] Given the importance of

___

[6] The report of the Senate Select Committee on Intelligence states that the provision was "modeled on protections for Federal Bureau of Investigation (FBI) employees in Section 2303 of Title 5." S. REP. NO. 113-

legal counsel in this context, retaliation against whistleblower lawyers like Mr. Zaid chills the release of information Congress sought to elicit just as effectively as direct retaliation against whistleblowers. *Cf. Abramski v. United States*, 573 U.S. 169, 179–80 (2014) (refusing to read statute in such a manner as to "undermine . . . [its] core provisions"); *Jacobs v. Schiffer*, 204 F. 3d 259 (D.C. Cir. 2000) (holding that Justice Department's position that whistleblower could not share confidential information with his attorney for purpose of protecting his whistleblower rights was not substantially justified and recognizing that employee had First Amendment right to share non-public information with private counsel).

Similarly, Congress has enacted 50 U.S.C. § 3091, requiring the President to "ensure that the congressional intelligence committees are kept fully and currently informed of the intelligence activities of the United States," including "any illegal intelligence activity," and providing

---

120, at 11 (2013). The FBI provision is titled "Prohibited *personnel practices* in the Federal Bureau of Investigation" (emphasis added), and in that context it was naturally focused on government personnel. In fact, the report further explains that Congress viewed attorneys as an important part of the process: "[t]his section would create certain due process protections, including the right . . . to be represented by counsel." *Id*. at 12.

that such reports are not "the unauthorized disclosure of classified information." *See also* 18 U.S.C. app. 3 §§ 1-16 (Classified Information Procedures Act); 50 U.S.C. § 1801 *et seq.* (Foreign Intelligence Surveillance Act).

The Executive Branch surely does not assert that those statutes and others (including the rest of 50 U.S.C. ch. 45 subch. III, titled Security Clearances and Classified Information) are unconstitutional. There should be no question, therefore, that the President does not have exclusive constitutional authority over classified information and security clearance matters.

This case therefore falls in *Youngstown* category 3: "[w]hen the President takes measures incompatible with the expressed *or implied* will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Youngstown Sheet*

*& Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring) (emphasis added) (footnote omitted).

> D. *Precedent Supports Judicial Review of Unconstitutional Actions by the Political Branches, Even in a National Security Context*

Longstanding precedent confirms that even the demands of national security do "not remove" these "constitutional limitations safeguarding essential liberties." *United States v. Robel*, 389 U.S. 258, 263–64 (1967). In *Robel*, following the Red Scare paranoias, the Court found that a law categorically barring Communist Party members from working at defense facilities violated the First Amendment. *Id.* The Court declined the Government's invitation to ignore the relevant statute's constitutional implications, remarking:

> Implicit in the term "national defense" is the notion of defending those values and ideals which set this Nation apart. For almost two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment. It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties—the freedom of association—which makes the defense of the Nation worthwhile.

*Id.* When the exercise of one of the political branches' powers "clashes with those individual liberties protected by the Bill of Rights," as it does

15

here, it is the judiciary's "'delicate and difficult task' to determine whether the resulting restriction on freedom can be tolerated." *Id.* at 264 (quoting *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939)).

The Court persisted in this "delicate and difficult task," even in the context of elevated national security concerns following the September 11, 2001 attacks, routinely holding that invocations of national security do not create a Constitution-Free Zone, as the Justice Department now suggests. For example, the plurality in *Hamdi v. Rumsfeld*, while explicitly balancing liberty interests against the powers outlined in *Egan*, soundly "reject[ed] the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts" in the context of an enemy combatant's detention, "as this approach serves only to *condense* power into a single branch of government." 542 U.S. 507, 535–36 (2004). *See also Boumediene v. Bush*, 553 U.S. 723, 765 (2008) ("To hold the political branches have the power to switch the Constitution on or off at will . . . would permit a striking anomaly in our tripartite system of government, leading to a regime in which Congress and the President, not this Court, say 'what the law is.'" (quoting *Marbury*, 1 Cranch at 177)); *Hamdan v. Rumsfeld*, 548 U.S. 557, 567, 674 (2006)

(rejecting President's decision to try alleged enemy combatant by military commission notwithstanding the President's finding that commissions were "necessary" "for the effective conduct of military operations and prevention of terrorist attacks").

Indeed, the most prominent instance in which the Court allowed Executive war-power to trump constitutional rights, *Korematsu v. United States,* 323 U.S. 214 (1944), has long since fallen into infamy.[7] As the dissenting justices cautioned, "it is essential that there be definite limits to [the government's] discretion," as "[i]ndividuals must not be left impoverished of their constitutional rights on a plea of military necessity that has neither substance nor support." *Id.* at 234 (Murphy, J., dissenting). So too here—except here there is not even a plea of military necessity or national security, simply the President's *ipse dixit* that "I have determined that it is no longer in the national interest for [Mark Zaid and other named and unnamed] individuals to access classified information." Presidential Memorandum, March 22, 2025. But security

---

[7] "*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear— 'has no place in law under the Constitution.'" *Trump v. Hawaii*, 585 U.S. 667, 710 (2018) (quoting *Korematsu v. United States*, 323 U.S. 214, 248 (1944) (Jackson, J., dissenting)).

clearances are not political trinkets to be awarded or revoked at the President's whim.

### E. The Judiciary is Well-Equipped to Adjudicate Mr. Zaid's Constitutional Claims

Nor would adjudicating the constitutionality of so summary a clearance revocation as Mr. Zaid's be judicially unmanageable, as the Department of Justice suggests. *See* DOJ Br. at 20. Courts are well-equipped generally to evaluate whether an executive action was taken for a retaliatory reason, and that is especially so where the action in question effectively proclaimed itself to be retaliatory. There is no mystery to uncover, no competing priorities to parse; the causation question in this case has all the subtlety of a smoking gun.

And in *Webster v. Doe*, discussed further below, the Court rejected the CIA's contention that review of a constitutional claim arising from a termination for national security reasons would entail "'rummaging around' in the Agency's affairs to the detriment of national security." *Webster*, 486 U.S. 592, 604 (1988). The Court, instead, expressed confidence that lower courts could balance discovery "against the extraordinary needs of the CIA for confidentiality and the protection of its methods, sources, and mission." *Id*.

*F.* Egan *Does Not Preclude Review of Mr. Zaid's Claims*

The Justice Department's argument relies heavily on *Dep't of Navy v. Egan,* 484 U.S. 518 (1988), which addressed the "narrow question" whether a civil service law that entitled a veteran to MSPB review of whether his discharge was for "cause" allowed the MSPB "to review the substance of an underlying decision to deny or revoke a security clearance." *Id*. at 520. In finding that the statute did not allow such review, the Court explained that "the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." *Id.* at 527.

Just a few months later, however, in *Webster v. Doe*, the Court held that "colorable constitutional claims" arising out of the CIA Director's decision to terminate an employee on national security grounds were reviewable by the judiciary, despite a statute authorizing the Director "in his discretion," to terminate the employment of any CIA employee "whenever he shall deem such termination necessary or advisable in the interests of the United States"—a statute that "fairly exudes deference to the Director, and appears . . . to foreclose the application of any

19

meaningful judicial standard of review." 486 U.S. at 594, 600, 603–04. There is no doubt that *Egan* should be read in light of *Webster*. Most of the Justices who joined the majority opinion in *Egan*, as well as all the Justices who dissented in *Egan*, joined the majority opinion in *Webster*.

Over the last four decades, this Court has applied *Egan* to statutory challenges to security clearance determinations. *See e.g., Ryan v. Reno*, 168 F.3d 520, 524 (D.C. Cir. 1999) (holding that "under *Egan* an adverse employment action based on denial or revocation of a security clearance is not actionable under Title VII"). But in light of *Webster*, this Court has taken care to distinguish the reviewability of constitutional claims. *See, e.g., Oryszak v. Sullivan*, 576 F.3d 522, 526 (D.C. Cir. 2009) ("[W]e have consistently held that . . . the authority to issue a security clearance is a discretionary function of the Executive Branch . . . at least where a constitutional claim is not properly presented."); *Reno*, 168 F.3d at 524 ("We emphasize that our holding is limited to Title VII discrimination actions and does not apply to actions alleging deprivation of constitutional rights."); *Greenberg*, 983 F.2d at 290 (finding it obvious that judiciary could review Fourth Amendment challenge to warrantless searches and seizures conducted "in the hope of uncovering information

about employees seeking security clearances"); *see also Gill v. United States Dep't of Just.*, 875 F.3d 677, 685 (D.C. Cir. 2017) (Tatel, J., concurring) ("In my view, if Gill could show that the government has a policy or practice of treating Muslims or naturalized citizens differently, his equal protection claims, like the claims at issue in *Greenberg*, would not be barred by *Egan*."). In other words, while *Egan* protects the Executive Branch's discretion to make predictive risk assessments for security clearances, it did not hold—or even contemplate—that such authority would permit the President to openly violate the Constitution he has sworn to uphold.

And because *Egan* addressed only "the *substance* of an underlying decision to deny or revoke a security clearance," *Egan*, 484 U.S. at 520 (emphasis added), this Court has also found procedural challenges to security clearance processes justiciable. For example, in *Greenberg*, the Court held that "[t]o stretch *Egan* to cover" a challenge to the "constitutionality of the methods used to gather information on which such [substantive] judgments presumably will be based . . . would be to endorse untenable, and far-reaching, restrictions on judicial review of governmental actions." *Greenberg*, 983 F.2d at 290.

This Court's recent decision in *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024), is not to the contrary. There, a panel of this Court concluded that *Egan* foreclosed review of Mr. Lee's constitutional challenges to an adverse clearance decision. *Id.* at 887–91. The panel reasoned that Mr. Lee's challenges to the revocation of his security clearance, which were grounded in allegedly discriminatory polygraph tests, "squarely challenge the substantive basis for that decision," and were, therefore, unreviewable. *Id.* at 894. While so ruling, the *Lee* Court reaffirmed *Greenberg* and explicitly acknowledged that constitutional claims in the security clearance context remain justiciable so long as they do not require courts to second-guess the substantive basis of an individualized risk assessment. *See id.* at 892–94; *see also Egan*, 484 U.S. at 526 (assuming that the MSPB had authority to review "the fact of denial, of the position's requirement of security clearance, and of the satisfactory provision of the requisite procedural protections").

This is one such case. Because of the transparently retaliatory nature of Mr. Zaid's security clearance revocation, there is no substantive determination to which this Court should defer. Mr. Zaid does not ask the court (as Lee did) to review a predictive assessment about any risk

22

he poses to national security, but instead to rule that the denial of an "individualized assessment afforded to others," in retaliation for his First Amendment activity, is unconstitutional. *Zaid*, 2025 WL 3724884, at *5. There is no doubt that Mr. Zaid was denied an individualized assessment. The government does not argue otherwise, and the facts recited above (at 1–4) make it obvious that neither he nor the many others affected by the President's summary orders received one. It is not the rejection of substantive review in *Lee* that controls here, but the embrace of procedural review in *Greenberg*.

### G.  *Misreading* Egan *and* Lee *to Foreclose Review Would Invite Further Abuse*

The circumstances at hand lay bare the risk of misreading *Egan* to immunize unconstitutional executive action in the security clearance context. The President's recent spate of clearance revocations targeted at his perceived enemies suggests that giving the executive "super-strong deference" in this area will "extend a 'standing invitation' to agencies" and the President "to exceed their powers and violate constitutional norms because there would be no independent check on their actions." Jason Rathod, *Not Peace, but A Sword:* Navy v. Egan *and the Case Against Judicial Abdication in Foreign Affairs*, 59 Duke L.J. 595, 606–07

(2009) (citation omitted). Expanding *Egan* to justify judicial abdication here would rubber-stamp the transparent retaliation in this case and invite even more flagrant abuse of the security clearance process.

For example, because this Court has implied that the Executive Branch's decisions about which employees require security clearances are entitled to deference, *see Harmon v. Thornburgh*, 878 F.2d 484, 492 (D.C. Cir. 1989), the administration might require any group of employees to have clearances, discharge them all after denying or revoking their clearances, and then seek to preclude judicial review. This tactic could be employed against any subgroup of employees, whether selected based on agency (*e.g.*, all employees of the Environmental Protection Agency or the Voice of America) or political party (*e.g.*, all registered Democrats). And that brings us back to the hypothetical—and ludicrous—categorical ban on clearances for Catholics and women posited above. Or substitute any other group. To accept the Justice Department's proposed extension of *Egan* (and *Lee*) to this case is to concede that such outrageous, facially non-substantive (indeed, *anti-*substantive) clearance revocations are beyond the reach of the courts. While the language in *Egan* is broad, the holding is narrow, and *cessante*

*ratione legis, cessat ipse lex*: "A change of circumstances renders the rule no longer applicable to the case." *Rogers v. Tennessee*, 532 U.S. 451, 474 (2001) (Scalia, J., dissenting) (cleaned up).

To avoid the untenable results discussed above, the Court should affirm the lower court's carefully reasoned conclusion that Mr. Zaid's constitutional claims are justiciable.

## II. The Presidential Memorandum Unconstitutionally Retaliates Against Mr. Zaid for His Legal Advocacy on Behalf of Whistleblowers

Mr. Zaid has stated much more than a colorable constitutional claim here. "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *accord, e.g.*, *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). To make out a First Amendment retaliation claim, a plaintiff must show that: (i) he engaged in constitutionally protected expression; (ii) defendants responded with an adverse action sufficient to deter a person of ordinary firmness in the plaintiff's position from speaking again; and (iii) there is a causal connection between the plaintiff's protected speech and the retaliatory actions taken against him.

*Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Mr. Zaid easily satisfies all three factors.

First, the Constitution protects Mr. Zaid's legal advocacy on behalf of his clients. Such advocacy is protected under both the Speech and Petition Clauses of the First Amendment. *See Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011) (holding that the framework for public employee retaliation claims under the Speech Clause applies to similar claims raised under the Petition Clause) ("This Court has said that the right to speak and the right to petition are 'cognate rights.'" (quoting *Thomas v. Collins,* 323 U.S. 516, 530 (1945))).

The First Amendment bars the government from punishing or suppressing legal advocacy because of its viewpoint, as the Supreme Court recognized in *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001). There, plaintiffs challenged a statute prohibiting the use of federal Legal Services Corporation funds in cases challenging federal statutes under the U.S. Constitution or state statutes under federal law or the U.S. Constitution. *Id.* at 537. The Court held that lawyers' advocacy on behalf of their private clients is constitutionally protected speech, regardless of who pays for it. *See id.* at 548–49. And it concluded that viewpoint-based

restrictions on such advocacy, even in the form of statutory restrictions on the use of legal services funds to raise federal statutory and constitutional challenges in litigation, violate the First Amendment. *Id.* ("Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest.").

Second, the draconian sanctions imposed by the Presidential Memorandum would deter an ordinary person in Mr. Zaid's position, *i.e.*, other attorneys, from engaging in similar advocacy in the future. Indeed, "several big law firms" facing the threat of similar sanctions have cut "deals with the White House," despite their immensely greater resources.[8] The revocation of a security clearance is nothing short of a professional death sentence for the many attorneys who require clearances to effectively represent their clients. *See Zaid*, 2025 WL 3724884, at \*12–13 (cataloging irreparable injury to Mr. Zaid and noting that "[t]he government does not dispute that denial of these rights is

---

[8] Matthew Goldstein, *Two Law Firms File for Permanent Relief From Trump's Executive Orders*, N.Y. Times (Apr. 8, 2025), https://www.nytimes.com/2025/04/08/business/jenner-block-trump-filing.html.

irreparable harm."). *Cf. Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143–44 (1951) (Black, J., concurring) ("[G]overnment blacklists" of disfavored organizations "smack[] of a most evil type of censorship."). The message to the bar is unmistakable: Cross the Administration at your peril.

Finally, while direct evidence of retaliatory animus is not required, *BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015), the causal connection between the Presidential Memorandum and Mr. Zaid's protected advocacy is totally direct: "The President expressed repeated, public displeasure with Zaid—calling him a 'sleazeball' and saying he should be sued for 'treason'—and expressly tied it to his representation of a government whistleblower." *Zaid*, 2025 WL 3724884, at *8. Based on that and other evidence, the district court found "that Zaid's representation of whistleblowers and other clients adverse to the government was the *sole* reason for summarily revoking his security clearance." *Id.* (emphasis added). The district court did not need to second-guess the merits of an expert national security determination to reach that conclusion.

### III. The Retaliation Against Mr. Zaid Violates Separation of Powers and Due Process

The Memorandum's retaliatory attack on Mr. Zaid for his constitutionally protected legal advocacy is not only a textbook First Amendment violation; it also threatens to undermine the bar's independence, violating basic separation-of-powers principles in yet another way. As discussed above, the Framers conceived of the courts as an "impenetrable bulwark against every assumption of power in the legislative or executive." 1 Annals of Cong., at 457 (1789) (J. Madison) (Joseph Gales ed., 1834). To play its role effectively, the bench depends on the skill and integrity of the bar. In other words, "[a]n informed, independent judiciary presumes an informed, independent bar." *Velazquez*, 531 U.S. at 534. Courts cannot guard against the usurpations of the other branches without the assistance of lawyers willing to challenge those usurpations on their clients' behalf.

American lawyers have earned their reputation for independence by standing ready to challenge the government, even in the most controversial and high-profile matters, whether in support of a cause in which they believe or on the principle that everyone deserves a robust defense. John Adams famously boasted that his representation of British

soldiers in the Boston Massacre prosecution was "one of the best Pieces of Service I ever rendered my Country." 2 Diary & Autobiography of John Adams 79 (L.H. Butterfield ed., 1961) (entry of March 5, 1773).[9]

The same has been true when the government has asserted that national security justified its actions. John W. Davis represented the steel companies that were seized by the government "to avert a national catastrophe." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952). Floyd Abrams defended the New York Times against the government's attempt to suppress the Pentagon Papers, publication of which was said to threaten a "'grave and immediate danger to the security of the United States.'" *N.Y. Times Co. v. United States*, 403 U.S. 713, 741 (1971) (Marshall, J., concurring) (quoting Brief for the United States at 7). James Donovan defended accused Soviet spy Rudolf Abel in the Hollow Nickel case. *Abel v. United States*, 362 U.S. 217 (1960). And numerous major law firms represented detainees at Guantánamo Bay who were suspected or accused of being involved in terrorist attacks

---

[9] Available at https://founders.archives.gov/documents/Adams/01-02-02-0003-0002-0002.

against the United States. *See, e.g., Boumediene v. Bush*, 553 U.S. 723, 730 (2008) (Seth Waxman of WilmerHale representing petitioners).

Members of the bar uphold its best traditions when they provide zealous advocacy to clients facing the full weight of the federal government—and justice would be poorly served if only the exceedingly brave or the independently wealthy were willing to undertake such representations. Particularly in complex, high-stakes matters, clients depend on their lawyers to orchestrate the evidence, precedents, and arguments necessary to make the best submission on their behalf. But many lawyers and law firms would sensibly decline to take any case, no matter how meritorious or significant, that presents even a small risk of ruinous sanctions.

This is what makes the Presidential Memorandum's retaliation so pernicious to the separation of powers. "By seeking to prohibit the analysis of certain legal issues and to truncate presentation to the courts, the enactment under review prohibits speech and expression upon which courts must depend for the proper exercise of the judicial power." *Velazquez*, 531 U.S. at 545. If allowed to stand, the Administration's retaliatory attack on Mr. Zaid and other lawyers disliked by the

Administration in power will chill many lawyers and law firms from taking on high-profile cases against the government. *See Goldstein*, supra note 8, at 28 (noting that firms are agreeing "not to support public interest groups challenging administration policies" as a condition of avoiding presidential sanctions). Even when lawyers take on a representation adverse to the government, the threat of sanctions will chill them from taking positions or making arguments that offend the Administration.

This fundamental conflict of interest will "distort[] the legal system by altering the traditional role of the attorneys" as zealous advocates for their clients. *Velazquez*, 531 U.S. at 544. As a result, clients will mistrust their counsel's loyalty, courts will confront case after case where only one view—the Administration's—is adequately and zealously represented, and the public will lose faith in the integrity of the judicial process. *See id.* at 546 ("The courts and the public would come to question the adequacy and fairness of professional representations when the attorney, either consciously to comply with this statute or unconsciously to continue the representation despite the statute, avoided all reference to questions of statutory validity and constitutional authority.").

The Presidential Memorandum also infringes Fifth and Sixth Amendment rights. In the criminal context, "[t]he right to select counsel of one's choice . . . has been regarded as the root meaning of the constitutional guarantee" under the Sixth Amendment. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 147–48 (2006). This right both requires "a fair or reasonable opportunity to obtain particular counsel," and bars "arbitrary action prohibiting the effective use of such counsel." *Cheek v. United States*, 858 F.2d 1330, 1334 (8th Cir. 1988) (quoting *United States ex rel. Carey v. Rundle*, 409 F.2d 1210, 1215 (3d Cir. 1969)). And in the civil context, the interest in aid of counsel is a fundamental aspect of due process. *See Doe v. District of Columbia*, 697 F.2d 1115, 1119 (D.C. Cir. 1983) ("[E]very litigant has a powerful interest in being able to retain and consult freely with an attorney."). The government infringes "due process in the constitutional sense" when it "arbitrarily" interferes with the attorney–client relationship. *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

By prohibiting Mr. Zaid from accessing classified material, the Presidential Memorandum prevents him from doing much of the work required in his representation and chills the work of others, giving the government an unfettered veto over the selection of counsel in such cases.

If this governmental bullying goes unchecked, the bar will swiftly lose its independence—to the detriment of litigants, courts, and public trust in the judicial process.

## CONCLUSION

The Court should affirm the district court's preliminary injunction.

March 27, 2026

Respectfully submitted,

*/s/ Arthur B. Spitzer*
Laura K. Follansbee
Arthur B. Spitzer
Scott Michelman
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF THE DISTRICT
    OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
Tel.: (202) 457-0800
Email: lfollansbee@acludc.org
      aspitzer@acludc.org
      smichelman@acludc.org

Brian Hauss
Ashley Gorski
Hina Shamsi
Ben Wizner
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
Email: bhauss@aclu.org

agorski@aclu.org
hshamsi@aclu.org
bwizner@aclu.org


*Counsel for Amici Curiae*[*]

[*] Counsel wish to acknowledge the assistance of ACLU-DC paralegal Ameerah Adetoro in the preparation of this brief.

# ADDENDUM

## STATEMENTS OF INTEREST OF *AMICI CURIAE*

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit organization that since 1920 has sought to protect the civil liberties and civil rights of all Americans. The ACLU of the District of Columbia ("ACLU-DC") is the ACLU's Washington, D.C. affiliate. The ACLU and ACLU-DC have frequently appeared in the courts in cases raising significant questions about the meaning of the Constitution, its limitations on government power, and the breadth of rights it grants. *See, e.g., A.A.R.P. v. Trump*, 605 U.S. 91 (2025); *NRA v. Vullo*, 602 U.S. 175 (2024); *J.G.G. v. Trump*, 147 F. 4th 1044 (D.C. Cir. 2025).

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government.

The Electronic Frontier Foundation (EFF) is a non-profit public interest organization that works to ensure new technology enhances, rather than erodes, civil liberties. With tens of thousands of dues-paying members, EFF has advocated for thirty-five years in favor of user rights and protections. EFF has participated, either directly or as amicus, in litigation to ensure our nation's surveillance programs operate in accordance with federal law and the Constitution, and has frequently confronted and defeated the federal government's assertions of expansive and unchecked national security authority. EFF has also represented whistleblowers and understand the vital role they play in uncovering government wrongdoing.

The Rutherford Institute is a nonprofit civil liberties organization headquartered in Charlottesville, Virginia. Founded in 1982 by its President, John W. Whitehead, the Institute provides legal assistance at no charge to individuals whose constitutional rights have been threatened or violated and educates the public about constitutional and human rights issues affecting their freedoms. The Rutherford Institute works tirelessly to resist tyranny and threats to freedom by seeking to ensure that the government abides by the rule of law and is held

accountable when it infringes on the rights guaranteed by the Constitution and laws of the United States.

**CERTIFICATE OF COMPLIANCE**

I hereby certify that my word processing program, Microsoft Word, counted 6,496 words of the foregoing brief, excluding the items exempted by Federal Rule of Appellate Procedure 32(f) and that this complies with the word limit set forth in Federal Rule of Appellate Procedure 29(a)(5).

*/s/ Arthur B. Spitzer*
Arthur B. Spitzer

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2026, I electronically filed the foregoing amicus brief in support of Plaintiff-Appellee with the U.S. Court of Appeals for the D.C. Circuit by using the Appellate CM/ECF system which will send notice to all counsel who are registered CM/ECF users.

*/s/ Arthur B. Spitzer*
Arthur B. Spitzer